**WO**

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Robert Louis Cromwell,<br>    Petitioner,<br>v.<br>Ryan Thornell, et al.,<br>    Respondents. | No. CV-23-00783-PHX-DWL<br>**ORDER**<br>DEATH PENALTY CASE |

Petitioner Robert Louis Cromwell ("Petitioner") is an Arizona death row inmate seeking habeas relief pursuant to 28 U.S.C. § 2254. In the underlying case, in addition to being convicted of sexually assaulting and murdering an 11-year-old victim, Petitioner was convicted of assaulting an adult victim, Kimberly Jensen ("Jensen"), by beating her into a state of semi-consciousness with a pool cue, leaving her hair matted with blood.

Now pending before the Court is Petitioner's motion to allow his habeas representatives to directly contact Jensen for the purpose of attempting to interview her. (Doc. 27 [sealed].) The motion is fully briefed. (Docs. 28, 29.) For the following reasons, the motion is denied.

**RELEVANT BACKGROUND**

On February 19, 2003, a Maricopa County jury convicted Petitioner of one count of first-degree murder and one count of sexual assault in the death of 11-year-old Stephanie Shortt ("Stephanie"). *State v. Cromwell*, 119 P.3d 448 (Ariz. 2005). "The jury also convicted [Petitioner] of two counts of aggravated assault, one against Ella Speaks, Stephanie's mother, and the other against Ella's friend, Kim Jensen." *Id.* at 449.

The underlying facts, which "are presumed correct" for purposes of this habeas action, *Atwood v. Ryan*, 870 F.3d 1033, 1039 (9th Cir. 2017), are as follows. Petitioner met Stephanie's mother, Ella, for the first time on the evening of October 7, 2001, as Ella was walking near the apartment where she lived with Stephanie and Stephanie's two younger sisters. *Cromwell*, 119 P.3d at 449-50. Later that evening, Ella and Petitioner went to several bars together and then returned to Ella's apartment around 1:00 a.m. *Id.* at 450. Ella's children were still awake when they returned. *Id.* Around 2:00 a.m., Ella received a phone call from a friend asking for assistance in "resolv[ing] a disturbance being caused by a mutual acquaintance, [Jensen]." *Id.* "Ella agreed and determined to leave her children with [Petitioner] because 'he seemed so nice.' [Petitioner] told Ella he would just stay in her room while she was gone. Ella was gone from the house for a little more than an hour." *Id.*

During Ella's absence, Petitioner sexually assaulted and murdered Stephanie. *Id.* at 450-51. When Ella returned to the apartment, accompanied by Jensen, Petitioner "attacked both of them with a pool cue, resulting in injuries to each. [Petitioner] ran out of the apartment after the attack and Ella quickly followed, after looking unsuccessfully for Stephanie." *Id.* at 451. When the police arrived, Jenson was "on the floor" and "semi-conscious" and "the back left side of [her] head was 'matted in blood.'" *Id.*

After unsuccessful appellate and post-conviction proceedings in state court, Petitioner filed a notice of intent to pursue habeas relief. (Doc. 1.) Afterward, the Court issued a case management order. (Doc. 5.) Among other things, the order addresses the Court's duty under the Crime Victims' Rights Act ("CVRA") to ensure that, in habeas actions, crime victims are afforded the rights described in 18 U.S.C. §§ 3771(a)(3), (4), (7) and (8), including, as pertinent here, the "right to be treated with fairness and with respect for the victim's dignity and privacy." To that end, the order prohibits Petitioner's representatives from directly contacting victims without court authorization. (Doc. 5 at 7.) The order also requires Petitioner, should he wish to directly contact a victim, to file a motion describing the proposed method of contact. (*Id.*)

**DISCUSSION**

I.  The Parties' Arguments

Petitioner seeks permission to have members of his habeas team directly contact and attempt to interview Jensen. (Doc. 27.) Petitioner is "mindful that Ms. Jensen is a victim in this case" but contends that "she also was and remains one of the State's key witnesses against [Petitioner] at his trial, providing critical testimony against him." (*Id.* at 3.) Petitioner further contends that Jensen's trial testimony regarding the identity of her assailant differed from the descriptions she previously gave to law enforcement and that, at the time of her testimony, she was facing two separate criminal cases and received apparently lenient treatment from the prosecutor. (*Id.* at 3-7.) Petitioner contends that, "[d]espite the above, neither direct appeal nor post-conviction counsel saw fit to attempt to contact and interview Ms. Jensen." (*Id*. at 7.) Petitioner thus requests authorization for his attorney and mitigation investigator to contact Jensen by traveling to her last known residence. (*Id.* at 7-8.) Petitioner contends it is necessary to contact Jensen in person because sending correspondence would likely be ineffective, as Jensen has resided at over 30 distinct addresses and the most recent database search indicates her last known residence is listed for sale by individuals other than her. (*Id.*) Petitioner proposes that his representatives will (1) identify themselves, (2) provide Jensen with copies of their identification and business cards, (3) inform Jensen she has the right to deny the interview request, and (4) request permission from Jensen to proceed with the interview. (*Id.* at 8.)

Respondents oppose the request. (Doc. 28.) First, Respondents argue that any information generated through an interview of Jensen would be inadmissible in this action under 28 U.S.C. § 2254(e)(2)(A), as Petitioner's criticisms of his prior counsel for not interviewing Jenson implicitly concede that any new information generated through the proposed interview would have been discoverable through the exercise of diligence. (*Id.* at 5-6.) Respondents further contend that the information sought by Petitioner is of marginal relevance and cumulative because "[it] appears [Petitioner] wants to interview Ms. Jensen about an unrelated criminal case that happened over 20 years ago. This

1 information would either be irrelevant or would have limited impeaching value. [Petitioner] concedes that trial counsel impeached Ms. Jensen with her inconsistent descriptions of her assailant and her conflicting accounts of seeing [Petitioner] before the murder. Ms. Jensen's testimony also showed she had prior criminal convictions and had been recently released from jail when [Petitioner] assaulted her. Additional impeachment about an unrelated criminal case would not have impacted the guilt determination." (*Id.* at 6.) Second, Respondents argue that, in part because the purpose of the interview would be to obtain inadmissible and marginally relevant information, authorizing Petitioner's representatives to directly contact Jensen would violate the CVRA's requirement that crime victims be treated with fairness and with respect for their dignity and privacy. (*Id.* at 6-7.)

In reply, Petitioner argues that Respondents' admissibility objections are "incredibly premature" because "investigation in habeas cases can lead counsel to discover areas in which the State may have violated a defendant's rights under *Brady* or *Napue*, or to uncover other misconduct by state actors," in which case "there would be no bar to the presentation of evidence," and more broadly because any questions of admissibility implicate "a host of potential questions that are improper at this stage of the case, such as: whether [Petitioner] can establish that he is actually innocent; whether the State of Arizona would entertain a successive state post-conviction petition based on the development of new evidence or an argument that [Petitioner] was actually innocent; whether [Petitioner] can show cause and prejudice to overcome default of a claim based on new evidence; [and] whether [Petitioner] could establish that Arizona's postconviction corrective process is in itself so seriously defective so as to constitute an impediment external to the defense which would be adequate to excuse default." (Doc. 29 at 2-3.) As for the CVRA, Petitioner argues that questioning Jensen about her prior forgery conviction would not violate her right to dignity and privacy because that conviction "was not expunged, or sealed, and the records of [it] are readily available to any member of the public." (*Id.* at 3.) Petitioner also contends that the ethical duties of habeas counsel include "seeking out and interviewing witnesses to the events underlying the criminal conviction, and putting the State's case

through the process of adversarial testing. There are a myriad of reasons why any relatively competent attorney would wish to interview Ms. Jensen beyond her conviction for forgery, among the least of which is simply to assess her account of events regarding the morning of the homicide, the descriptions she gave law enforcement of her attacker, and the testimony which she gave at trial." (*Id.* at 3-4.)

II. Analysis

Petitioner's request to allow his representatives to directly contact and attempt to interview Jensen implicates a pair of competing considerations. On the one hand, Petitioner and his counsel have an obvious and strong interest in leaving no stone unturned in the search for evidence and arguments that might support Petitioner's request for relief in this death-penalty habeas action. On the other hand, Jensen has a strong—and statutorily enshrined—right, as a victim of Petitioner's crimes, to be treated with fairness and with respect for her dignity and privacy during this habeas action. 18 U.S.C. §§ 3771(a)(8), 3771(b)(2)(A).

Having carefully considered those competing considerations in light of the particular facts of this case, the Court concludes that Petitioner's request should be denied. Even though, for the reasons stated in Petitioner's motion papers, there is at least a theoretical chance that the proposed contact might lead to the discovery of new information that could be admissible or otherwise useful to Petitioner in this habeas action, that is not a likely outcome. *See generally Shinn v. Ramirez*, 596 U.S. 366, 371 (2022) ("Often, a prisoner with a defaulted claim will ask a federal habeas court not only to consider his claim but also to permit him to introduce new evidence to support it. Under [AEDPA], the standard to expand the state-court record is a stringent one. If a prisoner has failed to develop the factual basis of a claim in State court proceedings, a federal court shall not hold an evidentiary hearing on the claim unless the prisoner satisfies one of two narrow exceptions and demonstrates that the new evidence will establish his innocence by clear and convincing evidence. In all but these extraordinary cases, AEDPA bars evidentiary hearings in federal habeas proceedings initiated by state prisoners.") (cleaned up). Indeed,

even if AEDPA's restrictions weren't applicable here, the Court would agree with Respondents' characterization of the request to contact Jensen as a "fishing expedition" (Doc. 28 at 7)—Jensen was already impeached at trial on many of the grounds that Petitioner's habeas representatives wish to explore via the proposed interview. The Court does not discount the possibility that a different habeas petitioner in a different case might be able to advance a more persuasive rationale for initiating direct contact with a victim, but such a persuasive rationale is lacking here.

On the other side of the ledger is Jensen's right to be treated with fairness and with respect for her dignity and privacy. Again, this is a case where Petitioner was convicted of aggravated assault for beating Jensen into a state of semi-consciousness with a pool cue, leaving her hair matted with blood. One can only imagine how traumatic that crime was from Jensen's perspective. It follows, at least in this Court's view, that Jensen's statutory rights to fairness, dignity, and privacy would be undermined by authorizing Petitioner's representatives to show up at her doorstep, unannounced, to re-question her about those traumatic events, particularly where at least one purpose of the surprise interview would be to gather evidence to undo Petitioner's assault conviction (and thus upend any sense of closure Jensen may have gained from it). *Cf. J.D. v. Hegyi*, 335 P.3d 1118, 1121 (Ariz. 2014) ("The VBR and its implementing legislation were adopted to provide crime victims with basic rights of respect, protection, participation and to aid the healing of their ordeals. Consistent with these goals, the right to refuse a defense interview allows a victim to avoid contact with the defendant before trial. The right also respects the victim's privacy, at least in the sense of preventing unwelcome questioning by the defense before the victim testifies in court. Such contact or questioning by the defense could subject the victim to further trauma.") (cleaned up); *State v. Riggs*, 942 P.2d 1159, 1162 (Ariz. 1997) ("A victim's right to refuse a pretrial interview . . . stems from the desire to protect a victim's privacy and minimize contact with the defendant prior to trial.") (cleaned up); *Ohralik v. Ohio State Bar Ass'n*, 436 U.S. 447, 465-66 (1978) ("[U]nder . . . adverse conditions the overtures of an uninvited lawyer may distress the solicited individual simply because of their

obtrusiveness and the invasion of the individual's privacy, even when no other harm materializes."). As this Court has previously stated:

> Although concepts such as "fairness," "dignity," and "privacy" are admittedly difficult to define with precision, they must mean *something*. And in the Court's view, at least in the unique context of a federal habeas corpus proceeding arising from an Arizona state-court death penalty conviction, these statutory rights are best safeguarded and effectuated by adopting the same procedural protections related to direct contact by defense counsel that were applicable during the underlying state-court proceedings. It would be anomalous if the rule were otherwise—that is, if the right of a crime victim to be free from potentially intrusive dignity and privacy violations (such as when a defense investigator unexpectedly shows up at a victim's door, years or decades after the [crime], and asks questions about this traumatic [event]), which remains intact throughout the defendant's trial, direct appeal, and PCR proceeding, somehow evaporates as soon as the case reaches the federal habeas corpus stage, even though review during that stage (unlike during some of the earlier stages) is generally limited to the record that was before the state court that adjudicated the claim on the merits.

*Reeves v. Shinn*, 2021 WL 5771151, *6 (D. Ariz. 2021) (cleaned up).

Finally, it should be noted that the rejection of Petitioner's request to directly contact Jensen does not preclude Petitioner from pursuing a less-intrusive method of attempting to contact her—routing such a request through the Arizona Attorney General's office, which is the mechanism he would have been required to follow during the underlying state-court proceedings. *Lehr v. Thornell*, 2023 WL 6216554, *1 (D. Ariz. 2023) ("Many other judges of this Court have concluded that one of the provisions of the AVBR [Arizona Victims' Bill of Rights]—the requirement that '[t]he defendant, the defendant's attorney or an agent of the defendant shall only initiate contact with the victim through the prosecutor's office'—provides a reasonable mechanism for furthering this federally-enshrined right to fairness, dignity, and privacy. The Court agrees with those prior decisions and will thus adopt the same rule here—Petitioner is prohibited from contacting victims directly and must initiate any such contact through the AG-VAO [Office of the Arizona Attorney General's Victim Advocate's Office] as contemplated by state law.") (citations omitted).[1]

---

[1] The Court acknowledges that, in light of the details set forth in Petitioner's motion,

Accordingly,

**IT IS ORDERED** that Petitioner's motion for access (Doc. 27) is **denied**.

Dated this 8th day of March, 2024.

Dominic W. Lanza
United States District Judge

---

it may be difficult for Petitioner to identify the address to which any such request would be sent. But nothing in this order prevents Petitioner's habeas team from taking additional investigative steps not involving direct victim contact to obtain accurate contact information for Jensen. The Court also notes that the Ninth Circuit is currently considering a constitutional challenge to certain aspects of Arizona's victim-notification provisions. *Az. Attorneys for Criminal Justice v. Mayes*, 9th Cir. 22-16729.