1  KRISTIN K. MAYES
2  ATTORNEY GENERAL
   (FIRM STATE BAR NO. 14000)
3
   KEVIN M. MORROW
4  ASSISTANT ATTORNEY GENERAL
   CAPITAL LITIGATION SECTION
5  2005 N. CENTRAL AVENUE
   PHOENIX, ARIZONA  85004
6  TELEPHONE: (602) 542-4686
   CLDOCKET@AZAG.GOV
7  (STATE BAR NUMBER 034697)
8  ATTORNEYS FOR RESPONDENTS

9           UNITED STATES DISTRICT COURT
10             DISTRICT OF ARIZONA

11  Robert Louis Cromwell,            CV–23–00783–PHX–DWL
                      Petitioner,
12
         -vs-                         ANSWER TO PETITION FOR
13                                    WRIT OF HABEAS CORPUS
    Ryan Thornell, et al.,
14                    Respondents.    [DEATH PENALTY CASE]
15

16

17       Respondents, pursuant to Rule 5 of the Rules Governing § 2254 Cases, and this

18  Court's order of August 3, 2023, hereby answer the Amended Petition for Writ of Habeas

19  Corpus. Doc. 38. For the reasons set forth in the following Memorandum of Points and

20  Authorities, Respondents respectfully request that the petition be denied and dismissed

21  with prejudice.

22

23

24

25

26

27

28

                              1

# TABLE OF CONTENTS

MEMORANDUM AND POINTS OF AUTHORITY ................................................. 4

I.    Preliminary Considerations. ...................................................................... 4

II.   Factual And Procedural Background .......................................................... 5

      A. Cromwell's crimes. .......................................................................... 5

      B. Jury Trial. ......................................................................................... 7

      C. Direct Appeal. .................................................................................. 8

      D. State post-conviction-relief proceedings. ........................................ 8

      E. Federal habeas corpus petition. ....................................................... 9

III.  AEDPA REVIEW. ...................................................................................... 9

      A. Law of exhaustion and procedural default. ..................................... 9

      B. Cause and Prejudice. ...................................................................... 10

      C. AEDPA's Relitigation Bar. ............................................................ 10

      D. Ineffective Assistance of Counsel. ................................................ 11

IV.   Cromwell Is Not Entitled To Habeas Relief. .......................................... 13

      A. Trial counsel was not ineffective at the guilt phase (Claim 1). ..... 13

      B. Trial counsel was not ineffective at sentencing (Claim 2). ........... 54

      C. Cromwell's claims he was denied a fair and impartial jury are
         all procedurally defaulted without excuse and also fail on the
         merits (Claim 3). ............................................................................ 95

      D. Cromwell is not entitled to relief on his claims asserting that he
         was denied a fair guilt phase adjudication (Claim 4). ................. 106

      E. Cromwell is not entitled to relief on his claims asserting that he
         was denied a fair adjudication of his sentence (Claim 5). ........... 126

      F. Cromwell's effective assistance of post-trial counsel claim is
         procedurally defaulted without excuse and also fails on the
         merits (Claim 6). .......................................................................... 139

      G. Appellate counsel was not ineffective (Claim 7). ........................ 141

      H. Cromwell's claim of ineffective assistance of PCR counsel is
         not cognizable (Claim 8). ............................................................. 161

      I.  Cromwell has failed to demonstrate that biased jurors were
          seated on the jury (Claim 9). ...................................................... 162

J.  Cromwell's prosecutorial misconduct claims are all procedurally defaulted without an excuse and also fail on the merits (Claim 10). .................................................................. 168

K.  Cromwell's death sentence is constitutional (Claim 11). ............ 186

L.  Cromwell is eligible for the death penalty (Claim 12). ............... 189

M. No cumulative error occurred (Claim 13). .................................. 196

Conclusion ........................................................................................ 197

**MEMORANDUM AND POINTS OF AUTHORITY**

**I.    PRELIMINARY CONSIDERATIONS.**

Regarding the record, on October 20, 2023, this Court received the requested state court record. Doc. 21. This Court did not request, *see* Doc. 17, and presumably did not receive, the trial exhibits. Certain relevant trial exhibits are attached as Exhibit 1 to this response and cited according to their trial exhibit number. Exhibit 2 is the transcripts of Cromwell's statements to police admitted at a pretrial hearing.

Respondent's citations to Cromwell's habeas petition are to the ECF page number. Citations to the state-court Electronic Index of Record produced on June 27, 2022, are abbreviated "R.O.A.".

In his petition, Cromwell provides brief "statements of exhaustion" identifying where certain claims were raised in state court. However, "Cromwell does not concede that any given claim is or is not exhausted, and he reserves the right to modify his position as the case progresses." Doc. 38 at 40-41. But this is contrary to the Court's directives which were to "state with specificity when and where each claim for relief was presented to or considered by the Arizona Supreme Court." Doc. 5 at 3.

Cromwell asserts that AEDPA is unconstitutional. Doc. 38 at 41. As this Court previously noted, that argument is foreclosed by existing precedent. Doc. 35 at 3. *See Crater v. Galaza*, 491 F.3d 1119, 1124-26 (9th Cir. 2007); *cf. Felker v. Turpin*, 518 U.S. 651, 663-64 (1996) (restrictions on second or successive habeas petitions under 28 U.S.C. § 2244(b) do not violate Suspension Clause); *Ferguson v. Palmateer*, 321 F.3d 820, 823 (9th Cir. 2003) (28 U.S.C. § 2244(a)(1)'s limitation period does not violate Suspension Clause); *see also Cruz v. Ryan*, 2018 WL 1524026, *3 n.4 (D. Ariz. Mar. 28, 2018) (AEDPA does not violate the Suspension Clause) (citing *Crater*, 491 F.3d at 1125-26).

Cromwell challenges "the presumption of correctness" and also "provides notice of his intention to challenge the presumption of correctness of specific findings of fact made by the state courts." Doc. 38 at. 42. Cromwell also "incorporates by specific reference each and every paragraph, including all facts, allegations, and arguments made

therein, into each and every claim presented." *Id.* at 43. But habeas claims must be pled with particularity, and the facts and legal theories supporting each claim must be set forth expressly in the petition. *See* Rule 2(c)(1) & (2), Rules Governing § 2254 Cases (petition must specify all grounds for relief and state the facts supporting each ground); *Mayle v. Felix*, 545 U.S. 644, 656 (2005) (acknowledging "Rule 2(c)'s demand that habeas petitioners plead with particularity"); *McFarland v. Scott*, 512 U.S. 849, 856 (1994) ("Habeas corpus petitions must meet heightened pleading requirements."). Consistent with this authority, this Court required Cromwell to plead discrete claims. Doc. 5 at 3. To the extent Cromwell intends to challenge any specific state-court factual findings, he must do so expressly and individually. He cannot challenge all state-court findings in one global statement, and he has waived his challenge to any specific facts not identified as erroneous in the petition. *Cf. Cook v. Schriro*, 538 F.3d 1000, 1014 n.5 (9th Cir. 2008).

Finally, Cromwell implies that he will respond to Respondents' affirmative defenses through subsequent motions and pleadings regarding discovery and expansion of the record, as well as during an evidentiary hearing that he believes the Court will order. *See, e.g.*, Doc. 38 at 42 ("Cromwell cannot adequately raise all of the constitutional defects infecting his convictions and sentences until he is granted access to discovery and those mechanisms."). But this is contrary to the Court's directives:

> The Reply shall respond to Respondents' allegations regarding both procedural defenses and the merits of each enumerated claim. In addition, Petitioner shall affirmatively raise in the Reply any arguments concerning availability of state remedies, cause and prejudice, fundamental miscarriage of justice, or equitable tolling in response to any allegations by Respondents of procedural or timeliness bars. The Reply shall not be used to raise new claims or new material facts in support of existing claims.

Doc. 5 at 4.

## II.    FACTUAL AND PROCEDURAL BACKGROUND.

### A.    Cromwell's crimes.

In October 2001, Cromwell met Ella as she was walking from her apartment to a nearby convenience store. *State v. Cromwell*, 119 P.3d 448, 450, ¶ 3 (Ariz. 2005). The two talked and Cromwell offered to escort Ella to the store, where she purchased

1    transmission fluid. *Id.* at ¶¶ 3-4. Cromwell walked Ella back to her apartment and helped

2    her put the transmission fluid into her car. *Id.* at ¶ 5. Ella invited Cromwell to dinner with

3    her and her three daughters, which he accepted. *Id.* The five of them drove together to the

4    restaurant, ate dinner, and returned to Ella's apartment. *Id.* at ¶¶ 5-6. Cromwell and Ella

5    then spent about an hour in Ella's bedroom, talking and smoking methamphetamine. *Id.*

6    at ¶ 6. The two then left the apartment and went to several local bars so that Ella could fill

7    out job applications. *Id.* at ¶ 6.

8         Cromwell and Ella returned to the apartment around 1:00 a.m. to find Ella's

9    daughters still awake in the living room. *Id.* at ¶ 8. Ella told the girls to go to sleep, and

10    she and Cromwell played cards in her bedroom for about an hour. *Id.* At some point, Ella

11    received a phone call from a friend asking her to come to his house to resolve a dispute

12    with Kim, a mutual acquaintance. *Id.* at ¶ 9. Ella agreed to leave Cromwell with her

13    children because "he seemed so nice." *Id*. In total, Ella was gone from the home for a

14    little over an hour. *Id.*

15         During Ella's absence, Stephanie's nine-year-old sister Amanda was
      awakened by the sound of Stephanie making a noise as if "she was really

16    hurt." Amanda then saw Stephanie standing in the bathtub, unclothed,
      while Cromwell, with socks on both of his hands, washed her with soap.

17    Amanda got out of bed on several occasions while Ella was gone, but
      Cromwell angrily told her to get back to bed each time. Eventually,

18    Amanda saw Stephanie follow Cromwell into Ella's bedroom. Although
      Stephanie remained in Ella's bedroom, Amanda saw Cromwell move from

19    the bedroom to the kitchen several times. During one such trip, Amanda
      heard a noise like "silverware shatter," and while Cromwell and Stephanie

20    were in the bedroom, she heard noises that made her think Stephanie was
      hurt. She then heard a "big bang" that sounded like a television dropping to

21    the floor. Amanda finally fell asleep while Stephanie was in the bedroom
      with Cromwell.

22

23    *Id.* at ¶ 10.

24         When Ella returned home with Kim, Cromwell attacked and injured them both

25    with a pool cue and fled the apartment. *Id.* at ¶ 11. While Ella was chasing Cromwell,

26    Amanda got up and found Stephanie's body with a television resting on her head. *Id.*

27    Stephanie, who was eleven years old at the time, died shortly thereafter from her injuries.

28    *Id.* at ¶ 15-16; *see also* R.T. 2/04/03, at 8, 10.

1   The autopsy showed that Stephanie had received at least five blows to the head, a

2   skull fracture, and was stabbed 13 times in the back. *Id.* at ¶ 17. Stephanie's vaginal

3   opening had been torn nearly to her rectum. *Id.*; *see* R.T. 2/11/03, at 62-63. The medical

4   examiner also determined that Stephanie was alive when she was stabbed and suffered

5   the vaginal trauma. *Id.* at ¶ 17.

6   **B.      Jury Trial.**

7   The State charged Cromwell with the murder and sexual assault of Stephanie, and

8   two counts of aggravated assault against Ella and Kim. *Id.* at ¶ 18.

9   At trial, Ella, Amanda, and Kim each identified Cromwell as the assailant. R.T.

10   2/4/03, at 17, 89-91 (Ella); R.T. 2/5/03, at 38 (Amanda); R.T. 2/10/03, at 101-03 (Kim).

11   The jury heard evidence that Cromwell's DNA profile was found on a vaginal swab taken

12   from the victim and on a pair of pants and a shirt found in the bedroom. R.T. 2/6/03, at

13   45-50 (vaginal), 50-55 (pants and shirt), 65-66, 82-83. The jury also heard evidence that a

14   DNA mixture was obtained from a swab of Cromwell's penis. R.T. 2/6/03, at 59-65. A

15   DNA analyst testified that the probability or "likelihood ratio" that the mixture from the

16   penile swab came from Cromwell and Stephanie was 100 billion to 1 times more likely in

17   the Caucasian population. R.T. 2/6/03, at 64.[1]

18   The jury found Cromwell guilty on all charges. *Cromwell*, 119 P.3d at 452, ¶ 18.

19   The jury also found both alleged aggravating circumstances: that Cromwell murdered

20   Stephanie in an especially cruel, heinous, or depraved manner, and that Stephanie was

21   under the age of 15 years. *Id.* at ¶ 54. The jury sentenced him to death for Stephanie's

22   murder. *Id.* at 181, ¶ 1.

23

24

25

---

26   [1]      In an amended report post-trial, an analyst recalculated the "likelihood ratio," as "1
27   billion times more likely in the Caucasian population if it is a mixture of Item [2.1]
     (Robert Cromwell) and [3] (Stephanie []) than if it is a mixture of Item [2.1] (Robert
28   Cromwell) and an unidentified person." R.O.A. 273.

**C.     Direct Appeal.**

In August 2005, the Arizona Supreme Court affirmed Cromwell's convictions and sentences, rejecting Cromwell's arguments that: 1) the trial court abused its discretion by denying his motion for new counsel just two months before trial; 2) the "especially heinous, cruel or depraved" language of then-A.R.S. § 13-703(F)(6) is unconstitutionally vague; and 3) Cromwell's non-capital sentences are unconstitutional in light of *Blakely v. Washington*, 542 U.S. 296 (2004). *See generally Cromwell*, 119 P.3d 448. The court also independently reviewed Cromwell's death sentence, upheld the aggravating factors, found Cromwell's mitigating factors—his less than adequate childhood experiences and his mental state—were "remarkably weak," and concluded the mitigation was not sufficiently substantial to warrant leniency. *Id.* at ¶¶ 52-57. The Supreme Court denied certiorari. *Cromwell v. Arizona*, 547 U.S. 1151 (2006).

**D.     State post-conviction-relief proceedings.**

Following the conclusion of his direct appeal, Cromwell initiated post-conviction ("PCR") proceedings. Notice of PCR Proceedings, *filed* 05/21/2007 (R.O.A. 322). In May 2009, Cromwell filed a motion to determine competency and stay PCR proceedings. R.O.A. 347. Following briefing and an evidentiary hearing, the PCR court found Cromwell competent to proceed and denied the motion to stay. R.O.A. 353; R.O.A. 361; Evid. Hr'g, 04/23/14; Evid. Hr'g, 04/24/14; R.O.A. 490.

In August 2018, Cromwell filed his petition for post-conviction relief, asserting multiple claims of error in the guilt and penalty phases of the trial and on appeal. Petition *filed* 8/17/2018 (R.O.A. 604). On September 9, 2020, the PCR court denied relief and summarily dismissed his petition. Minute entry *filed* 9/9/2020 (R.O.A. 803).

Cromwell filed a petition for review. Petition for Review *filed* 3/11/2022 ("PCR PFR"). On April 5, 2023, the Arizona Supreme Court granted review and denied relief on one issue, and it denied review on all other issues. ASC Decision Order *filed* 4/5/2023.

### E.    Federal habeas corpus petition.

On April 18, 2024, Cromwell timely filed his First Amended Petition for Writ of Habeas Corpus. Doc. 38. Cromwell alleges 13 claims for relief, most with numerous sub-claims. Cromwell is not entitled to relief.

## III.    AEDPA REVIEW.

### A.    Law of exhaustion and procedural default.

Before a state prisoner advances his claims in a federal habeas corpus petition, he must exhaust those claims in the state courts "by invoking one complete round of the State's established appellate review process." *O'Sullivan v. Boerckel*, 526 U.S. 838, 845 (1999). State exhaustion requires a prisoner to "'fairly present' his claims in each appropriate state court (including a state supreme court with powers of discretionary review), thereby alerting that court to the federal nature of the claim." *Baldwin v. Reese*, 541 U.S. 27, 29 (2004).

Further, habeas corpus relief is available only for custody that violates the Federal Constitution, laws, or treaties. 28 U.S.C. § 2254(a). "[I]t is not the province of a federal habeas court to reexamine state-court determinations on state-law questions." *Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991). Additionally, under the independent state grounds principle, a federal habeas court generally may not review a claim if the state court's denial of relief rests upon an independent and adequate procedural state ground. *Coleman v. Thompson*, 501 U.S. 722, 728 (1991).

Claims may be procedurally barred from federal habeas review based upon an express bar or an implied bar. *See Robinson v. Schriro*, 595 F.3d 1086, 1100 (9th Cir. 2010). If a state court *expressly* applied a procedural bar when the petitioner attempted to raise the claim in state court, and that state procedural bar is both "independent" and "adequate," review of the merits of the claim by a federal habeas court is barred. *Ylst v. Nunnemaker*, 501 U.S. 797, 801 (1991). A procedural bar may be implied where state procedural rules would render futile a return to state court. In such cases, the claim is deemed technically exhausted but procedurally defaulted. *Coleman*, 501 U.S. at 735 n.1

1   (claims are barred from habeas review when not first raised before state courts and those

2   courts "would now find the claims procedurally barred").

3   **B.    Cause and Prejudice.**

4   This Court may review a procedurally defaulted claim only if the petitioner alleges

5   and proves both "cause" for the procedural default and "actual prejudice" arising from

6   the alleged constitutional error, *Manning v. Foster*, 224 F.3d 1129, 1132-33 (9th Cir.

7   2000), or if the petitioner establishes that a fundamental "miscarriage of justice" has

8   occurred. *Sawyer v. Whitley*, 505 U.S. 333, 339 (1992). Generally, the ineffective

9   assistance of state post-conviction counsel does not provide cause to excuse the

10  procedural default of a claim. *Coleman,* 501 U.S. at 752. However, the Supreme Court

11  held in *Martinez v. Ryan*, 566 U.S. 1 (2012), that the ineffective assistance of post-

12  conviction counsel *may* provide cause to excuse the procedural default of a claim of

13  ineffective assistance of trial counsel. *Id.* at 17. In *Shinn v. Ramirez*, 596 U.S. 366 (2022),

14  the Supreme Court held that 28 U.S.C. § 2254(e)(2)'s requirements for presenting new

15  evidence applies to claims whose defaults are excused under *Martinez*. The requirements

16  of § 2254(e)(2) also apply to new evidence presented to determine whether cause and

17  prejudice exist under *Martinez*. *Ramirez*, 596 U.S. at 389.

18  **C.    AEDPA's Relitigation Bar.**

19  Congress set forth in AEDPA "a difficult to meet and highly deferential standard

20  for evaluating state-court rulings, which demands that state-court decisions be given the

21  benefit of the doubt." *Cullen v. Pinholster*, 563 U.S. 170, 181 (2011) (quotations and

22  citations omitted); *see also Harrington v. Richter*, 562 U.S. 86, 102 (2011). This

23  deferential standard bars relitigation of federal claims unless the petitioner can establish

24  that the state court's adjudication of a claim "was contrary to, or involved an

25  unreasonable application of, clearly established Federal law," or "was based on an

26  unreasonable determination of the facts in light of the evidence presented in the State

27  court proceeding." 28 U.S.C. § 2254(d).

28

A state court decision is "contrary to" clearly established Supreme Court precedent when the court has applied a rule of law that contradicts the governing law set forth in Supreme Court precedent or has encountered a set of facts that are "materially indistinguishable" from a Supreme Court decision and yet reached a different result than the Supreme Court. *Early v. Packer*, 537 U.S. 3, 8 (2002). "For purposes of § 2254(d)(1), 'an *unreasonable* application of federal law is different from an *incorrect* application of federal law.'" *Richter*, 562 U.S. at 101 (quoting *Williams v. Taylor*, 529 U.S. 362, 410 (2000)). "A state court's determination that a claim lacks merit precludes federal habeas relief so long as fairminded jurists could disagree on the correctness of the state court's decision." *Id.* (quotation marks omitted).

This Court should grant habeas relief only if the state court's error actually prejudiced a prisoner—the error must have "had substantial and injurious effect or influence in determining the jury's verdict." *Brecht v. Abrahamson,* 507 U.S. 619, 637-38 (1993) (quotations omitted); *see also Brown v. Davenport*, 142 S. Ct. 1510, 1517 (2022) ("When a state court has ruled on the merits of a state prisoner's claim, a federal court cannot grant relief without first applying both the test this Court outlined in *Brecht* and the one Congress prescribed in AEDPA."). This Court must apply *Brecht*'s standard even if the state court did not conduct a harmless error analysis. *Bains v. Cambra*, 204 F.3d 964, 977-78 (9th Cir. 2000).[2] And if the state court conducted a harmless-error analysis, the prisoner can only obtain relief if the state court's harmless-error determination was unreasonable. *Davis v. Ayala*, 576 U.S. 257, 269-70 (2015).

### D.    Ineffective Assistance of Counsel.

Cromwell cannot prevail on his claims that counsel was ineffective unless he proves both that counsel's performance fell below an "objective standard of

---

[2]    Where a habeas petition governed by AEDPA alleges ineffective assistance of counsel under *Strickland*, the Ninth Circuit "appl[ies] *Strickland*'s prejudice standard and do[es] not engage in a separate analysis applying the *Brecht* standard." *Musladin v. Lamarque*, 555 F.3d 830, 834 (9th Cir. 2009).

reasonableness," and any deficient performance prejudiced the defense. *Strickland v. Washington*, 466 U.S. 668, 687-88 (1984). But courts "must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Id.* at 689. To prove deficient performance, a defendant must "overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy." *Id.* (marks omitted).

To establish prejudice, a defendant must show that counsel's errors were so serious that they deprived him of a fair trial. *Strickland*, 466 U.S. at 687. A defendant must show "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.*

Moreover, when analyzing a claim under *Strickland*, the reviewing court cannot substitute its own judgment for that of the original sentencer; rather, the reviewing court must determine whether the sentencer *in the defendant's case* would have rendered a different verdict:

> [W]hen a defendant challenges a conviction, the question is whether there is a reasonable probability that, absent the errors, the factfinder would have had a reasonable doubt respecting guilt. When a defendant challenges a death sentence such as the one at issue in this case, the question is whether there is a reasonable probability that, absent the errors, the sentencer— including an appellate court, to the extent it independently reweighs the evidence—would have concluded that the balance of aggravating and mitigating circumstances did not warrant death.

*Strickland*, 466 U.S. at 695.

Finally, when claims have been resolved under *Strickland* by a state court, habeas review is subject to double deference because the court must give "both the state court and the defense attorney the benefit of the doubt." *Burt v. Titlow*, 571 U.S. 12, 15 (2013); *see also Richter*, 562 U.S. at 105 ("When § 2254(d) applies, the question is not whether counsel's actions were reasonable. The question is whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard."); *Murray v. Schriro*,

1  882 F.3d 778, 826 (9th Cir. 2018) (noting "the double deference applicable to AEDPA

2  claims of ineffective assistance of counsel").

3  **IV.  CROMWELL IS NOT ENTITLED TO HABEAS RELIEF.**

4      **A.  Trial counsel was not ineffective at the guilt phase (Claim 1).**

5

6      Cromwell asserts 20 issues of ineffective assistance of trial counsel (IAC) at the

7  guilt phase, with an additional 10 sub-issues. *See* Doc. 38 at 43-110. Respondents address

8  the issues as best they can be discerned. *See Shah v. United States*, 878 F.2d 1156, 1161

9  (9th Cir. 1989) (holding that vague and conclusory allegations of ineffective assistance

10 do not warrant habeas relief).

11     **1.  Most of these claims are procedurally defaulted.**

12     Cromwell only identifies the exhaustion of sub-claims 1-4, 1-5, 1-11, and 1-14.

13 Doc. 38 at 43-110. Cromwell failed to address the procedural status of the remaining sub-

14 claims. Cromwell did not raise the remainder of these issues in the state court, and he

15 would be procedurally barred from exhausting the claims now. *See* Ariz. R. Crim. P.

16 32.2(a)(3) (precluding claims that could have been raised on direct appeal or in a prior

17 PCR proceeding); *State v. Shrum*, 203 P.3d 1175, 1178, ¶ 12 (Ariz. 2009) ("Rule 32.2(a)

18 precludes collateral relief on a ground that either was or could have been raised on direct

19 appeal or in a previous PCR proceeding."); *see also Stewart v. Smith*, 46 P.3d 1067,

20 1071, ¶ 12 (Ariz. 2002) ("The ground of ineffective assistance of counsel cannot be

21 raised repeatedly.").

22     Thus, the remaining sub-issues are technically exhausted but procedurally

23 defaulted in this habeas proceeding. *Coleman*, 501 U.S. at 735 n.1 (claims are barred

24 from habeas review when not first raised before state courts and those courts "would now

25 find the claims procedurally barred"). Cromwell identifies no cause and prejudice or

26 fundamental miscarriage of justice to excuse the defaults. *See* Doc. 38, at 43-110.

27 Therefore, these issues are ineligible for habeas relief.

28

**2.    Cromwell's improper reliance on juror declarations.**

Cromwell's reliance on juror declarations in support of his argument that trial counsel was ineffective is improper and the declarations should be struck and not considered by this Court.

The state court did not consider Cromwell's juror declarations for the IAC claim. R.O.A. 803 at 5, 19. The court correctly granted the State's request to strike the juror declarations. *Id.* at 36. And Cromwell did not attempt to include the juror declarations in the Appendix to his Petition for Review. *See* Appendix *filed* 4/1/22. Thus, Cromwell cannot rely on evidence not properly presented to the state court. *See Shinn v. Ramirez*, 596 U.S. 366, 378 (2022) (habeas petitioner must properly present claim in compliance with state procedures); 28 U.S.C. § 2254(e)(2) ("If the applicant has failed to develop the factual basis of a claim in State court proceedings, the court shall not hold an evidentiary hearing on the claim").

Moreover, juror testimony cannot be used to impeach a verdict unless "extrinsic influence or relationships have tainted the deliberations." *Tanner v. United States*, 483 U.S. 107, 120 (1987). Rule 606(b)(1) of the Federal Rules of Evidence prohibits–with three narrow exceptions not applicable here–juror testimony "about any statement made or incident that occurred during the jury's deliberations; the effect of anything on that juror's or another juror's vote; or any juror's mental processes concerning the verdict or indictment." Fed. R. Evid. 606(b)(1). Accordingly, "[t]he court may not receive a juror's affidavit or evidence of a juror's statement on these matters." *Id.* The only exception to the prohibitions in Rule 606 occurs when "a juror makes a clear statement that indicates he or she relied on racial stereotypes or animus to convict a criminal defendant." *Pena-Rodriguez v. Colorado*, 137 S.Ct. 855, 869 (2017).

Because they go to the jurors' mental processes concerning the verdict, Cromwell's cited juror declarations (*E.g.* PCR-Exs. 47-50, 78-80) cannot be considered as evidence in support of Cromwell's claims. *See Gallegos v. Shinn*, 2020 WL 836600, at *11 (D. Ariz. Feb. 20, 2020) ("The proffered declarations concern the jurors' deliberative

14

1    process and the effect of the evidence on their votes. Therefore, they may not be

2    considered under Rule 606(b).”); *Smith v. Schriro*, 2006 WL 726913, *22-23 (D. Ariz.

3    2006) (rejecting request to expand the record with juror declarations in support of

4    *Strickland* claims); *see also Garza v. Ryan*, 2017 WL 1152814, at *15 (D. Ariz. Mar. 28,

5    2017) (collecting cases).

### 3.    The claims lack merit.

####     a.    *Trial counsel did not abandon Cromwell (Claim 1-1).*

8    Cromwell alleges that his trial counsel abandoned him, completely denying him

9    the representation of counsel. Doc. 38 at 43. Cromwell failed to address the procedural

10   status of this claim. *Id.* Cromwell did not raise this issue in his PCR petition or the PCR

11   PFR, and he would be procedurally barred from exhausting the claim now. *See* Ariz. R.

12   Crim. P. 32.2(a)(3); *Shrum*, 203 P.3d at 1178; *Stewart*, 46 P.3d at 1071. Thus, Claim 1-1

13   is technically exhausted but procedurally defaulted. Cromwell identifies no cause and

14   prejudice or fundamental miscarriage of justice to excuse the default, and it should be

15   dismissed on that basis. The claim is also meritless.

16    “[A] trial is unfair if the accused is denied counsel at a critical stage of his trial.”

17   *United States v. Cronic*, 466 U.S. 648, 659 (1984). “[I]f counsel entirely fails to subject

18   the prosecution’s case to meaningful adversarial testing, then there has been a denial of

19   Sixth Amendment rights that makes the adversary process itself presumptively

20   unreliable.” *Id.* In *Bell v. Cone*, the Court clarified *Cronic* by stating that an “attorney’s

21   failure must be *complete*.” 535 U.S. 685, 697 (2002) (emphasis added); *see id.* (holding

22   claim fails because “respondent’s argument is not that his counsel failed to oppose the

23   prosecution throughout the sentencing proceeding as a whole, but that his counsel failed

24   to do so at specific points”). Like in *Bell*, Cromwell has not demonstrated a Sixth

25   Amendment violation but merely criticizes specific points where his trial counsel took no

26   action. Doc. 38 at 44-45. But trial counsel (1) cross examined most of the State’s

27   witnesses, *see, e.g.*, R.T. 2/3/03, 67 (Vine), 103 (Busby), R.T. 2/3/03, at 101 (Ella), R.T.

28   2/5/03, at 39 (Amanda), 68 (Yedowitz), 118 (Fitch), R.T. 2/6/03, at 71 (Sartor), 105

(Caruso), R.T. 2/10/03, at 66 (Kim); (2) presented 3 defense witnesses, including Cromwell, R.T. 2/12/03; (3) gave a closing argument at the guilt phase, R.T. 2/13/03, at 78-101, and closing argument at the aggravation phase, R.T. 2/20/03, at 40-44; (4) presented a mitigation mental health expert, R.T. 2/24/03, at 35-100 (Dr. Rosengard); and (5) presented other mitigation arguments, R.T. 3/4/03, at 107-16.  *Cf. State v. Glassel*, 116 P.3d 1193, 1211, ¶ 64 (Ariz. 2005) (rejecting *Cronic* claim when counsel gave an opening statement and closing argument at the penalty phase and argued that the jury should accept three mitigating circumstances). This claim is meritless.

> b.    *Trial counsel was not ineffective for not moving to change venue (Claim 1-2-1).*

Cromwell alleges trial counsel was ineffective for not seeking a change of venue. Doc. 38 at 45-46. Cromwell failed to address the procedural status of this claim. *Id.* Cromwell did not raise this issue in his PCR petition or the PCR PFR, and he would be procedurally barred from exhausting the claim now. *See* Ariz. R. Crim. P. 32.2(a)(3); *Shrum*, 203 P.3d at 1178; *Stewart*, 46 P.3d at 1071. Thus, Claim 1-2-1 is technically exhausted but procedurally defaulted. Cromwell identifies no cause and prejudice or fundamental miscarriage of justice to excuse the default, and it should be dismissed on that basis. The claim is also meritless.

Five of the 148 prospective jurors ("PJs") (11, 20, 48, 80, 81) told the trial court they thought they had heard something about the case in the media. R.T. 1/30/03, at 20, 122.  The court told the PJs that "the rules relating to the press are different than the rules relating to court" and that "[i]t's a rule of Court that a juror disregard anything that they may have heard about a case outside of the courtroom." *Id.* at 20-21, 123. When asked if any of the jurors couldn't follow that rule, PJ 20 indicated he could not, and he was questioned by the court and then excused for cause. *Id.* at 21-24. Later, the attorneys met with the judge "off the record at bench" to discuss which jurors to question individually, and PJ 11 was one of those chosen. *Id.* at 92. The court asked her about the news article she read and whether she could "set aside all of that information." *Id.* PJ 11 said she

1    could and that she knew "what is in the paper is not always completely accurate." *Id.* at

2    92-93. The court directed her to "not tell any of the jurors about anything that you read in

3    the paper." *Id.* When questioned, PJ 80 and 81 were unsure where or what they had heard

4    about the case. *Id.* at 147-49. PJs 11, 80, and 81 did not sit on the jury. *Id.* at 152; R.T.

5    2/3/03, at 6; *see* R.O.A. 91 (State used strike on PJ 11).

6        Counsel did not render deficient performance by not requesting a change of venue

7    because it would have been futile to file such a motion. To support a motion for change

8    of venue based on lack of impartiality in the jury pool, a criminal defendant must show

9    either presumed or actual prejudice. *Gallego v. McDaniel*, 124 F.3d 1065, 1070 (9th Cir.

10   1997). To establish actual prejudice, a criminal defendant must show that at least one

11   juror in his case demonstrated actual hostility or partiality that could not be laid aside to

12   impartially judge the defendant's guilt. *Harris v. Pulley*, 885 F.2d 1354, 1360 (9th Cir.

13   1988). To establish presumed prejudice, a criminal defendant must show that the

14   community in which the trial was held "was [so] saturated with prejudicial and

15   inflammatory media publicity about the crime" that he was unable to receive a fair trial.

16   *Ainsworth v. Calderon*, 138 F.3d 787, 795-96 (9th Cir. 1998).

17       Cromwell does not present any evidence of actual prejudice, nor does he

18   demonstrate that the community was so saturated with prejudicial and inflammatory

19   media that he was unable to receive a fair trial. *Cf. State v. Arias*, 462 P.3d 1051, 1059, ¶

20   22 (Ariz. App. 2020) (finding no presumed prejudice when "it is uncontroverted that the

21   trial publicity was extensive"). Instead, Cromwell merely cites to the acknowledgments

22   by 5 out of 148 potential jurors that they had possibly heard something about the case in

23   the media. Doc. 38 at 45. Cromwell does not even cite to this supposed pretrial media

24   evidence. *See id.* There was no basis for counsel to assert that any media coverage that

25   did exist had a prejudicial and inflammatory effect on Cromwell's prospective jurors. *See*

26   *Skilling*, 561 U.S. at 384 (stating that "pretrial publicity—even pervasive, adverse

27   publicity—does not inevitably lead to an unfair trial").

28

1      The trial court took several steps to discover and excuse potential jurors with

2 preconceived notions of guilt. The jurors were questioned by the court about any pretrial

3 exposure to information about the case. R.T. 1/30/03, at 20, 122. The court excused the

4 single juror who responded that he had heard information and could not set aside what he

5 had heard. *Id.* at 24; *cf. State v. Nordstrom*, 25 P.3d 717, 728, ¶ 19 (Ariz. 2001) ("court

6 removed thirty-seven of the two hundred prospective jurors because of their responses" to

7 questions about media exposure). The empaneled jurors were also told to avoid exposure

8 to information about the case. R.T. 2/3/03, at 114. "A jury is presumed to follow its

9 instructions." *Weeks v. Angelone*, 528 U.S. 225, 234 (2000). This claim is meritless.

10
11           c.     *Trial counsel was not ineffective for not objecting to the jury questionnaire (Claim 1-2-2).*

12      Cromwell alleges that his trial counsel failed to challenge the jury questionnaire's

13 statement regarding a sentence of life with a possibility of parole and that the only

14 alternative to death is natural life. Doc. 38 at 47. Cromwell failed to address the

15 procedural status of this sub-claim. *Id.* Cromwell did not raise this issue in his PCR

16 petition or the PCR PFR, and he would be procedurally barred from exhausting the claim

17 now. *See* Ariz. R. Crim. P. 32.2(a)(3); *Shrum*, 203 P.3d at 1178; *Stewart*, 46 P.3d at 1071.

18 Thus, Claim 1-2-2 is technically exhausted but procedurally defaulted. Cromwell

19 identifies no cause and prejudice or fundamental miscarriage of justice to excuse the

20 default, and it should be dismissed on that basis. The claim is also meritless.

21      Contrary to Cromwell's assertion, at the time that Cromwell murdered Stephanie,

22 Arizona had three possible sentences for first degree murder. A.R.S. § 13–703(A) (2001)

23 (death, natural life, and life without possibility of release for 25 or 35 years). The Arizona

24 Supreme Court repeatedly held defendants like Cromwell had the possibility of a parole-

25 eligible sentence. *See State v. Wagner*, 982 P.2d 270, 272, ¶ 11 (Ariz. 1999) ("Arizona's

26 statute, however, *states with clarity* that the punishment for committing first degree

27 murder is either death, natural life, or life in prison *with the possibility of parole*. Thus, a

28 person of ordinary intelligence can easily determine the range of punishment he or she

faces for committing first degree murder.") (emphasis added). Not until 2015 did the Arizona Supreme Court hold that parole was not available for adults who committed felonies after 1994. *State v. Lynch*, 357 P.3d 119, 138, ¶ 64 (Ariz. 2015), *rev'd*, *Lynch v. Arizona*, 578 U.S. 613 (2016).

Cromwell cannot demonstrate deficient performance from counsel's inability to predict future changes in the law. *See Gerard v. Gootkin*, 856 Fed. Appx. 645, 647 (9th Cir. 2021) ("The failure to predict future changes in the law cannot be considered ineffective assistance."). And Cromwell has failed to show any prejudice from counsel's supposed deficient performance. Finally, this Court recently found a similar claim in another case "plainly meritless." *Ellison v. Thornell*, 721 F.Supp.3d 820, 972 (D. Ariz. 2024).

        d.    *Trial counsel was not ineffective for not objecting to the dismissal of unqualified jurors (Claim 1-2-3)*

Cromwell alleges trial counsel was ineffective during voir dire because they should have objected to the excusal of categorically life-voting jurors. Doc. 38 at 47. Cromwell failed to address the procedural status of this sub-claim. *Id.* Cromwell did not raise this issue in his PCR petition or the PCR PFR, and he would be procedurally barred from exhausting the claim now. *See* Ariz. R. Crim. P. 32.2(a)(3); *Shrum*, 203 P.3d at 1178; *Stewart*, 46 P.3d at 1071. Thus, Claim 1-2-3 is technically exhausted but procedurally defaulted. Cromwell identifies no cause and prejudice or fundamental miscarriage of justice to excuse the default, and it should be dismissed on that basis. The claim is also meritless.

During voir dire, the court struck six PJs who stated that they were either categorically opposed to the death penalty or would vote for it every time. *See* R.T. 1/30/03, at 29-41 (PJ 4, 27, 55, 58, 62, 87). Cromwell alleges trial counsel should have objected. But "death qualification" of juries is both constitutional and required. *See Lockhart v. McCree*, 476 U.S. 162, 173 (1986) (constitutional); *State v. Detrich*, 932 P.2d 1328, 1336 (Ariz. 1997) ("not only permissible but imperative"). Here, the court

1  questioned and attempted to rehabilitate the six jurors with extreme pro- or anti- death

2  penalty views. Counsel acknowledged that the court "asked all the questions that [he]

3  wanted to have asked." R.T. 1/30/03, at 150. Counsel was not ineffective for attempting

4  something futile. Nor has Cromwell shown prejudice because the jury as composed was

5  impartial. *See Lockhart*, 476 U.S. at 177-78; *Irvin v. Dowd*, 366 U.S. 717, 722 (1961)

6  ("In essence, the right to jury trial guarantees to the criminally accused a fair trial by a

7  panel of impartial, 'indifferent' jurors").

8           e.     *Trial counsel was not ineffective during voir dire (Claim 1-2-*

9                 *4).*

10  Cromwell also alleges trial counsel should have asked more questions during voir

11  dire. Doc. 38 at 48-66. This claim is partially procedurally defaulted. In state court,

12  Cromwell alleged trial counsel was ineffective for not challenging Jurors 3 and 7. R.O.A.

13  604, at 83. The state court found that Cromwell failed to show "these jurors were

14  substantially impaired or unable to perform their duties in accordance with the jury

15  instructions due to their views about the death penalty." R.O.A. 803 at 18. The court also

16  found that the jurors' "questionnaire responses do not demonstrate bias, and [Cromwell]

17  has not shown a reasonable probability that the trial court would have granted counsel's

18  request to challenge these jurors for cause … or that the result of the trial would have

19  been different." *Id.* Cromwell only raised the issue of Juror 7 to the ASC. *See* PCR PFR

20  at 60. This Court should apply AEDPA deference to the state court's rejection of that

21  portion of the claim.

22  The remainder of the claim (i.e., questions to the other jurors) is technically

23  exhausted but procedurally defaulted because Cromwell did not raise it in his PCR

24  petition or the PCR PFR, and he would be procedurally barred from exhausting the claim

25  now. *See* Ariz. R. Crim. P. 32.2(a)(3); *Shrum*, 203 P.3d at 1178; *Stewart*, 46 P.3d at 1071.

26  Cromwell identifies no cause and prejudice or fundamental miscarriage of justice to

27  excuse the default, and it should be dismissed on that basis. Moreover, Cromwell's

28  argument lacks merit.

The trial court limited voir dire to "150 minutes of attorney questioning" and "through an extensive written voir dire questionnaire and also through the Court's questioning of the jurors." R.T. 1/27/03, at 7. During voir dire, counsel successfully moved to have PJs 19 and 52 removed for cause and unsuccessfully moved against PJ 45, before using a strike. R.O.A. 101.[3]

Cromwell alleges that counsel should have asked more questions of, or attempted to strike for cause, each of the ten jurors that he used preemptory strikes on. (PJs 8, 22, 35, 45, 46, 60, 66, 72, 73, 74). Doc. 38 at 50-55, 58. Cromwell also alleges that counsel should have asked more questions of an additional eight jurors who did not sit on the jury. (PJs 25, 34, 39, 82, 85, 88, 89, 94).[4] *Id.* at 55-58. Cromwell then alleges counsel should have asked more questions of, or attempted to strike for cause, ten of the seated jurors. (Juror 1, 3, 5, 7, 8, 9, and 15, plus alternates 4, 6, and 13). *Id.* at 60-65.

Counsel was able to determine whether any prospective jurors would automatically impose death by asking if they believed that no mitigation could make a life sentence ever be the appropriate sentence for aggravated first-degree murder. R.T. 1/30/03, at 68; *see id.* at 82, 86 (PJs 28 and 54 removed for cause). The court also asked several PJs whether they believed the death penalty should always be imposed upon a murder conviction; the questionnaire completed by all PJs additionally asked this question. *Id.* at 70-71. Counsel also individually questioned PJs who knew victims of violent crimes and whether they could remain fair. *Id.* at 64-66.

The Supreme Court has reiterated that "[n]o hard-and-fast formula dictates the necessary depth or breadth of voir dire." *Skilling*, 561 U.S. at 386. "Jury selection ... is 'particularly within the province of the trial judge.'" *Id.* (quoting *Ristaino v. Ross*, 424 U.S. 589, 594-95 (1976)). An "attorney's actions during voir dire are considered to be matters of trial strategy." *Hughes v. United States*, 258 F.3d 453, 457 (6th Cir. 2001); *see*

---

[3] PJ 45 is discussed in more detail *infra*.
[4] Regarding PJ 25, PJ 34, and PJ 39, the State used preemptory strikes on them, the others were numbered too high to have served based on the number of available strikes.

1 *also Gardner v. Ozmint*, 511 F.3d 420, 426 (4th Cir. 2007) ("On habeas review, federal

2 courts generally accord 'particular deference' to the judgment of trial counsel during voir

3 dire.").

4         Here, Cromwell's criticisms that trial counsel should have asked more questions

5 and tried to get an additional 28 prospective jurors removed for cause based on

6 speculation about what they may or may not have said is insufficient to overcome the

7 strong presumption that counsel's performance was reasonable. *See Hovey v. Ayers*, 458

8 F.3d 892, 910 (9th Cir. 2006) ("The conduct of voir dire 'will in most instances involve

9 the exercise of a judgment which should be left to competent defense counsel.'") (quoting

10 *Gustave v. United States*, 627 F.2d 901, 906 (9th Cir. 1980)); *see also Wilson v. Henry*,

11 185 F.3d 986, 991 (9th Cir. 1999) (no deficiency where counsel relied on jurors'

12 statements that they would be fair and follow the law, without asking about their views

13 on criminal history).

14         Moreover, even if trial counsel could be found to have performed deficiently

15 during voir dire, Cromwell would still not be entitled to relief on the claim because he

16 was not prejudiced by any theoretical deficiency. "Establishing *Strickland* prejudice in

17 the context of juror selection requires a showing that, as a result of trial counsel's [error],

18 the jury panel contained at least one juror who was biased." *Davis v. Woodford*, 384 F.3d

19 628, 643 (9th Cir. 2004); *see Ross v. Oklahoma*, 487 U.S. 81, 88 (1988) (holding that "so

20 long as the jury that sits is impartial," there is no Sixth Amendment violation); *Irvin*, 366

21 U.S. at 722. Cromwell, however, has not demonstrated the prejudice necessary to entitle

22 him to relief on this claim under *Strickland*. *See Ybarra v. McDaniel*, 656 F.3d 984 1001

23 (9th Cir. 2011) ("Ybarra has not made the required showing of prejudice under

24 *Strickland*, because he has not shown that any juror who harbored an actual bias was

25 seated on the jury as a result of counsel's ... voir dire [conduct].").

26                 f.     *Trial counsel was not ineffective regarding the DNA evidence*

27                     *(Claim 1-3-1).*

28

Cromwell alleges trial counsel was ineffective for not calling a DNA expert witness to counter the State's DNA experts. Doc. 38 at 66. Cromwell failed to address the procedural status of this claim. *Id.* Cromwell did not raise this issue in his PCR petition or the PCR PFR, and he would be procedurally barred from exhausting the claim now. *See* Ariz. R. Crim. P. 32.2(a)(3); *Shrum*, 203 P.3d at 1178; *Stewart*, 46 P.3d at 1071. Thus, Claim 1-3-1 is technically exhausted but procedurally defaulted. Cromwell identifies no cause and prejudice or fundamental miscarriage of justice to excuse the default, and it should be dismissed on that basis. The claim is also meritless.

The State presented testimony from criminalist Kelley Fitch, who took cuttings and samples from various pieces of crime scene evidence for testing, R.T. 2/5/03, at 74-130, nurse Kimberly Yedowitz, who collected evidence from Cromwell and Stephanie, *id.* at 59-63, medical examiner Dr. John Hu, who collected sexual assault evidence from Stephanie, R.T. 2/6/03, at 5-20, and criminalist Kathleen Sartor, who analyzed the collected DNA samples, *id.* at 21-83.

Counsel's strategic decisions do not constitute ineffective assistance simply because in retrospect different tactics might have been available. *See Strickland*, 466 U.S. at 689; *see Waters v. Thomas*, 46 F.3d 1506, 1512 (11th Cir. 1995) ("Which witnesses, if any, to call, and when to call them, is the epitome of a strategic decision, and that is one that [a reviewing court] will seldom, if ever, second guess."). The ultimate decision not to call witnesses at trial is well within counsel's "full authority to manage the conduct of the trial." *Taylor v. Illinois*, 484 U.S. 400, 418 (1988) ("Putting to one side the exceptional cases in which counsel is ineffective, the client must accept the consequences of the lawyer's decision ... not to put certain witnesses on the stand ....").

Cromwell offers nothing but speculation that a hypothetical expert witness's testimony would have swayed the jury.[5] *See Yarbrough v. Johnson*, 520 F.3d 329, 336

---

[5]    Indeed, most of Cromwell's argument contains neither citations to the record, caselaw, or other authority. *See* Doc. 38 at 69-70.

(4th Cir. 2008) (holding failure to hire DNA expert in capital murder trial not deficient, noting defendant "simply hoped that the expert might find something to help his case"). This is insufficient to support a *Strickland* claim, particularly in light of trial counsel's cross-examination of the State's DNA expert witnesses as part of a reasonable trial strategy regarding Cromwell's pretrial statements and testimony that his sperm DNA came from a condom used when he had sex with the victim's mother. *See* R.T. 02/12/03, at 14 (Cromwell's testimony); R.O.A. 723, at 7, 22-23 (Logan discussing Cromwell's "inside out condom defense"); R.T. 2/5/03, at 70 (nurse admitting unlikely to find sperm if intercourse with a condom); R.T. 2/6/03, at 68-69 (criminologist discussing sperm transfer from used condom).

Cromwell has not even proffered what a hypothetical expert would have testified to. *See Murtishaw v. Woodford*, 255 F.3d 926 (9th Cir. 2001) ("it is essential to compare the evidence that actually was presented to the jury with the evidence that might have been presented had counsel acted differently" (internal quotations omitted)); *cf. Flores v. Thornell*, 2024 WL 268288, at *8 (D. Ariz. Jan. 5, 2024) (no deficient performance for failure to present DNA expert "because the expert testimony presented at the post-conviction hearing did not conclusively establish that Flores was not present at the scene of the crime").

A petitioner bears the burden of demonstrating counsel's choices regarding the presentation of his defense constituted deficient performance and were prejudicial. *See Matylinsky v. Budge*, 577 F.3d 1083, 1091 (9th Cir. 2009). A petitioner's speculation that counsel failed to adequately investigate a potential line of defense or failed to present particular testimony rarely creates a "reasonable probability" that a different result would have occurred absent the purportedly deficient representation. *Strickland*, 466 U.S. at 694. Counsel's choice of a sound defense strategy, and any decisions made regarding the implementation of that strategy, are "virtually unchallengeable." *Id.* at 690. *See also Ayala*, 829 F.3d at 1103. It is well settled that "counsel's tactical decisions at trial ... are

1  given great deference and must similarly meet only objectively reasonable standards."

2  *Elmore*, 799 F.3d at 1250. *See Reynoso*, 462 F.3d at 1112.

3      Moreover, Cromwell cannot establish that any alleged deficiency prejudiced him

4  given the evidence presented at trial. This evidence included Cromwell's DNA being

5  found on the victim's vagina and three witnesses identifying Cromwell as the assailant.

6  Thus, even if his trial counsel could have somehow retained an expert to exclude

7  Stephanie from the penile swab, the jury nevertheless would have convicted Cromwell.

8  Accordingly, this argument is meritless.

9      Cromwell briefly argues that counsel should have had the other evidence collected

10  from the crime scene subjected to DNA testing. Doc. 38 at 72. This argument is likewise

11  speculative and meritless, and Cromwell cannot show prejudice. *See Cummings v.*

12  *Sirmons*, 506 F.3d 1211, 1223 n.2 (10th Cir. 2007) (no IAC for failure to request DNA

13  testing of the other collected evidence); *John v. United States*, 2023 WL 5366312, at *5-6

14  (D. Ariz. Aug. 22, 2023) (rejecting IAC claim regarding lack of independent DNA

15  testing).

16          g.     *Trial counsel was not ineffective regarding the crime scene*
17                 *evidence (Claim 1-3-2).*

18      Cromwell alleges trial counsel was ineffective for various alleged failures

19  regarding the State's crime-scene evidence. Doc. 38 at 73. Specifically, the (1) "scene

20  contamination," (2) "[f]ailure to adequately test crime scene evidence," (3) "[a]bsence of

21  evidence at crime scene," (4) "[c]ondom at the crime scene," (5) lack of a scale crime

22  scene diagram, and (6) lack of an expert. *Id.* at 73-76. Cromwell failed to address the

23  procedural status of this claim. *Id.* Cromwell did not raise this issue in his PCR petition or

24  the PCR PFR, and he would be procedurally barred from exhausting the claim now. *See*

25  Ariz. R. Crim. P. 32.2(a)(3); *Shrum*, 203 P.3d at 1178; *Stewart*, 46 P.3d at 1071. Thus,

26  Claim 1-3-2 is technically exhausted but procedurally defaulted. Cromwell identifies no

27  cause and prejudice or fundamental miscarriage of justice to excuse the default, and it

28  should be dismissed on that basis. The claim is also meritless.

1    Cromwell cannot show that his counsel was deficient. Cromwell cites to nothing
2  but unsupported speculation regarding the alleged crime scene contamination. He notes
3  that "twenty individuals passed through the scene …. The paramedics alone entered the
4  scene three different times." Doc. 38 at 73. But the paramedics were trying to treat
5  Cromwell's victims. R.T. 2/3/03, at 88 ("four paramedics came up … and then they
6  immediately went to the child and started doing CPR and trying to establish her vitals"),
7  *id.* at 90 (Kim treated in the living room); R.T. 2/4/03, at 153. And counsel was able to
8  cross the first responding police officer and get him to admit that the primary function of
9  responding paramedics is to render aid, not to preserve a crime scene. R.T. 2/3/03, at 105-
10  07.

11    Cromwell lists items taken from the scene that were not tested and argues it "could
12  have shown the absence of Mr. Cromwell's DNA or latent prints." Doc. 38 at 75, 76. But
13  it is just as likely the evidence could have been inculpatory. A decision not to investigate
14  particular facts may be reasonable when the attorney has reason to believe doing so
15  would reveal inculpatory evidence. *Richter*, 562 U.S. at 108. Cromwell speculates on the
16  results of various testing of evidence found at the crime scene; but given that Cromwell's
17  DNA was found inside the deceased victim's vagina, trial counsel "had reason to
18  question the truth of his client's account." *Id.* Particularly when Cromwell admitted being
19  in the apartment that day, R.T. 2/11/03, at 117, touching the knives in the apartment, R.T.
20  2/12/03, at 18-19, and to sharpening Ella's pool stick, *id.* at 50. Further Cromwell fails to
21  show that the evidence was even able to be further tested or if any conclusive result could
22  be obtained. Moreover, trial counsel was able to use the prosecution's lack of further
23  testing to try and discredit the criminal investigation and argue that the prosecution failed
24  to meet their burden. R.T. 2/13/03, at 92-94. *See Wesley v. Williams*, 2023 WL 5747311,
25  at *10 (D. Nev. Sept. 1, 2023) (rejecting IAC claim for failing to further test fingerprints).

26    Cromwell claims counsel should have argued the fluorescent lights in the living
27  room could have explained Amanda's testimony that she heard "shocking" sounds
28  coming from the bathroom when Cromwell was "washing" Stephanie in the bathtub.

Doc. 38 at 76; R.T. 2/5/03 at 21-22, 44. But Amanda testified the living room lights were off. *Id.* at 24. Cromwell also claims counsel should have argued "photographs of the scene [picture] an item resembling a used condom." Doc. 38 at 76. Cromwell does not identify what picture he is referring too.[6] *Id.* Officer Busby testified he saw no evidence of a condom in the bedroom. R.T. 2/5/03 at 87. These arguments are highly speculative as Cromwell fails to explain how counsel could have impeached this testimony.

Regarding the failure to produce a diagram of the crime scene in the victim's apartment, Cromwell speculates that such information would even be available to trial counsel; indeed, Arizona courts have denied attempts to access a victim's house for such a purpose. *State v. Ketchner*, 2024 WL 1924961, at *2-4, ¶¶ 14-25 (Ariz. App. May 2, 2024) (mem. decision); *see also United States. v. Bullcoming*, 22 F.4th 883, 890 (10th Cir. 2022) (no constitutional right to access victim's property); *see also Weatherford v. Bursey*, 429 U.S. 545, 559 (1977) ("no general constitutional right to discovery in a criminal case").[7]

Cromwell claims counsel should have consulted a crime scene expert. Doc. 38 at 73-77. Cromwell does not allege what this theoretical expert would have testified to. *See Murtishaw*, 255 F.3d 926; *Dows v. Wood*, 211 F.3d 480, 486 (9th Cir. 2000) ("no evidence that this witness would have provided helpful testimony for the defense"). Thus, Cromwell can show neither deficient performance nor prejudice. *Wildman v. Johnson*, 261 F.3d 832, 839 (9th Cir. 2001) ("speculating as to what expert would say is not enough to establish prejudice").

Finally, Cromwell faults counsel for not arguing that confirmation bias clouded the law enforcement investigation. Doc. 38 at 77. This Court recently rejected a more-developed and exhausted version of this claim. *See DeMocker v. Shinn*, 2024 WL 3718615, *27 (D. Ariz. Jan. 26, 2024) (holding "state courts' rejection of [IAC] claim"

---

[6]    Crime scene photos admitted at trial include Exhibits: 35, 73, 77, 79, 87.
[7]    Crime scene diagrams admitted at trial include Exhibits: 33 and 70.

1    for failing to call expert on cognitive bias, who provided report to the PCR court, was not

2    "an unreasonable application of *Strickland*"). Cromwell's argument is meritless.

3                    h.    *Trial counsel was not ineffective regarding the pathology*
4                          *evidence (Claim 1-3-3).*

5            Cromwell asserts trial counsel was ineffective for various alleged failures

6    regarding the State's pathological evidence. Doc. 38 at 78. Specifically, Cromwell alleges

7    there were some inaccuracies in the pathological testimony, including the age of the

8    victim's bruises, whether the victim's lung collapsed, the existence of defensive wounds,

9    and that trial counsel should have hired a forensic pathologist. *Id.* at 79-83. Cromwell

10   failed to address the procedural status of this claim. *Id.* Cromwell did not raise this issue

11   in his PCR petition or the PCR PFR, and he would be procedurally barred from

12   exhausting the claim now. *See* Ariz. R. Crim. P. 32.2(a)(3); *Shrum*, 203 P.3d at 1178;

13   *Stewart*, 46 P.3d at 1071. Thus, Claim 1-3-3 is technically exhausted but procedurally

14   defaulted. Cromwell identifies no cause and prejudice or fundamental miscarriage of

15   justice to excuse the default, and it should be dismissed on that basis. The claim is also

16   meritless.

17           Trial counsel did not cross-examine the State's pathology witnesses. But counsel

18   is presumed to have done so for strategic reasons. *Strickland*, 466 U.S. at 690 ("counsel is

19   strongly presumed to have rendered adequate assistance and made all significant

20   decisions in the exercise of reasonable professional judgment"). Here, such reason could

21   include not wanting to linger on the horrific manner that Cromwell raped and murdered

22   Stephanie. *See State v. Pandeli*, 394 P.3d 2, 9, ¶ 14 (Ariz. 2017) ("counsel reasonably

23   concluded that a cross-examination would give the expert a chance to inflict greater

24   damage than he had on direct"); *see also* Trial Ex. 141 (autopsy report).

25           Moreover, the general cause of death was not disputed, and counsel was instead

26   attempting to sow doubt as to whether Cromwell was the murderer. *See Strickland*, 466

27   U.S. at 676, 698 ("failure to examine the medical examiner's reports or to cross-examine

28

1  the medical witnesses testifying on the manner of death" when cause of death was

2  undisputed "cannot be found unreasonable").

3      Cromwell cannot establish prejudice as he fails to present the affidavit of any

4  expert establishing what the proposed witness would have testified to at trial. To establish

5  prejudice under *Strickland*, a habeas petitioner must show not only that the testimony

6  would have been favorable, but also that an identified witness would have testified at

7  trial. *See, e.g.*, *Dows*, 211 F.3d at 486. Cromwell's speculation about what a supposed

8  pathology expert would have testified about does not satisfy the prejudice prong. *See*

9  *Wildman*, 261 F.3d at 839; *see also Plunkett v. Att'y Gen. of Ariz.*, 2021 WL 1153049, at

10 *2 (D. Ariz. Mar. 26, 2021) (rejecting IAC claim when petitioner failed to provide expert

11 affidavit backing up his claim); *Villalobos v. Ryan*, 2021 WL 6883076, at *6 (D. Ariz.

12 May 20, 2021), *aff'd*, 2024 WL 838700 (9th Cir. Feb. 28, 2024) ("Given the weight of

13 the evidence" petitioner's proffered pathology expert insufficient to prove prejudice).

14                    i.    *Trial counsel was not ineffective regarding cross-examination*
15                          *of the lay witnesses (Claims 1-3-4 & 1-3-5).*

16     Cromwell alleges trial counsel was ineffective for various alleged failures

17 regarding the cross-examination of the State's three lay witnesses (Ella, Kim, and

18 Amanda). Doc. 38 at 84. Cromwell also asserts "Counsel should have engaged an expert

19 witness in the area of child testimony." *Id.* at 90. Cromwell failed to address the

20 procedural status of these claims. *Id.* Cromwell did not raise these issues in his PCR

21 petition or the PCR PFR, and he would be procedurally barred from exhausting the

22 claims now. *See* Ariz. R. Crim. P. 32.2(a)(3); *Shrum*, 203 P.3d at 1178; *Stewart*, 46 P.3d

23 at 1071. Thus, Claims 1-3-4 & 1-3-5 are technically exhausted but procedurally

24 defaulted. Cromwell identifies no cause and prejudice or fundamental miscarriage of

25 justice to excuse the defaults, and they should be dismissed on that basis. The claims are

26 also meritless.

27     Cromwell has not rebutted the "strong presumption" that counsel limited his cross-

28 examination of the witnesses "for tactical reasons rather than through sheer neglect."

1    *Yarborough v. Gentry*, 540 U.S. 1, 8 (2003); *Cheney v. Washington*, 614 F.3d 987, 996

2    (9th Cir. 2010); *see Dunham v. Travis*, 313 F.3d 724, 732 (2d Cir. 2002) ("Decisions

3    about 'whether to engage in cross-examination, and if so to what extent and in what

4    manner, are ... strategic in nature' and generally will not support an ineffective assistance

5    claim.") (additional quotation omitted).

6          It was not unreasonable for trial counsel to exercise caution when cross-examining

7    Cromwell's victims. *See Brown v. Dixon*, 591 F. Supp. 3d 1251, 1279-80 (S.D. Fla.

8    2022) ("lawyers don't want to look as though they're beating up on sympathetic

9    victims"). And trial counsel still crossed Ella regarding the discrepancies between her

10   testimony and statements to police, R.T. 2/4/03, at 103-10, her drug use, *id.* at 103, 122-

11   23, and lying to police about leaving the children with Cromwell, *id.* at 104. Contrary to

12   Cromwell's argument, Doc. 38 at 89, trial counsel crossed Kim regarding her release

13   from jail right before the murder, R.T. 2/10/03, at 66, 68-69, living with a drug dealer

14   named Kelly, *id.* at 67, contradicting Ella about who helped with her car, *id.* at 76, her

15   prior inconsistent statement that Cromwell had been at Kelly's apartment, *id.* at 85, 95,

16   and that she first described her assailant as a bald "skinhead," *id.* at 86, with tattoos, *id.* at

17   82, 90-92.[8] Through both women's testimony, trial counsel tried to suggest that a tattooed

18   man named Greg was involved in the murder. R.T. 2/4/03, at 118-19, 125; R.T. 2/10/03,

19   at 69-70.

20         It was also not unreasonable for counsel not to aggressively cross a child witness

21   when doing so could antagonize the jury against Cromwell. *See Dorsey v. Chapman*, 262

22   F.3d 1181, 1185-86 (11th Cir. 2001); *cf. Sirias v. Secretary*, 2015 WL 5440336, at *19

23   (M.D. Fla. Sept. 15, 2015) ("It would be sound trial strategy to let a child-witness'

24   testimony stand on its own[.]"); *Giles v. Culliver*, 2013 WL 1346380, at *56 (N.D. Ala.

25   _____

26   [8]      Respondents object to Cromwell's citation to the sealed exhibits to Doc. 27, that
     are not in the state court record. *See, e.g.*, Doc. 38 at 89 (citing a reference to Kim's
27   prescribed medication and speculating on its purpose).

28

Apr. 3, 2013) (discussing strategic choice not to cross-examine surviving child victims); *Fry v. Shoop*, 2023 WL 2456592, at *32 (N.D. Ohio Mar. 10, 2023) ("reasonable trial strategy not to impeach a child witness"). But still, trial counsel crossed Amanda and suggested that she was coached by her parents to identify Cromwell. R.T. 2/5/03, at 39-42.[9] And even had trial counsel further attacked Amanda's testimony, the jury would likely still find her credible as her testimony generally matched the physical evidence. *See Zapien v. Davis*, 849 F.3d 787, 795 (9th Cir. 2015). Finally, Cromwell has not established that it was ineffective not to hire "an expert witness in the area of child testimony." Doc. 38 at 90. He offers nothing but speculation on how such an expert could undercut Amanda's testimony. *See Lee v. Lampert*, 653 F.3d 929, 943 (9th Cir. 2011) (holding jury could easily reject defense expert's opinion on reliability of child-victim's testimony). And Cromwell cannot establish prejudice as he fails to present the affidavit of any expert establishing what the proposed witness would have testified at trial. *See Dows*, 211 F.3d at 486; *Watson v. Thaler*, 2010 WL 110268, at *4 (N.D. Tex. Jan. 11, 2010) (rejecting ineffectiveness claim for failing to employ expert regarding child's testimony when petition lacked "affidavits or statements from a licensed psychologist regarding what testimony might have been testified to or how it would have been helpful").

> j.    *Trial counsel was not ineffective regarding theoretical alternative suspects (Claim 1-3-6).*

Cromwell alleges trial counsel should have found an alternative suspect to focus on. Doc. 38 at 91. Cromwell failed to address the procedural status of this claim. *Id.* Cromwell did not raise this issue in his PCR petition or the PCR PFR, and he would be procedurally barred from exhausting the claim now. *See* Ariz. R. Crim. P. 32.2(a)(3); *Shrum*, 203 P.3d at 1178; *Stewart*, 46 P.3d at 1071. Thus, Claim 1-3-6 is technically exhausted but procedurally defaulted. Cromwell identifies no cause and prejudice or

---

[9]    Cromwell alludes, without citation, to an interview of Amanda by a Wendy Dutton. Doc. 38 at 90. Upon information and belief, this is not in the state court record and these arguments should not be considered.

1  fundamental miscarriage of justice to excuse the default, and it should be dismissed on
2  that basis. The claim is also meritless.

3      At best, Cromwell suggests a different trial strategy that, in hindsight, he asserts
4  could have been more fruitful than the strategy taken at trial. *See Gustave*, 627 F.2d at
5  904 ("Mere criticism of a tactic or strategy is not in itself sufficient to support a charge of
6  inadequate representation."). But trial counsel is not ineffective for failing to pursue
7  "every conceivable line of ... evidence." *Wiggins v. Smith*, 539 U.S. 510, 533 (2003).
8  According to their interviews, trial counsel's strategy involved attempting to "deal with
9  Mr. Cromwell's previous statements" and put on Cromwell's "inside-out condom"
10 defense. PCR-Ex. 63, at 50-51; PCR-Ex. 73, at 7, 22. Trial counsel was not ineffective.
11 *See Clark v. Chappell*, 936 F.3d 944, 980 (9th Cir. 2019) (decision to explore other
12 avenues, rather than "weak theory" of an alternative suspect, was reasonable based on the
13 overwhelming evidence incriminating defendant).

14     Even assuming counsel had made the additional investigation Cromwell suggests,
15 there is no reasonable probability of a different outcome at trial. Cromwell fails to proffer
16 evidence he would have presented. *See Pardo v. Sherman*, 733 Fed. Appx. 368, 370 (9th
17 Cir. 2018) (trial counsel not ineffective for not pursuing alternative suspect theory when
18 record is unclear counsel "should have been aware of the proffered fact witnesses").
19 Moreover, there is serious doubt as to the admissibility of any evidence counsel could
20 have theoretically discovered. *See State v. Goudeau*, 372 P.3d 945, 984 (Ariz. 2016)
21 (affirming exclusion of inadmissible "third-party culpability evidence [that] did not create
22 a reasonable doubt as to [defendant's] guilt"); *State v. Machado*, 246 P.3d 632, 635 n.2
23 (Ariz. 2011) ("a defendant may not, in the guise of a third-party culpability defense,
24 simply 'throw strands of speculation on the wall and see if any of them will stick'"). The
25 claim is meritless.

26         k.    *The state court's decision that Cromwell did not have an*
                *"irreconcilable conflict of interest" with Logan was not*
27              *contrary to, or an unreasonable application of, Supreme*
                *Court precedent and did not rely on an unreasonable*
28              *determination of the facts (Claims 1-4 & 1-5).*

1    Cromwell argues that Attorney Logan's hostile relationship resulted in an
2  "irreconcilable conflict of interest," Doc. 38 at 92, and counsel should have withdrawn,
3  *id.* at 94. Cromwell exhausted Claims 1-4 & 1-5 by arguing on direct appeal that the trial
4  court should have granted the motion for new counsel. Opening Brief *filed* 8/18/04; *see*
5  *also* Claim 4-1 *infra*. Cromwell also raised the issue in his PCR petition and in his
6  petition for review. *See* R.O.A. 604 at 117-31; PCR PFR at 40. The PCR court found the
7  claim precluded "because the Arizona Supreme Court finally adjudicated on the merits
8  the substance of [Cromwell's] claim that trial counsel had a conflict of interest that
9  adversely affected the representation."  R.O.A. 803 at 29. The PCR court also found in
10  the alternative that the claim is meritless.  *Id.*

11    This Court should review both the Arizona Supreme Court's, and the PCR court's,
12  rejections of these claims with the double deference required by AEDPA and *Strickland*.
13  *See Pinholster*, 563 U.S. at 190 ("Our review of the [state court's] decision is thus
14  'doubly deferential.' We take a 'highly deferential' look at counsel's performance,
15  through the 'deferential lens of § 2254(d).'" (citations omitted)).

16    Contrary to Cromwell's description, the conflict with counsel arose from
17  differences in trial strategy, particularly in dealing "with Mr. Cromwell's previous
18  statements" and that the strategy they "had was just one that [counsel] didn't really like
19  because it was Mr. Cromwell's theory." PCR-Ex. 63 at 50. For example:

20 21    Logan: He had a few versions of the facts that he was absolutely adamant
occurred and there was little way anyone could ever reconcile that with
other facts of the case. And when we attempted to he got upset and angry.

22 23    [PCR Counsel] Levy: He had a clearly implausible version of the facts
according to what we've seen in the records.

24  PCR Ex. 73 at 7; *see also* PCR Ex. 63 at 51 (Buck: "[Cromwell's inside-out condom
25  theory was] the most asinine story I have ever heard. Well maybe not the most asinine
26  but certainly it's up there. … And nobody would believe that.").

27    The Arizona Supreme Court rejected this claim on direct appeal, finding "no
28  irreconcilable conflict between Cromwell and Logan. The friction between them

33

stemmed strictly from disagreement as to their respective assessments of the facts and trial strategy." *Cromwell*, 119 P.3d at 454, ¶¶ 32-35.

In rejecting Cromwell's PCR Petition, the PCR court similarly held that the claim fails on the merits, finding:

> Several months prior to trial, counsel filed a motion to withdraw and argued there existed an irreconcilable conflict and a breakdown in communication with [Cromwell]. The trial judge held a hearing on November 20, 2002. During the ex-parte portion of the hearing, counsel described that [Cromwell] did not believe the State had evidence 'of any sort.' [Cromwell] explained his view of the evidence, and told the trial judge that he did not trust trial counsel and needed new counsel. The trial judge denied the request for new counsel.
>
> [Cromwell] thereafter refused to speak with trial counsel and [Cromwell] filed a bar complaint, both of which were brought to the trial court's attention. …
>
> This record demonstrates shows [*sic*] that trial counsel provided his professional opinion to defendant about the strength of the State's evidence, but ultimately counsel pursued and presented the evidence and defense requested by [Cromwell]. While [Cromwell] faults trial counsel's statements in court and challenges whether there exists loyalty, defendant does not demonstrate that counsel's failure to investigate competence resulted in prejudice. Additionally, [Cromwell] does not allege an alternative defensive strategy that counsel failed to pursue. Finally, the record from the hearing concerning the conflict and the trial demonstrate that trial counsel advised defendant about the evidence and his right to testify and present statements of allocution to the jury. [Cromwell] insisted on exercising his constitutional right to testify, and defendant decided not to allocute after a colloquy with the trial judge. [Cromwell] presents no evidence that the State offered a plea agreement, and this record calls into serious question that [Cromwell] was willing to admit guilt and enter into a plea agreement. …
>
> [T]he record refutes [Cromwell's] allegation that an actual conflict existed, and [Cromwell] failed to show a plausible alternative defense that trial counsel failed to pursue.

R.O.A. 803 at 29-32 (citation omitted).

Cromwell fails to argue how the last reasoned state court decision is contrary to or an unreasonable application of Supreme Court precedent. *See Williams*, 529 U.S. at 410. He has therefore waived this claim for relief. *See Cook*, 538 F.3d at 1014 n.5. Moreover, the state court decisions were not contrary to, nor an unreasonable application of, clearly established federal law.

A criminal defendant has a Sixth Amendment right to representation by competent counsel. U.S. Const. amend. VI. A defendant is not, however, entitled to counsel of choice or to a meaningful relationship with his or her attorney. *Morris v. Slappy*, 461 U.S. 1, 13-14 (1983). The Sixth Amendment ensures the right to representation that is free from conflicts of interest and the assistance of counsel with undivided loyalty. *Woods v. Georgia*, 450 U.S. 261, 271 (1981) (potential conflict when petitioners represented by their employer's lawyer). To obtain relief, a defendant must show that "an actual conflict of interest adversely affected his lawyer's performance." *Cuyler v. Sullivan*, 446 U.S. 335, 348 (1980).

Here, Cromwell has failed to allege facts sufficient to support a belief that an irreconcilable conflict existed warranting new counsel to avoid the clear prospect of an unfair trial. Indeed, "Cromwell, in open court, stated his belief that Logan was competent and there was no expression of hatred or violence …." *Cromwell*, 119 P.3d at 455, ¶ 36; *see* R.T. 11/20/02, at 9. Attorney Logan said they "got along on a reasonably civil level," they "were not at each other's throats," and the one profanity that Logan said to Cromwell was explained as "atypical," and it "didn't occur again, didn't occur before that day." PCR Ex. 732 at 22-23. Cromwell has not shown an actual conflict of interest requiring his trial counsel to withdraw. *See United States v. Hillsberg*, 812 F.2d 328, 333-34 (7th Cir. 1987) (holding denial of motion to substitute counsel not reversible error when the "defendant abruptly states that he does not trust his attorney but gives no grounds for that distrust ... or where defendant and counsel have 'personality conflicts and disagreements over trial strategy.'"); *accord Cromwell*, 119 P.3d at 454, ¶ 30. Under these circumstances, Cromwell cannot establish the PCR court's decision was contrary to, or an unreasonable application of *Morris*, or that it was based on an unreasonable determination of the facts.

l.    *Trial counsel did not engage in simultaneous representation (Claims 1-6 & 1-7).*

Cromwell alleges that attorney Logan engaged in simultaneous representation and was required to withdraw from representing Cromwell. Doc. 38 at 95-96. Cromwell failed to address the procedural status of these claims. *Id.* Cromwell did not raise these issues in his PCR petition or the PCR PFR, and he would be procedurally barred from exhausting the claims now. *See* Ariz. R. Crim. P. 32.2(a)(3); *Shrum*, 203 P.3d at 1178; *Stewart*, 46 P.3d at 1071. Thus, Claims 1-6 & 1-7 are technically exhausted but procedurally defaulted. Cromwell identifies no cause and prejudice or fundamental miscarriage of justice to excuse the defaults, and they should be dismissed on that basis. The claims are also meritless.

The Sixth Amendment right to counsel includes the right to assistance by a conflict-free attorney. *Wood*, 450 U.S. at 271. "To establish a Sixth Amendment violation based on a conflict of interest ..., the defendant 'must demonstrate that an actual conflict of interest adversely affected his lawyer's performance.'" *Noguera v. Davis*, 5 F.4th 1020, 1035 (9th Cir. 2021) (quoting *Cuyler*, 446 U.S. at 348). "An 'actual conflict' means 'a conflict of interest that adversely affects counsel's performance,' not simply a 'theoretical division of loyalties.'" *Id.* (quoting *Mickens v. Taylor*, 535 U.S. 162, 171, 172 n.5 (2002)). And even if an actual conflict is proven, a petitioner must also demonstrate resulting prejudice. *See United States v. Walter-Eze*, 869 F.3d 891, 905 (9th Cir. 2017) ("presumption of prejudice [is] limited to joint representation").

"Conflicts of interest can arise both in cases of simultaneous representation and successive representation, though it generally is more difficult to demonstrate an actual conflict resulting from successive representation." *Fitzpatrick v. McCormick*, 869 F.2d 1247, 1252 (9th Cir. 1989). "In successive representation, conflicts of interest may arise if the cases are substantially related or if the attorney reveals privileged communication of the former client or otherwise divides his loyalties." *Mannhalt v. Reed*, 847 F.2d 576, 580 (9th Cir. 1988). Substantiality is present if the factual contexts of the two representations are similar or related. *Trone v. Smith*, 621 F.2d 994, 998 (9th Cir. 1980).

1       As an initial matter, Cromwell fails to cite anything in the state court record

2 supporting that Logan ever represented Kim, and this Court, in accordance with

3 *Pinholster*, should decline to consider new evidence.

4       But even assuming *arguendo* that Cromwell's factual assertions are true, he fails

5 to establish an actual conflict. First, given his assertion that Logan withdrew from

6 representing Kim after only 8 days, it is unclear that Logan took any actions in

7 representing Kim or learned any privileged information of Kim's that he could

8 theoretically reveal. *See Thomas v. Mun. Ct. of Antelope Valley Judicial Dist. of Cal.*, 878

9 F.2d 285, 289 (9th Cir. 1989) ("The interest to be preserved by preventing attorneys from

10 accepting representation adverse to a former client is the protection and enhancement of

11 the professional relationship in all of its dimensions."). Second, Cromwell provides no

12 indication that Kim's forgery case was at all related, much less "substantially related," to

13 Cromwell's murder trial. *See Trone v. Smith*, 621 F.2d 994, 998 (9th Cir. 1980)

14 (prohibition requires that "later case bears a substantial connection to the earlier one"); *cf.*

15 *Mickens*, 535 U.S. at 175 (trial court not required to inquire into the likelihood of

16 conflict).

17       Cromwell laments that "Logan failed to impeach [Kim] with the forgery charges

18 on which he had represented her." Doc. 38 at 91. But trial counsel crossed Kim regarding

19 her release from jail right before the murder, R.T. 2/10/03, at 66, 68-69. *See State v.*

20 *Alvarado*, 481 P.3d 737, 746 (Idaho 2021) ("fact that [counsel] attempted to ask

21 questions about [former-client witnesses'] incarceration still strongly suggests [counsel]

22 was not avoiding the issue of [former-client witnesses'] convictions out of a professional

23 ethical duty"). Any additional information about Kim's conviction would be limited to

24 the fact of the conviction, the name of the crime, the place and the date. *State v. Tucker*,

25 759 P.2d 579, 594 (Ariz. 1988).

26       Trial counsel crossed Kim and attacked her credibility in several other ways,

27 including that she was living with a drug dealer named Kelly, R.T. 2/10/03, at 67, that

28 she contradicted Ella about who helped with her car, *id.* at 76, Kim's prior inconsistent

1  statement that Cromwell had been at Kelly's apartment, *id.* at 85, 95, and that she first

2  described her assailant as a bald "skinhead," *id.* at 86, with tattoos, *id.* at 82, 90-92. *See*

3  *United States. v. Scott*, 145 F.3d 878, 888 (7th Cir. 1998) ("So long as cross-examination

4  elicits adequate information to allow a jury to assess a witness's credibility, motives or

5  possible bias, the Sixth Amendment is not compromised.").

6      Moreover, Cromwell cannot establish that any alleged deficiency prejudiced him

7  given the evidence presented at trial. This evidence included Cromwell's DNA being

8  found on the victim's vagina and two other witnesses identifying Cromwell as the

9  assailant. Thus, even if his trial counsel had conducted additional cross-examination of

10  Kim, the jury nevertheless would have convicted Cromwell. Accordingly, this argument

11  is meritless.

12             m.    *Trial counsel was not ineffective for seeking a continuance in*
13                    *August 2002 (Claim 1-8).*

14      Cromwell alleges trial counsel should have moved for a continuance after the

15  decision in *Ring v. Arizona*, 536 U.S. 584 (2002) (judges finding capital aggravators

16  unconstitutional). Doc. 38 at 96. Cromwell failed to address the procedural status of this

17  claim. *Id.* Cromwell did not raise this issue in his PCR petition or the PCR PFR, and he

18  would be procedurally barred from exhausting the claim now. *See* Ariz. R. Crim. P.

19  32.2(a)(3); *Shrum*, 203 P.3d at 1178; *Stewart*, 46 P.3d at 1071. Thus, Claim 1-8 is

20  technically exhausted but procedurally defaulted. Cromwell identifies no cause and

21  prejudice or fundamental miscarriage of justice to excuse the default, and it should be

22  dismissed on that basis.

23      Moreover, a careful examination of the record and broader legal context reveals

24  this claim is both factually incorrect–because counsel *did* get a continuance–and

25  meritless.

26      Cromwell asserts that counsel was ineffective for not requesting a continuance in

27  July 2002 after the decision in *Ring*, for opposing the State's request for a continuance,

28

and for not seeking training to become familiar with the new process. Doc. 38 at 96 (citing R.O.A. 50 at 1, 5-6).

But counsel competently argued against a continuance, asserting that under *Ring*, "there is no procedural mechanism available that would allow the State to seek the death penalty." R.O.A. 50 at 3; *see* R.O.A. 46 (moving to strike death penalty notice under *Ring*). But the following month the law changed:

> Subsequent to the *Ring* decision, the Arizona Legislature convened a special session for the purpose of rewriting the Arizona Death Penalty Statute. On August 1, 2002 the Legislature passed and the Governor signed into law a new sentencing bill in response to [*Ring*]. The law has an emergency clause making the law effective immediately. Additionally, it has an applicability provision making it applicable to any capital sentencing commenced after the effective date of the law.

R.O.A. 62 at 2. At the next hearing on August 9, defense counsel noted he could not be ready for the trial scheduled that month, stating:

> Given the sudden, and very drastic change in the status of capital litigation in this case, there is no way for us to be ready for a trial that would include a penalty phase trial at the same time or immediately after the guilt phase of trial, should we get to the penalty phase.
>
> As you know, the custom and the practice has been that it's generally somewhere between 5 or 6 months later before we get to the 703 hearings. For that reason, Judge, because I have to accomplish both at the same time, under rules that are still incredibly unfamiliar to everybody in the state,
>
> I'm going to suggest that the trial date is absolutely inappropriate and I can't imagine being ready for this trial for sometime prior to January. I consulted with Mr. Cromwell and he's not happy to be continuing this trial and objects to continuing the trial. I believe in this case it's my call and there is no way that I could be ready and effectively represent him at a trial that could include a death penalty phase.

R.T. 8/9/02, at 8. The court granted the request and gave Cromwell a six-month continuance. *Id.* During that time, Logan attended an "NACDL seminar" to prepare to voir dire a capital sentencing jury. PCR Ex. 73 at 11, 14-15.

Logan opposed a continuance immediately after *Ring* to attempt to get the death notice dismissed under that precedent. *See* R.O.A. 46; 50; 60; 62; R.T. 8/9/02, at 7 (Logan: "[prior motions] have all been made moot by the package [sic] of a statute, that while I don't concede applies to Mr. Cromwell, I would address that in future

pleadings"). Logan could not know in July that the legislature would amend the death penalty statute in August. *See Sophanthavong v. Palmateer*, 378 F.3d 859, 870 (9th Cir. 2004) ("*Strickland* does not mandate prescience ...."). Logan then argued, unsuccessfully, that the statute violated the *ex post facto* clause. *See* R.O.A. 66; *State v. Hampton*, 140 P.3d 950, 957 (Ariz. 2006) (collecting cases rejecting *ex post facto* claim to 2002 statute). Only after pursuing these reasonably sound tactics did Logan seek a continuance and use those six months to prepare for Arizona's new capital sentencing process. *See Pandeli*, 394 P.3d at 18 (defendant did not show counsel ineffective at voir dire and noting counsel "attended a one-day seminar on jury selection for capital case" post-*Ring*); *see also LaGrand v. Stewart*, 133 F.3d 1253, 1275 (9th Cir. 1998) ("[I]t is not the experience of the attorney that is evaluated, but rather, his performance."). Cromwell's claim is frivolous.

> n.    *Trial counsel did not fail to manage their caseload (Claim 1-9).*

Cromwell alleges trial counsel Logan was ineffective because he also represented other capital defendants before and after Cromwell's trial. Doc. 38 at 98-99. Cromwell failed to address the procedural status of this claim. *Id.* Cromwell did not raise this issue in his PCR petition or the PCR PFR, and he would be procedurally barred from exhausting the claim now. *See* Ariz. R. Crim. P. 32.2(a)(3); *Shrum*, 203 P.3d at 1178; *Stewart*, 46 P.3d at 1071. Thus, Claim 1-9 is technically exhausted but procedurally defaulted. Cromwell identifies no cause and prejudice or fundamental miscarriage of justice to excuse the default, and it should be dismissed on that basis. The claim is also meritless.

First, Cromwell fails to support most of his factual assertions about Attorney Logan's caseload with citations to the record. Second, Cromwell was also represented by Attorney Buck in addition to Logan. *Cf. Pandeli*, 394 P.3d at 17 ("Defendants facing the death penalty do not have a per se constitutional right to the assistance of two attorneys."). Moreover, the Ninth Circuit has held that defense attorneys who "faced

unmanageable caseloads and were inexperienced in capital litigation … do not, in and of themselves, amount to a *Strickland* violation. Rather, [defendants] must point to specific acts or omissions that may have resulted from counsel's inexperence and other professional obligations." *Woods v. Sinclair*, 764 F.3d 1109, 1132 (9th Cir. 2014). As discussed throughout this brief, Cromwell's trial attorneys were not deficient, and Cromwell has proven no prejudice. Finally, Cromwell's criticism of the mitigation specialist is unavailing as "defendants do not have a stand-alone right to a mitigation specialist." *Pandeli*, 394 P.3d at 17; *Schackart v. Shinn*, 2022 WL 912530, at *10 (D. Ariz. Mar. 29, 2022) (same); *cf. Bobby v. Van Hook*, 558 U.S. 4, 10 (2009) (capital trial counsel was effective when they "looked into enlisting a mitigation specialist when the trial was still five weeks away").

> o.   *Trial counsel was not ineffective regarding the funding of the public defender system (Claim 1-10).*

Cromwell alleges he received ineffective trial counsel because of a "systemic breakdown in the public defender system" due to funding issues. Doc. 38 at 99. Cromwell failed to address the procedural status of this claim. *Id.* Cromwell did not raise this issue in his PCR petition or the PCR PFR, and he would be procedurally barred from exhausting the claim now. *See* Ariz. R. Crim. P. 32.2(a)(3); *Shrum*, 203 P.3d at 1178; *Stewart*, 46 P.3d at 1071. Thus, Claim 1-10 is technically exhausted but procedurally defaulted. Cromwell identifies no cause and prejudice or fundamental miscarriage of justice to excuse the default, and it should be dismissed on that basis. The claim is also meritless.

Cromwell asserts, relying on the declaration of the mitigation specialist, that there was an "unwritten policy" that the Office of Legal Advocate ("OLA") "would only approve one expert per capital case" and require that the expert be local. Doc. 38 at 99-100 (citing PCR Ex. 54). But this assertion is not supported by the statements of Cromwell's trial attorneys. *See* PCR Ex. 73 at 14 (Logan: "Well I've heard it … [but] I had more than one [expert] on capital cases … we had 2 or 3 experts on Corey Morris");

41

PCR Ex. 63 at 6 (Buck: "[OLA] never denied any" funding for requested experts); *see also* R.O.A. 753 (Ex. B-D). Cromwell has not established a "systemic breakdown." *See Vermont v. Brillon*, 556 U.S. 81, 85 (2009) (holding no violation on the speedy-trial right due to six-month period when defendant lacked an attorney, finding such did not establish an "institutional breakdown" in the public defender system); *Weis v. State*, 694 S.E.2d 350, 355 (Ga. 2010) ("there can be no 'systemic breakdown in the public defender system' when there are still attorneys within that system who are available to represent the criminal defendant").

Moreover, and as explained in this brief, Cromwell fails to establish either that counsel was deficient for not obtaining another theoretical expert, or that the lack of such an expert caused prejudice.[10] *See Berryman v. Wong*, 954 F.3d 1222, 1230 (9th Cir. 2020) (rejecting claim that counsel was "ineffective at both the guilt and penalty phases for failing to obtain … funding authorization for the EEG tests and PET scan"); *Marks v. Davis*, 106 F.4th 941, 993 (9th Cir. 2024) ("Even assuming counsel performed deficiently by failing to retain an expert," defendant could not prove prejudice.). As the Ninth Circuit noted, "the Supreme Court's precedent does not support the theory that if counsel had 'nothing to lose' by pursuing a defense, then counsel is deficient for failing to pursue it .... An argument that counsel could have relied on any number of hypothetical experts whose insight might possibly have been useful is speculative and insufficient to establish that counsel was deficient." *Atwood v. Ryan*, 870 F.3d 1033, 1064 (9th Cir. 2017) (cleaned up); *accord Ellison*, 2024 WL 942283, at *84. "Even if some of the arguments would unquestionably have supported the defense, it does not follow that counsel was incompetent for failing to include them." *Yarborough*, 540 U.S. at 7.

        p.    *The state court's decision that trial counsel was not ineffective for not asserting Cromwell was incompetent was not contrary to, or an unreasonable application of, Supreme*

---

[10]     Cromwell argued five theoretical guilt-phase experts were required, without establishing their testimony. *See* Doc. 38 at 66 (DNA), *id.* at 75 (crime scene), *id.* at 79–83 (pathologist), *id.* at 90 (child testimony), *id.* at 103 (impulsivity).

*Court precedent and did not rely on an unreasonable determination of the facts. (Claim 1-11).*

Cromwell alleges trial counsel was ineffective because they did not force him to be subjected to a competence evaluation. Doc. 38 at 100. Cromwell does not explain how the state court's adjudication of this claim was unreasonable in light of clearly-established federal law at the time of his state-court proceeding.

Cromwell's trial counsel both said there was nothing to indicate to them Cromwell was schizophrenic at the time of trial. PCR Ex. 63 at 28, 29, 31 (Buck: "he did appear to me to be competent to stand trial."); PCR Ex. 73 at 11 (Logan: "we relied upon what [the mental health experts] told us"). Cromwell was examined by Dr. Rosengard in 2002, who diagnosed Cromwell with "depression, "Posttraumatic stress disorder," "Generalized anxiety disorder," "Panic disorder," and "Attention deficit hyperactivity disorder." PCR Ex. 60 at 10. Not until July 2017 would Dr. Rosengard suggest that Cromwell might have schizophrenia. PCR Ex. 37. In his 2018 PCR Petition, Cromwell asserted that counsel was ineffective for not asserting that he was incompetent to stand trial. R.O.A. 604 at 115.

The PCR court rejected this claim, finding that Cromwell failed to show deficient performance or prejudice:

> [Cromwell] next alleges that trial counsel unreasonably failed to pursue 'obvious red flags,' and this caused prejudice. This claim is not colorable because [Cromwell] has not shown that trial counsel unreasonably failed to investigate and pursue a competency evaluation.
>
> As discussed above, even if Dr. Rosengard had diagnosed [Cromwell] with schizophrenia with auditory hallucinations, the record does not demonstrate that [Cromwell] was 'actively psychotic,' or that mental illness interfered with [Cromwell's] ability to assist counsel or meaningfully understand and participate in the trial proceedings. [Cromwell's] disagreements with counsel about the strength of the State's evidence do not demonstrate incompetence or otherwise rebut the evidence of [Cromwell's] appropriate behavior in court. *See, e.g., State v. Contreras*, 2015 WL 6696905 at 4 (Ariz. App. Nov. 3, 2015) (finding that defendant's "disagreements with his lawyer about whether or not he should take the deal is not ... evidence that he's struggling or that he's incompetent. It means that he wants to defend himself in a different way.") While [Cromwell] unquestionably had strong opinions about the evidence and the presentation of his defense, [Cromwell] did not testify in an erratic or inappropriate manner, and he

43

directly answered questions posed to him during direct and cross-examination.

Additionally, [Cromwell] makes no showing that counsel had concerns about his competence. To the contrary, the evidence demonstrates otherwise. For instance, during a posttrial interview, mitigation specialist Christianson explained that she saw no evidence of any kind of psychosis and that [Cromwell] was oriented. *See Bishop v. Superior Court*, 150 Ariz. 404, 408 (1986) (observing that generally defense counsel is the most knowledgeable witness at competency hearing). Instead, Christianson believed [Cromwell] was a little angry about what people were saying about him. (Ex. 56 at 8) Lead counsel James Logan provided the following explanation, which plainly demonstrates that counsel knew the standard for a competency finding:

I always looked at [Rule 11] as rather narrow. Does he understand the nature of the proceedings? Is he able to assist in his defense? Nothing to do with his mental state at the time of the offense, nothing to do with guilty except insane. He knew what the proceedings were. And he went through those proceedings with us, he understood them. He knew those things. Able to assist? He did everything that he thought he could do to assist. I mean he was telling us his version of the facts and doing what he thought had, you know, we talked about lots of things. (Ex. 73 at 24)

In sum, the [Cromwell] has not shown evidence that raises a reasonable concern about his competency during the trial proceedings. Given the evidence discussed above and that trial counsel retained Dr. Rosengard, who opined at trial that no evidence indicated [Cromwell] was incompetent, counsel did not fall below a reasonable standard of care in failing to request a competency evaluation. Additionally, [Cromwell] has not shown a reasonable probability of a different result, but for counsel's failure to pursue a competency determination.

R.O.A. 803 at 27-28.

"Attorneys are entitled to rely on the opinions of properly selected, adequately informed and well-qualified experts." *Crittenden v. Ayers*, 624 F.3d 943, 966 (9th Cir. 2010). *See also Sims v. Brown*, 425 F.3d 560, 585-86 (9th Cir. 2005) ("Attorneys are entitled to rely on the opinions of mental health experts, and to impose a duty on them to investigate independently of a request for information from an expert would defeat the whole aim of having experts participate in the investigation.") (citation omitted). Indeed, "[i]f an attorney has the burden of reviewing the trustworthiness of a qualified expert's conclusion before the attorney is entitled to make decisions based on that conclusion, the role of the expert becomes superfluous." *Hendricks v. Calderon*, 70 F.3d 1032, 1039 (9th Cir. 1995). At a minimum, there is no clearly established federal law supporting

44

1   Cromwell's criticism. *See, e.g.*, *Earp v. Cullen*, 623 F.3d 1065, 1077 (9th Cir. 2010) ("An

2   expert's failure to diagnose a mental condition does not constitute ineffective assistance

3   of *counsel*, and [a defendant] has no constitutional guarantee of effective assistance of

4   experts.") (emphasis in original). Trial counsel was not ineffective for relying on Dr.

5   Rosengard's diagnosis.

6       Moreover, the record overwhelmingly demonstrates that Cromwell understood the

7   proceedings against him and had sufficient ability to consult with his lawyer with a

8   reasonable degree of rational understanding. *See Godinez v. Moran*, 509 U.S. 389, 396

9   (1993) ("The standard for competence to stand trial is whether the defendant has

10  sufficient present ability to consult with his lawyer with a reasonable degree of rational

11  understanding and has a rational as well as factual understanding of the proceedings

12  against him.") (cleaned up). Because Cromwell was competent to be tried and no

13  competency hearing was required, trial counsel could not be ineffective for not further

14  investigating or asserting Cromwell's incompetence to proceed. *See also* Claims 4-4 &

15  12-3.

16      Cromwell cannot establish that the PCR court's decision was contrary to, or an

17  unreasonable application of, any Supreme Court precedent, or that it was based on an

18  unreasonable determination of the facts.

19          q.    *Trial counsel was not ineffective in their communication with*

20                *Cromwell (Claims 1-12 & 1-13).*

21      Cromwell alleges that counsel was ineffective because they failed to adequately

22  communicate or meet with Cromwell. Doc. 38 at 101-02. Cromwell failed to address the

23  procedural status of these claims. *Id.* Cromwell did not raise this issue in his PCR petition

24  or the PCR PFR, and he would be procedurally barred from exhausting the claims now.

25  *See* Ariz. R. Crim. P. 32.2(a)(3); *Shrum*, 203 P.3d at 1178; *Stewart*, 46 P.3d at 1071.

26  Thus, Claims 1-12 & 1-13 are technically exhausted but procedurally defaulted.

27  Cromwell identifies no cause and prejudice or fundamental miscarriage of justice to

28

excuse the default, and they should be dismissed on that basis. The claim is also meritless.

Cromwell fails to support his allegations that counsel did not adequately communicate with him but merely suggests counsel did not adequality explain the DNA report. Doc. 38 at 101. He asserts only two jail visits occurred between November 20, 2002, and January 28, 2003,[11] *id.* at 102, but Logan noted in his 2015 interview it was probable that he "had gone there a few times and [Cromwell] refused to see me more than once then it is possible that that is where we were, we were getting ready for trial with other things." PCR-Ex. 73 at 10. *See* PCR-Ex. 56 at 7 (Christianson: "I can't say with absolute certainty that he didn't refuse to visit with me sometimes."); *see generally Chandler v. United States*, 218 F.3d 1305, 1314 n. 14 (11th Cir. 2000) (in examining IAC claims, "courts must recognize that counsel does not enjoy the benefit of unlimited time and resources").

The Supreme Court has never held that a defendant is entitled to new counsel because of a lack of communication or disagreement over strategic decisions. *Larson v. Palmateer*, 515 F.3d 1057, 1066-67 (9th Cir. 2008). "[N]o Supreme Court case has held that 'the Sixth Amendment is violated when a defendant is represented by a lawyer free of actual conflicts of interest, but with whom the defendant refuses to cooperate because of dislike or distrust.'" *Id.* (quoting *Plumlee v. Masto*, 512 F.3d 1204, 1211 (9th Cir. 2008) (en banc)).

Cromwell's conclusory allegations that the attorney-client relationship was inadequate do not establish deficient performance. *See Jones v. Gomez*, 66 F.3d 199, 204-05 (9th Cir. 1995) (conclusory allegations made without reference to the record or any document are insufficient to meet specificity requirement); *James v. Borg*, 24 F.3d 20, 26 (9th Cir. 1994) ("Conclusory allegations which are not supported by a statement of

---

[11]    Three federal holidays occurred during this time. *See also Sinatra v. Heckler*, 566 F. Supp. 1354, 1356 (E.D.N.Y. 1983) ("court takes judicial notice that a substantial number of federal employees take vacations at this time of year").

specific facts do not warrant habeas relief."); *see also Hedlund v. Ryan*, 815 F.3d 1233, 1245 (9th Cir. 2016) (rejecting claim where arguments were not "well developed with citation to authority" and petitioner did not cite specific examples of improper questions).

Furthermore, Cromwell has not demonstrated how counsel's alleged failure to regularly meet with him impacted his trial. *See Payton v. Woodford*, 258 F.3d 905, 922 (9th Cir. 2001) (prejudice not established where although Payton and counsel conferred for only 8.1 hours, Payton failed to show how additional consultation would have produced a different result), *rev'd on other grounds, Brown v. Payton*, 544 U.S. 133 (2005); *United States v. Savala Ramirez*, 127 Fed. Appx. 414, 416 (10th Cir. 2005) (petitioner failed to show prejudice regarding no jail visits from counsel).

> r.    *The state court's decision that trial counsel was not ineffective regarding premeditation or impulsivity was not contrary to, or an unreasonable application of, Supreme Court precedent and did not rely on an unreasonable determination of the facts (1-14 & 1-15).*

Cromwell alleges trial counsel was ineffective for not investigating or presenting an impulsivity defense, Doc. 38 at 103, or contesting premeditation, *id.* at 104. Cromwell addressed "counsel's failure to raise a *Christensen*[12] impulsivity defense" in his PCR petition. R.O.A. 604 at 60. Cromwell also argued counsel should have objected to the jury instruction and the prosecutor's closing. *Id.* at 64. But Cromwell failed to raise the claims with the Arizona Supreme Court. *Cf.* PCR PFR at 49-57.[13] Cromwell would be procedurally barred from exhausting the claim now. *See* Ariz. R. Crim. P. 32.2(a)(3). Claims 1-14 & 1-15 are therefore technically exhausted but procedurally defaulted and should be dismissed on that ground. *See Baldwin*, 541 U.S. at 29. The claims are also meritless.

The state court rejected Cromwell's *Christensen* argument, finding:

---

[12]    *State v. Christensen*, 628 P.2d 580 (Ariz. 1991).

[13]    Cromwell attempted to incorporate his entire PCR petition by reference, which is not permitted by rule, and thus the claim was not fairly presented to the Arizona Supreme Court. *State v. Bortz*, 821 P.2d 236, 238 (Ariz. App. 1991); Ariz. R. Crim. P. 32.16(d).

[Cromwell] relies on two categories of evidence. He first cites to Dr. Woods' medical opinion that frontal lobe and executive functioning impairment resulted in 'deficits in planning, understanding, and predicting consequences, and behavioral controls, consistent with Mr. Cromwell's tendency to act impulsively." (Ex. 22 at 33-34) [Cromwell] next contends that Dr. Woods and lay witnesses could have testified to "observational evidence" about [Cromwell's] "behavioral tendencies" or "character traits" of impulsivity to rebut premeditation. This claim is not colorable. Even assuming the truth of [Cromwell's] allegations, there is no reasonable probability of a different sentencing result, but for counsel's failure to present a "*Christensen* defense." First, [Cromwell] has not shown a reasonable probability that the trial court would have allowed counsel to introduce Dr. Woods' medical opinion about [Cromwell's] brain impairment to establish impulsivity because *Mott* prohibits such evidence. Additionally, "a tendency to act impulsively in no way precludes a finding of legal premeditation," *State v. Wood*, 180 Ariz. 53, 64 (1994), and *Christensen* does not apply to the jury's unanimous felony murder verdict. *See State v. Lopez*, 234 Ariz. 465,469, ¶¶ 20-23 (App. 2014) (*Christensen*'s rule is applied only to rebut premeditation).

Moreover, the State's evidence rebuts [Cromwell's] claim. [Cromwell] spent the evening with Ella and her three daughters, and he volunteered to stay with the children. While the children were alone with [Cromwell], Amanda heard the victim making noises as though she was hurt "lots of time," and [Cromwell] stopped Amanda from getting up two to three times. Amanda saw [Cromwell] washing the victim in the bathtub with socks on his hands. Amanda also saw [Cromwell] go back and forth from the bedroom into the kitchen, and Amanda heard "silverware shatter." Additionally, [Cromwell] told Amanda that he spoke with Ella about the victim's "privates" and [Cromwell] touched Amanda to show her where he had touched the victim. [Cromwell] then remained in the apartment, and Ella saw [him] standing at the bedroom window, looking into the parking lot. After opening the door, [Cromwell] attacked both [Kim] and Ella with a pool cue. In sum, the duration of the murder event, and the totality of [Cromwell's] actions that evening and night, overwhelmingly establishes reflective, rather than impulsive behavior. [Cromwell] has not alleged the existence of an unreasonable decision to forego the presentation of a "*Christensen* defense," or that this alleged deficiency caused prejudice.

R.O.A. 803 at 9.

"Arizona does not allow evidence of a defendant's mental disorder short of insanity either as an affirmative defense or to negate the *mens rea* element of a crime." *State v. Mott*, 931 P.2d 1046, 1054 (Ariz. 1997). The United States Supreme Court upheld *Mott*'s restriction on "opinion testimony going to mental defect or disease, and its effect on the cognitive or moral capacities on which sanity depends." *Clark v. Arizona*, 548 U.S. 735, 760 (2006). In *Christensen*, the Arizona Supreme Court allowed the introduction of *character trait* evidence relating to premeditation. 628 P.2d at 582.

1    Counsel could not be ineffective for attempting to admit inadmissible opinion evidence

2    about Cromwell's premeditation. *See, e.g.*, Doc. 38 at 103 ("counsel also failed to obtain

3    an expert that could testify to [] Cromwell's impulsivity"); *see also Cronic*, 466 U.S. at

4    657 n.19 ("The Sixth Amendment does not require that counsel do what is impossible or

5    unethical. If there is no bona fide defense to the charge, counsel cannot create one and

6    may disserve the interests of his client by attempting a useless charade."). And asserting

7    character trait evidence of impulsivity would have conflicted with Cromwell's testimony

8    denying that he committed the crimes. *See Falls v. Brinkman*, 919 F.2d 144 (9th Cir.

9    1990) (petitioner's disagreement with counsel's strategic decision–which would have

10   been inconsistent with petitioner's testimony–"cannot form the basis of an ineffective

11   assistance of counsel claim").

12        Regarding the jury instructions/closing argument, the state court rejected

13   Cromwell's claim, finding that the premeditation instructions were correct. R.O.A. 803 at

14   10. The PCR court contrasted the instructions here with disapproved instructions using

15   phrases like "actual reflection is not required," or "as instantaneous as successive

16   thoughts of the mind," neither of which was used in this case. *Id.* (citing *State v.

17   Thompson*, 65 P.3d 420, 429, ¶ 33 (Ariz. 2003)). The prosecutor argued that: "The

18   opportunity to reflect, and this man did reflect on what he did. Opportunity to reflect.

19   That's all the State has to prove and we have overwhelming proved that in this case."

20   R.T. 2/13/03 at 71-72. The PCR court held that the "prosecutor's argument reasonably

21   can be interpreted to argue that the passage of time suggests premeditation because the

22   prosecutor next recounted the circumstantial evidence that established premeditation."

23   R.O.A. 803 at 11; *see Thompson*, 65 P.3d at 429, ¶ 33 (noting "state may argue that the

24   passage of time *suggests* premeditation, but it may not argue that the passage of time *is*

25   premeditation"). The PCR court found no deficient performance or prejudice, finding it

26   "noteworthy that defendant insisted on and did present a mistaken identity defense."

27   R.O.A. 803 at 11. The court also found that "the prosecutor presented substantial

28   evidence of premeditation, and there is no reasonable probability of a different verdict

49

1   with a modified jury instruction or prosecutorial argument." *Id.*; *see State v. Van Winkle*,

2   285 P.3d 308, 313, ¶ 16 (Ariz. 2012) (finding substantial evidence of premeditation from

3   a "prolonged, brutal attack").

4           The claim is meritless.

5                   s.      *Trial counsel was competent (Claims 1-16, 1-17, 1-18, & 1-*

6                           *19).*

7           Cromwell makes several assertions attacking trial counsel's general competence,

8   including: lack of an opening statement, Doc. 38 at 105, statements during closing, *id.* at

9   106, sidebars off the record, *id.* at 106-07, not preserving a record of the juror's races for

10  a theoretical *Batson* challenge, *id.* at 107-08, not specifically objecting to the disclosure

11  of Cromwell's jail medical records to the State's expert, *id.* at 109, and not objecting to

12  alleged prosecutorial misconduct, *id.* Cromwell failed to address the procedural status of

13  these claims. *Id.* Cromwell did not raise these issues in his PCR petition or the PCR PFR,

14  and he would be procedurally barred from exhausting the claims now. *See* Ariz. R. Crim.

15  P. 32.2(a)(3); *Shrum*, 203 P.3d at 1178; *Stewart*, 46 P.3d at 1071. Thus, Claims 1-16, 1-

16  17, 1-18, & 1-19 are technically exhausted but procedurally defaulted. Cromwell

17  identifies no cause and prejudice or fundamental miscarriage of justice to excuse the

18  default, and it should be dismissed on that basis. The claim is also meritless.

19          Counsel's performance was not deficient under *Strickland* because it did not fall

20  below an objective standard of reasonableness under prevailing professional norms. 466

21  U.S. at 687-88. The right to counsel provided by the Sixth Amendment is a right to

22  "reasonable competence, not perfect advocacy judged with the benefit of hindsight."

23  *Yarborough*, 540 U.S. at 8. The Court in *Yarborough* noted the words of Justice (and

24  former Solicitor General) Jackson:

25          I made three arguments of every case. First came the one that I planned-as I
            thought, logical, coherent, complete. Second was the one actually
26          presented-interrupted, incoherent, disjointed, disappointing. The third was
            the utterly devastating argument that I thought of after going to bed that
27          night.

28  *Id.* (quoting Advocacy Before the Supreme Court, 37 A.B.A.J. 801, 803 (1951)).

1    Cromwell's nitpicking criticisms of counsel's performance during an 11-day guilt

2    phase of a capital murder trial does not demonstrate that counsel "made errors so serious

3    that [he] was not functioning as the 'counsel' guaranteed ... by the Sixth Amendment."

4    *Strickland* 466 U.S. at 687. *See Florida v. Nixon*, 543 U.S. 175, 191 (2004) ("Attorneys

5    representing capital defendants face daunting challenges in developing trial strategies, not

6    least because the defendant's guilt is often clear.").

7        First, Cromwell cannot show deficient performance or prejudice due to a lack of

8    an opening statement. *See Yarborough*, 540 U.S. at 5-6 ("it might sometimes make sense

9    to forgo closing argument altogether"). Second, counsel's tactical concessions during

10   closing are entitled to deference. *Id.* at 9 ("By candidly acknowledging his client's

11   shortcomings, counsel might have built credibility with the jury and persuaded it to focus

12   on the relevant issues in the case."); J. Stein, *Closing Argument* § 204, p. 10 (1992-1996)

13   ("[I]f you make certain concessions showing that you are earnestly in search of the truth,

14   then your comments on matters that are in dispute will be received without the usual

15   apprehension surrounding the remarks of an advocate"). Third, Cromwell has not

16   established, or even alleged, that the unrecorded side-bars would reveal any prejudicial

17   error or that the court would have sustained such an objection. *See Sanchez v.

18   Quarterman*, 2006 WL 3759871, at *7 (S.D. Tex. Dec. 19, 2006) (counsel not ineffective

19   for failing to object to unrecorded hearing). Fourth, Cromwell's assertions of a theoretical

20   *Batson* challenge if the jurors' races were documented is completely speculative and

21   counsel need not pursue constitutional claims which he reasonably believes to be of

22   questionable merit. *See Lancaster v. Newsome*, 880 F.2d 362, 374-75 (11th Cir. 1989)

23   (counsel not ineffective for failing to object to jury composition where he reasonably

24   believed that method to be constitutional, and thus made "informed, tactical decision" not

25   to object). Fifth, the jail medical records were clearly admissible. *See Romero v.

26   Lynaugh*, 884 F.2d 871, 879 (5th Cir. 1989) (counsel not ineffective for failing to block

27   admissible evidence); *State v. Schackart*, 858 P.2d 639, 644 (Ariz. 1993) ("defendant

28   who places his or her mental condition in issue and gives notice of an intention to rely on

1   psychiatric testimony has 'opened the door' to an examination by" state's expert); *State v.*
2   *Dann*, 207 P.3d 604, 621, ¶¶ 90-92 (Ariz. 2009) (applying *Schackart*). Finally, as
3   explained *infra*, no prosecutorial misconduct occurred to warrant an objection.

4       Cromwell's conclusory allegations that the attorney-client relationship was
5   inadequate do not establish deficient performance. *See Jones*, 66 F.3d at 204-05; *James*,
6   24 F.3d at 26; *see also Hedlund*, 815 F.3d at 1245. Cromwell has failed to overcome the
7   strong presumption that counsel made decisions in the exercise of professional judgment.
8   *See Strickland*, 466 U.S. at 690; *see also Massaro v. United States*, 538 U.S. 500, 505
9   (2003) (presumption has particular force where ineffective-assistance claim is based
10  solely on the trial record and court "may have no way of knowing whether a seemingly
11  unusual or misguided action by counsel had a sound strategic motive").

12              t.    *Trial counsel was not ineffective regarding Cromwell's*
13                    *statements to Officer Vine (Claim 1-20).*

14      Cromwell alleges that counsel was ineffective because they failed to get
15  Cromwell's statements to Officer Vine suppressed. Doc. 38 at 109. Cromwell also alleges
16  trial counsel failed to challenge Vine's entry into Cromwell's apartment. *Id.* Cromwell
17  failed to address the procedural status of this claim. *Id.* Cromwell did not raise these
18  issues in his PCR petition or the PCR PFR, and he would be procedurally barred from
19  exhausting the claims now. *See* Ariz. R. Crim. P. 32.2(a)(3); *Shrum*, 203 P.3d at 1178;
20  *Stewart*, 46 P.3d at 1071. Thus, Claim 1-20 is technically exhausted but procedurally
21  defaulted. Cromwell identifies no cause and prejudice or fundamental miscarriage of
22  justice to excuse the default, and it should be dismissed on that basis. The claim is also
23  meritless. *See also* Claims 2-13, 4-5 and 5-3 *infra*.

24      Before Cromwell's trial, the court held a voluntariness hearing to determine the
25  admissibility of his statements to Officer Vine and his subsequent statements to Detective
26  Ballentine. R.T. 12/19/02. Officer Vine testified that after he found Cromwell inside his
27  apartment and asked him to come outside to talk, the woman Officer Vine had contacted
28  earlier identified Cromwell. *Id.* at 16-17. Vine placed Cromwell under arrest for assault

and gave him *Miranda* warnings. *Id.* at 17. Later, Cromwell was taken to police headquarters and was questioned by Detective Ballentine. *See* R.O.A. 79, R.O.A. 79 (Ex. 2 [transcript]).[14]

The state court found Cromwell's statements to "Officer Vine before [he] was Mirandized … were voluntary and [] that [Cromwell] was not in custody for purposes of *Miranda*" and that the statements "after he was Mirandized … were voluntarily made up and until" Cromwell asked for a lawyer. R.T. 12/19/02 at 29.

At the hearing and at trial, Officer Vine did not specify exactly how he made it to Cromwell's apartment door, which was open, other than that the house manager, Glover, pointed him in "the general direction." R.T. 12/19/02 at 12 ("through some series of events, did you get to [Cromwell's] room"); R.T. 2/3/03, at 51-53 (Vine testifying at trial that he made inquiries and ended up at Cromwell's open apartment door); *cf.* PCR-Ex. 28 (Glover declaration).

Cromwell proffers no argument as to why officer Vine's entry into the apartment was improper given that he was in pursuit of a suspect and was apparently given consent to enter the building by the house manager. *See Birchfiled v. North Dakota*, 136 S. Ct. 2160 (2016) ("It is well established that a search is reasonable when the subject consents, … and that sometimes consent to search need not be express but may be fairly inferred from context.") (internal citation omitted). Moreover, Cromwell makes no attempt to argue why his statements to Officer Vine were prejudicial. Indeed, the State sought to preclude the introduction of the statements as self-serving hearsay. R.T. 2/3/03, at 61, 66. Furthermore, the State did not admit Cromwell's statements to Officer Vine at the guilt phase of trial. *Id.* at 55-66. This claim is meritless.

---

[14] Attached as Exhibit 2.

1        **B.**     **Trial counsel was not ineffective at sentencing (Claim 2).**

2        Cromwell asserts 14 issues, with 7 sub-issues, of ineffective assistance of counsel

3 at the sentencing phase. *See* Doc. 38 at 110-53. Respondents address the issues as best

4 they can be discerned. *See Shah*, 878 F.2d at 1161.

5        **1.**     **Most of these claims are procedurally defaulted.**

6        Cromwell only identifies the exhaustion of sub-issues in Claims 2-1, 2-3, 2-4, 2-8,

7 2-9, 2-10, and 2-11. Doc. 38 at 110-53. Cromwell did not raise the remaining claims in

8 state court, and would be procedurally barred from exhausting them now. *See* Ariz. R.

9 Crim. P. 32.2(a)(3) (precluding claims alleging violation of constitutional right that could

10 have been raised on direct appeal or in a prior post-conviction proceeding); *Shrum*, 203

11 P.3d at 1178, ¶ 12 ("Rule 32.2(a) precludes collateral relief on a ground that either was or

12 could have been raised on direct appeal or in a previous PCR proceeding."). Thus, the

13 remaining sub-issues are technically exhausted but procedurally defaulted in this habeas

14 proceeding. *Coleman*, 501 U.S. at 735 n.1 (claims are barred from habeas review when

15 not first raised before state courts and those courts "would now find the claims

16 procedurally barred"). Cromwell identifies no cause and prejudice or fundamental

17 miscarriage of justice to excuse the default. *See* Doc. 38 at 110-53. Therefore, these

18 issues are ineligible for habeas relief.

19        **2.**     **Cromwell improperly relies on juror declarations.**

20        Cromwell's reliance on juror declarations in support of his argument that trial

21 counsel was ineffective at the penalty phase, *see e.g.*, Doc. 38 at 112, is improper, and the

22 declarations should be struck and not considered by this Court for the reasons stated

23 *supra*.

24        **3.**     **Independent Review.**

25        Cromwell also cannot demonstrate prejudice from any ineffectiveness in counsel's

26 decisions at sentencing because any theoretical error was cured by the Arizona Supreme

27 Court's independent review. *Strickland* prejudice requires a reviewing court to consider

28 "whether there is a reasonable probability that, absent the errors, the sentencer—

*including an appellate court, to the extent it independently reweighs the evidence*—would have concluded that the balance of aggravating and mitigating circumstances did not warrant death." 466 U.S. at 695 (emphasis added). The "appellate court" here was the Arizona Supreme Court, which independently reviewed Cromwell's death sentence and cured any possible prejudice resulting from most theoretical sentencing errors.

On independent review, the supreme court "reviews the entire record and independently considers whether a capital sentence is not only legally correct, but also appropriate." *State v. Roseberry*, 353 P.3d 847, 849, ¶ 13 (Ariz. 2015). The supreme court does not defer to the jury's findings and "will modify a death sentence to a life sentence if warranted." *Id.* at 849-50, ¶ 13. "[I]ndependent review serves as a constitutional means to cure sentencing errors." *Id.* at 850, ¶ 14 (citing *Clemons v. Mississippi*, 494 U.S. 738, 748-50 (1990)) (independent review cured trial court's error in instructing jury that a causal nexus was required for mitigation); *see also McKinney v. Arizona*, 589 U.S. 139, 144 (2020) ("*Clemons* reweighing is a permissible remedy for an *Eddings* error.").

This is so because the Constitution does not require a jury to impose a death sentence. *See McKinney*, 589 U.S. at 144 ("[I]n a capital sentencing proceeding just as in an ordinary sentencing proceeding, a jury (as opposed to a judge) is not constitutionally required to weigh the aggravating and mitigating circumstances or to make the ultimate sentencing decision within the relevant sentencing range."); *Clemons*, 494 U.S. at 745 ("Any argument that the Constitution requires that a jury impose the sentence of death or make the findings prerequisite to imposition of such a sentence has been soundly rejected by prior decisions of [the Supreme Court]."). Accordingly, "state appellate courts can and do give each defendant an individualized and reliable sentencing determination based on the defendant's circumstances, his background, and the crime." *Id.* at 749.

### 4.    The claims lack merit.

a.    *The state court's decision that trial counsel was not ineffective regarding the mitigation presentation, investigation, and consultation with expert witnesses was not contrary to, or an unreasonable application of, Supreme Court precedent and did not rely on an unreasonable*

*determination of the facts in the record (Claims 2-1, 2-3, 2-4, & 2-8).*

Cromwell argues trial counsel was ineffective in the investigation and presentation of mitigation evidence at sentencing. Doc. 38 at 111-14, 116-25, 140-45. Cromwell exhausted these claims by presenting them to the PCR court and the Arizona Supreme Court, R.O.A. 604 at 36-49; PCR-PFR at 49-57, which both found the claims meritless. This Court should review the state court's rejections of these claims with the double deference required by AEDPA and *Strickland. See Pinholster*, 563 U.S. at 190.

<u>*Relevant facts*</u>

During his PCR proceedings, Cromwell alleged multiple claims of ineffective assistance of trial counsel for supposedly failing to sufficiently investigate and present mitigation. The PCR court rejected Cromwell's claims, finding:

> [Cromwell] alleges that trial counsel conducted an unreasonably limited mitigation investigation, and failed to follow up with appropriate experts partly due to an office policy that required the use of "a single, in-state expert." [Cromwell] argues that these alleged deficiencies caused prejudice by preventing the jury from learning about [Cromwell's] "genetic predisposition to serious mental illness," a schizophrenia diagnosis, and frontal lobe and executive functioning impairment, as well as the extent of childhood trauma and abuse presented at trial. The State responds that [Cromwell's] proffered evidence is cumulative, that counsel presented the results of a reasonable investigation to a qualified expert, that lead counsel, James Logan, has previously testified he did not have a problem getting funding for experts (exhibits B-D), and no pre-trial evidence raised a reasonable belief that [Cromwell] had schizophrenia or brain impairment.
>
> In a capital case, trial counsel has an obligation to conduct a thorough investigation of a defendant's background. *Williams v. Taylor*, 529 U.S. 362, 393, 396 (2000). *See also Porter v. McCollum*, 558 U.S. 30, 39 (2009) ("It is unquestioned that under the prevailing professional norms ..., counsel had an 'obligation to conduct a thorough investigation of the defendant's background".) In analyzing the reasonableness of counsel's failure to present proffered mitigation, the focus is "whether the investigation supporting trial counsel's decision not to introduce mitigating evidence of [defendant's] background was <u>itself reasonable</u>." *Wiggins v. Smith*, 539 U.S. 510, 522-23 (2003) (emphasis in original). Additionally, professional standards require that a mitigation investigation "should comprise efforts to discover <u>all reasonably available</u> mitigating evidence". *Id.* at 524 (citation omitted) (emphasis in original). …
>
> During [Cromwell's] penalty proceeding, trial counsel presented testimony from two witnesses, Dr. Rosengard, a psychiatrist, and mitigation specialist Lisa Christianson. Dr. Rosengard met with [Cromwell] two times for approximately 60 to 90 minutes, and conducted a forensic interview and a

mini-mental examination. Dr. Rosengard also reviewed summaries of interviews of [Cromwell's] family members, [Cromwell's] records from McDowell Health Care Center and Correctional Health Services, and a transcript of [Cromwell's] police interview. Based on the records reviewed, and Dr. Rosengard's interviews with [Cromwell] and the summaries of family interviews, Dr. Rosengard diagnosed [Cromwell] with major depression, post-traumatic stress disorder, a generalized anxiety disorder, a panic disorder, and attention deficit disorder. Dr. Rosengard further testified that doctors had prescribed testosterone as a treatment for [Cromwell's] acquired human immunodeficiency virus (HIV) and explained that testosterone is a steroid with negative side effects, which may include an increased level of anger and violent reactions.

Dr. Rosengard's testimony included information about [Cromwell's] background and his opinion that the emotional trauma and neglect in [Cromwell's] background contributed to the development of the diagnosed mental illnesses. Christianson then provided the jury with a background about [Cromwell's] chaotic and unstable living situations throughout his younger years, and [Cromwell's] institutional placements that resulted from inappropriate parenting and juvenile referrals. Christianson also recounted family descriptions of sexual abuse committed by [Cromwell's] maternal grandfather against [Cromwell's] mother and aunt, and [Cromwell] and his sister. Family members also told Christiansen that a maternal uncle sexually abused [Cromwell], and that his mother neglected her children and abused them physically and emotionally. Not all of the information provided by family members was mitigating, and trial counsel argued to the jury that Christianson's willingness to testify fully about the statements made by family members demonstrated her credibility. …

The foregoing testimony demonstrates that trial counsel conducted an investigation into [Cromwell's] background and retained Dr. Rosengard to conduct a mental health evaluation. Specifically, mitigation specialist Christianson obtained juvenile and medical records, and she interviewed a number of [Cromwell's] family members and told the jury about instability, neglect, and abuse experienced by [Cromwell], including sexual abuse.

[Cromwell] argues, however, that counsel failed to consider additional information that was reasonably available. Specifically, [Cromwell] contends that counsel failed to follow up with witnesses provided by the former mitigation specialist Melissa Kupferberg, and failed to provide these witness statements to the jury and Dr. Rosengard. [Cromwell] further points to medical and military records from [Cromwell's] grandfather, Hershel Wooley, and argues that these records and witness declarations demonstrate a genetic disposition to serious mental illness. Additionally, [Cromwell] presented opinions from defense and state experts who diagnosed him with schizophrenia and cognitive disorder during a post-conviction competency evaluation, and [Cromwell] presented expert diagnoses of frontal lobe and executive functioning impairment.

[Cromwell] has not shown that trial counsel conducted an unreasonable investigation or failed to follow up on reasonably available mitigating evidence. First, Christianson interviewed most of the family members who provided post-conviction declarations, and [Cromwell] has not shown that trial counsel failed to obtain reasonably available information during these interviews concerning [his] background. Additionally, Christianson

57

testified about [Cromwell's] juvenile records, which provided documentation about [his] unstable and abusive home environment.

With respect to the witnesses listed by Kupferberg, Christianson did interview Jacqueline Snowden, the case manager of A Place Called Home, [Cromwell's] residence at the time of the offense. (Ex. 30) Nonetheless, even assuming that counsel conducted an inadequate investigation concerning the witnesses listed by Kupferberg, [Cromwell] has not shown why this was unreasonable or how such investigation would have changed the direction of the mitigation investigation. For instance, in her post-trial declaration, Snowden wrote that [Cromwell] stared off into space, had glassy eyes and talked to himself. Snowden further believed that [Cromwell] experienced auditory hallucinations and had a serious mental illness. (Ex. 30) Zane Williams, a resident at A Place Called Home, described [Cromwell] as childlike, and that he had bizarre ideas and believed in conspiracy theories. (Ex. 31)

This information reasonably should have pointed counsel to a mental health evaluation and a review of [Cromwell's] medical records. However, counsel completed such an investigation by retaining Dr. Rosengard, a psychiatrist, to assess [Cromwell] for mental illness, and by obtaining [Cromwell's] medical records from McDowell Health Care Center. Consistent with the obtained medical records and the other witness statements, Dr. Rosengard diagnosed [Cromwell] with major depression, post-traumatic stress disorder, a generalized anxiety disorder, a panic disorder, and attention deficit disorder.

Thus, while the evidence reasonably available to trial counsel suggested that [Cromwell] may have a mental illness, [Cromwell] has not shown that counsel unreasonably failed to uncover evidence that required a neuropsychological evaluation or brain scanning. Instead, the record supports the conclusion that [Cromwell] obtained additional information in 2010, during the postconviction proceeding, when mental health staff at the prison advised counsel that [Cromwell] underwent a "recent and sudden change in behavior." (Dkt. 246 at 2). Considering the evidence available to trial counsel, [Cromwell] has not made the required factual showing that similar information was available to counsel prior to [Cromwell's] trial in 2003.

R.O.A. 803 at 5-7.

The PCR court found neither deficient performance nor prejudice under *Strickland*:

[Cromwell] also has not overcome *Strickland's* strong presumption that under the circumstances of this case, counsel's challenged decision to have Christianson testify was not sound trial strategy. The fact that family members revealed unfavorable information about [Cromwell] does not demonstrate the unreasonableness of counsel's decision. Whether the family members testified themselves or Christianson revealed the substance of their statements, the jury would have learned the information challenged by [Cromwell]. Additionally, Christiansen's testimony demonstrates that family members were difficult to contact and suspicious about the mitigation investigation. Counsel may have decided the better path was to

58

present [Cromwell's] background through Christianson rather than undependable family members, as portrayed by the trial testimony.

In addition to failing to show deficient performance, [Cromwell] has not demonstrated prejudice. Considering the totality of the mitigation presented in post-conviction and the totality of mitigation presented at trial, [Cromwell] has not shown a reasonable probability of a different penalty phase verdict. Even if the jury heard [Cromwell's] additional evidence, the especially cruel aggravator and the brutal attack against the young victim were substantial aggravating evidence. Additionally, [Cromwell's] behavior during the entire evening spent with the victim and Ella undercuts [Cromwell's] presentation of schizophrenia and cognitive impairment.

For all of the foregoing reasons, [Cromwell] has not met his burden to show ineffective assistance of trial counsel relating to the mitigation investigation and presentation of evidence during the penalty phase.

R.O.A. 803 at 8. The Arizona Supreme Court denied review on this claim. *See* ASC Decision Order *filed* 4/5/2023.

## *Cromwell is not entitled to relief*

Cromwell asserts that counsel was ineffective because there were other theoretical sources of mitigation evidence not investigated. Doc. 38 at 117-122. As the PCR court explained, much of this information was presented to the jurors at sentencing, such that the information he cites would be largely cumulative to the evidence that was presented to the jury. *See Pinholster*, 563 U.S. at 200 (the omission of additional, cumulative evidence is neither deficient nor prejudicial). Even if Cromwell is correct that in hindsight counsel could have found different mitigation evidence than presented, he has not established that no reasonable attorney would have done so. *See Strickland*, 466 U.S. at 689 ("There are countless ways to provide effective assistance in any given case. Even the best criminal defense attorneys would not defend a particular client in the same way."). Cromwell has therefore not shown either deficient performance or prejudice resulting from counsel's actions.

Cromwell asserts that counsel was ineffective for having the mitigation specialist testify. Doc. 38 at 122. Cromwell does not establish how this constituted deficient performance. Nor has Cromwell established that the testimony would have been any "more convincing" had it come directly from the witnesses rather than the mitigation

specialist and therefore he was not prejudiced. Moreover, this Court must presume that counsel made a reasonable, strategic decision to elicit this testimony from the mitigation specialist rather than lay witnesses. *See Strickland*, 466 U.S. at 689. And counsel's strategy in presenting the mitigation specialist is clearly revealed through Christianson's 2015 interview where she described the difficulty in getting Cromwell's family to cooperate due to their belief Cromwell should be executed:

> The thin[g] that sticks out with this case, and always has stuck out, he was, it was the only case I've ever had where the **family members actually felt he should be executed**. And that was, that's basically what they said. Mom, they didn't want anything to do with it, they didn't ... And **that's largely why I testified is because nobody would cooperate with us**.

PCR Ex. 56 at 4 (emphasis added).

Cromwell argues that unfavorable evidence was admitted through the mitigation specialist. Doc. 38 at 140-41. But the mitigation specialist gained credibility with the jury by telling them the information that may have been damaging in addition to mitigating information about Cromwell. Moreover, because all of this information, including information that Cromwell claims was not mitigating, was considered by Dr. Rosengard in reaching his opinion, it would have been presented as the basis for the expert's opinions. In fact, had defense counsel withheld this information, including from their expert, his opinions could have been attacked as opinions rendered on incomplete information.

And the mitigating evidence Cromwell claims was damaging was accompanied and explained by the expert testimony of Dr. Rosengard, who interviewed Cromwell, reviewed his records, and reviewed interviews of Cromwell's family members, testified about the effect that Cromwell's background, medical history, substance abuse, and psychiatric diagnoses would have on his behavior. Ex. 57; R.T. 2/24/03, at 35-100; R.T. 2/25/03, at 11-107.

Cromwell contends that Christina Hurst, his counselor at Body Positive, could have testified that she, her husband, and young daughter attended several camp outings with Cromwell and his young son, and that she never saw Cromwell display

1    inappropriate behavior towards his son or her daughter. Doc. 38 at 117, 123 (citing PCR-

2    Ex. 51). However, Hurst states in her declaration that she was "shocked to learn about the

3    allegations of the crime Robert was arrested for," and there is no indication that she knew

4    about Cromwell's inappropriate behavior with his sister, Diana's, children. Ex. 51; R.T.

5    3/3/03, at 83-87. The State would have argued that this demonstrates that Hurst did not

6    really know Cromwell, such that her testimony would have been undermined and/or not

7    mitigating.

8         Cromwell claims counsel was mistaken that he had no friends. Doc. 38 at 124. But

9    Jackie Snowden, Cromwell's caseworker at the home for HIV-positive men where he

10   lived until his arrest, confirms that, to her knowledge, Cromwell "had no meaningful

11   relationship with family or with a woman," and "had only one or two friends at the

12   facility." PCR-Ex. 30 at ¶¶ 8-7.

13        Cromwell claims his sister Diana "was willing to testify in support of her brother's

14   life." Doc. 38 at 125; *cf.* PCR-Ex. 52 at 6858 ("willing to testify on [Cromwell's]

15   behalf."). But Cromwell had "asked Diana's kids to find him young girls," and she had

16   "a gut feeling that [Cromwell] molested [her] daughter." PCR-Ex. 52 at 6907.

17   Reasonable counsel could strategically decide not to call her as a mitigation witness. *See*

18   *Strickland*, 466 U.S. at 689.

19        Furthermore, even if Cromwell's family history was more dysfunctional than

20   portrayed at trial, Cromwell has not established that this would have changed his

21   sentence. Dr. Rosengard explained how Cromwell's dysfunctional family history would

22   have impacted him and his behaviors. Moreover, the mitigating weight of a dysfunctional

23   family history lessens the further removed a petitioner is from the dysfunctional family

24   environment. "Difficult childhood circumstances [] receive less weight as more time

25   passes between the defendant's childhood and the offense." *State v. Prince*, 250 P.3d

26   1145, 1171, ¶ 111 (Ariz. 2011) ("Prince was twenty-six years old when he killed [the

27   victim], attenuating the impact of his dysfunctional childhood on his conduct."); *see also*

28   *Nelson*, 273 P.3d at 643, ¶ 53 ("The jury was entitled to give diminished mitigating

weight to Nelson's childhood because he was thirty-five years old when he killed Amber, which lessens 'the impact of his dysfunctional childhood on his conduct.'") (quoting *Prince*, 250 P.3d 1171, ¶ 111); *Pandeli*, 161 P.3d 557, 575, ¶ 72 ("Pandeli murdered [the victim] when he was in his late twenties, reducing the relevance of his traumatic childhood."). Here, Cromwell was 35 years old when he raped and murdered Stephanie. R.O.A. 2. Thus, the jury would have given "diminished mitigating weight" to additional evidence of Cromwell's dysfunctional childhood. *See Nelson*, 273 P.3d at 643. *See also Clabourne v. Lewis*, 64 F.3d 1373, 1382 (9th Cir. 1995) ("[F]ailure to present cumulative testimony does not amount to ineffective assistance.").

The state court's decision that trial counsel was not ineffective regarding the mitigation presentation and investigation was not contrary to, or an unreasonable application of, Supreme Court precedent and did not rely on an unreasonable determination of the facts in the record.

        b.     *Trial counsel was not ineffective regarding a penalty-phase mental health expert (Claim 2-9).*

Cromwell argues counsel was ineffective for not hiring an expert to present evidence of Cromwell's schizophrenia and frontal lobe and executive functioning impairment. Doc. 38 at 145. Cromwell exhausted this claim by presenting it to the PCR court and the Arizona Supreme Court, R.O.A. 604 at 36-49; PCR-PFR at 49-57, which both found the claim meritless. This Court should review the state court's rejections of these claims with the double deference required by AEDPA and *Strickland*. *See Pinholster*, 563 U.S. at 190.

The PCR court rejected Cromwell's claim, and found neither deficient performance nor prejudice under *Strickland*:

> During [Cromwell's] penalty proceeding, trial counsel presented testimony from two witnesses, Dr. Rosengard, a psychiatrist, and mitigation specialist Lisa Christianson. Dr. Rosengard met with [Cromwell] two times for approximately 60 to 90 minutes, and conducted a forensic interview and a mini-mental examination. Dr. Rosengard also reviewed summaries of interviews of [Cromwell's] family members, [Cromwell's] records from McDowell Health Care Center and Correctional Health Services, and a transcript of [Cromwell's] police interview. Based on the records reviewed,

and Dr. Rosengard's interviews with [Cromwell] and the summaries of family interviews, Dr. Rosengard diagnosed [Cromwell] with major depression, post-traumatic stress disorder, a generalized anxiety disorder, a panic disorder, and attention deficit disorder. Dr. Rosengard further testified that doctors had prescribed testosterone as a treatment for [Cromwell's] acquired human immunodeficiency virus (HIV) and explained that testosterone is a steroid with negative side effects, which may include an increased level of anger and violent reactions.

Dr. Rosengard's testimony included information about [Cromwell's] background and his opinion that the emotional trauma and neglect in [Cromwell's] background contributed to the development of the diagnosed mental illnesses. …

The foregoing testimony demonstrates that trial counsel conducted an investigation into [Cromwell's] background and retained Dr. Rosengard to conduct a mental health evaluation. …

This information reasonably should have pointed counsel to a mental health evaluation and a review of [Cromwell's] medical records. However, counsel completed such an investigation by retaining Dr. Rosengard, a psychiatrist, to assess [Cromwell] for mental illness, and by obtaining [Cromwell's] medical records from McDowell Health Care Center. Consistent with the obtained medical records and the other witness statements, Dr. Rosengard diagnosed [Cromwell] with major depression, post-traumatic stress disorder, a generalized anxiety disorder, a panic disorder, and attention deficit disorder.

Thus, while the evidence reasonably available to trial counsel suggested that [Cromwell] may have a mental illness, defendant has not shown that counsel unreasonably failed to uncover evidence that required a neuropsychological evaluation or brain scanning. …

In addition to failing to show deficient performance, [Cromwell] has not demonstrated prejudice. Considering the totality of the mitigation presented in post-conviction and the totality of mitigation presented at trial, [Cromwell] has not shown a reasonable probability of a different penalty phase verdict. Even if the jury heard [Cromwell's] additional evidence, the especially cruel aggravator and the brutal attack against the young victim were substantial aggravating evidence. Additionally, [Cromwell's] behavior during the entire evening spent with the victim and Ella undercuts [Cromwell's] presentation of schizophrenia and cognitive impairment.

R.O.A. 803 at 5-8. The Arizona Supreme Court denied review on this claim. *See* ASC Decision Order *filed* 4/5/2023.

Cromwell's assertions fail because trial counsel retained psychiatrist Dr. Rosengard who evaluated Cromwell and reviewed his extensive medical and mental health records along with the interviews of numerous family members, yet the expert did not diagnose Cromwell with schizophrenia or possible frontal lobe and executive

functioning impairment. Furthermore, Cromwell has not established that a reasonable probability that evidence of schizophrenia or frontal lobe and executive functioning impairment would have changed the outcome.

When first evaluated by Dr. Rosengard, Cromwell was cordial, cooperative, understood the extent of the evaluation, denied and showed no psychotic thought processes, and denied having paranoid delusions or experiencing auditory hallucinations. PCR-Ex. 57, at 1020, 1024, 1026. Also, although Cromwell was taking antidepressants, he was not taking antipsychotics, nor had there been any diagnosis or concern of schizophrenia or possible impairment by the jail. *Id.* at 1020. Furthermore, none of Cromwell's mental health treatment records in the years before the murders gave any suggestion of schizophrenia or similar impairment. PCR-Exs. 41, 43, 52; PCR-Ex. 57 at 1044. The only mention of auditory hallucinations is in Dr. Rosengard's February 10, 2003, supplemental report, which notes that Cromwell self-reported that he has experienced auditory hallucinations when he was angry. PCR-Ex. 57 at 1043. But again, there is no indication from the jail of a concern of schizophrenia or medication for such. *Id.* at 1043-44. And, in his supplemental report, Dr. Rosengard concluded that he had nothing additional to add to his report and that the information he reviewed substantiates his prior diagnoses of psychiatric conditions, which did not include schizophrenia.

Thus, there was no evidence before trial, other than a single, belated self-report of auditory hallucinations, that suggested that Cromwell was schizophrenic or otherwise impaired. Consequently, counsel was not deficient when they did not pursue a diagnosis of schizophrenia or retain a neurologist because there was no evidence that Cromwell was suffering from either of those maladies. *See Rompilla v. Beard*, 545 U.S. 374, 383 (2005) ("[R]easonably diligent counsel may draw a line when they have a good reason to think further investigation would be a waste.") (citing *Wiggins*, 539 U.S. at 525).

For example, in *Earp*, the defendant was convicted of first-degree murder and rape and sentenced to death. Earp alleged his trial counsel was ineffective for failing to investigate potential organic brain damage.  623 F.3d at 1075. Counsel did not investigate

Earp's mental state; nor did she request a neuropsychological evaluation of Earp. *Id.* She did, however, review Earp's medical records and also had psychologists and a psychiatrist evaluate Earp. *Id.* at 1075-76. There were no indications of organic brain damage from the experts or records. *Id.* The Ninth Circuit found that Earp's trial counsel was not deficient. *Id.* at 1077. The court reasoned, "[w]hen there is no 'objective indication' that a defendant has a mental illness or brain damage, we cannot label counsel 'ineffective for failing to pursue this avenue of mitigation.'" *Id.* at 1076 (quoting *Gonzalez v. Knowles*, 515 F.3d 1006, 1015 (9th Cir. 2008)). Trial counsel cannot be faulted for failing to further investigate potential mitigation when a thorough investigation did not suggest the existence of such mitigating evidence. *Id.*

The fact that brain damage was found in Earp, and now Cromwell, after they were convicted, does not impeach the ultimate determination whether trial counsel sufficiently investigated the possibility the condition existed. *Id.* "An expert's failure to diagnose a mental condition does not constitute ineffective assistance of *counsel*, and [defendant] has no constitutional guarantee of effective assistance of experts." *Id.* at 1077 (emphasis in original). Cromwell's counsel hired a qualified expert, reasonably relied on his expertise, and presented his conclusions in a way that supported his mitigation case. Under these circumstances, counsel was not responsible for any alleged failing on the expert's part. *See Stokley v. Ryan*, 659 F.3d 802, 814 (9th Cir. 2011) (citing *Murtishaw v. Woodford*, 255 F.3d 926, 946 (9th Cir. 2001) ("[C]ounsel's actions are not deficient just because, through 'the fabled twenty-twenty vision of hind-sight,' a better course of action becomes apparent.")); *see also Earp*, 623 F.3d at 1077.

Cromwell nonetheless contends counsel was deficient because they limited themselves to a single expert to save money and because counsel failed to provide crucial information to his expert. Doc. 38 at 146. These contentions fail. First, Cromwell's argument that counsel limited themselves to a single expert to save money and did not seek a neuropsychological evaluation because there was allegedly an unwritten policy to fund only one mental expert is not only inaccurate, but also irrelevant. There is no

evidence counsel in this case made investigation decisions based on funding or that they would have been denied funding had they requested another expert. Rather, in contrast to the mitigation specialist's opinion, Cromwell's lead counsel, Logan, has repeatedly testified that he never had a problem getting funding for experts and that he made the ultimate decisions regarding experts on the case. *See* R.O.A. 753. This testimony was given in cases involving the same office and with the same mitigation specialist. Furthermore, as set forth above, because the mitigation investigation, including Dr. Rosengard's evaluation and Cromwell's medical and mental health records, did not suggest the existence of schizophrenia or brain damage, it was reasonable for counsel not to pursue such evidence.

Second, although Cromwell contends that counsel was ineffective for not providing Dr. Rosengard with "critical information," he fails to detail what information was not provided to Dr. Rosengard.  Doc. 38 at 146. Nonetheless, even with the current information set forth in Dr. Rosengard's declaration—about Cromwell's family history of mental illness and possible indications of Cromwell being mentally ill—Dr. Rosengard now states only that he would have recommended a "comprehensive mental health evaluation" and a competency evaluation, not that he would have diagnosed Cromwell with schizophrenia or suspected brain damage. PCR-Ex. 37, ¶ 17. Moreover, during trial, Dr. Rosengard specifically testified that he did not see anything during his contact with Cromwell that indicated he was not competent to stand trial and that Cromwell performed well on objective tests establishing Cromwell's orientation and basic knowledge of the world. R.T. 2/24/03, at 77, 89. Thus, there is no reasonable probability that Dr. Rosengard would have diagnosed Cromwell with schizophrenia or brain damage.

Because counsel's challenged conduct must be evaluated from their perspective at the time, eliminating the "distorting effects of hindsight," *Strickland*, 466 U.S. at 689, Cromwell's assertion that, had counsel done more, "it most likely would have demonstrated" brain damage and changed the outcome, fails. The focus is not on what "defense counsel could have presented, [but rather] … whether counsel's actions were

reasonable." *Turner v. Calderon*, 281 F.3d 851, 877 (9th Cir. 2002) (quoting *Babbitt v. Calderon*, 151 F.3d 1170, 1174 (9th Cir. 1998)). And as set forth above, there is no right to effective assistance of experts. *Earp*, 623 F.3d 1077.

Further, at the time of Cromwell's trial, defense attorneys were commonly advising their clients to refuse to submit to an evaluation by a State's expert.[15]  *See* Ex. 73 at 25 (Logan: "I wanted to keep him away from doctors that were not ours."). Counsel told Cromwell he did not have to be interviewed. *Id.* at 19. Although Cromwell refused to submit to an evaluation by the State's expert, Dr. Gina Lang, Dr. Rosengard was permitted to testify, over the State's objection, with Dr. Lang present for his testimony. R.T. 2/21/03, at 9-16. It is unlikely that the trial court would have permitted numerous other defense experts to testify based on further evaluations and testing, without allowing the State's experts to evaluate Cromwell. Thus, under the prevailing professional norms at the time, counsel's performance was reasonable.

Moreover, even if Cromwell suffered from schizophrenia or brain damage, he fails to demonstrate how this alleged evidence would have been mitigating and/or how this would have changed the outcome of his case. *See Schriro v. Landrigan*, 550 U.S. 465, 480-81 (2007) (no colorable claim of ineffective assistance at sentencing because newly-asserted evidence would not have changed the result). Cromwell claims that an expert could have explained to the jury that frontal lobe and executive functioning impairment inhibit controls and causes a person to act impulsively, thereby impairing his ability to conform his conduct with the requirements of the law. Doc. 38 at 151. This same opinion, however, was presented at trial with regard to other mitigation, *see* R.T. 2/24/03, at 45-51, 72-73, such that it is cumulative and would not have changed the outcome. *See*

---

[15]    This would change in 2004 after *Phillips v. Araneta*, 93 P.3d 480 (Ariz. 2004), which gave trial court discretion to preclude mental health expert evidence during the penalty phase as a sanction for a defendant's refusal to submit to mental health examination by state expert. *See* David Kader et al., *The Supreme Court of Arizona: Its 2003-2004 Decisions*, 37 Ariz. St. L.J. 17, 155 (2005) ("Court is unwilling to let a defendant who places his mental capacity at issue to avoid State expert examination, even during the penalty phase"); *see also Kansas v. Cheever*, 571 U.S. 87, 94 (2013).

*Pinholster*, 563 U.S. at 200 (the omission of additional, cumulative evidence is neither deficient nor prejudicial). Furthermore, this Court must consider that this proffered mitigation can act as a double-edged sword—that Cromwell's brain damage is permanent, leaving him with poor impulse control and making him a danger to others until his death. *See, e.g.*, *Pinholster*, 563 U.S. at 201 (evidence regarding the petitioner's family background could have led the jury to believe he was beyond rehabilitation); *see also Littlejohn v. Royal*, 875 F.3d 548, 559-60 (10th Cir. 2017) (evidence of brain damage may act as "double-edged sword" and act as an aggravating effect rather than mitigating effect on sentencing jury).

Additionally, regardless of which specific diagnosis Cromwell claims impaired his ability to conform his conduct to the requirements of the law, he has failed to establish a reasonable probability the jury would have assigned significant weight to this evidence—such that it would have changed the outcome—given his failure to establish that this affected his behavior on the night of the murder. Here, the evidence demonstrates that Cromwell's actions were planned and deliberate, not reflexive or impulsive. Cromwell spent several hours with Ella and her three young daughters that evening before offering to babysit Ella's three young daughters. Cromwell then chose Stephanie and separated her from her two sisters. Amanda, Stephanie's younger sister, awoke to the noise of her sister in the bathtub—Stephanie was making a noise like she was hurt. R.T. 2/5/03, at 21. Amanda saw Cromwell washing Stephanie with socks on his hands and Cromwell told Amanda to go back to bed. *Id*. at 22-23. Amanda then saw Stephanie standing naked in the hallway before going into the bedroom with Cromwell. *Id*. at 24-25. Cromwell continually went from the bedroom to the kitchen and back, presumably to retrieve the kitchen knife he used to stab her. *Id*. at 25. Amanda heard sounds coming from the bedroom—like Stephanie was hurt. *Id*. at 29.

After sexually assaulting Stephanie, stabbing her with a kitchen knife until it broke, beating her with a flashlight, and dropping a television on her head, he covered her up with a blanket.[16] R.T. 2/3/03, at 84-87; R.T. 2/4/03, at 182; R.T. 2/5/03, at 32-33; R.T. 2/11/03, at 14-17, 34-36. He wrapped a towel around the broken flashlight and pants around the knife blade. R.T. 2/4/03, at 77, 179-82, 189; R.T. 2/5/03, at 92-97; R.T. 2/6/03, at 57, 65, 86. Cromwell told Amanda about Stephanie's privates and then touched Amanda's privates to show her where he had touched Stephanie. R.T. 2/5/03, at 29-30. Cromwell, however, did not physically harm either Amanda or Heather.

Then Cromwell watched out the window for Ella and Kim to arrive back at the apartment. R.T. 2/4/03, at 51-54; R.T. 2/10/03, at 35, 38. After Ella and Kim walked inside the apartment, Cromwell struck Kim in the back of the head with a pool stick or hammer. R.T. 2/4/03, at 62-63; R.T. 2/5/03, at 127-28; R.T. 2/10/03, at 41, 88. Cromwell then attacked Ella with a pool stick, and after it broke, he ran out the door. R.T. 2/4/03, at 62-63. Cromwell had assembled the pool sticks while Ella was gone. *Id.* at 74. All of this shows calculation, planning, and awareness that what he was doing was wrong, not impulsive or reflexive actions, including his attempts to cover up his actions.

Thus, counsel not pursuing diagnoses of schizophrenia or brain damage, when there was no suggestion of the existence of such, was reasonable and Cromwell has not proven otherwise, nor proven a reasonable probability that this would have changed the outcome.

The state court's decision that trial counsel was not ineffective regarding the mitigation presentation and investigation was not contrary to, or an unreasonable application of, Supreme Court precedent and did not rely on an unreasonable determination of the facts in the record.

        c.   *Trial counsel was not ineffective in their understanding of mitigation (Claim 2-2).*

---

[16]    Stephanie was stabbed 11 times, and her vaginal opening was gaping and traumatized.  R.T. 2/11/03, 17-20, 36.

1    Cromwell asserts his counsel performed deficiently because they lacked an

2  "understanding about mitigation." Doc. 38 at 114. Cromwell failed to address the

3  procedural status of this claim. *Id.* Cromwell did not raise this issue in his PCR petition or

4  the PCR PFR, and he would be procedurally barred from exhausting the claim now. *See*

5  Ariz. R. Crim. P. 32.2(a)(3); *Shrum*, 203 P.3d at 1178; *Stewart*, 46 P.3d at 1071. Thus,

6  Claim 2-2 is technically exhausted but procedurally defaulted. Cromwell identifies no

7  cause and prejudice or fundamental miscarriage of justice to excuse the default, and it

8  should be dismissed on that basis. The claim is also meritless.

9    Lead counsel James Logan was an experienced capital defense attorney and the

10  chief trial attorney at the Office of the Legal Advocate. PCR-Ex. 73 at 3. As Cromwell

11  notes, Logan had recent experience trying a capital jury case in Arizona. *See* Doc. 38 at

12  98 (discussing Logan's representation of Tracy Hampton). And he had other experience

13  with capital trials. *See, e.g.*, PCR-Ex. 73 at 4 (discussing prior representation of Brian

14  Dann); *Dann*, 207 P.3d at 611, ¶ 11 ("James Logan, his 2001 trial counsel").[17] Bruce

15  Buck was also an experienced criminal defense attorney. PCR Ex. 63 at 2-3 (12 years of

16  criminal law experience and had tried a murder case).

17    The PCR court found: "[Cromwell] has not shown that trial counsel conducted an

18  unreasonable investigation or failed to follow up on reasonably available mitigating

19  evidence." R.O.A. 803 at 7. As described by the PCR court, counsel reasonably

20  investigated and presented available mitigation evidence to the jury during the penalty

21  phase. *Id.*; *cf. Hardwick v. Sec., Fla. Dept. of Corrections*, 803 F.3d 541, 547 (11th Cir.

22  2015) (concluding defense counsel "did not understand mitigation" when he "failed to

23  investigate, obtain, or present *any* mitigating evidence to the jury" such as "school,

24  medical, mental health, or juvenile justice records, or any social service records" or "ask

25  [expert] or anyone else to investigate or evaluate mitigation evidence").

26  _____

27  [17]    For further background, Logan started criminal defense work in 1974 and conducted a hundred felony trials, including "two or three" capital trials before Hampton
28  and Cromwell. *See Hampton v. Ryan*, 2:14-CV-02504, Doc. 51-3, at ECF #620.

Buck argued at closing that the mitigation evidence supported the jury finding Cromwell deserved leniency and to spend the rest of his life in prison:

> So should Robert Cromwell be put to death? Is the offer of evidence of mental illness, psychological and physical abuse sufficiently substantial to call for leniency, the leniency that really means the rest of his life in prison and the rest of his life where he cannot commit this type of offense?

> This human being, broken from the time that he was a child, broken so he never had a chance, who his behavior in the community is a twisted reflection of what is visited upon him, does he have to be put to death? No, he doesn't. No, he doesn't.

> The evidence in mitigation is obviously substantial. The degree of abuse and neglect can't be described in any other way. Leniency in the form of the rest of his life in prison, it's called for. It's a safe alternative. It's a safe alternative, because we know from the records that while not in the community and while in a institutional setting, Robert Cromwell's behavior has been acceptable. We know that from the juvenile court records, after a period in which he wasn't accustomed to being institutionalized, his behavior became better and better and better. We know from the records of the Maricopa County jail, when he went in, in the year and a half since Robert Cromwell was arrested, we only have two minor write-ups and no incidents of violence and no incident of anything remotely predatory.

> Life in prison is an appropriate sentence under the circumstances and we would ask that you impose that sentence.

R.T. 3/4/03, at 115-16. *Cf. Hardwick*, 803 F.3d at 546 (ineffective strategy to rely solely on closing argument and "appeal for mercy … and the sanctity of human life …. Rather than give the jury any mitigation evidence at all to consider").

Buck spent his rebuttal closing addressing and countering arguments raised by the State. *See* R.T. 3/4/03, at 129-33. And he tried to argue that the State's expert, Dr. Lang, supported Cromwell's leniency argument. *Id.* at 133-34 ("Perhaps Dr. Lang's testimony, even though she didn't come out with any particular diagnosis, but certainly bordered on it, is significant too, because she told you that Robert Cromwell is screwed up in the head. … He's screwed up in the head, because he was made that way, not by his choice, not by anything that as a child he had control over.").

Just because the jury did not find the mitigation in this case sufficient to call for leniency does not mean defense counsel did not understand mitigation. *See Wilson v. State*, 2024 WL 3218214, at *41 (Ala. App. June 28, 2024) ("claim that his counsel did

71

1   not understand mitigation when he used the word 'excuse' to describe certain mitigating

2   evidence does not set forth sufficient facts to show that his trial counsel did not actually

3   understand the concept of mitigating evidence").

4              d.      *Trial counsel was not ineffective during opening and closing
                        at sentencing (Claim 2-5).*
5

6          Cromwell asserts that his counsel performed deficiently in their presentation of

7   opening statements and closing argument at sentencing. Doc. 38 at 125. Cromwell failed

8   to address the procedural status of this claim. *Id.* Cromwell did not raise this issue in his

9   PCR petition or the PCR PFR, and he would be procedurally barred from exhausting the

10  claim now. *See* Ariz. R. Crim. P. 32.2(a)(3); *Shrum*, 203 P.3d at 1178; *Stewart*, 46 P.3d at

11  1071. Thus, Claim 2-5 is technically exhausted but procedurally defaulted. Cromwell

12  identifies no cause and prejudice or fundamental miscarriage of justice to excuse the

13  default, and it should be dismissed on that basis. The claim is also meritless.

14         Cromwell has cited no law to support this claim. On the contrary, "[t]he timing of

15  an opening statement, and even the decision whether to make one at all, is ordinarily a

16  mere matter of trial tactics and in such cases will not constitute the incompetence basis

17  for a claim of ineffective assistance of counsel." *United States v. Rodriguez-Ramirez*, 777

18  F.2d 454, 458 (9th Cir. 1985). *See LaGrand*, 133 F.3d at 1275. In *Yarborough*, the Court

19  counseled that defense attorneys often must make strategic decisions as to what

20  arguments to include in closing arguments and may choose to acknowledge the

21  "shortcomings" of their client's case in order to build credibility with the jury. 540 U.S.

22  at 7-10. In *Bell*, the Supreme Court approved of a strategic decision by counsel to waive

23  closing argument altogether, to prevent the prosecutor from having an opportunity at a

24  rebuttal closing. 535 U.S. at 701-02; *see also Nixon*, 543 U.S. at 192 (reasonable for

25  defense counsel to concede guilt in a guilt-phase to "impress the jury with his candor,"

26  and to build on that impression during the penalty phase.) And as the Ninth Circuit held:

27         Counsel's closing statements, even if properly characterized as concessions,
           constituted only a few isolated sentences within the entire trial. At no point
28         did counsel recommend that the jury find Hovey guilty of first degree

1  murder. As a whole, counsel's closing argument attempted to expose the
2  deficiencies in the prosecution's case.

3  *Hovey*, 458 F.3d at 907.

4  Cromwell claims that Buck's closing argument was "weak." Doc. 38 at 126.

5  Although hindsight may offer additional arguments that could have been made,

6  perfection was not required. *Smith v. Stewart*, 140 F.3d 1263, 1274 (9th Cir. 1998)

7  ("Perhaps it was not [perfect], but perfection is not required."). And like in *Smith*, most of

8  Cromwell's specific criticisms can only be made by ignoring most of what Buck argued.

9  *Id.* ("Smith can only make his claim by mischaracterizing what his trial counsel said.").

10  Cromwell claims Buck was "vouching for the prosecutor," Doc. 38 at 126, but

11  Buck then said "[the prosecutor] has his perspective and on some things, I think you find

12  he was wrong." R.T. 3/4/03, at 129. Cromwell claims Buck "argued that at least one of []

13  Cromwell's relatives was afraid of him," Doc. 38 at 126, but Buck was responding to the

14  prosecutor's argument that "people that know him best are afraid of him," R.T. 3/4/03, at

15  119, and argued it was just "one person …. No testimony as to that from any of the other

16  relatives." *Id.* at 130. Cromwell criticizes Buck for trying to bolster "Christianson's

17  credibility since someone who was lying would not have testified to the damaging things

18  that she had," Doc. 38 at 126, but this rebutted the prosecutor questioning whether

19  Christianson could be believed. *See* R.T. 3/4/03, at 124. Buck acknowledged his client's

20  shortcomings to bolster credibility, *see Yarborough*, at 540 U.S. at 7-10, and Buck argued

21  to the jury to spare Cromwell:

22  This human being, broken from the time that he was a child, broken so he
23  never had a chance, who his behavior in the community is a twisted
    reflection of what is visited upon him, does he have to be put to death? No,
24  he doesn't. No, he doesn't.

25  R.T. 3/4/03, at 115. *Cf. Carter v. Johnson*, 131 F.3d 452, 466 (5th Cir. 1997) (defense

26  counsel's demonstration of personal antipathy toward defendant during closing argument

27  in penalty phase was not ineffective assistance of counsel where counsel nevertheless

28  argued against death sentence); *see also Danner v. Ryan*, 2010 WL 6787460, at *9 (D.

Ariz. Nov. 19, 2010) (noting "great deference afforded to a trial counsel's summation, especially on federal habeas review, the record reflects that trial counsel worked with what little he had to try to convince the jury"). Trial counsel was not deficient.

Cromwell's argument that a different closing argument may have led to a different verdict is purely speculative. *See Yarborough*, 540 U.S. at 7. And under *Strickland*, Cromwell fails to show any probability that had counsel argued slightly differently to the jury, the outcome of the trial would have been any different.

### e.    *Trial counsel was qualified (Claim 2-6).*

Cromwell asserts that Logan and Buck were not qualified to serve as defense counsel in the penalty phase of a capital case. Doc. 38 at 127. Specifically, Cromwell contends that "Logan's delegation [of the mitigation phase to Buck] constituted deficient performance" because Buck was not qualified under the 2003 ABA Guidelines. *Id.* at 128. Cromwell failed to address the procedural status of this claim. *Id.* Cromwell did not raise this issue in his PCR petition or the PCR PFR, and he would be procedurally barred from exhausting the claim now. *See* Ariz. R. Crim. P. 32.2(a)(3); *Shrum*, 203 P.3d at 1178; *Stewart*, 46 P.3d at 1071. Thus, Claim 2-6 is technically exhausted but procedurally defaulted. Cromwell identifies no cause and prejudice or fundamental miscarriage of justice to excuse the default, and it should be dismissed on that basis. The claim is also meritless and potentially not cognizable.

First, a violation of the ABA Guidelines does not necessarily equate to a constitutional violation. *See Bobby v. Van Hook*, 558 U.S. 4, 7 (2009) (per curiam) (explaining that the ABA standards "can be useful as 'guides' to what reasonableness entails, but only to the extent they describe the professional norms prevailing when the representation took place"). Such a claim then does not allege a violation of a federal constitutional provision. Accordingly, Cromwell has not stated a claim for which this Court may grant relief. *See* 28 U.S.C. § 2254(a).

Moreover, the 2003 ABA Guidelines on which Cromwell relies had not been promulgated when his trial started. *See Lee v. Thornell*, 118 F.4th 969, 987 (9th Cir.

2024) (1989 ABA Guidelines apply to trials pre-2003 Guidelines). Additionally, Buck met the requirements promulgated by Arizona for the appointment of co-counsel in a capital trial. *See* Ariz. R. Crim. P. 6.8(b)(2) (2003); PCR Ex. 63 at 2-3 (12 years of criminal law experience and had tried a murder case); *cf. Pandeli*, 394 P.3d at 17, ¶ 64 ("relative inexperience of a second-chair defense attorney in capital trials does not in itself constitute IAC;" Rule only *recommends* a second attorney); *cf. also Knowles v. Mirzayance*, 556 U.S. 111, 122 (2009) ("[I]t is not 'an unreasonable application of' 'clearly established Federal law' for a state court to decline to apply a specific legal rule that has not been squarely established by [the Supreme Court].").

Regardless, Buck presented mitigating evidence of Cromwell's mental deficiencies and childhood trauma. *Cf. Wiggins v. Smith*, 539 U.S. 510, 533 (2003) (*Strickland* does not "require defense counsel to present mitigating evidence at sentencing in every case"). Psychiatrist Dr. Rosengard testified that Cromwell suffered abuse as a child, has a history of depression, and is infected with HIV. Dr. Rosengard specifically diagnosed Cromwell with mood disorder of depression, PTSD, anxiety disorder, panic disorder, and attention deficit disorder. R.T. 2/24/03, at 42-49, 52, 58, 64-66. Cromwell was treated with two different antidepressants in jail. *Id*. at 50. The mitigation specialist described his juvenile history, including that he was severely abused—mentally, physically, and sexually—by numerous family members including his mother, that he was molested by his grandfather, that he was neglected and abused most of his life, that he was placed in numerous foster homes, and that there was a family history of sexual and substance abuse. R.T. 2/25/03, at 110-61; R.T. 3/3/03, at 7-109.

This Court must "presume that the lawyer is competent" unless his conduct demonstrates otherwise. *Cronic*, 466 U.S. at 658. Cromwell has failed to establish that counsel was unqualified.

> f. *Trial counsel was not ineffective regarding the State's ASPD rebuttal evidence (Claims 2-7-1 & 2-7-2).*

Cromwell asserts that counsel failed to defend against the testimony by Dr. Lang that Cromwell meets several criteria for a diagnosis of Antisocial Personality Disorder ("ASPD"). Doc. 38 at 129. Cromwell also contends counsel should have somehow prevented Dr. Rosengard from saying anything negative about Cromwell on cross-examination. *Id.* at 134-37. Cromwell failed to address the procedural status of these claims. *Id.* Cromwell did not raise this issue in his PCR petition or the PCR PFR and would be procedurally barred from exhausting the claim now. *See* Ariz. R. Crim. P. 32.2(a)(3); *Shrum*, 203 P.3d at 1178; *Stewart*, 46 P.3d at 1071. Thus, Claims 2-7-1 & 2-7-2 are technically exhausted but procedurally defaulted. Cromwell identifies no cause and prejudice or fundamental miscarriage of justice to excuse the defaults, and they should be dismissed on that basis. The claims are also meritless.

Counsel hired psychiatrist Dr. Rosengard several months before trial in late 2002. PCR Ex. 37; PCR Ex. 57. There was an initial meeting between Rosengard and Cromwell in November 2002, an initial evaluation in December, and a subsequent re-evaluation in February 2003. PCR Ex. 57 at 27. Dr. Rosengard: interviewed Cromwell, reviewed his records, reviewed interviews of Cromwell's family members, and testified about the effect that Cromwell's background, medical history, substance abuse, and psychiatric diagnoses would have on his behavior. Ex. 57; R.T. 2/24/03, at 35-100; R.T. 2/25/03, at 11-107; R.O.A. 803 at 6. Dr. Rosengard explained that the kind of turmoil in Cromwell's early life—that Cromwell did not know his father, that his mother had been with a number of men, that his mother was sexually abused by her father, that Cromwell was abused at a young age, both physically and sexually, that he was in foster care until age 18, ran away often and was transient, that he was rejected and not nurtured, that his family history was replete with drug and alcohol abuse, and that Cromwell drank paint thinner that his father left out, causing some disability—had implications for "developing poor self-esteem and increasing the potential for depression and other psychiatric pathologies," and likely had a "substantially negative impact." R.T. 2/24/03, at 45-51. Dr. Rosengard testified about Cromwell's HIV infection and the effects that testosterone

would have on someone, including "outrageous episodes of aggression" if they are abusing it, including self-treating with double doses if he missed a dose. *Id*. at 51-52, 63. Dr. Rosengard specifically diagnosed Cromwell with mood disorder of depression, PTSD, anxiety disorder, panic disorder, and attention deficit disorder. *Id*. at 42-49, 52, 58, 64-66.

Trial counsel argued that Cromwell would not be interviewed by the State's doctors. R.T. 12/19/02, at 37. Counsel confirmed post-trial that this was part of his strategy. Ex. 73 at 25 ("I wanted to keep him away from doctors that were not ours."). Counsel told Cromwell he did not have to be interviewed. *Id.* at 19.[18]

Although Cromwell refused to submit to an evaluation by State's expert Dr. Lang, Dr. Rosengard was still permitted to testify, over the State's objection, with Dr. Lang present for his testimony. R.T. 2/21/03, at 9-16; R.T. 2/25/03, at 34 (stipulation). Dr. Lang later opined that Cromwell met the criteria for ASPD. R.T. 3/4/03, at 68-82. Dr. Lang testified she was limited in her ability to provide a diagnosis as she was unable to meet with Cromwell and conduct a comprehensive forensic evaluation. *Id.* at 81. Counsel's tactics included attacking the expert's ability to make any diagnoses without examining Cromwell. *See id.* (noting Lang "didn't come out with any particular diagnosis"); Ex. 73 at 19-20.

The State cross-examined Dr. Rosengard about his observations and opinions on Cromwell. *See* R.T. 2/24/03 at 85-94; R.T. 2/25/03, at 44-79. Attorneys, whether for the prosecution or the defense, are afforded wide latitude in the "cross-examination of expert witnesses ... for purposes of testing their knowledge, judgment, bias and the validity of their opinions." *City of Tucson v. LaForge*, 446 P.2d 692, 696 (Ariz. App. 1968); *see* Ariz. R. Evid. 611(b) ("A witness may be cross-examined on any relevant matter.").

---

[18]    As noted *supra*, at the time of Cromwell's trial, it was common practice in the defense community to advise clients that they could refuse to submit to an examination by the State's expert.

Rebutting a defendant's mental health experts is part of the "adversarial process." *Cheever*, 571 U.S. at 94.

Trial counsel made a reasonable strategic decision to present mental health mitigation evidence that opened the door to the State's ASPD criteria evidence, but trial counsel alleviated that by tactically limiting the ability of the State's expert to form a diagnosis and by thoroughly impeaching her testimony. *See Pinholster*, 563 U.S. at 201; *Wong*, 558 U.S. at 24 (noting certain mitigating evidence exposes petitioner to further aggravating evidence). *Cf. Atkins v. Virginia*, 536 U.S. 304, 321 (2002) (recognizing that mitigating evidence can be a "two-edged sword").

Cromwell cites no case law to support his argument that counsel was deficient during the State's cross-examination of Dr. Rosengard. *See* Doc. 38 at 134-37. This is not a case where lack of preparation or access to information prevented the expert from reaching a definitive diagnosis. *Cf. Bean v. Calderon*, 163 F.3d 1073, 1078-79 (9th Cir. 1998) (finding counsel deficient for failing to provide necessary information to two experts as a result of which "the experts were unable to definitively opine as to whether Bean suffered from organic brain damage and other mental disorders"); *see also Bloom v. Calderon*, 132 F.3d 1267, 1277-78 (9th Cir. 1997) (finding deficient performance where counsel failed to obtain a psychiatric expert until days before trial and then failed to prepare the expert); *Clabourne v. Lewis*, 64 F.3d 1373, 1384 (9th Cir. 1995) (defense expert was "wholly unprepared to testify" having not interviewed the defendant "and having less than two days to prepare his testimony"). Or where the expert was prevented from testifying at all. *Cf. Sturgeon v. Quarterman*, 615 F. Supp. 2d 546, 572 (S.D. Tex. 2009) (defense counsel's failure to prepare expert lead to her preclusion by trial court).

Regarding records allegedly[19] not provided to Dr. Rosengard (Cromwell's juvenile records, his 1985 conviction, his offense a year prior to the murder), R.T. 2/25/03 at 45,

---

[19] The facts of this are not clear in the record. *Cf.* R.T. 3/3/03 at 29, 67 (noting records *were* sent to Rosengard).

62, 71, 80-81, this did not prevent Dr. Rosengard from diagnosing Cromwell. *See Doerr v. Ryan*, 2021 WL 2826151, at *41 (D. Ariz. July 7, 2021) (no deficient performance when experts "were able to diagnose Doerr with brain damage"). As described above, Dr. Rosengard, who was retained prior to trial, was provided with "statement that is from his mother, from maternal uncles, aunts, sister, his wife," records from the "jail clinic," grand jury transcripts, and copies of witness interviews. R.T. 2/24/03, at 41; PCR-Ex. 57; PCR Ex. 60. Based on this information, Dr. Rosengard diagnosed Cromwell with major depression, PTSD, generalized anxiety disorder, panic disorder, and attention deficit disorder. R.T. 2/24/03, at 64; PCR Ex. 60 at 10.

Finally, Dr. Rosengard was not "badly discredited" as a result of lack of preparation for his testimony. While some of his admissions on cross-examination may not have helped Cromwell's case, they were not the result of being left unprepared by counsel. *See Mickey v. Ayers*, 606 F.3d 1223, 1246 (9th Cir. 2010) (explaining that counsel did not perform deficiently in failing to "better coordinate" experts' testimony). In sum, these claims are meritless.

> g.  *Trial counsel was not ineffective regarding the State's rebuttal of the PTSD diagnosis (Claim 2-7-3).*

Cromwell asserts that counsel failed to defend against the testimony by Dr. Lang that Cromwell was not suffering from PTSD when he murdered Stephanie. Doc. 38 at 137. Cromwell also contends "trial counsel utterly failed to correct this false dilemma, cross-examine Dr. Lang about her misleading testimony regarding PTSD, or correct the prosecution's likewise misleading argument." *Id.* at 138. Cromwell failed to address the procedural status of this claim. *Id.* Cromwell did not raise this issue in his PCR petition or the PCR PFR, and he would be procedurally barred from exhausting the claim now. *See* Ariz. R. Crim. P. 32.2(a)(3); *Shrum*, 203 P.3d at 1178; *Stewart*, 46 P.3d at 1071. Thus, Claim 2-7-3 is technically exhausted but procedurally defaulted. Cromwell identifies no cause and prejudice or fundamental miscarriage of justice to excuse the default, and it should be dismissed on that basis. The claim is also meritless.

1    Dr. Lang testified that some of Cromwell's statements to Dr. Rosengard may not

2    have been completely accurate; for example, Cromwell was hoarding his prescribed

3    medication in his jail cell instead of taking it. R.T. 3/4/03, at 49-50. Dr. Lang testified

4    that the documents describing Cromwell murdering Stephanie did not support that the

5    murder was caused by a PTSD "trigger." *Id.* at 56 ("if you see a posttraumatic reaction in

6    any kind of a scenario, you would expect it to be one of shock, sort of an impulsive

7    perhaps defensive kind of reaction against something. Here, you don't really see that.").

8    But Dr. Lang testified that if Cromwell "does have PTSD caused by his mother, then you

9    would expect the main trigger to be his mother." *Id.* at 57. Dr. Lang also criticized Dr.

10   Rosengard for not going "through a better process of differential diagnosis." *Id.* at 65-66.

11   At closing, the prosecutor argued that the evidence demonstrated that Cromwell

12   was not suffering from PTSD or substantially impaired when he murdered Stephanie. *See*

13   R.T. 3/4/03, at 116-29.

14   The record does not support Cromwell's assertions and he fails to cite any law in

15   support of this argument. Nor can he prove prejudice.

16   Rebutting a defendant's mental health expert is part of the "adversarial process."

17   *Cheever*, 571 U.S. at 94. Under Arizona law, the State is permitted to introduce rebuttal

18   evidence during the penalty phase. A.R.S. § 13-752(G); *State v. Forde*, 315 P.3d 1200,

19   1228, ¶ 118 (Ariz. 2014); *see also Leteve*, 354 P.3d at 405-06 (noting that the State may

20   introduce relevant evidence whether or not the defendant presents evidence during the

21   penalty phase and thus "may 'rebut' mitigation—that is, a conclusion that the defendant

22   should be shown leniency").

23   Attempts to prevent Dr. Lang's testimony would have been futile. *See Rupe*, 93

24   F.3d at 1445 (counsel was not ineffective for not attempting something futile). While

25   Cromwell claims trial counsel did not do enough on cross-examination, *see* Doc. 38 at

26   138, he has not rebutted the "strong presumption" that counsel limited the cross-

27   examination of Dr. Lang "for tactical reasons rather than through sheer neglect."

28   *Yarborough*, 540 U.S. at 8; *Cheney*, 614 F.3d at 996; *Dunham*, 313 F.3d t 732.

80

Finally, the Arizona Supreme Court conducted a separate, independent review of the aggravating and mitigating factors and determined that Cromwell's death sentence was appropriate. *Cromwell*, 119 P.3d 448. Therefore, even if the trial counsel committed some theoretical constitutional error at sentencing, a proper and independent review of the mitigation and aggravation by the state supreme court cured any such defect. *See Clemons*, 494 U.S. at 750, 754.

> h.    *Trial counsel was not ineffective regarding the State's brief references to HIV (Claim 2-7-4).*

Cromwell asserts counsel failed to object whenever the prosecutor mentioned his HIV diagnosis and claims the state used HIV as an "aggravating factor." Doc. 38 at 138. Cromwell failed to address the procedural status of this claim. *Id.* Cromwell did not raise this issue in his PCR petition or the PCR PFR and would be procedurally barred from exhausting the claim now. *See* Ariz. R. Crim. P. 32.2(a)(3); *Shrum*, 203 P.3d at 1178; *Stewart*, 46 P.3d at 1071. Thus, Claim 2-7-4 is technically exhausted but procedurally defaulted. Cromwell identifies no cause and prejudice or fundamental miscarriage of justice to excuse the default, and it should be dismissed on that basis. The claim is also meritless.

Cromwell claims he contracted HIV at age 17 in the early 1980s. R.T. 2/24/03, at 58; R.T. 2/11/03, at 79. During the guilt phase, Cromwell testified about being HIV positive and living in a house for HIV positive men. R.T. 2/11/03, at 79-80, 84, 116. During the guilt phase closing, the prosecutor briefly mentioned Cromwell's HIV diagnosis in the context of repeating Ella's testimony about meeting Cromwell. R.T. 2/13/03, at 51, 56, 108.

During the penalty phase, the State cross-examined Dr. Rosengard regarding traits Cromwell showed that were consistent with ASPD. R.T. 2/25/03, at 51-52. Dr. Rosengard testified that "doing things against the law; such as, using drugs and his involvement with a prostitute before could be considered antisocial traits …. He was involved with a prostitute, at least one time that I know of." *Id.* at 52. When asked: "Does

that involve his description of how he obtained the HIV?" to which Rosengard replied: "Yes. That's correct." *Id.* When asked to describe what Cromwell said, Dr. Rosengard testified: "He told me that he was drinking one evening, got into a dispute, got beat up and had a sexual relationship with a prostitute." *Id.*; *see also* PCR-Ex. 57 at 9 ("[Cromwell] indicated that he contracted AIDS at the age of 17, and he retroactively recognize who he got it from. He indicated that he got into a fight, and his lip was cut; and then in an inebriated state, after that fight, he had sex with a prostitute, including performing oral sex with this prostitute.").

The State sought to introduce testimony of K.M., that she had been raped by Cromwell in 1995. R.T. 3/4/03, at 4-20. The evidence that Cromwell had unprotected sex with K.M., while knowingly HIV positive, would support Dr. Lang's opinion that Cromwell has ASPD. *Id.* at 14. The court precluded the evidence. *Id.* at 20.

During the testimony of Dr. Lang, she mentioned that Cromwell spoke about having unprotected sex with Ella, which showed Cromwell "has a reckless disregard for the rights and safety for others," a criteria for ASPD. *Id.* at 76-77.

The State did not mention HIV during the penalty phase argument. *See id.* at 116-28. The record does not support Cromwell's assertions, and he fails to cite any law in support of this argument. Nor can he prove prejudice.

The Supreme Court has held that once a defendant is found eligible for death based on a constitutionally sufficient narrowing circumstance, the sentencer's discretion is virtually unlimited. *Zant v. Stephens*, 462 U.S. 862, 878-79 (1983). Consideration of a non-statutory aggravating circumstance, even if contrary to state law, does not violate the Constitution. *Barclay v. Florida*, 463 U.S. 939 (1983). *Cf. State v. Gulbrandson*, 906 P.2d 579, 599 (Ariz. 1995) ("sentencing court may only consider evidence in aggravation that tends to establish a statutory aggravating factor"). Additionally, no risk existed here that the jury would consider Cromwell's HIV diagnosis as a non-statutory aggravator because the court explicitly instructed the jury that it could not consider the statement as a new aggravating circumstance. *Forde*, 315 P.3d at 1229, ¶ 126. Finally, the Arizona

1    Supreme Court conducted a separate, independent review of the aggravating and
2    mitigating factors and determined that Cromwell's death sentence was appropriate.
3    *Cromwell*, 119 P.3d 448. Therefore, even if counsel committed some theoretical
4    constitutional error at sentencing, a proper and independent review of the mitigation and
5    aggravation by the state supreme court cured any such defect. *See Clemons*, 494 U.S. at
6    750, 754; *Schackart v. Ryan*, 2009 WL 692318, at *13 (D. Ariz. Mar. 17, 2009).

7                    i.    *Trial counsel was not ineffective regarding evidence of future*
8                          *dangerousness (Claim 2-7-5).*

9         Cromwell alleges counsel was ineffective by not rebutting the State's evidence of
10   future danger, or questioning Dr. Lang about future dangerousness. Doc. 38 at 139.
11   Cromwell failed to address the procedural status of this claim. *Id.* Cromwell did not raise
12   this issue in his PCR petition or the PCR PFR and would be procedurally barred from
13   exhausting the claim now. *See* Ariz. R. Crim. P. 32.2(a)(3); *Shrum*, 203 P.3d at 1178;
14   *Stewart*, 46 P.3d at 1071. Thus, Claim 2-7-5 is technically exhausted but procedurally
15   defaulted. Cromwell identifies no cause and prejudice or fundamental miscarriage of
16   justice to excuse the default, and it should be dismissed on that basis. The claim is also
17   meritless.

18        The Supreme Court has held that once a defendant is found eligible for death
19   based on a constitutionally sufficient narrowing circumstance, the sentencer's discretion
20   is virtually unlimited. *Zant*, 462 U.S. at 878-79. Consideration of a non-statutory
21   aggravating circumstance, even if contrary to state law, does not violate the Constitution.
22   *Barclay*, 463 U.S. 939; *see Simmons*, 512 U.S. at 175 (O'Connor, J., concurring) ("the
23   defendant's future dangerousness is a consideration on which the State may rely in
24   seeking the death penalty"); *California v. Ramos*, 463 U.S. 992, 1003, n.17 (1983)
25   (explaining it is proper for a sentencing jury in a capital case to consider "the defendant's
26   potential for reform and whether his probable future behavior counsels against the
27   desirability of his release into society").

28

1    Although Cromwell contends that future dangerousness was implicit in the crimes

2   and in his juvenile history, the prosecutor's penalty phase closing argument lacked any

3   suggestion of future dangerousness. Instead, the prosecutor focused mostly on the

4   mitigation evidence, arguing that Cromwell's abuse as a child and him being a runaway

5   did not explain these crimes and that the evidence demonstrated that Cromwell was not

6   suffering from PTSD and was not substantially impaired when he committed these

7   crimes. *See generally* R.T. 3/4/03, at 116-29. There was no evidence that Cromwell ever

8   abused or attacked any other young girl. R.T. 3/3/03, at 71, 76-77, 83-84; R.T. 3/4/03, at

9   119; *see* R.T. 3/4/03, at 20 (precluding other act evidence). Similarly, in response to a

10  jury question, the jury was informed that Cromwell's 2001 felony conviction was not

11  sexual in nature. R.T. 2/13/03, at 13-15. Thus, given the fleeting nature of any suggestion

12  of future dangerousness, there was little need for rebuttal.

13
14   j.   *The state court's decision that trial counsel was not
        ineffective regarding the lack of a* <u>Simmons</u> *instruction was
        not contrary to, or an unreasonable application of, Supreme
        Court precedent and did not rely on an unreasonable
15      determination of the facts in the record (Claim 2-10).*

16    Cromwell alleges counsel was ineffective by not requesting a *Simmons* instruction

17  in the penalty phase. Doc. 38 at 148. Cromwell exhausted this claim by presenting it to

18  the PCR court and the Arizona Supreme Court, R.O.A. 604 at 105; PCR-PFR at 77,

19  which both found the claim meritless. This Court should review the state court's

20  rejections of these claims with the double deference required by AEDPA and *Strickland*.

21  *See Pinholster*, 563 U.S. at 190.

22                      *Factual Background*

23    In the penalty phase, the state court instructed the jury as follows regarding the

24  possible sentences Cromwell could receive:

25      [I]f you find the mitigation is sufficiently substantial to call for leniency,
        the Court will sentence the defendant to either life imprisonment without
26      the possibility of parole or life without parole until at least 35 years have
        passed.
27

28  R.T. 3/4/03, at 140. Trial counsel did not object to this instruction.

In his PCR petition, Cromwell argued that the trial counsel was ineffective for failing to request an instruction pursuant to *Simmons v. South Carolina*, 512 U.S. 154 (1994), and failing to instruct the jury that he would be ineligible for parole. R.O.A. 604, at 105-07. Addressing Cromwell's claim under *Strickland*, the PCR court concluded that Cromwell was not entitled to relief because:

> the jury convicted [Cromwell] of sexually assaulting, and beating and stabbing to death a ten-year-old victim. The jury further found [Cromwell] committed these crimes in an especially cruel and especially heinous or depraved manner. Given the jury's findings and the evidence that overwhelmingly supports these findings, there is no reasonable probability of a different sentencing result, but for the parole eligibility instruction. [Cromwell] has not shown that counsel's failure to raise the *Simmons* error at trial caused prejudice.

R.O.A. 803, at 23. The Arizona Supreme Court granted review on this claim, but denied relief, holding:

> The record does not show that trial and appellate counsel violated Cromwell's Sixth Amendment right to effective assistance of counsel by failing to invoke *Simmons v. South Carolina*, 512 U.S. 154 (1994).

ASC Decision Order *filed* 4/5/2023.

*Legal background.*

In 1994, the Supreme Court held in *Simmons*, that when "a capital defendant's future dangerousness is at issue, and the only sentencing alternative to death available to the jury is life imprisonment without possibility of parole, due process entitles the defendant 'to inform the jury of [his] parole ineligibility, either by a jury instruction or in arguments by counsel.'" *Cruz v. Arizona*, 598 U.S. 17 21 (2023) (citation omitted). Also in 1994, Arizona removed parole eligibility for felonies committed after 1993.[20] *See* A.R.S. § 41–1604.09(I)(1). As a result, the Supreme Court found the only form of release potentially available under Arizona law for a defendant convicted of first-degree murder after 1993 "was, and remains, executive clemency." *Cruz*, 598 U.S. at 21. The Arizona

---

[20]    The Arizona Legislature only amended the department of corrections organization statute, but did not amend the sentencing statutes to omit references to parole. *See* A.R.S. § 13–703(A) (2002).

1   Supreme Court had held in multiple cases, however, that *Simmons* did not apply to

2   Arizona's sentencing scheme because parole was available. *Id.*; *see Wagner*, 982 P.2d at

3   272, ¶ 11 ("Arizona's statute, however, *states with clarity* that the punishment for

4   committing first degree murder is either death, natural life, or life in prison with *the*

5   *possibility of parole*. Thus, a person of ordinary intelligence can easily determine the

6   range of punishment he or she faces for committing first degree murder.") (emphasis

7   added). In 2016, the Supreme Court rejected this conclusion, found parole unavailable in

8   Arizona, and held that "it was fundamental error to conclude that *Simmons* 'did not

9   apply' in Arizona." *Cruz*, 598 U.S. at 20 (quoting *Lynch*, 578 U.S. at 615).

10                              *This claim is meritless.*

11       Cromwell fails to explain how the court's adjudication was unreasonable in light

12   of clearly-established federal law at the time of his case. Nor can he.

13       Counsel did not perform deficiently because at the time of the penalty phase in

14   Cromwell's trial—February and March 2003—there had been no challenge to the

15   instruction given in Cromwell's case. This Court must assess the reasonableness of

16   counsel's actions from their perspective at the time. *Maryland v. Kulbicki*, 577 U.S. 1, 4

17   (2015) (citing *Strickland*, 466 U.S. at 690). In reviewing an ineffective assistance of

18   counsel claim, counsel's conduct is measured by what the law is at the time of trial.

19   Counsel is not ineffective for failing to anticipate a change in the law. *United States v.*

20   *Chambers*, 918 F.2d 1455, 1461 (9th Cir. 1990); *Gerard v. Gootkin*, 856 Fed. Appx. 645,

21   647 (9th Cir. 2021) ("The failure to predict future changes in the law cannot be

22   considered ineffective assistance."); *see Commonwealth v. Rainey*, 928 A.2d 215, 241-42

23   (Pa. 2007) (trial counsel not deficient for failing to predict *Simmons*).

24       This Court recently rejected a similar claim, holding that, at the time of the trial,

25   Arizona Supreme Court law did not require a *Simmons* instruction. *Ellison v. Thornell*,

26   721 F.Supp.3d 820, 972 (D. Ariz. 2024). This Court found that "[g]iven that backdrop,

27   reasonable counsel could have concluded [defendant] was in fact parole-eligible (and,

28   therefore, there were no grounds for an objection)." *Id.* at 973. *See Nordstrom v.*

*Thornell*, 2024 WL 1092517, at *6 (D. Ariz. Mar. 13, 2024) (IAC claim for failing to request a *Simmons* instruction meritless); *Cota v. Thornell*, 2023 WL 4595176, at *35 (D. Ariz. July 18, 2023) ("Even if counsel had failed to request such an instruction, that failure would not be ineffective assistance because, under then-current Arizona law and its incorrect interpretation of *Simmons*, Cota was theoretically entitled to some form of release"); *see also Commonwealth v. Mason*, 130 A.3d 601, 652 (Pa. 2015) (rejecting ineffectiveness claim for failing to request a *Simmons* instruction).

*No prejudice*

Finally, Cromwell fails to demonstrate why the PCR court's finding of no prejudice was unreasonable. *See* R.O.A. 803 at 23. That finding is entitled to deference. *See Pinholster*, 563 U.S. at 190. Moreover, the Arizona Supreme Court conducted a separate, independent review of the aggravating and mitigating factors and determined that Cromwell's death sentence was appropriate. *Cromwell*, 119 P.3d 448. Therefore, even if trial counsel committed some theoretical constitutional error at sentencing, a proper and independent review of the mitigation and aggravation by the state supreme court cured any such defect. *See Clemons*, 494 U.S. at 750, 754. This claim is meritless.

k.    *The state court's decision that trial counsel was not ineffective at the aggravation phase was not contrary to, or an unreasonable application of, Supreme Court precedent and did not rely on an unreasonable determination of the facts in the record (Claim 2-11).*

Cromwell argues that trial counsel was deficient in challenging the especially heinous, cruel, or depraved ("(F)(6)") aggravating factor. Doc. 38 at 149.  Cromwell exhausted this claim by presenting it to the PCR court and the Arizona Supreme Court. R.O.A. 604 at 68; PCR PFR at 66. This Court should review the state court's rejections of these claims with the double deference required by AEDPA and *Strickland*. *See Pinholster*, 563 U.S. at 190.

Pre-trial, counsel unsuccessfully moved to dismiss the (F)(6) aggravating factor. R.O.A. 69; R.O.A. 77; R.O.A. 80. The jury separately found proven beyond a reasonable doubt that Cromwell committed the murder in an especially cruel manner, R.O.A. 137,

and in an especially heinous or depraved manner, R.O.A. 136. On appeal, Cromwell challenged the (F)(6) cruelty aggravator as unconstitutionally vague. *Cromwell*, 119 P.3d at 455, ¶ 40.

The Arizona Supreme Court rejected this argument, finding that the following jury instruction provided sufficient narrowing and specificity to overcome defendant's constitutional vagueness challenge:

> Cruelty goes to mental and physical anguish suffered by the victim. Mental anguish occurs when the victim experiences significant uncertainty about her fate. In order to constitute cruelty, conduct must occur before death and while a victim is conscious. Conduct occurring after death or while a victim is unconscious does not constitute cruelty. Before conduct can be found cruel, the State must prove that the defendant knew or should have known that the conduct would cause suffering to the victim.

*Id.* at 189, ¶ 42. The Court also independently reviewed the (F)(6) aggravating factor. The Court found that the record was "replete with cruelty" and that the ten-year-old victim, "unquestionably suffered unspeakable mental anguish, given the medical examiner's finding that she was still alive at the time of the stabbing injuries and the sexual assault. The crimes committed ... against the child bespeak horrific cruelty ... and given her tender age [the victim] was made to suffer pre-death anguish by conduct indescribable except in the most repulsive terms." *Id.* at 191, ¶ 55.

In his PCR petition, Cromwell claimed trial counsel was ineffective for failing to rebut the State's case in aggravation. R.O.A. 604 at 68.

The PCR court concluded that Cromwell was not entitled to relief, finding "substantial evidence of an especially cruel killing" and:

> Additionally, the evidence rebuts [Cromwell's] argument that the injuries suffered by the victim were "inflicted in quick succession, one of them leading rapidly to unconsciousness." *State v. Soto-Fong*, 187 Ariz. 186, 204 (1996). As discussed above, multiple times Amanda heard sounds as though the victim was hurt, and Amanda saw the victim unclothed in the bathtub and standing outside of the bathtub. Amanda also heard something hit the bathtub, and she testified that the victim walked slowly and looked hurt. After the victim went into the bedroom, Amanda heard a "bang."
>
> Amanda's testimony corresponds with the physical evidence. Specifically, Detective Femenia found "a broken section to a wood handle, to a hammer," "a section of a metal, black flashlight" and a broken kitchen knife in the bedroom area. (R.T. 2/4/03 at 171, 176, 180, 182) Detective

Femenia also noted a blood drop dripping down the wall in "the entryway from the hallway into the bedroom." (*Id.* at 184) In the bedroom area, Detective Femenia observed "blood spatter[] and possibly blood castoff and "small blood stains" on a cabinet, and "blood spatter" on the wall. A full-length mirror had "blood spatter," and there was a "little blood spatter" on a window. (*Id.* at 184-85) In the bathroom, Detective Femenia noted "blood spatter" on "the back wall of the shower tub ... on the inside of the tub, on the surface of the tub." (*Id.* at 185)

The foregoing evidence established that [Cromwell] forcefully struck the victim numerous times, and Amanda heard the victim's expressions of pain. Amanda also saw the victim unclothed and conscious, in the bathroom and bedroom entry area, and Detective Femenia documented blood in both of these locations (in addition to the bedroom).

Moreover, Dr. Keen's testimony does not support a conclusion that a rapid series of blows rendered the victim unconscious. Instead, Dr. Keen's testimony also established that the victim consciously suffered physical pain. Dr. Keen testified that multiple blunt force trauma and stabbing injuries caused the victim's death. (R.T. 2/11/03 at 71-72) He opined that all of the victim's injuries occurred before death, and most of them occurred around the time of death. (*Id.* at 65-66) In reaching these conclusions, Dr. Keen discussed three major types of injuries. (1) Blunt force trauma, bruising, and lacerations, (2) thirteen stab wounds to the back, and (3) severe vaginal tearing and injury.

With respect to the stab wounds, Dr. Keen found no basis to exclude the knife blade in evidence as the instrument that caused the wounds. (*Id.* at 56) Dr. Keen testified that the victim was alive when stabbed, but [Cromwell] is correct that Dr. Keen was uncertain whether the victim was conscious during the entire stabbing due to some of the head wounds. (*Id.* at 58) Dr. Keen also opined that a small amount of bleeding around the lungs, "suggests that the damage to the lungs is rather late in the course of the assault, probably among the last injuries sustained and she did not live for a long period of time after the insult of the stabbing wounds." (*Id.* at 65) Similarly, Dr. Keen found the least amount of hemorrhaging in the vaginal area, but the hemorrhaging indicated the victim was still alive when the vaginal injuries began. (*Id.* at 63, 66) With regard to the head wounds, contrary to [Cromwell's] argument, Dr. Keen did not testify that the victim was unconscious for all of the head wounds. Instead, Dr. Keen testified that two lacerations above the ear, and a forehead injury fracturing the skull, caused Stephanie to lose consciousness. (*Id.* at 59) Dr. Keen also testified that other severe injuries occurred when the victim was conscious. Specifically, Dr. Keen documented a large bruise to the victim's shoulder and other wounds that resulted from a minimum of five different blows to the head. (*Id.* at 51) The bruise measured five by four inches and extended from the left forehead down to the maxilla (jaw) area. (*Id.* at 45) Dr. Keen opined that a large flat surface, such as the floor or a cabinet, could cause this type of injury. (*Id.* at 46) Dr. Keen further documented mouth injury that caused a tear to the lip and gums, and a missing tooth, (*id.* at 50), and testified these injuries were neither "life threatening" nor "conscious impairing." (*Id.* at 59) Dr. Keen also opined that a fracture in the orbital area and a severe injury to the ear would not necessarily cause loss of consciousness. (*Id.*) Dr. Keen documented defensive wounds on both hands, testifying that the victim very likely received the associated bruising

while conscious and trying to block a blow with her hands or by trying to steady herself from a push. (*Id.* at 43, 52-54)

R.O.A. 803 at 13-15.

The PCR court also found that the State presented substantial evidence that Cromwell used violence beyond that necessary to kill Stephanie.

> For instance, Dr. Keen testified that blunt force trauma and the stabbing wounds caused death. Dr. Keen testified that "certainly" the blunt force injury to the victim's forehead caused her to become unconscious. (R.T. 2/11/03 at 59) Dr. Lucid testified that this forehead laceration was quite large, and she was able to feel the fractured skull underneath the wound. (*Id.* at 15. *See also id.* at 49-Dr. Keen pulled apart "a gaping area of the skin and described a linear fraction across the skull bone"). Dr. Lucid further observed brain matter coming through the wound, which indicated it was very severe. (*Id.* at 15) Dr. Lucid also observed blood coming out of the ear canal, a sign of a skull fracture, and she felt a facial fracture and noted "an unstable fracture of the alveolar ridge or upper jaw." (*Id.* at 15-16) In addition to these severe and life-threatening injuries, [Cromwell] sexually assaulted the child and stabbed her thirteen times with a coarsely serrated kitchen knife. Dr. Keen testified that the pattern of ten of the stab wounds likely meant the victim was either nonresponsive or could not move. (*Id.* at 57, 60-61)

R.O.A. 803 at 16.

In sum, the PCR court found: (1) "Substantial evidence established that the victim consciously suffered physical pain and experienced mental anguish," (2) "substantial evidence that defendant knew or should have known his conduct would cause suffering," and (3) "substantial evidence of violence beyond that necessary to kill." R.O.A. 803 at 15, 16. The PCR court held that Cromwell had not "shown that counsel's professional performance was unreasonable or that there is a reasonable probability of a different result, but for the alleged deficiencies." *Id.* at 15-16.

Cromwell fails to explain how the court's adjudication was unreasonable in light of clearly-established federal law at the time of his appeal. A "cursory and vague" claim of ineffective assistance is insufficient to establish a *Strickland* violation. *See Greenway v. Schriro*, 653 F.3d 790, 804 (9th Cir. 2011).

Nor could he. The Supreme Court has affirmed the constitutionality of Arizona's (F)(6) aggravator. *Ellison v. Thornell*, 721 F. Supp. 3d 820, 919 (D. Ariz. 2024); *see*

*Walton v. Arizona*, 497 U.S. 639, 655 (1990); *see also Dixon v. Ryan*, 2016 WL 1045355, *45 (D. Ariz. 2016), *aff'd*, 932 F.3d 789 (9th Cir. 2019).

Cromwell is simply wrong in his assertion that counsel "fell below a reasonable standard of care, which required them to rebut the case in aggravation." Doc. 38 at 150. The Supreme Court has never clearly established such a holding; rather to the contrary, it has found such per se rules inconsistent with *Strickland*'s holding that "the performance inquiry must be whether counsel's assistance was reasonable considering all the circumstances." *Roe v. Flores-Ortega*, 528 U.S. 470, 478 (2000) (quoting *Strickland*, 466 U.S. at 688). Counsel is not required to attempt to futilely rebut clearly established evidence of the aggravators. *See Pandeli*, 394 P.3d at 13 (no deficient performance by counsel when he explained not futilely challenging (F)(6) aggravator to prevent loss of credibility).

The Arizona Supreme Court found the record in this case "is replete with evidence of cruelty …. Eleven-year-old Stephanie, given her tender age, was made to suffer pre-death anguish by conduct indescribable except in the most repulsive terms. *Cromwell*, 119 P.3d at 458, ¶ 55. Again, Cromwell does not and cannot establish what further examination would have changed the outcome or the court's independent review. *See Clemons*, 494 U.S. at 750, 754.

l.    *Trial counsel was not ineffective for not arguing about the non-existent nexus requirement between mitigation and the crime (Claim 2-12).*

Cromwell asserts that his counsel performed deficiently for not arguing that there is no nexus requirement for mitigation. Doc. 38 at 151. Cromwell failed to address the procedural status of this claim. *Id.* Cromwell did not raise this issue in his PCR petition or the PCR PFR and would be procedurally barred from exhausting the claim now. *See* Ariz. R. Crim. P. 32.2(a)(3); *Shrum*, 203 P.3d at 1178; *Stewart*, 46 P.3d at 1071. Thus, Claim 2-12 is technically exhausted but procedurally defaulted. Cromwell identifies no cause and prejudice or fundamental miscarriage of justice to excuse the default, and it should be dismissed on that basis. The claim is also meritless.

91

In the penalty phase, the state court instructed the jury as follows regarding what possible mitigation the jury could consider:

> Mitigation includes anything offered by [Cromwell] or the State before or during this phase of the trial helpful in determining whether to impose a sentence less than death. It may include any aspect of [Cromwell's] character, propensities or record and any evidence relating to the offense ….

R.T. 3/4/03, at 140. Trial counsel did not object to this instruction.

Contrary to Cromwell's description, Doc. 38 at 152, the State did not argue that the mitigation must have a nexus to the crime. Instead, the State requested a "reasonable sanction" to "take into consideration the surprise to the State concerning what [counsel] want to try to introduce now." R.T. 2/24/03, at 9-13. The court declined, stating "The sanction that I would impose would be allowing more time for you folks to prepare as needed." *Id.* at 13. At trial, the prosecutor argued to the jury that Cromwell had not proved that, if he had PTSD, that it was impacting him at the time of the offense. R.T. 3/4/03, at 121-24, and described Cromwell during the murder as "cold and calculated" *Id.* at 124

The Supreme Court has emphasized that "a State cannot preclude the sentencer from considering any relevant mitigating evidence that the defendant proffers in support of a sentence less than death," *Payne v. Tennessee*, 501 U.S. 808, 822 (1991) (internal quotation marks omitted); *see Eddings*, 455 U.S. at 113-14 (holding that sentencer should consider any "relevant mitigating evidence").

The Supreme Court held in 2004 (after Cromwell's trial) that a jury cannot be prevented from giving effect to mitigating evidence solely because the evidence has no causal "nexus" to a defendant's crimes. *Tennard v. Dretke*, 542 U.S. 274 (2004); *accord State v. Anderson*, 111 P.3d 369, 391, ¶ 93 (Ariz. 2005). "But the failure to establish such a causal connection may be considered in assessing the quality and strength of the mitigation evidence. *See State v. Newell*, 132 P.3d 833, 849, ¶ 82 (Ariz. 2006) (citing *Anderson*, 111 P.3d at 392).

1    Not once during closing argument did the prosecutor suggest that, absent a causal

2    nexus to the murders, the jury could not rely on Cromwell's childhood experiences as

3    mitigation. R.T. 3/4/03, at 116-29; *see id.* at 127 (noting jury could "give some credit to

4    Dr. Rosengard, in spite of what the State said and in spite of what was pointed out to you

5    as what the evidence is, and find that, yeah, he did suffer from some childhood that was

6    not the best in the world."). The prosecutor assumed that at least some jurors would find

7    mitigation and asked them to weigh it against the aggravators. *Id.* at 27-28; *see Anderson*,

8    111 P.3d at 393, ¶ 97 ("Once the jury has heard all of the defendant's mitigation

9    evidence, there is no constitutional prohibition against the State arguing that the evidence

10   is not particularly relevant or that it is entitled to little weight.").

11   Finally, Cromwell cannot prove prejudice because jurors are presumed to follow

12   their instructions, *see State v. Robinson*, 509 P.3d 1023, 1046 (Ariz. 2022), and the

13   Arizona Supreme Court independently reviewed Cromwell's case and found "the

14   evidence of mitigation is not sufficiently substantial to warrant leniency," *Cromwell*, 119

15   P.3d at 459. *See Clemons*, 494 U.S. at 750.

16          m.    *Trial counsel was not ineffective for not objecting to*
17                *Cromwell's statements to law enforcement (Claim 2-13).*

18   Cromwell argues counsel was ineffective for not objecting more to the use of

19   Cromwell's statements to police. Doc. 38 at 152. Cromwell failed to address the

20   procedural status of this claim. *Id.* Cromwell did not raise this issue in his PCR petition or

21   the PCR PFR and would be procedurally barred from exhausting the claim now. *See* Ariz.

22   R. Crim. P. 32.2(a)(3); *Shrum*, 203 P.3d at 1178; *Stewart*, 46 P.3d at 1071. Thus, Claim

23   2-13 is technically exhausted but procedurally defaulted. Cromwell identifies no cause

24   and prejudice or fundamental miscarriage of justice to excuse the default, and it should be

25   dismissed on that basis.

26   As described more fully in response to Claim 1-20 *supra* and Claims 4-5 and 5-3

27   *infra*, this claim is also meritless.

28

1      The state court found "the statements of the defendant to Officer Vine before the

2  defendant was Mirandized … were voluntary and [] that [Cromwell] was not in custody

3  for purposes of *Miranda*" and that the statements "after he was Mirandized … were

4  voluntarily made up and until" Cromwell asked for a lawyer. R.T. 12/19/02 at 29.

5      At the hearing and at trial, Officer Vine did not specify exactly how he made it to

6  Cromwell's apartment door, which was open, other than that the house manager, Glover,

7  pointed him in "the general direction." R.T. 12/19/02 at 12 ("through some series of

8  events, did you get to this defendant's room"); R.T. 2/3/03, at 51-53 (Vine testifying at

9  trial that made inquiries and ended up at Cromwell's open apartment door); *see* PCR-Ex.

10  28 (Glover declaration).

11      Cromwell proffers no argument as to why Officer Vine's entry into the apartment

12  was improper given that he was in pursuit of a suspect and was apparently given consent

13  to enter the building by the house manager. *See Birchfiled*, 136 S. Ct. 2160 ("It is well

14  established that a search is reasonable when the subject consents, … and that sometimes

15  consent to search need not be express but may be fairly inferred from context.") (internal

16  citation omitted).

17      Nor does Cromwell establish prejudice under *Strickland*. Without any citation to

18  the record, he claims his statements to police "were extensively used by the State's expert

19  Dr. Lang to establish a 'consistent with' opinion regarding ASPD" and that "[t]he State

20  also relied on these statements during its arguments." Doc. 38, at 170. But as the Arizona

21  Supreme Court noted in its independent review of Cromwell's death sentence, his crimes

22  "bespeak horrific cruelty" and "[e]leven-year-old Stephanie, given her tender age, was

23  made to suffer pre-death anguish by conduct indescribable except in the most repulsive

24  terms." *Cromwell*, 119 P.3d at 458, ¶ 55. Balanced against that evidence, Cromwell's

25  mitigating factors were "remarkably weak" and deserved "inconsequential weight." *Id.* at

26  459, ¶ 57. Under these circumstances, Cromwell cannot establish that use of his

27  statements to police in the penalty phase (which was unrelated to the strength of the

28  aggravating factors and the weakness of his mitigation) demonstrates "a reasonable

1    probability that … the result of the proceeding would have been different." *Strickland*,

2    466 U.S. at 694. *See also Clemons*, 494 U.S. at 750, 754.

3                    n.    *Trial counsel was not ineffective for not objecting to legally*
                          *correct jury instructions (Claim 2-14).*
4

5        Cromwell argues counsel was ineffective for not objecting to the penalty phase

6    jury instructions that described the circumstances under which it "must" unanimously

7    impose a life sentence or a death sentence. Doc. 38 at 153. Cromwell failed to address the

8    procedural status of this claim. *Id.* Cromwell did not raise this issue in his PCR petition or

9    the PCR PFR, and would be procedurally barred from exhausting the claim now. *See*

10   Ariz. R. Crim. P. 32.2(a)(3); *Shrum*, 203 P.3d at 1178; *Stewart*, 46 P.3d at 1071. Thus,

11   Claim 2-14 is technically exhausted but procedurally defaulted. Cromwell identifies no

12   cause and prejudice or fundamental miscarriage of justice to excuse the default, and it

13   should be dismissed on that basis.

14       As described more fully in response to Claim 5-1 *infra*, this argument fails

15   because the instructions given were correct statements of the law. There is no Supreme

16   Court decision that "prohibit[s] states from requiring a unanimous vote in order to impose

17   a life sentence." *State v. Ellison*, 140 P.3d 899, 922, ¶ 102 (Ariz. 2006). And the jury was

18   correctly instructed that "if all jurors find mitigation exists, and all find the mitigation

19   they found is sufficiently substantial to call for leniency, you must return a verdict of life

20   in prison." R.T. 3/4/03, at 140-41.

21       Defense counsel was not ineffective for attempting something futile. *See Rupe v.*

22   *Wood*, 93 F.3d 1434, 1445 (9th Cir. 1996) (failure to take futile action can never be

23   deficient performance). This claim is meritless.

24       **C.    Cromwell's claims he was denied a fair and impartial jury are all**
              **procedurally defaulted without excuse and also fail on the merits**
25            **(Claim 3).**

26       Cromwell argues that he was denied a fair and impartial jury. Doc. 38, at 147.

27   Specifically, Cromwell argues that: (1) inflammatory pretrial publicity tainted the jury

28   pool; (2) the trial court improperly excused potential jurors who expressed reservations

about imposing the death penalty; (3) during *voir dire*, the trial court questioned jurors disparately based upon their views regarding the death penalty; and (4) the trial court erred by not dismissing a juror for cause. *Id*. at 147-52. Cromwell's claims are both procedurally defaulted without excuse and meritless. As such, they must be dismissed.

### 1. Cromwell's claims are procedurally defaulted without excuse.

Cromwell did not properly present any of the claims set forth in Claim 3 to any state court. As such, the claims are technically exhausted, but procedurally defaulted, because: (1) Cromwell failed to fairly present these claims to all levels of state court as federal, constitutional claims; and (2) Arizona's procedural rules now preclude Cromwell from returning to state court to properly exhaust the claims in any subsequent Rule 32 proceedings. *See* Ariz. R. Crim. P. 32.2(a)(3); Ariz. R. Crim. P. 32.4; *see also Beaty*, 303 F.3d at 987; *Moreno*, 116 F.3d at 410.

As a result of Cromwell's procedural default, this Court need not consider the merits of these claims unless Cromwell establishes either "cause and prejudice" or a "fundamental miscarriage of justice." *Moorman v. Schriro*, 426 F.3d 1044, 1058 (9th Cir. 2005). Cromwell, however, has failed to assert any basis sufficient to demonstrate cause and prejudice. Nor can Cromwell demonstrate a fundamental miscarriage of justice. *Coleman*, 501 U.S. at 750. To show a miscarriage of justice, the petitioner must make a "credible showing of actual innocence." *Frost*, 749 F.3d at 1232. Cromwell fails to do so. Thus, his claims are procedurally defaulted without excuse. Procedural default notwithstanding, the claims are meritless.

### 2. The claims are meritless.

####     a.    *Cromwell was not denied a fair and impartial jury due to unfair pretrial publicity (Claim 3-1).*

Cromwell argues that his right to a fair and impartial jury was violated due to "extreme prejudicial pretrial publicity." Doc. 38, at 147. Cromwell's claim is unavailing.

A conviction rendered by a jury tainted by pretrial publicity violates the constitutional guarantee of a fair and impartial jury, *Irvin v. Dowd*, 366 U.S. 717, 721-

729 (1961), and due process is violated when a trial court fails to protect a defendant from disruptive influences in the courtroom and massive, pervasive, and prejudicial publicity surrounding the prosecution, from which jurors are not insulated or sequestered. *Sheppard v. Maxwell*, 384 U.S. 333, 349-54 (1966); *see also Rideau v. Louisiana*, 373 U.S. 723, 724-726 (1963). However, "even pervasive, adverse publicity does not inevitably lead to an unfair trial." *Nebraska Pres Ass'n v. Stuart*, 427 U.S. 539, 554 (1976). Indeed, it is not required that jurors "be totally ignorant of the facts and issues involved," but that each "juror can lay aside his impression or opinion and render a verdict based on the evidence presented in court." *Irvin*, 366 U.S. at 722-723. Furthermore, a trial court's finding of jury impartiality is not to be reversed, save for those situations in which error is manifest. *Id*. at 723; *see also Patton v. Yount*, 467 U.S. 1025, 1031-32 (1984) (noting the presumption of correctness to be accorded a state trial court's finding of impartiality and finding no manifest error in trial court's determination of jury impartiality against a claim of excessive and pervasive pretrial publicity). The trial court's determination of questions regarding *voir dire* and jury impartiality are entitled to "special deference," even on direct appeal. *Patton*, 467 U.S. at 1038 (internal quotations omitted). "Prejudice is presumed when the record demonstrates that the community where the trial was held was saturated with prejudicial and inflammatory media publicity about the crime." *Harris v. Pulley*, 885 F.2d 1354, 1361 (9th Cir. 1989).

Cromwell has failed to demonstrate that his trial was unduly tainted by pretrial publicity. As discussed *supra*, Cromwell has failed to demonstrate actual or presumed prejudice. The record reflects that the trial court took precautionary steps to ensure jurors could set aside any media exposure, and, in fact, excused the single juror who indicated that he had been exposed to the media and could not set aside what he had heard.[21] R.T.

---

[21]    Five of the 148 prospective jurors ("PJs") (11, 20, 48, 80, 81) told the court they thought they had heard something about the case in the media. R.T. 1/30/03, at 20, 122. The court told the prospective jurors that "the rules relating to the press are different than the rules relating to court" and that "[i]t's a rule of Court that a juror disregard anything that they may have heard about a case outside of the courtroom." *Id*. at 20-21, 123. When (continued ...)

1/20/03, at 20, 24, 122; *cf Nordstrom*, 25 P.3d at 728, ¶ 19 ("court removed thirty-seven of the two hundred prospective jurors because of their responses" to questions about media exposure). Additionally, the empaneled jurors were also told to avoid exposure to information about the case and that they were to determine the issue of guilt and innocence only upon the testimony and evidence presented. R.T. 2/3/03, at 14, 114. This Court presumes the jury followed its instructions. *Weeks*, 528 U.S. at 234.

As such, Cromwell has failed to demonstrate that the pretrial publicity in this instance was sufficient to trigger a presumption of prejudice. Cromwell has also failed to demonstrate actual prejudice. Pretrial publicity that is merely factually repetitive is not tantamount to prejudicial and inflammatory media saturation under extant Supreme Court jurisprudence. The pretrial publicity in this case was not such that it promised to "turn the trial into a mockery of justice or a mere formality" that would have demanded a presumption of prejudice. *State v. Bible*, 858 P.2d 1152, 1166 (Ariz. 1993). Accordingly, Cromwell's conviction was not obtained "in a trial atmosphere that had been utterly corrupted by press coverage." *Murphy v. Florida*, 421 U.S. 794, 798 (1975).

> b.    *The trial court did not improperly excuse jurors with reservations about the death penalty (Claim 3-2).*

Cromwell argues that the state trial court improperly dismissed jurors who expressed reservations about imposing the death penalty, thus denying him a fair and impartial jury. Doc. 38 at 148.  Cromwell's claim is unavailing.

---

( ... continued)

asked if any of the jurors could not follow that rule, and PJ 20 indicated he could not, he was questioned by the court and then excused for cause. *Id*. at 21-24. Later, the attorneys met with the judge "off the record at bench" to discuss which jurors to question individually and PJ 11 was one of those chosen. *Id*. at 92. The court asked her about the news article she read and whether she could "set aside all of that information." *Id*. She said she could and that she knew "what is in the paper is not always completely accurate." *Id*. at 92-93. The court directed her to "not tell any of the jurors about anything that you read in the paper." *Id*. When questioned, PJ 80 and 81 were unsure where or what they had heard about the case. *Id*. at 147-49. PJs 11, 80, and 81 did not sit on the jury. *Id*. at 152; R.T. 2/3/03, at 6; *see* R.O.A. 91 (State strike on PJ 11).

Capital defendants have the right to be sentenced by a fair and impartial jury. A trial court may not strike a prospective juror for cause "simply because [he or she] voiced general objections to the death penalty or expressed conscientious or religious scruples against its infliction." *Witherspoon v. Illinois*, 391 U.S. 510, 522 (1968). However, if a person's views would "prevent or substantially impair the performance of his duties as a juror," the trial court may excuse the person for cause. *Wainwright v. Witt*, 469 U.S. 412, 424 (1985) (quoting *Adams v. Texas*, 448 U.S. 38, 45 (1980)). A person's statements and demeanor during *voir dire* that demonstrate a difficulty or hesitancy to vote for the death penalty can support a trial judge's finding that the person is substantially impaired in ability to act as a fair and impartial juror. *State v. Lynch*, 234 P.3d 595, 603, ¶¶ 27-28 (Ariz. 2010). A person's bias need not be proved with unmistakable clarity. *Witt*, 469 U.S. at 424. In fact, the answers a venire member gives do not by themselves compel any conclusion about the person's ability to serve. *Darden v. Wainwright*, 477 U.S. 168, 1778 (1986). "[T]he need to defer to the trial court remains because so much may turn on a potential juror's demeanor." *Id*. In fact, "the manner of the juror while testifying is oftentimes more indicative of the real character of his opinion than his words." *Reynolds v. United States*, 98 U.S. 145, 156 (1879).

Cromwell argues that the state trial court erred in dismissing several jurors. Doc. 38 at 149. Specifically, Cromwell argues that the trial court "improperly excused jurors who had conscientious scruples about the death penalty." *Id*. Cromwell's claim is unavailing.

During *voir dire*, the trial court issued the following instruction to the jury:

[T]the State is seeking the death penalty in this case. In past times, the assigned judge made the sentencing decision. Because of a recent change in Arizona law, in death penalty cases, for the most part, that is no longer true.

For the most part, with respect to whether the state is seeking the death penalty, the jury is the decision-maker with respect to sentencing. The jury is in fact the sentence-maker with respect to the fact of the death penalty. However, in talking about this, we put the cart before the horse a little bit, because the death penalty possibility is not going to come into play, unless and until the defendant is found guilty of 1st Degree Murder. That is not going to come into play unless and until the State proves that charge beyond a reasonable doubt. We're just asking you about this, because this is

our only opportunity to explore your attitudes and feelings about it. But again, let's not put the cart before the horse.

The defendant is presumed innocent under the law. As he sits there right now, he's innocent. The state is going to attempt to prove something. If they do, then we go to another level, if they do. Again, it's going to be the jury, if we get to that point, not the judge, who decides whether or not the death penalty is imposed. If we get to that point, that would be based on additional evidence. Does anybody not understand what I have just said? If so, please raise your hand.

…

When deciding whether or not there should be a death penalty under the laws of a particular state, the State Legislature might think about a lot of things; for example, they might think about cost factors involved, which would be associated with potential punishment. For example, they might think of the deterrent effect that a particular sentence might have. That's for the State Legislature to consider, if they decide to. In a particular case, where the State is seeking the death penalty against a defendant, those are irrelevant considerations for the jury. This was mentioned a little bit in the questionnaire that you have read. There are specific legal provisions and a specific legal standard for a jury determining whether or not the death penalty should be imposed. The costs associated with your decision and any deterrent effect that your decision might have is totally irrelevant to that legal standard and to that decision.

Is there anybody who cannot follow my instructions on the law with respect to that? If so, please raise your hand.

…

In a case in which the death penalty is imposed, there is always an appeal or appeals. Interestingly, in such an appeal, questions are raised about the decisions that I make. A higher court would be deciding whether or not I made mistakes, but that higher court would not be looking at decisions made by the jury. You are the sole decision-makers with respect to the issues presented to you. What you decide sticks and, again, some other court may be looking at whether or not I made a mistake, but not at whether or not you made a mistake. You are the sole decision-makers. Is there anybody who doesn't understand this concept?

…

In Arizona, the death penalty may be imposed if a defendant is convicted of 1st Degree Murder; however, it is not to be imposed in every such case. The decision on whether or not the death penalty should be imposed is based on a number of factors, which make up the legal standard. For example, proof of premeditation alone would not support the imposition of the death penalty. If somebody is convicted of premeditated murder, that makes the death penalty possible under many circumstances, but not enough to justify the death penalty. And in fact, that's not part of the specific standard that you folks would be considering in the sentencing phase of this case, if and when we get to that point. Let me ask you folks this, and whether you put this in your questionnaire or not, I want to hear

about it again today, but is there anybody here who would never be able to return a verdict calling for the death penalty? If so, raise your hand.

R.T. 1/30/03, at 26-29. In response, several jurors raised their hands indicating they believed they would be unable to impose the death penalty in any circumstance, and subsequently voiced their concerns:

**Juror 27** – In response to whether he could impose the death penalty, Juror 27 stated he was "absolutely opposed to the death penalty in any instance."

**Juror 58** – Indicated that she would "never impose the death penalty no matter what the circumstances," would be "unable to follow [the court's] legal instructions[, and] "would automatically vote against the death penalty.

**Juror 62** – Indicated she was opposed to the death penalty and would be unable to follow the trial court's instructions regarding the death penalty.

**Juror 87** – Indicated on jury questionnaire that, after hearing the evidence, reviewing the instructions, and deliberating with the jurors, she would not enter a verdict of death, even if she believed it was the appropriate sentence. During *voir dire*, she reiterated her belief that, if asked to decide if the death penalty should be imposed, her answer would be no, even if there were no mitigating circumstances.

*Id*. at 29-31, 135-38. The defense proffered no follow-up questions. *Id*. at 31. The court dismissed the jurors for cause without objection. *Id*. at 31, 144.

Contrary to Cromwell's claim, the trial court did not err in removing Jurors 27, 58, 62, and 87 for cause. The court did not, as Cromwell suggests, strike jurors who had "reservations" or "conscientious scruples" about imposing the death penalty, but rather, the record reflects that the trial court struck the jurors due to their responses in their jury questionnaire and *voir dire*, in and during which the jurors categorically stated that they would be *unable* to impose the death penalty under any circumstance. Moreover, none of the jurors gave even a modicum of indication that they would be willing to set aside their views and consider a death sentence. As such, given that the trial court had an adequate basis for determining that the jurors' views about capital punishment would substantially

impair their ability to serve impartially, this Court must defer to the trial court's determination and reject Cromwell's claims to the contrary. *See Uttecht*, 551 U.S. at 8.

          c.     *The trial court did not conduct* voir dire *in a facially biased manner (Claim 3-3).*

Cromwell argues that the trial court violated due process by disparately questioning the prospective jurors based upon their views of the death penalty. Doc. 38 at 152. Cromwell's claim is unavailing.

Contrary to Cromwell's claim, the court's questions during *voir dire* did not, as Cromwell suggests, predispose the selected jury to favor the death penalty. The record reflects that the court addressed each juror fairly in determining whether his or her attitudes would prevent them from serving as a capital juror, and inquired of each juror whether he or she would be able to be fair and impartial, be willing to follow the law, able to weigh the aggravating and mitigating factors, and be able to impose the death penalty. Given this, there is nothing in the record supporting Cromwell's claim that the court questioned jurors differently based upon their view of the death penalty. This is particularly so given that both the prosecutor and defense counsel were afforded the opportunity to *voir dire* the jurors regarding their bias in favor of or against the death penalty.

Moreover, to the extent Cromwell argues that the trial court demonstrated a pro-death bias by striving more fervently to rehabilitate "death-leaning" prospective jurors, while failing to exhibit the same with "life-leaning" jurors, Cromwell does not assert that the court applied different legal standards in dismissing jurors for cause, that the court asked improper questions, that the parties lacked the opportunity to further explore the views of the jurors, or that a biased juror was allowed to serve on the jury. The process known as "death qualification" of prospective jurors is an important early part of a capital trial. Trial courts must of course "be evenhanded in their questions to prospective jurors ... and should inquire into the jurors' attitudes both for and against the death penalty to determine whether these views will impair their ability to serve as jurors." *People v.*

1   *Champion*, 891 P.2d 93, 108 (Cal. 1995). It is well-established, however, that the court

2   has broad discretion in the number and type of questions issued during *voir dire*. *See e.g.*,

3   *Rosales-Lopez v. United States*, 451 U.S. 182 (1981); *United States v. Perez-Martinez*,

4   525 F.2d 365 (9th Cir. 1975).

5        Contrary to Cromwell's claim, the trial court did not abuse its considerable

6   discretion in its manner of questioning. And although Cromwell asserts that the trial court

7   did not attempt to question "life-leaning" jurors in the same manner as "death-leaning"

8   jurors, he ignores the fact that several jurors, as discussed *supra*, indicated that they

9   would not impose the death penalty under any circumstance, thus explaining the brevity

10  of questioning regarding those jurors. Given the deference afforded to trial courts, this

11  Court must presume the trial court formulated its questions based upon the individual

12  characteristics of each juror, including the juror's questionnaire and in-court demeanor.

13  To conclude otherwise would require a trial court to question each potential juror the

14  same irrespective of their individual circumstance, thus intruding upon the trial court's

15  ability to conduct *voir dire*. *See Perez-Martinez*, 525 F.2d 365; *United States v. Heck*,

16  499 F.2d 778, 779 (9th Cir. 1974) (holding that "the scope of the *voir dire* examination

17  and the procedures to be utilized therein are matters within the sound discretion of the

18  trial judge").

19       In sum, because nothing in the record suggests the trial court lacked impartiality

20  when it conducted *voir dire*, Cromwell's claim must be rejected. *See Heck*, 499 U.S. at

21  (holding that void dire procedures constitute error only when they are so unreasonable or

22  devoid of constitutional purpose as to be an abuse of discretion.).

23          d.    *The state trial court did not err in failing to dismiss*
24                *Prospective Juror 45 for cause (Claim 3-4).*

25       Cromwell argues that the state trial court erred in not dismissing PJ 45 for cause.

26  Doc. 38, at 153. Specifically, Cromwell argues that PJ 45's views on the death penalty

27  would have impaired her ability to be fair and impartial. *Id.* Cromwell's claim is

28  meritless.

During *voir dire*, the trial court queried the jury as follows:

> How many of you here believe that if the State does prove that Mr. Cromwell is guilty, and they prove that beyond a reasonable doubt, and they prove those aggravating factors, that there is just no mitigation in the world that is sufficient to call for something other than the death penalty?

R.T. 1/30/03, at 68. PJ 45 raised her hand. *Id*.

During individual questioning, the court explained that, if Cromwell was found guilty, and if an aggravating circumstance was proven, the jury would be required to determine if Cromwell's mitigating evidence was sufficiently substantial to justify a life sentence. *Id*. at 83. The court then queried whether PJ 45 would be able to serve with an open mind in regards to weighing the mitigating and aggravating circumstances. *Id*.

In response, PJ 45 explained that she had not fully understood the court's prior question, and that, after the court's clarification, she would be able to have an "open mind" during the penalty phase. *Id*. at 84. Specifically, she agreed that she would reserve her decision until she had received the court's instructions and after considering all the evidence presented. *Id*. PJ 45 also explained, during defense questioning, that there was possible mitigation that could "cause her to vote for something other than death …." *Id* at 87.

Outside of the jury's presence, defense counsel moved to strike PJ 45 for cause based, in part, upon her initial answer. *Id*. at 88-89. The trial court denied the motion:

> [PJ 45] clearly understands the defendant's right and will follow the Court's instructions with respect to those rights. I also find, based on not only the language, but the body language and the tone of Juror [45], that she can clearly render a clear and impartial verdict with respect to all phases of this case. Therefore, the defense's challenge for cause with respect to Juror [45] is denied.

*Id*. at 90.

The Sixth Amendment guarantees a criminal defendant the right to an impartial jury. *Morgan v. Illinois*, 504 U.S. 719, 726 (1992) (citing *Turner v. Louisiana*, 379 U.S. 466 (1965) and *Irvin*, 366 U.S. at 717). The *voir dire* process is intended to protect a defendant's right to an impartial jury by exposing possible biases of potential

1    jurors. *Dennis v. Mitchell*, 354 F.3d 511, 520 (6th Cir. 2003) (citing *McDonough Power*

2    *Equip., Inc. v. Greenwood*, 464 U.S. 548, 554 (1984)). When a juror is challenged "for

3    cause," the relevant questions are: (1) "did the juror swear that he could set aside any

4    opinion he might hold and decide the case on the evidence;" and (2) "should the juror's

5    protestation of impartiality have been believed." *Patton v. Yount*, 467 U.S. 1025, 1036

6    (2009). The Supreme Court explained in *Witt*, that a juror may be excused for cause

7    "where the trial judge is left with the definite impression that a prospective juror would

8    be unable to faithfully and impartially apply the law." 469 U.S. at 428-29.

9          Federal habeas courts must accord "special deference" to state trial courts in

10   reviewing the trial court's determination of juror credibility because trial judges are in the

11   best position to assess the demeanor and credibility of the jurors. *See, e.g.*, *Darden*, 477

12   U.S. at 175-78. The trial judge's determination of a juror's bias [or lack thereof] is a

13   finding of fact entitled to a "presumption of correctness" under 28 U.S.C. § 2254(d) and

14   "may only be overturned where manifest error is shown." *Holder v. Palmer*, 558 F.3d

15   328, 339 (6th Cir. 2009) (citing *Patton*, 467 U.S. at 1031).

16         Cromwell argues that the state trial court erred in refusing to dismiss PJ 45 for

17   cause because PJ 45's views on the death penalty would have impaired her ability to be

18   fair and impartial. Doc. 38, at 153. Cromwell's claim is meritless.

19         Here, the record reflects that, although PJ 45 initially expressed confusion

20   regarding the procedure of imposing the death penalty, after further explanation and

21   questioning, she ultimately agreed that, if she were to consider the death penalty, she

22   would have an "open mind," and would not decide until after considering the trial court's

23   instructions and the totality of evidence presented regarding mitigating and aggravating

24   factors. The trial court ultimately determined that, despite her initial confusion, PJ 45

25   could be fair and impartial, not only upon her answers, but also upon her body language

26   and tone. Given that the state trial court "was in the best position to observe the

27   prospective jurors and determine whether they were impaired," *Johnson*, 447 P.3d at 814,

28   ¶ 111, and the extraordinary deference given to the state trial court's determination of

1    juror credibility, Cromwell has failed to demonstrate that the trial court erred in failing to

2    strike PJ 45 for cause.

3         Regardless, the record demonstrates, and Cromwell acknowledges, that PJ 45 was

4    not empaneled and did not serve on Cromwell's jury. The claim is therefore defeated by

5    *United States v. Martinez-Salazar*, 528 U.S. 304, 308 (2000), where the Supreme Court

6    held "that if the defendant elects to cure [the erroneous refusal of a trial judge to dismiss

7    a potential juror for cause] by exercising a peremptory challenge, and is subsequently

8    convicted by a jury on which no biased juror sat,[22] he has not been deprived of any rule-

9    based or constitutional right."[23]

10        Accordingly, Cromwell's claim must be rejected.

11        **D.    Cromwell is not entitled to relief on his claims asserting that he was**
           **denied a fair guilt phase adjudication (Claim 4).**
12

13        In Claim 4, Cromwell makes five allegations that the trial court erred and deprived

14   him of a fair guilt-phase adjudication. Doc. 38, at 160-67. Cromwell has failed to

15   demonstrate that any of these allegations warrant habeas relief.

16            **1.    The Arizona Supreme Court's decision affirming the trial**
                  **court's denial of Cromwell's motion for new counsel was not**
17                **contrary to, or an unreasonable application of, Supreme Court**
                  **precedent and did not rely on an unreasonable determination of**
18                **the facts in the record (Claim 4-1).**

19        In this claim, Cromwell argues that the trial court "improperly facilitated counsel's

20   abandonment" at trial when it denied his motion for new counsel. Doc. 38, at 160-61.

21   This Court should deny relief because the Arizona Supreme Court's decision that

22   Cromwell was not denied his right to counsel was reasonable under AEDPA.

23            a.    *Exhaustion and state court decision.*

24   _____

25   [22]   As will be discussed *infra*, Cromwell has failed to demonstrate that any biased

26   juror sat on his jury.

27   [23]   Respondents do not concede that the trial court erred in failing to dismiss PJ 45 for
     cause, but regardless, the fact that the juror did not serve on Cromwell's jury means that

28   *Martinez-Salazar* precludes habeas relief on such a claim.

1    This claim alleges the trial court erred when it denied Cromwell's motion for new

2  trial at a hearing on November 20, 2002. Although not acknowledged in his habeas

3  petition, Cromwell exhausted this claim on direct appeal. *See Cromwell*, 119 P.3d at 452-

4  55, ¶¶ 19-37.

5    In its decision denying relief, the Arizona Supreme Court thoroughly described the

6  hearing at which the trial judge addressed the Motion to Withdraw or in the Alternative

7  Motion to Determine Counsel that defense counsel James Logan filed in response to

8  Cromwell's *pro se* request that Logan be removed from his case. *Id.* at 452, ¶¶ 19-25.

9  Cromwell alleged at the time that "Logan has no intention of defending me zealously"

10  and told Cromwell in "no uncertain terms that not only would I be found guilty, but I will

11  die." *Id.* at 452, ¶ 19. Cromwell told the trial court that he and Logan did not "agree on

12  where to go with my defense." *Id.* at 452, ¶ 20. Asked by the court to elaborate on the

13  nature of the conflict, Cromwell explained that he and Logan "disagreed on how to

14  question the State's DNA expert" and "on whether to call Ella's friend, Kelly Lancaster,

15  to testify," he "disagreed with Logan's discovery efforts, specifically, his decision not to

16  subpoena the telephone records of Ella Speaks and his failure to obtain Stephanie's

17  school records," and that "he and Logan differed on how to proceed with the defense of

18  his case and that Logan told him that if he were to proceed to trial, he would be found

19  guilty." *Id.* at 452-53, ¶ 22-25.

20    Logan explained his perspective on the purported conflict, noting that: 1) the DNA

21  expert was not qualified to express the opinion on which Cromwell wanted the expert to

22  be questioned; 2) calling Lancaster "would be a strategically unwise maneuver"; 3) he

23  had obtained relevant telephone records, but some calls had been unavailable; 4) the

24  hearing was the first time he heard of Cromwell's desire to obtain Stephanie's school

25  records and that he would attempt to obtain them but he might not be successful because

26  they were victim records; and 5) he felt he was ethically bound to give Cromwell his

27  opinion of the case including "potential viable alternatives to what could be a worse

28

situation." *Id.* The Arizona Supreme Court also noted that Logan stated the following at the hearing:

> Mr. Cromwell tends to reject anything that I tell him that is not in line with his theory that he be found not guilty and there really is no evidence against him of any sort. He has instead vastly maintained that there is no evidence against him. He wanted to go to trial on the first trial setting, because there was no evidence against him. When I point out to him evidence that is clearly damaging evidence and clearly evidence that would support a conviction, he becomes upset. He becomes angry with me and I am not assisting him.

*Id.* at 453, ¶ 25.

The trial court explained its decision denying the motion to change counsel as follows:

> Appellant is not entitled to counsel of choice and is not entitled to a meaningful, that's "meaningful," relationship with his attorney. I have considered all the relevant factors. I'll note that the quality of counsel currently representing [Cromwell] is excellent.
>
> I'll note that a significant amount of time has elapsed since the alleged date of violation and since charges were filed. I'll note that trial is set for January 21 of 2003 and we have some motion hearings set for December 6th of this year. I'll note that and confirm what I said earlier, which is, if a new lawyer would be put on the case now, it would lead to a significant delay in the processing of the case, which would be to the prejudice of [Cromwell], to the prejudice of the victims, to the prejudice of the State, and to the prejudice of the interests of justice, not only in the form of resolving matters with due speed, but also in the form of the potential for fading memories.
>
> Counsel and [Cromwell] have a conflict with respect to strategy. To me, this is a conflict that will reappear *ad infinitum* if a new quality lawyer is appointed to represent [Cromwell]. So I could appoint a new counsel, which would lead us back to exactly the same situation that we're in, only it would be about a year later. In other words, to the extent that you could characterize the disagreement between Defense Counsel and [Cromwell] as a conflict, the new lawyer, to the extent [he] is competent counsel, would be confronted with exactly the same conflict.
>
> I'll also note that granting the motion would lead to significant inconvenience to witnesses and victims.

*Id.* at 453, ¶ 26.

On appeal, the Arizona Supreme Court affirmed the trial judge's decision, stating that "[t]here was no irreconcilable conflict between Cromwell and Logan" and that "[t]he friction between them stemmed strictly from disagreement as to their respective

assessments of the facts and trial strategy." *Id.* at 454, ¶ 35. The court concluded that "[t]here was no abuse of discretion by the judge in this instance inasmuch as he did exactly what we expect trial judges to do: he held a hearing, heard the statements and responses of both the defendant and counsel, gave consideration to each, knew and applied the *LaGrand*[24] factors, and, in a reasonable exercise of discretion, denied the defendant's request." *Id.* at 455, ¶ 37.

b.    *The state court decision was reasonable.*

Cromwell does not acknowledge the Arizona Supreme Court's decision on this issue, much less establish that it was contrary to, or an unreasonable application of, Supreme Court precedent or that it was based on an unreasonable determination of the facts under 28 U.S.C. § 2254(d). In any case, the Arizona Supreme Court reasonably denied relief. A criminal defendant's Sixth Amendment rights include the "right to representation that is free from conflicts of interest." *Wood v. Georgia*, 450 U.S. 261, 271 (1981). "[I]n order to succeed on a claim based on an alleged conflict, there must be a showing of an *actual* conflict, namely that a defendant's attorney is representing conflicting interests." *Plumlee v. Masto*, 512 F.3d 1204, 1210 (9th Cir. 2008). The Sixth Amendment does not guarantee, however, a "meaningful relationship" between an accused and his counsel. *Morris v. Slappy*, 461 U.S. 1, 13-14 (1984). And no Supreme Court decision has held that "the Sixth Amendment is violated when a defendant is represented by a lawyer free of actual conflicts of interest, but with whom the defendant refuses to cooperate because of dislike or distrust." *Plumlee*, 512 F.3d at 1211. Thus, for example, the Ninth Circuit held the Sixth Amendment not violated when a defendant "complained solely about his counsel's strategic decisions and lack of communication with him, including that his counsel did not make motions that he requested, contacted witnesses without his consent and did not present him the list of defense witnesses for his approval." *Larson*, 515 F.3d at 1067.

---

[24]    *State v. LaGrand*, 733 P.2d 1066 (Ariz. 1987).

1    Cromwell argues that the trial court deprived him of a "fair adjudication of his

2    guilt or innocence" by forcing him to proceed to trial with "counsel who two months

3    before trial had already given up and accepted defeat." Doc. 38, at 161. The trial court

4    noted, however, that Logan had been providing Cromwell with "excellent"

5    representation, *Cromwell*, 119 P.3d at 453, ¶ 26, and the record of the hearing on

6    Cromwell's motion does not support the conclusion that Logan had given up. And

7    importantly, nothing in the record suggests that Logan had an actual conflict of interest.

8    Instead, as both the trial court and Arizona Supreme Court found, Cromwell and Logan

9    simply disagreed over trial strategy. However, as the Ninth Circuit has held, a

10   defendant's Sixth Amendment rights are not violated when he is required to proceed with

11   counsel with whom he disagrees over trial strategy. *See Plumlee*, 512 F.3d at 1211;

12   *Larson*, 515 F.3d at 1067. Under these circumstances, Cromwell cannot establish that the

13   Arizona Supreme Court's decision affirming the trial court's denial of his pretrial motion

14   for new counsel was contrary to, or an unreasonable application of *Morris*, or that it was

15   based on an unreasonable determination of the facts.

16          **2.    Cromwell's claim that the trial court facilitated a conflict**
               **between himself and Logan is procedurally defaulted and**
17             **meritless (Claim 4-2).**

18          Cromwell argues the trial court "failed to protect Mr. Cromwell's constitutional

19   right to conflict-free counsel" by failing to "engage in a meaningful determination of

20   whether a conflict existed." Doc. 38, at 161-62. Cromwell is not entitled to relief because

21   this claim is procedurally defaulted and meritless.

22                  a.      *Factual and procedural background.*

23          At a hearing the day before jury selection, Cromwell asserted to the trial judge that

24   "there is no communication," "no intelligent communication between [Logan] and I."

25   R.T. 1/27/03, at 9. The court asked Logan, "are you avoiding the defendant or refusing to

26   listen to him or anything of the sort?" *Id.* at 10. Logan responded:

27          Judge, yesterday, Sunday, I was in the jail at—I forget what time it was.  It
            was somewhere around 11:00 in the morning, speaking to Mr. Cromwell.  I
28          asked him if he wanted to speak with me.  I won't go into all the words that
            were said, but I did specifically ask him more than one time, 'Do you want

1    to talk to me about this case?'   The end result of that is, we had no
2    discussion.

3    *Id.* The court then asked Logan if he had "been interested in talking to [Cromwell] and

4    providing him with legal advice and gaining factual information from him, to the extent

5    that you still need more factual information?"  *Id.* Logan responded that he had attempted

6    to talk with Cromwell but that Cromwell "made it obvious by his words and actions that

7    he simply did not want to discuss things with me."  *Id.* After some discussion about a bar

8    complaint that Cromwell had apparently filed against Logan, the trial court addressed

9    Cromwell directly and told him "if you want to make a motion or make your request to

10   do anything with respect to this case, if you don't do it now, you lose an opportunity to

11   do it and probably the right to do it."  *Id.* at 12-13.

12       Next, after an off-record discussion, Logan stated that he had taken a few minutes

13   to speak with Cromwell:

14       I have asked him if he has any requests that he would like to make of the
         Court.  I made sure that he understood that question.  He said that he didn't.
15       He said he had no requests at this point to make of the Court.  I asked him
         if he had any other things that he wanted the Court to do.  He said, "No." I
16       told him that the end result of that would be that we would be in court
         tomorrow to start trial and he said that's what he wants.
17

18   *Id.* at 14. The court then asked Cromwell if what Logan had stated was correct, and

19   Cromwell answered, "Yes." *Id.*

20       Later, in his PCR petition, Cromwell included a claim asserting that Logan had an

21   actual conflict of interest, citing to the discussion related above at the pretrial hearing.

22   R.O.A. 604 at 111-14. The post-conviction court found the claim precluded under Rule

23   32.2(a)(3) "because the Arizona Supreme Court finally adjudicated on the merits the

24   substance of [Cromwell's] claim that trial counsel had a conflict of interest that adversely

25

26

27

28

111

1  affected the representation."  R.O.A. 803 at 29.[25] The court alternatively found that the

2  claim lacked merit, concluding that "the record refutes defendant's allegation that an

3  actual conflict existed, and defendant failed to show a plausible alternative defense that

4  trial counsel failed to pursue." *Id.* at 32. In his petition for review from the denial of post-

5  conviction relief, Cromwell argued that the post-conviction court erred by denying this

6  claim. PCR PFR, at 40-48. The Arizona Supreme Court denied review. ASC Decision

7  Order *filed* 4/5/2023.

8              b.      *This claim is procedurally defaulted.*

9       The PCR court applied an express procedural bar to this claim. As a result, it is

10 procedurally defaulted in this habeas proceeding. *Coleman*, 501 U.S. at 729-30; *see*

11 *Nunnemaker*, 501 U.S. at 803 (higher court's subsequent summary denial of review

12 affirms lower court's application of a procedural bar). Cromwell identifies no cause and

13 prejudice or fundamental miscarriage of justice to excuse the default. *See* Doc. 38, at

14 161-62. Therefore, this claim is ineligible for habeas relief.

15             c.      *This claim fails on the merits.*

16       Because the state court found this claim to be meritless in addition to being

17 procedurally barred, Cromwell must overcome 28 U.S.C. § 2254(d)'s high bar to relief

18 even if some cause existed to excuse this claim's procedural default. *See Clabourne v.*

19 *Ryan*, 745 F.3d 362, 383 (9th Cir. 2014) (applying AEDPA deference to alternative

20 holding on the merits). Once again, nothing in the record suggests that Logan held an

21 actual conflict of interest. The references in the record to which Cromwell refers simply

22 demonstrate a strained relationship between counsel and client. Because the Supreme

23 Court has held that a defendant has no Sixth Amendment right to a meaningful

24 relationship with counsel, Cromwell cannot establish that the post-conviction court's

25 ────────────────

26 [25]     It appears that the PCR court erroneously cited Rule 32.2(a)(3) when it should
   have cited Rule 32.2(a)(2).   Rule 32.2(a)(2) bars relief on claims that were "finally
27 adjudicated on the merits in an appeal," which was the explanation the court gave for
   finding the claim precluded.
28

1    alternative ruling denying this claim on the merits unreasonably applied Supreme Court

2    precedent or rested on an unreasonable determination of the facts under § 2254(d).

3          **3.    Cromwell's claim that the trial court demonstrated bias by**
          **showing favor to the State and hostility to the defense is**
4          **procedurally defaulted and meritless (Claim 4-3).**

5          Referring to a few specific instances at trial, Cromwell argues the trial court

6    violated his rights to an impartial tribunal by favoring the State and showing hostility

7    toward the defense. Doc. 38, at 162-63. This claim is procedurally defaulted and

8    meritless.

9                    a.    *This claim is procedurally defaulted.*

10          Cromwell did not present this claim either on direct appeal or in his PCR

11   proceeding, and he would be procedurally barred from exhausting the claim now. *See*

12   Ariz. R. Crim. P. 32.2(a)(3) (precluding claims that could have been raised on direct

13   appeal or in a prior PCR proceeding); *Shrum*, 203 P.3d at 1178, ¶ 12 ("Rule 32.2(a)

14   precludes collateral relief on a ground that either was or could have been raised on direct

15   appeal or in a previous PCR proceeding."). Thus, it is technically exhausted but

16   procedurally defaulted. *Coleman*, 501 U.S. at 735 n.1 (claims are barred from habeas

17   review when not first raised before state courts and those courts "would now find the

18   claims procedurally barred"). Cromwell identifies no cause and prejudice or fundamental

19   miscarriage of justice to excuse the default. *See* Doc. 38, at 162-63. Therefore, this claim

20   is ineligible for habeas relief.

21                    b.    *This claim also fails on the merits.*

22          Cromwell's judicial bias claim also fails on its merits. A criminal defendant has a

23   due process right to an impartial judge. "A judge's conduct justifies a new trial if the

24   record shows actual bias or leaves an abiding impression that the jury perceived an

25   appearance of advocacy or partiality." *United States v. Marks*, 530 F.3d 799, 806 (9th

26   Cir. 2008). An appearance of bias rises to the level of a due process violation only where

27   the judge has a pecuniary or personal interest in the outcome of the proceedings,

28   "becomes embroiled in a running, bitter controversy with one of the litigants," or "acts as

113

part of the accusatory process." *Crater v. Galaza*, 491 F.3d 1119, 1130 (9th Cir. 2007) (citing cases). To prevail on a claim of actual judicial bias, a habeas petitioner must "overcome a presumption of honesty and integrity in those serving as adjudicators." *Withrow v. Larkin*, 421 U.S. 35, 47 (1975). He must also show that the trial judge "prejudged, or reasonably appears to have prejudged, an issue." *Kenneally v. Lungren*, 967 F.2d 329, 333 (9th Cir. 1992). A judge's remarks or opinions do not establish bias unless they "reveal such a high degree of favoritism or antagonism as to make fair judgment impossible." *Liteky v. United States*, 510 U.S. 540, 555 (1994). On federal habeas review, relief is warranted only if "the state trial judge's behavior rendered the trial so fundamentally unfair as to violate federal due process under the United States Constitution." *Duckett v. Godinez*, 67 F.3d 734, 740 (9th Cir. 1995). Cromwell's claim falls far short of these standards.

Cromwell argues that the trial court's unconstitutional bias was demonstrated by the following:

> When explaining (outside the jury's presence) its decision to allow the prosecutor to ask Dr. Rosengard, Cromwell's expert witness in the penalty phase, about Cromwell's prior conviction, over Cromwell's objection, the court stated in part that "every mental healthcare provider that I have ever talked to has said something to the effect of prior conduct is the best predictor of future behavior." R.T. 2/25/03, at 65.

> During argument regarding admissibility of certain evidence in the penalty phase, the trial court restated the State's argument to be sure the court properly understood it. R.T. 3/4/03, at 15-16.

> When explaining its ruling granting the defense's motion for directed verdict on witness elimination as a theory of proving an aggravating circumstance, the court stated "[w]ere I on the Appellate Court, I think I would agree with the State's position; .... But given the [s]tate of the law in Arizona, I'm going to grant the defense Motion for Directed Verdict ...." R.T. 2/20/03, at 24.

> When defense counsel asked a 9-year-old witness during cross-examination, "You're looking at your mom now. Are you trying to see if she can help you?," the trial court interjected, "You know, I don't see that, Counsel. I'm sorry." R.T. 2/05/03, at 41. Later, when discussing that interaction, the court stated that in the future it would "delay [its] objection for later," outside the jury's presence, but that it was "clear" that the court's comment "had no impact on the jury." *Id.* at 73.

114

Doc. 38, at 162-63. Cromwell asserts that these statements by the trial judge "show[] bias (or at the very least the appearance of bias) toward the State" and "bias against the defense," thereby depriving him of his right to an impartial tribunal and a fair trial. *Id.*

These statements and comments by the trial judge fail to establish "such a high degree of favoritism or antagonism as to make fair judgment impossible." *Liteky*, 510 U.S. at 555. In fact, they do not demonstrate any favoritism or antagonism at all. The first three comments evidence no favoritism, but were simply the court either explaining its rulings or ensuring it understood a party's position before making its decision. And the final comment, regarding the witness, also does not evidence favoritism or antagonism, but was the court's attempt to make a clear record of what was occurring in the courtroom. *See* R.T. 2/05/03, at 71-73. Under these circumstances, Cromwell cannot establish that the trial court "rendered the trial so fundamentally unfair as to violate federal due process," and his claim therefore fails. *See Duckett*, 67 F.3d at 740.

> **4.    The state court's decision denying Cromwell's claim that he was incompetent to be tried was not contrary to, or an unreasonable application of, Supreme Court precedent and was not based on an unreasonable determination of the facts (Claim 4-4).**

Cromwell argues that he was incompetent to be tried and the trial court therefore violated his constitutional rights by failing to set a hearing on his competency and suspend the proceedings until he was competent to stand trial.   Doc. 38, at 163-64. Cromwell is not entitled to habeas relief because the PCR court's denial of this claim was not contrary to, or an unreasonable application of, Supreme Court precedent and was not based on an unreasonable determination of the facts.

> a.    *Exhaustion and state court decision.*

Cromwell exhausted this claim by presenting it in his PCR petition. *See* R.O.A. 604 at 95-105; PCR PFR at 32-39.[26] In its decision denying relief, the post-conviction

---

[26]    Although the PCR court applied a procedural bar to Cromwell's substantive due process claim, *see* Claim 12-3 *infra*, it did not apply such a bar to his procedural due process claim raised here.

court explained its reasons for denying Cromwell's competency claim.  First, the court recounted the relevant factual background for the claim:

> [Defense] Counsel did not request a competency evaluation during [Cromwell's] trial proceedings, nor did a competency evaluation take place. It appears that the only information concerning [Cromwell's] competence came from Dr. Rosengard's testimony in the penalty proceeding. During direct-examination, Dr. Rosengard testified that he reviewed [Cromwell's] jail records and went to the jail three times to conduct a psychiatric evaluation. (R.T. 2/24/03 at 41-43.)  The first visit took place on November 3, 2002, and [Cromwell] pleasantly and firmly stated that he did not want to have any contact with Dr. Rosengard. (*Id.* at 43.) Dr. Rosengard returned to the jail on December 24, 2002 and "spent a good deal of time" with [Cromwell] "obtaining information," asking [Cromwell] whether he experienced symptoms for different diagnoses, conducting an "objective" evaluation, and reading additional information, such as "the records in the jail." (*Id.*)

> While recounting his professional background, Dr. Rosengard explained that 25 percent of his practice is forensic-related, and that he conducts competency evaluations. (*Id.* at 39.)  Referring to "Arizona State Statutes," Dr. Rosengard explained the legal requirements for a competency evaluation, and testified that he was on the County's list of mental health experts who are qualified to conduct competency evaluations. (*Id.* at 39-40.)

> During cross-examination, the prosecutor referred to this prior testimony and clarified with Dr. Rosengard that he "didn't do a competency evaluation in this case." (*Id.* at 77.)  The prosecutor then asked, "But being aware of the competency evaluations and what you have to do for competency evaluations, you didn't see anything during your contact with Mr. Cromwell here that would indicate to you that he was not competent to stand trial?"  Dr. Rosengard responded, "That's right." (*Id.*)

R.O.A. 803 at 24. The court then explained its decision, first addressing Cromwell's argument that he was entitled to an evidentiary hearing on competency based on *State v. Martinez*, 402 P.3d 995 (Ariz. 2017):

> In *Martinez*, the defendant filed a petition for post-conviction relief and raised due process claims under Rule 32.1(a), arguing that he was not competent during change of plea and sentencing proceedings. Defendant also alleged a related ineffective assistance claim, arguing trial counsel failed to "reinvestigate his competence and to request another competency determination before the plea and sentencing." *Id.* at 111.

> The trial court denied relief without holding an evidentiary hearing. The Arizona Supreme Court granted relief on the defendant's "core due process claim—that he was not competent at the time of his guilty plea or sentencing." *Id.* ("Criminal defendants are constitutionally entitled to be competent at the time of trial, change of plea, and sentencing.") (citing *Pate v. Robinson*, 383 U.S. 375, 378 (1966) ("the conviction of an accused

116

person while he is legally incompetent violates due process"); Ariz. R. Crim. P. 11.1.

Nonetheless, contrary to [Cromwell's] argument, the evidence presented by [Cromwell] is distinguishable from *Martinez*. In that case, the Arizona Supreme Court relied on evidence presented "from a doctor who had reviewed medical and jail records and interviewed [the defendant] *ten days* after sentencing," opining that defendant "was not competent at the time of the interview," and that defendant more likely than not "was incompetent at the time of his plea and later sentencing." *Id.* (emphasis added). Conversely, the indicia of incompetence relied on by [Cromwell] is based on events that took place in 2010, nearly seven years after the trial concluded.   (*See* Pet. at 97-98.)   Additionally, [Cromwell's] evidence documents that prison mental health staff observed a "recent and sudden change" in [Cromwell's] behavior in 2010. (Dkt. 246 at 2.)

To determine a defendant's competency to stand trial, the "test must be whether he has sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding and whether he has a rational as well as factual understanding of the proceedings against him." *Dusky v. United States*, 362 U.S. 402, 402 (1960). In Arizona, "[i]f the court determines that reasonable grounds" exist, the court should order a mental health examination. Ariz. R. Crim. P. 11.3 & 11.4.  Reasonable grounds "exist when 'there is sufficient evidence to indicate that the defendant is not able to understand the nature of the proceedings against him and to assist in his defense.'" *State v. Kuhs*, 223 Ariz. 376, 380 ¶ 13 (2010).

Assuming the truth of [Cromwell's] allegations, the evidence does not demonstrate that [Cromwell] did not understand the nature of the proceedings against him or that he was unable to assist in his defense. As discussed above, a "sudden change" in behavior many years after trial does not demonstrate [Cromwell's] incompetence, nor does a mental health diagnosis. Ariz. R. Crim. P. 11.1 ("The presence of a mental illness, defect or disability alone is not grounds for finding a defendant incompetent to stand trial.").

R.O.A. 803 at 25-26. The court reviewed the evidence and found the trial court was not required to hold a competency hearing:

[Cromwell's] evidence demonstrates that [Cromwell] displayed a few instances of unusual facial expressions and behaviors in court, sometimes declined visits from experts and counsel, and expressed strong disagreement with trial counsel's professional judgment concerning the strength of the State's evidence.   However, the evidence does not demonstrate that these behaviors and actions were the result of a mental disorder that affected [Cromwell's] competency.  Instead, the totality of the trial record strongly demonstrates that [Cromwell] understood the nature of the trial proceeding and the evidence against him, and that [Cromwell] could control his behavior when he decided to do so.

Specifically, the evidence demonstrates that [Cromwell] directly and intelligently participated in colloquies with the court and answered questions during his trial testimony.  Additionally, [Cromwell] did not display erratic or inappropriate behavior in court, and Dr. Rosengard has not pointed to any information in the jail records describing such behavior.

117

*See State v. Delahanty*, 226 Ariz. 502, 505 ¶ 9 (2011) (considering defendant's testimony at pretrial hearing, colloquy with trial judge, and appropriate behavior in court, and finding trial record "replete with evidence" that defendant was competent); *see also State v. Tromble*, 116 Ariz. 249, 253 (App. 1977) ("We will not equate a defendant's refusal to cooperate" with incompetence). …

A trial court is required to hold a competency hearing if "on the basis of the facts and circumstances known to the trial judge, there was or should have been a good faith doubt about the defendant's ability … to participate intelligently in the proceedings." *Delahanty*, 226 Ariz. at 505 ¶ 8. In making this determination, courts may rely on ["]observations of the defendant's demeanor and his ability to answer questions." *State v. Moody*, 208 Ariz. 424, 443 (2004).

As discussed above, [Cromwell] has not shown reasonable grounds or a good faith doubt about his competence during the trial proceedings. The trial record documents [Cromwell's] behavior and ability to express himself during pretrial proceedings, including a determination of counsel, and while [Cromwell] testified at trial. These prior proceedings present no evidence to support [Cromwell's] claim. [Cromwell] has not shown a due process violation due to the trial court's failure to inquire into his competency.

R.O.A. 803 at 26-27. The Arizona Supreme Court denied review of this claim without comment. ASC Decision Order *filed* 4/5/2023.

           b.    *Cromwell is not entitled to relief.*

Cromwell is not entitled to relief on this claim because the post-conviction court's decision was not contrary to, or an unreasonable application of, clearly established federal law and it was not based on an unreasonable determination of the facts. A criminal defendant has the "right not to be tried while legally incompetent." *Drope v. Missouri*, 420 U.S. 162, 173 (1975). "[T]he standard for competence to stand trial is whether the defendant has 'sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding' and has 'a rational as well as factual understanding of the proceedings against him.'" *Godinez v. Moran,* 509 U.S. 389, 396 (1993) (citation omitted).

Citing to *Pate v. Robinson*, 383 U.S. 375 (1966), Cromwell argues that there were reasonable grounds to doubt that he was competent to be tried and that the trial judge thus violated his due process rights by allowing counsel to waive a competency examination, failing to set a hearing on competency, and failing to suspend proceedings until Cromwell

was competent. Doc. 38, at 163. In *Pate,* the trial court refused to order a hearing on competency despite four witnesses "express[ing] the opinion that [the defendant] was insane" and the defendant's long history of irrational behavior. 383 U.S. at 378-85. The Supreme Court held that the evidence showing the defendant was insane entitled him to a hearing to determine his competency. *Id.* at 385. The Court also held that the decision to order a competency hearing cannot rest solely on the defendant's demeanor at trial, but that observations of demeanor still can be "relevant to the ultimate decision as to his sanity …." *Id.* at 385-86.

The PCR court's decision denying relief on this claim was not contrary to or an unreasonable application of *Pate*. Unlike in *Pate*, no witnesses expressed the opinion that Cromwell was insane or otherwise incompetent and Cromwell did not display a history of irrational behavior. Cromwell argues, however, that the court should have been aware that his competency was in question because he on several occasions refused to leave his cell or attend court, acted "bizarre[ly]" in court (by standing when the court issued an oral ruling, raising his hand when the arresting officer identified him, and swaying in his chair and staring at the jury while testifying), acted belligerently with his counsel, and believed the case "would be thrown out." Doc. 38, at 163-64. Viewed in context of all of the information before the trial court, none of the behaviors Cromwell lists indicated that he lacked "sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding" or "a rational as well as factual understanding of the proceedings against him." *See Godinez,* 509 U.S. at 396.

Instead, as the PCR court noted, Cromwell "directly and intelligently participated in colloquies with the court and answered questions during his trial testimony," "did not display erratic or inappropriate behavior in court," "did not testify in an erratic or inappropriate manner, and he directly answered questions posed to him during direct and cross-examination." R.O.A. 803 at 27, 28. The court concluded that "the totality of the trial record strongly demonstrates that [Cromwell] understood the nature of the trial proceeding and the evidence against him, and that [Cromwell] could control his behavior

1   when he decided to do so." *Id.* at 26. Moreover, as the PCR court noted, Dr. Rosengard, a

2   mental health professional with experience performing competency evaluations, testified

3   at trial that he did not see anything causing him to question Cromwell's competency.

4   R.O.A. 803 at 24.

5       In light of the totality of the evidence before the trial and post-conviction courts,

6   Cromwell cannot establish that the state court decision denying relief was an

7   unreasonable application of *Pate*. Though Cromwell may have "displayed a few instances

8   of unusual facial expressions and behaviors in court, sometimes declined visits from

9   experts and counsel, and expressed strong disagreement with trial counsel's professional

10  judgment concerning the strength of the State's evidence," R.O.A. 803 at 26, the PCR

11  court reasonably concluded that the evidence overall did not require the trial judge to

12  hold a hearing on Cromwell's competency. This claim should be denied.

13
14
**5.   Cromwell is not entitled to relief on his claim his statements to police should have been suppressed (Claim 4-5).**

15      Cromwell argues that his Fourth Amendment rights were violated when the

16  arresting officer entered his residence without a warrant or consent and that, as a result,

17  Cromwell's statements to the officer should have been suppressed as "fruit of the

18  poisonous tree."  Doc. 38, at 166. This claim fails because it is barred by *Stone v. Powell*,

19  428 U.S. 465 (1976), procedurally defaulted, and meritless.

20          a.      *Factual background.*

21      Early in the morning on the night of the murder, Phoenix Police Officer Donald

22  Vine was dispatched to the area of 32nd Street and Osborn Road to contact a 911 caller.

23  R.T. 2/2/03, at 41-43. Officer Vine located the caller, a woman, who was driving a green

24  car, when she "ran a red light," "almost hit [his] patrol car," and "started screaming at—

25  we need to go down the street." *Id.* at 44. Before the officer could tell her to stop, she

26  "put her car in reverse and started going." *Id.* Officer Vine followed until the woman

27  stopped at residential driveway. *Id.* The woman was crying and had blood on her

28  forearms. *Id.* at 46. She was "very hysterical, very distraught" and "was talking about

1  somebody on a bike who lived in that area," and she said "something about an assault and

2  maybe possibly something with a pool cue stick or something." *Id.*

3  Because the woman had stated the person who committed the assault had been

4  riding a bike, Officer Vine entered an apartment near where the woman had stopped her

5  car that had a bike parked in front of it. *Id.* at 47-53. The apartment door was open, and

6  Cromwell was inside. *Id.* at 53-55, 72. Cromwell agreed to come outside to speak with

7  the officer. *Id.* at 55.

8  Before Cromwell's trial, the court held a voluntariness hearing to determine the

9  admissibility of Cromwell's statements to Officer Vine and his subsequent statements to

10  a detective. R.T. 12/19/02. Officer Vine testified that after he found Cromwell inside his

11  apartment and asked him to come outside to talk, the woman Officer Vine had contacted

12  earlier identified Cromwell. *Id.* at 16-17. Vine placed Cromwell under arrest for assault

13  and gave him *Miranda* warnings. *Id.* at 17. Later, Cromwell was taken to police

14  headquarters and was questioned by Detective Ballentine. *See* R.O.A. 79 (Ex. 2

15  [transcript]).

16  At the voluntariness hearing, defense counsel argued that Cromwell's statements

17  to Detective Ballentine should be suppressed because Officer Vine made an "implied

18  promise" by telling Cromwell he was under arrest for assault rather than homicide. *Id.* at

19  27-28. The court found, however, that Cromwell's statements were voluntary and

20  admissible. *Id.* at 29. First, the court found that Cromwell's initial statements to Officer

21  Vine before receiving *Miranda* warnings were voluntary and that Cromwell was not in

22  custody when the statements were made. *Id.* Second, the court found Cromwell's post-

23  *Miranda* statements were likewise voluntary, but statements made after Cromwell

24  requested a lawyer would not be admissible in the State's case-in-chief. *Id.* at 29-30.

25  Cromwell did not assert a Fourth Amendment violation in connection with his arrest or

26  challenge the trial court's admissibility ruling on direct appeal or in his post-conviction

27  proceeding. Furthermore, the State did not admit Cromwell's statements to Officer Vine

28

1   at trial. R.T. 2/2/03, at 55-66. The State admitted Cromwell's interview with Detective

2   Ballentine when cross-examining Cromwell. R.T. 2/12/03, at 15-16.

3                     b.     *This claim is barred in these proceedings.*

4        In *Stone v. Powell*, the Supreme Court held that "where the State has provided an

5   opportunity for full and fair litigation of a Fourth Amendment claim, a state prisoner may

6   not be granted federal habeas corpus relief on the ground that evidence obtained in an

7   unconstitutional search or seizure was introduced at his trial." 428 U.S. at 494. "The

8   relevant inquiry is whether petitioner had the opportunity to litigate his claim, not

9   whether he did in fact do so or even whether the claim was correctly decided." *Ortiz-*

10  *Sandoval v. Gomez*, 81 F.3d 891, 899 (9th Cir. 1996) (citations omitted). The reasoning

11  for *Stone*'s rule is that "in the case of a typical Fourth Amendment claim, asserted on

12  collateral attack, a convicted defendant is usually asking society to redetermine an issue

13  that has no bearing on the basic justice of his incarceration." *Stone*, 428 U.S. at 491 n.31.

14  Additionally, "the exclusionary rule is a judicially created remedy rather than a personal

15  constitutional right ... [which is of] minimal utility ... when sought to be applied to Fourth

16  Amendment claims in a habeas proceeding." *Stone*, 428 U.S. at 494 n.37.

17        Although Cromwell did not present his Fourth Amendment challenge to the state

18  courts, he had the opportunity to do so at the voluntariness hearing. Cromwell could have

19  argued at that hearing that his statements to police should have been suppressed as fruit

20  of the poisonous tree because Officer Vine allegedly violated his Fourth Amendment

21  rights by entering his residence without a warrant. The fact that he elected not to make

22  that challenge does not undermine the conclusion that he had a full and fair opportunity

23  to litigate his alleged Fourth Amendment claim in the state courts. Accordingly, this

24  claim is precluded under *Stone*.

25                   c.     *Cromwell's claim is procedurally defaulted.*

26        In addition to being barred by *Stone*, this claim is procedurally defaulted because

27  Cromwell failed to exhaust it in state court. The claim he raised in state court challenged

28  the voluntariness of his statements to a detective at police headquarters based on the

theory that Officer Vine made an "implied promise" that he was only being questioned with regard to misdemeanor assault, rather than homicide. *See* R.T. 12/19/02, at 27-28. He has never presented the state courts with the claim he raises now—that all of his statements to police were inadmissible because Officer Vine entered his home in violation of the Fourth Amendment. Because Cromwell may not return to state court to properly exhaust the claim, it is technically exhausted but procedurally defaulted. *See* Ariz. R. Crim. P. 32.2(a)(3); *Shrum*, 203 P.3d at 1178, ¶ 12 ("Rule 32.2(a) precludes collateral relief on a ground that either was or could have been raised on direct appeal or in a previous PCR proceeding."). Cromwell identifies no cause and prejudice or fundamental miscarriage of justice to excuse the default.

> d.     *This claim fails on the merits.*

Even if this Court could reach the merits of Cromwell's Fourth Amendment claim, it still should deny relief.

The Fourth Amendment "generally requires the obtaining of a judicial warrant" or consent before police can enter a home. *Riley v. California*, 573 U.S. 373, 382 (2014). Consent can be given by anyone with apparent authority to consent. *Illinois v. Rodriguez*, 497 U.S. 177, 186-89 (1990); *see Georgia v. Randolph*, 547 U.S. 103, 109 (2006) (roommate generally has authority to grant permission for a search). Additionally, the "warrant requirement is subject to certain exceptions," *Brigham City v. Stuart*, 547 U.S. 398, 403 (2006), such as when "the exigencies of the situation make the needs of law enforcement so compelling that [a] warrantless search is objectively reasonable." *Kentucky v. King*, 563 U.S. 452, 460 (2011). One such exigency recognized by the Court is that "[p]olice officers may enter premises without a warrant when they are in hot pursuit of a fleeing suspect." *Id.* (citing *United States v. Santana*, 427 U.S. 38, 42-43 (1976)). "When the totality of circumstances shows an emergency—such as imminent harm to others, a threat to the officer himself, destruction of evidence, or escape from the home—the police may act without waiting." *Lange v. California*, 594 U.S. 295, 308 (2021).

1    The existing record is admittedly thin on this issue, but the fault for that lies with

2    Cromwell.  Because Cromwell did not assert a Fourth Amendment violation at trial, the

3    State had no reason to elicit and fully develop the facts to show whether exigent

4    circumstances justified Officer Vine's warrantless entry into Cromwell's residence or if

5    the house manager gave consent to entry when she indicated to Officer Vine the location

6    of Cromwell's room within the house.

7    Nonetheless, Cromwell cannot establish a Fourth Amendment violation on this

8    record. Upon being dispatched pursuant to a 911 call, Officer Vine encountered the

9    "screaming," "crying," "hysterical," and "distraught" victim, who asserted that someone

10    had assaulted her with a pool cue. She led the officer to a home where the suspect, whom

11    she said had been riding a bike, had fled. Seeing a bike parked outside the residence,

12    Officer Vine entered and encountered Cromwell, who voluntarily came outside to talk.

13    Given that Officer Vine had probable cause to believe that a suspect who had just

14    committed a violent attack with a pool cue had fled into the home and (due to the

15    presence of the bike) was currently inside, the totality of the circumstances showed an

16    emergency that justified his entry without waiting for a warrant. *See Lange*, 594 U.S. at

17    308. As a result, Cromwell cannot establish that his Fourth Amendment rights were

18    violated.

19    Regardless of whether a Fourth Amendment violation occurred, however,

20    Cromwell cannot show any prejudice under *Brecht* because admission of his statements

21    to police had no effect on the verdict. The State presented overwhelming evidence of

22    Cromwell's guilt at trial. Stephanie's mother, Ella, testified that Cromwell offered to stay

23    with her three girls who were asleep on a mattress in the living room when she left to

24    help a friend.  R.T. 2/4/03, at 41-51.  Stephanie's sister, Amanda, identified Cromwell as

25    the person who was bathing Stephanie naked, who told Amanda to go back to bed, who

26    asked her where the phone was, and who kept going into the kitchen. R.T. 2/5/03, at 21-

27    26, 55.  Amanda also testified that she heard Stephanie make a noise like she was hurt

28

1    when she was in the bathroom, that she heard Stephanie moaning like she was hurt

2    coming from the bedroom, and she heard a television bang. *Id*. at 26-29.

3        When Ella returned home, Cromwell hit both her and Kim with a pool stick until it

4    broke and then fled the apartment. R.T. 2/4/03, at 41-51. When Ella only saw two of her

5    daughters, and they did not know where Stephanie was, Ella ran after Cromwell. *Id*. at

6    56-64. After Ella chased Cromwell out of the apartment, Amanda and her sister looked

7    for Stephanie and found her under covers on the bed with a television on her head. R.T.

8    2/5/03, at 30-33. Ella identified Cromwell that night and noticed that he had changed his

9    shoes. R.T. 2/4/03, at 89-91.

10        Kim testified that when they arrived back at Ella's apartment they saw Cromwell

11    looking out the window. R.T. 2/10/03, at 35, 38.  After Ella introduced Kim to Cromwell

12    and they entered the apartment, Kim was struck in the back of the head and lost

13    consciousness. *Id*. at 37-47. Kim testified that after she regained consciousness she heard

14    Ella screaming, "Where is my baby?" and ran after Cromwell through the front door. *Id*.

15    at 47-48. She also heard Ella's other two girls screaming "He's killing her."  *Id*. at 52.

16    Kim identified Cromwell as the person who struck her. *Id*. at 101, 103.

17        Cromwell's DNA was found on a vaginal swab from Stephanie that contained a

18    sperm fraction. R.T. 2/6/03, at 45-50. Cromwell's DNA was found from sperm on plaid

19    pants and a shirt that were in the bedroom. *Id*. at 50-55, 65-66, 82-83. Ella denied having

20    sex with Cromwell, and the sex crime kit showed no evidence of it. R.T. 2/4/03, at 34;

21    R.T. 2/5/03, at 109-10. Stephanie's blood was found on the flashlight, knife blade, and

22    knife handle that were found in the bedroom and matched the injuries to Stephanie. R.T.

23    2/6/03, at 57, 65, 86.

24        In contrast, the State did not admit Cromwell's statements to Officer Vine, and

25    admitted his statements to Detective Ballentine only during Cromwell's cross-

26    examination after the State had presented its case-in-chief. Under these circumstances,

27    Cromwell cannot meet his burden of showing *Brecht* prejudice. *See Brecht*, 507 U.S. at

28    639 (finding trial error was harmless where "the State's evidence of guilt was, if not

overwhelming, certainly weighty"); *see also, e.g.*, *Sims*, 425 F.3d at 571 (finding any *Miranda* error harmless where evidence of petitioner's guilt was overwhelming and there was no reasonable likelihood that the challenged statements actually prejudiced him).

**E.    Cromwell is not entitled to relief on his claims asserting that he was denied a fair adjudication of his sentence (Claim 5).**

Cromwell alleges that the trial court made multiple errors that deprived him of a fair penalty-phase adjudication. Doc. 38, at 167-70. Cromwell has failed to demonstrate that any of these allegations warrant habeas relief.

**1.    Cromwell is not entitled to relief on his claim challenging the penalty phase jury instructions (Claim 5-1-1).**

In this claim, Cromwell argues that the trial court violated the Eighth Amendment when it instructed the jury in the penalty phase regarding the circumstances under which it "must" impose a death sentence. Doc. 38, at 167-69. This claim is both procedurally defaulted and meritless.

a.    *Factual background and state court decision.*

Among the final jury instructions the trial court provided to the jury in the penalty phase were the following:

> You can reach a verdict in any of the following ways:
> One, if no jurors find the defendant proved any mitigation by a preponderance of the evidence, you must return a verdict of death.
> Two, if some jurors find the defendant proved mitigation, the jurors who found mitigation must weigh the mitigation they found against the aggravating factors already found. The jurors who found mitigation may disagree about what mitigation exists. If all the jurors who found mitigation find the mitigation is not sufficiently substantial to call for leniency and all the remaining jurors continue to find no mitigation exists, then you must return a verdict of death.
> Three, if all jurors find mitigation exists, all must weigh the mitigation they found against the aggravating factors already found. The jurors may disagree about what mitigation exists. If all the jurors find the mitigation is not sufficiently substantial to call for leniency, you must return a verdict of death.
> Four, if all jurors find mitigation exists, and all find the mitigation they found is sufficiently substantial to call for leniency, you must return a verdict of life in prison.

R.T. 3/4/03, at 140-41.

In his PCR petition, Cromwell argued that this instruction violated the Eighth and Fourteenth Amendments because it precluded the jurors from giving effect to all of the mitigating evidence. R.O.A. 604 at 83-84. The state court found the claim precluded under Arizona Rule of Criminal Procedure 32.2(a)(3) "for failure to object at trial or raise the issue on appeal." R.O.A. 803 at 19.

Alternatively, the court found that the claim failed on the merits. The court noted that the trial judge also instructed the jurors that "[a] finding some mitigation exists need not be unanimous" and that they "need not agree on what particular mitigation exists," they must weigh any existing mitigation against the aggravating factors to determine whether it is sufficiently substantial to call for leniency, and "[y]ou alone decide whether the mitigation is sufficiently substantial to call for leniency." *Id.* at 19; *see also* R.T. 3/04/03, at 139. The court concluded that:

> [t]he instruction and the prosecutor's argument did not mandate a sentence of death, and the trial court properly instructed the jury. *See State v. Ellison*, 213 Ariz. 116, 139 ¶¶ 101-02 (2006) (finding no error because jury instruction did not "require the jurors to unanimously find the existence of any individual mitigating circumstances before it could be considered") (citations omitted). *See also State v. Tucker*, 215 Ariz. 298, 317 ¶¶ 70-74 (2007) (the "four-point" instruction did not create an impermissible "presumption" of death). The United States Supreme Court has held "that, as a requirement of individualized sentencing, a jury must have the opportunity to consider all evidence relevant to mitigation, and a state statute that permits a jury to consider mitigating evidence comports with that requirement." *Kansas v. Marsh*, 548 U.S. 163, 170 (2006). Additionally, provided that "a State's method of allocating the burdens of proof doesn't lessen the State's burden to prove … the existence of aggravating circumstances, a defendant's constitutional rights are not violated by placing on him the burden of proving mitigating circumstances are sufficiently substantial to call for leniency." *Id.* at 170-71.
>
> The foregoing authority defeats [Cromwell's] claim that counsel unreasonably failed to object to the prosecutorial argument and the jury instruction.

R.O.A. 803 at 20. The Arizona Supreme Court denied review of this claim without comment. PCR PFR, at 62; ASC Decision Order *filed* 4/5/2023.

b.     *This claim is procedurally defaulted.*

1    The state court applied an express procedural bar to this claim. R.O.A. 803 at 19.

2    As a result, it is procedurally defaulted in this habeas proceeding. *See Coleman*, 501 U.S.

3    at 729-30; *see also Nunnemaker*, 501 U.S. at 803 (higher court's subsequent summary

4    denial of review affirms lower court's application of a procedural bar). Cromwell

5    identifies no cause and prejudice or fundamental miscarriage of justice to excuse the

6    default. *See* Doc. 38, at 167-69. Therefore, this claim is ineligible for habeas relief.

7                  c.    *This claim also fails on the merits.*

8    Because the post-conviction court found this claim to be meritless in addition to

9    being procedurally barred, Cromwell must overcome 28 U.S.C. § 2254(d)'s high bar to

10   relief even if some cause existed to excuse the procedural default. *See Clabourne*, 745

11   F.3d at 383 (applying AEDPA deference to alternative holding on the merits). Cromwell

12   cannot do so because the state court's decision denying this claim was reasonable.

13   The Supreme Court has held that, because jurors must be allowed to consider any

14   relevant mitigation evidence in making their sentencing decision, sentencing statutes

15   cannot require jurors to unanimously find the existence of any individual mitigating

16   circumstance before that mitigator can be considered. *McKoy v. North Carolina*, 494

17   U.S. 433, 439-40 (1990); *Mills v. Maryland*, 486 U.S. 367, 379-80 (1988). Cromwell

18   argues that the instruction cited above violated this principle by "preclud[ing] their giving

19   effect to any reasons to spare Mr. Cromwell's life." Doc. 38, at 168. This argument fails

20   because the Supreme Court's decisions "do not prohibit states from requiring a

21   unanimous vote in order to impose a life sentence." *Ellison*, 140 P.3d at 922, ¶ 102.

22   Moreover, in *Boyde v. California*, 494 U.S. 370 (1990), the Court held that an

23   instruction unconstitutionally restricts the jury's consideration of relevant mitigation only

24   if "there is a reasonable likelihood that the jury applied the challenged instruction in a

25   way that prevented the consideration of constitutionally relevant evidence." *Id.* at 380.

26   The instructions Cromwell objects to did not prevent the jury's consideration of

27   mitigation evidence. Rather, the trial court specifically instructed the jury that it was to

28   consider, as possible mitigation, "anything offered by the defendant or the State before or

during this phase of the trial helpful in determining whether to impose a sentence less than death" and "may include any aspect of the defendant's character, propensities or record and any evidence relating to the offense." R.T. 3/4/03, at 139. This instruction made clear to the jurors they could give meaningful consideration to any evidence they considered mitigating. Under these circumstances, the state court reasonably determined that the penalty phase jury instructions complied with the Eighth Amendment.

> **2.    Cromwell is not entitled to relief on his claim that the jury was erroneously instructed on his potential parole eligibility (Claim 5-1-2).**

In this claim, Cromwell argues that his due process rights were violated when the trial court failed to instruct the jury in the penalty phase that he would never be eligible for parole and, instead, instructed that if sentenced to life he could be eligible for parole after serving 35 years. Doc. 38, at 169. This claim is meritless.

> a.    *Factual background.*

In the penalty phase, the court instructed the jury as follows regarding the possible sentences Cromwell could receive:

> If you unanimously find the mitigation is not sufficiently substantial to call for leniency, you must impose the death penalty. If you find the mitigation is sufficiently substantial to call for leniency, the Court will sentence the defendant to either life imprisonment without the possibility of parole or life without parole—and I think there is a correction here, Counsel.
>
> So agreed?
>
> Mr. Logan: Yes, Judge.
>
> The Court: So agreed by the State?
>
> Mr. Clayton: Yes.
>
> The Court: We're going to change the words from 25 to 35, so please make that change.
>
> Then in a moment, I'll reread the entire sentence.
>
> Again, if you find the mitigation is sufficiently substantial to call for leniency, the Court will sentence the defendant to either life imprisonment without the possibility of parole or life without parole until at least 35 years have passed.

1    R.T. 3/4/03, at 140. Cromwell did not object to this instruction and, in fact, as

2    demonstrated above, affirmatively assented to it.

3         In his PCR petition, Cromwell argued that the trial court violated his rights under

4    *Simmons v. South Carolina*, 512 U.S. 154 (1994), and *Lynch v. Arizona*, 578 U.S. 613

5    (2016), by erroneously instructing the jury that he could be eligible for parole if

6    sentenced to life and failing to affirmatively instruct the jury that he would in fact be

7    ineligible for parole. R.O.A. 604 at 86-92. To avoid preclusion, Cromwell argued that he

8    was entitled to relief under Rule 32.1(g), which applies when "there has been a

9    significant change in the law that, if applicable to the defendant's case, would probably

10   overturn the defendant's judgment or sentence." *Id.*; *see also* R.O.A. 803 at 20.

11   Addressing Cromwell's claim under Rule 32.1(g)'s standards, the PCR court concluded

12   Cromwell was not entitled to relief because the rule stated in *Lynch*, 578 U.S. 613, was

13   not a significant change in the law and did not apply retroactively to Cromwell's case.

14   R.O.A. 803 at 21. The court would also find that, given the aggravating factors found by

15   the jury "and the evidence that overwhelmingly supports these findings, there is no

16   reasonable probability of a different sentencing result, but for the parole eligibility

17   instruction." *Id.* at 23.

18        Cromwell challenged the post-conviction court's denial of relief in a petition for

19   review to the Arizona Supreme Court. PCR PFR, at 77. The Arizona Supreme Court

20   granted review but denied relief on the IAC aspect of this claim, finding that counsel's

21   failure to invoke *Simmons* did not violate his Sixth Amendment rights. ASC Decision

22   Order *filed* 4/5/2023. *See* Claim 2-10. The court denied relief on all other claims,

23   including Cromwell's due process claim under *Simmons* and *Lynch*.

24                          b.    *Legal background.*

25        In 1994, the Supreme Court held in *Simmons*, that when "a capital defendant's

26   future dangerousness is at issue, and the only sentencing alternative to death available to

27   the jury is life imprisonment without possibility of parole, due process entitles the

28   defendant 'to inform the jury of [his] parole ineligibility, either by a jury instruction or in

                                      130

arguments by counsel.'" *Cruz*, 143 S.Ct. at 655 (citation omitted). Also in 1994, Arizona removed parole eligibility for felonies committed after 1993.[27]   A.R.S. § 41–1604.09(I)(1).  As a result, the Supreme Court found the only form of release potentially available for an Arizona defendant convicted of first-degree murder after 1993 "was, and remains, executive clemency." *Cruz*, 143 S.Ct. at 655. The Arizona Supreme Court had held in multiple cases, however, that *Simmons* did not apply to Arizona's sentencing scheme because parole was available. *Id.*; *see Wagner*, 982 P.2d at 272, ¶ 11 ("Arizona's statute, however, *states with clarity* that the punishment for committing first degree murder is either death, natural life, or life in prison with *the possibility of parole*. Thus, a person of ordinary intelligence can easily determine the range of punishment he or she faces for committing first degree murder.") (emphasis added). In 2016 the Supreme Court rejected this conclusion, found parole unavailable, and held that "it was fundamental error to conclude that *Simmons* 'did not apply' in Arizona." *Id.* at 654 (quoting *Lynch*, 578 U.S. at 615).

After *Lynch*, the defendant in *Cruz* attempted to raise the *Simmons* issue in a PCR petition under Arizona Rule of Criminal Procedure 32.1(g), which allows for relief in a successive proceeding when "there has been a significant change in the law that, if applicable to the defendant's case, would probably overturn the defendant's judgment or sentence."  The Arizona Supreme Court concluded that Rule 32.1(g) did not apply because *Lynch* was not a "significant change in the law." *Cruz I*, 487 P.3d 991. The Supreme Court vacated that decision, however, finding that *Lynch* "overruled binding precedent" and represented a "clear break from the past." *Cruz*, 143 S.Ct. at 658-59.

c.    <em>This claim is meritless.</em>

The Supreme Court's decision in *Cruz* established that *Lynch* is a significant change in the law under Rule 32.1(g), thereby allowing defendants to present a

---

[27]    The Arizona Legislature only amended the department of corrections organization statute, but did not amend the sentencing statutes to omit references to parole.  *See* A.R.S. § 13–703(A) (2002).

*Simmons/Lynch* claim in a successive petition for post-conviction relief. Since this was the basis for the post-conviction court's denial of relief (which the Arizona Supreme Court declined to review without comment), this claim is subject to de novo review in this habeas proceeding. However, this claim fails on the merits because Cromwell neither objected to the instruction given by the trial court nor requested an instruction on his parole ineligibility, and because he cannot show prejudice under *Brecht*.

*Simmons* requires that "where a capital defendant's future dangerousness is at issue, and the only sentencing alternative to death available to the jury is life imprisonment without possibility of parole, due process entitles the defendant 'to inform the jury of [his] parole ineligibility, either by a jury instruction or in arguments by counsel.'" *Shafer v. South Carolina*, 532 U.S. 36, 39 (2001) (quoting *Ramdass v. Angelone*, 530 U.S. 156, 165 (2000)) (brackets in original); *see also O'Dell v. Netherland*, 521 U.S. 151, 159 (1997) ("[T]he Due Process Clause require[s] allowing the defendant to inform the jury—through argument or instruction—of his parole ineligibility in the face of a prosecution's future dangerousness argument.").

Cromwell did not object to the instruction given by the trial court regarding the possible sentences he could receive, and he did not request that the court inform the jury of his parole ineligibility. *See* R.T. 3/4/03, at 140. The Supreme Court has indicated that *Simmons* does not place any sua sponte duty on a trial judge and only entitles the defendant to inform the jury of parole ineligibility at the defendant's request. *See, e.g.*, *Shafer*, 532 U.S. at 39 (when future dangerousness is raised, "due process entitles the defendant to inform the jury of his parole ineligibility, either by a jury instruction or in arguments by counsel") (cleaned up); *Ramdass*, 530 U.S. at 165 (same); *Simmons*, 512 U.S. at 171 ("Because petitioner's future dangerousness was at issue, he was entitled to inform the jury of his parole ineligibility."). Several circuits have thus found that there is no *Simmons* error where the defendant did not request to inform the jury of parole ineligibility. *Ingram v. Zant*, 426 F.3d 1047, 1054 n.5 (11th Cir. 1994) ("*Simmons* ... does not help Ingram in this case because he never requested the trial court to instruct the jury

regarding the significance of life imprisonment."); *Campbell v. Polk*, 447 F.3d 270, 289 (4th Cir. 2006); *Townes v. Murray*, 568 F.3d 840, 850 (4th Cir. 1995) ("[T]he fact that a jury was not informed of the defendant's parole ineligibility would not violate the defendant's due process rights, as recognized by *Simmons*, if that lack of information was due to the defendant's own inaction. ... [T]he defendant's right, under *Simmons*, is one of opportunity, not of result.").

Similarly, several judges of this Court have likewise concluded that defendant's failure to request a parole ineligibility instruction precludes a finding of *Simmons* error. *See Payne v. Thornell*, 679 F. Supp. 3d 931, 936 (D. Ariz. 2023) ("Payne cites to no controlling authority finding *Simmons* error where a defendant has failed to request a parole ineligibility instruction in response to the State's assertion of future dangerousness"); *Fitzgerald v. Thornell*, 2023 WL 5671335, at *5 (D. Ariz. Sept. 1, 2023) (same); *Morris v. Thornell*, 2023 WL 4237334, *3-7 (D. Ariz. June 28, 2023) (denying *Rhines* stay as to unexhausted *Simmons* claim, and dismissing that claim, because the petitioner did not request a *Simmons* instruction at trial and "[t]he Arizona Supreme Court's decision in *Bush*[28] explains the due process holding of *Simmons* and validates Respondents' argument that Morris has failed to present a colorable claim"); *Bearup v. Shinn*, 2020 WL 5544378, *6 (D. Ariz. 2020) (same); *see also Ellison v. Thornell*, 2023 WL 4847599, *5 (D. Ariz. July 28, 2023) ("[C]onstruing *Simmons* as creating a right to a jury instruction on parole ineligibility upon request is consistent with how the Supreme Court has often conceptualized due-process rights in this context, which is as 'an opportunity to be heard.'").

Here, Cromwell was not prevented from informing the jury of his parole ineligibility. He did not request a jury instruction to that effect or otherwise attempt to inform the jury. As a result, no *Simmons* error occurred, and his claim fails on the merits.

---

[28] In *State v. Bush*, 423 P.3d 370, 388, ¶ 75 (Ariz. 2018), the Arizona Supreme Court held that there is no *Simmons* error where the defendant did not request an instruction or otherwise attempt to inform the jury of his parole ineligibility.

133

Finally, even if Cromwell could establish *Simmons* error, he still is not entitled to habeas relief because he cannot show that failure to inform the jury of his parole ineligibility affected the penalty phase verdict. After reviewing the trial record on independent review, the Arizona Supreme Court discussed the weight and gravity of the aggravating factors in this case:

> The record is replete with evidence of cruelty. Stephanie, the eleven-year-old victim, unquestionably suffered unspeakable mental anguish, given the medical examiner's finding that she was still alive at the time of the stabbing injuries and the sexual assault. The crimes committed by Cromwell against the child bespeak horrific cruelty. Eleven-year-old Stephanie, given her tender age, was made to suffer pre-death anguish by conduct indescribable except in the most repulsive terms.

*Cromwell*, 119 P.3d at 458, ¶ 55; *see also* R.O.A. 803 (PCR court held there was no prejudice, finding "there is no reasonable probability of a different sentencing result, but for the parole eligibility instruction."). Nothing in the record indicates that the potential for parole played a role in the jury's sentencing decision. And given the strength of the aggravating factors, as detailed by the Arizona Supreme Court and the PCR court, Cromwell cannot establish that failure to instruct the jury on parole ineligibility "had substantial and injurious effect" on the jury's sentencing decision. *Brecht*, 507 U.S. at 637. As a result, Cromwell would not be entitled to habeas relief even if he could establish error under *Simmons*.

### 3. Cromwell is not entitled to relief on his claim of judicial bias in the penalty phase (Claim 5-2).

Cromwell argues the trial court was not "neutral" at sentencing, violating his right to "an impartial tribunal, undermining his right to a fair trial." Doc. 38, at 170. This claim is procedurally defaulted and meritless.

#### d.    *Factual background.*

In support of this claim, Cromwell cites only to an incident that occurred on the first day of penalty phase proceedings. Before the first witness's testimony, defense counsel referred to a prior conversation regarding the defense's objection to the State introducing evidence of an uncharged rape allegedly committed by Cromwell and his

prior conviction in Texas. R.T. 2/24/03, at 24. Counsel wanted to ensure that he did not say anything during his penalty phase opening statement to open the door to admission of those prior acts. *Id.* at 24-25. The trial court stated that it could not "give you a definitive ruling until I hear the information that is presented." *Id.* at 25. The court acknowledged that if the defense presented evidence regarding Cromwell's positive adjustment to incarceration, then it was "more likely" the prior acts would be admissible. *Id.* at 25-26.

Counsel responded that he would avoid mentioning Cromwell's adjustment to incarceration during the opening statement but that he would "like to have a ruling with regard to the admissibility of the State's evidence" prior to the testimony of the second mitigation witness. *Id.* at 27. The court answered:

> I don't think you are going to get it, Counsel. I talked about this last week. I said, folks, I want to frame these issues and you said, well, it's going to be better after you hear it. So you know, I don't think you are going to get it. Just start working through it. You have told me the theory that you want to pursue and I said, go ahead. You can pursue that theory. And then after spending an hour getting to that point, then you say maybe I don't want to, when I made—obviously, when discussing this back in chambers, my interest in dates, and I made it pretty obvious about 45 minutes ago, what I said, hopefully, relatively clearly, that you're setting yourself up for the other information coming in or at least having less of any ability to oppose that if you go into this information.

> Now, we got a jury waiting back there for an hour and 10 minutes and this is a situation—well, let me just stop.

> What do you want to do? Do you want me to try your case for you?

> Mr. Buck: No, your Honor. Your Honor—

> The Court: Let me take a break. We'll take a recess.

*Id.* at 27-28.

Court resumed after a very brief recess. *Id.* at 28. During further discussion, defense counsel stated, "Please let me tell you that I did not mean to upset the Court with the--." *Id.* at 29. The trial court responded, "I didn't take it that way. It's just that I have had a jury waiting for an hour and 10 minutes and trying to be very accommodating and also trying to anticipate issues." *Id.* Shortly thereafter the court told counsel, "You have been doing a good job. I want to make it clear for the record." *Id.* at 30. Additionally, the

court said "you did not do anything to upset me. I was just a little frustrated a few moments ago, because we have had the jury waiting and keep coming up with new issues that we're bouncing through." *Id.*

> ### e.    *This claim is procedurally defaulted.*

Cromwell did not present this claim either on direct appeal or in his post-conviction relief proceeding and he would be procedurally barred from exhausting the claim now. *See* Ariz. R. Crim. P. 32.2(a)(3) (precluding claims alleging violation of constitutional right that could have been raised on direct appeal or in a prior post-conviction proceeding); *Shrum*, 203 P.3d at 1178, ¶ 12 ("Rule 32.2(a) precludes collateral relief on a ground that either was or could have been raised on direct appeal or in a previous PCR proceeding."). As a result, it is procedurally defaulted in this habeas proceeding. *Coleman*, 501 U.S. at 735 n.1 (claims are barred from habeas review when not first raised before state courts and those courts "would now find the claims procedurally barred"). Cromwell identifies no cause and prejudice or fundamental miscarriage of justice to excuse the default. *See* Doc. 38, at 169-70. Therefore, this claim is ineligible for habeas relief.

> ### f.    *This claim fails on the merits.*

Cromwell cites no law or authority to support this claim. He simply asserts that the trial judge's "hostility" "indicates" that Cromwell "did not have the guarantee of an impartial tribunal, undermining his right to a fair trial." *Id.* at 170. This unsupported assertion is insufficient to establish that Cromwell's rights were violated and that he is entitled to habeas relief. Even so, the trial court did not violate Cromwell's right to an impartial tribunal.

Just as with Claim 4-3, the trial judge's interaction with defense counsel in the penalty phase does not demonstrate "such a high degree of favoritism or antagonism as to make fair judgment impossible." *Liteky*, 510 U.S. at 555. As the judge explained, he became frustrated with defense counsel for continuing to raise new issues while the jury was waiting to enter the courtroom. R.T. 2/24/03, at 27-28. However, nothing indicates

1  that this momentary frustration affected any of the court's rulings or its treatment of

2  counsel in front of the jury. Moreover, shortly after the interaction, the trial court made

3  clear that it had attributed no malintent on the part of defense counsel and stated that it

4  believed defense counsel was "doing a good job." *Id.* at 30. Under these circumstances,

5  Cromwell cannot establish that the trial court violated his due process right to an

6  impartial tribunal. *See Liteky*, 510 U.S. at 555-56 ("*Not* establishing bias or partiality,

7  however, are expressions of impatience, dissatisfaction, annoyance, and even anger, that

8  are within the bounds of what imperfect men and women ... sometimes display.")

9  (emphasis in original).

10
11
  **4.    Cromwell is not entitled to relief on his claim that the trial court erred by "allowing" the use of his statements to police in the penalty phase (Claim 5-3).**

12  In this claim, asserting a Fourth Amendment violation, Cromwell refers back to

13  Claim 4-5 and argues that the trial court "erred in not suppressing [his] statements" and

14  that their use "at the penalty phase violated [his] rights." Doc. 38, at 170. Like Claim 4-

15  5, this claim, too, is barred by *Stone v. Powell*, procedurally defaulted, and meritless.

16
  a.    *This claim is barred in these proceedings.*

17  Though Cromwell does not cite any law in support of this claim, he appears to

18  refer to his argument in Claim 4-5 in which he asserted that his statements to police

19  should have been suppressed because they resulted from an alleged Fourth Amendment

20  violation. As stated above, however, "where the State has provided an opportunity for full

21  and fair litigation of a Fourth Amendment claim, a state prisoner may not be granted

22  federal habeas corpus relief on the ground that evidence obtained in an unconstitutional

23  search or seizure was introduced at his trial." *Stone*, 428 U.S. at 494. Because Cromwell

24  could have asserted this claim at trial, on appeal, or in his post-conviction proceeding and

25  it asserts that evidence obtained in an unconstitutional search or seizure was introduced in

26  the penalty phase, it is barred in this habeas proceeding.

27
  b.    *This claim is procedurally defaulted.*

28

1    Cromwell did not present this claim either on direct appeal or in his post-

2  conviction relief proceeding and he would be procedurally barred from exhausting the

3  claim now. *See* Ariz. R. Crim. P. 32.2(a)(3) (precluding claims alleging violation of

4  constitutional right that could have been raised on direct appeal or in a prior post-

5  conviction proceeding); *Shrum*, 203 P.3d at 1178, ¶ 12 ("Rule 32.2(a) precludes collateral

6  relief on a ground that either was or could have been raised on direct appeal or in a

7  previous PCR proceeding."). As a result, it is procedurally defaulted in this habeas

8  proceeding. *Coleman*, 501 U.S. at 735 n.1 (claims are barred from habeas review when

9  not first raised before state courts and those courts "would now find the claims

10 procedurally barred"). Cromwell identifies no cause and prejudice or fundamental

11 miscarriage of justice to excuse the default. *See* Doc. 38, at 170. Therefore, this claim is

12 ineligible for habeas relief.

13           c.      *This claim fails on the merits.*

14   As with Claim 4-5, this claim fails on the merits because Officer Vine did not

15 violate Cromwell's Fourth Amendment rights by entering his residence under exigent

16 circumstances. Nor does Cromwell establish prejudice under *Brecht*. Without any citation

17 to the record, he claims that his statements to police "were extensively used by the State's

18 expert Dr. Lang to establish a 'consistent with' opinion regarding ASPD" and that "[t]he

19 State also relied on these statements during its arguments." Doc. 38, at 170. But as the

20 Arizona Supreme Court noted in its independent review of Cromwell's death sentence,

21 his crimes "bespeak horrific cruelty" and "[e]leven-year-old Stephanie, given her tender

22 age, was made to suffer pre-death anguish by conduct indescribable except in the most

23 repulsive terms." *Cromwell*, 119 P.3d at 458, ¶ 55. Balanced against that evidence,

24 Cromwell's mitigating factors were "remarkably weak" and deserved "inconsequential

25 weight." *Id.* at 459, ¶ 57. Under these circumstances, Cromwell cannot establish that use

26 of his statements to police in the penalty phase (which was unrelated to the strength of the

27 aggravating factors and the weakness of his mitigation) "had substantial and injurious

28 effect" on the jury's sentencing decision. *Brecht*, 507 U.S. at 637.

**F.    Cromwell's effective assistance of post-trial counsel claim is procedurally defaulted without excuse and also fails on the merits (Claim 6).**

Cromwell claims counsel was ineffective in arguing the motion to vacate judgment regarding a new report on the DNA evidence created and disclosed post-trial. Doc. 38 at 170. This claim is procedurally defaulted and meritless.

### 1.    Procedural status.

Cromwell did not raise this argument in his PCR petition. R.O.A. 604. Instead, Cromwell raised a claim regarding the effectiveness of appellate counsel on this issue.[29] Cromwell would be procedurally barred from exhausting the claim now. *See* Ariz. R. Crim. P. 32.2(a)(3); *Shrum*, 203 P.3d at 1178, ¶ 12 *Stewart*, 46 P.3d at 1071, ¶ 12. It is thus technically exhausted but procedurally default. *Coleman*, 501 U.S. at 735 n.1. Cromwell identifies no cause and prejudice or fundamental miscarriage of justice to excuse the default. *See* Doc. 38, at170-71. Therefore, this claim is ineligible for habeas relief.

### 2.    The claim lacks merit.

Analyst Sartor testified that she considered two possibilities for the "mixed DNA profile" from the combined swabs of Cromwell's penis:

> The mixture is a combination of Items [2.1], Robert Cromwell, and [3.1], Stephanie [], or the mixture is a combination of Item [2.1], Robert Cromwell, and an unidentified person. The chance of obtaining this particular mixed DNA is 100 billion times more likely in the Caucasian population if it's a mixture of [2.1], Robert Cromwell, and [3.1], Stephanie [], than if it's a mixture of Item [2.1], Robert Cromwell, and an unidentified person.

R.T. 2/6/03, at 64. The analyst was testifying to the likelihood ratio that Stephanie was the source of the DNA on Cromwell's penis.

After Cromwell's trial, the Phoenix lab reviewed all cases in which likelihood ratios had been used. R.T. 1/30/04, at 22-23. As a result, Sartor recalculated the statistics

---

[29]    Cromwell also tried to raise misconduct claims in PCR related to the DNA analyst that the PCR court found precluded (*See* Claims 10-1-3 & 10-8 *infra*).

here and found them overstated. *Id.* at 26-27. On May 6, 2003, the State disclosed to the defense an amended DNA report reflecting a recalculation of the "likelihood ratio" for the mixed DNA profile to 1 billion times more likely in the Caucasian population. R.O.A. 273. Cromwell moved to vacate the judgment based on the new evidence. R.O.A. 274. The court held a hearing in January 2004 and denied Cromwell's motion, finding it clear the new evidence "would not have changed the verdict." R.O.A. 304.

The PCR court, in rejecting Cromwell's separate claim regarding assistance of appellate counsel, recounted the factual background and found Cromwell's argument meritless, holding:

> As background, on May 6, 2003, the State disclosed an amended DNA report (dated May 1, 2003), which recalculated the "likelihood ratio" related to whether the contributor of a "penile swab" (Item 2902943-1.1,2,3) came from defendant and the victim, or from defendant and an unidentified person. At trial, the analyst testified that the probability or "likelihood ratio" that the mixture came from defendant and the victim was 100 billion to 1 times more likely in the Caucasian population. (R.T. 2/6/03 at 50)

> In the amended report, the analyst recalculated the "likelihood ratio," as "1 billion times more likely in the Caucasian population if it is a mixture of [2.1] (Robert Cromwell) and [3] (Stephanie []) than if it is a mixture of [2.1] (Robert Cromwell) and an unidentified person." (Dkt. 177)

> One-week after receiving the amended report, trial counsel filed a Rule 24.2 motion to vacate the judgment entered on March 6, 2003, arguing that amended report contained newly discovered evidence and warranted a new trial because "defendant was sentenced to death on the basis of DNA probabilities that were mistakenly overstated by 100 times." (Dkt. 178) The trial court set an evidentiary hearing, and counsel moved to withdraw after determining "it would be inappropriate for [his] office to represent this defendant at the hearing on this motion." (Dkt. 186) The trial court granted the request, and appointed new counsel. After an evidentiary hearing, the trial court found it "clear" that "the new evidence would not have changed the verdict" and denied the Rule 24.2 motion on its merits. (Dkt. 208) Counsel filed a notice of appeal and moved to withdraw.

> [Cromwell] now contends appellate counsel unreasonably failed to raise on appeal that "erroneous DNA probability calculations" deprived [Cromwell] the right to present a defense, constituted a Brady violation, deprived [Cromwell] the ability to raise this issue under Rule 24.1, and that the trial court abused its discretion in denying the Rule 24.2 motion to vacate judgment.

> The issue addressed is whether [Cromwell] has shown ineffective assistance of appellate counsel under *Strickland*. …

140

[Cromwell] also has not shown deficient performance or prejudice. Putting aside the DNA evidence obtained from [Cromwell's] "penile swabs," the jury heard overwhelming evidence of [Cromwell's] guilt as outlined in prior sections of this ruling. For instance, Ella and Amanda identified defendant, and Ella testified that [Cromwell] assaulted her. The jury further heard evidence that a DNA analyst obtained [Cromwell's] DNA profile from a vaginal swab taken from the victim, and on a pair of pants and a shirt found in the bedroom.

[Cromwell's] claims are without merit, and defendant has not shown that appellate counsel unreasonably failed to raise these claims on appeal or a reasonable probability the claims would have prevailed on appeal.

R.O.A. 803 at 34.

Cromwell now claims that post-trial counsel Robert Doyle should have hired an expert to rebut the testimony of the DNA analyst. Doc. 38 at 171. But Cromwell has not proffered what a hypothetical expert would have testified to. *See Murtishaw*, 255 F.3d 926. Cromwell fails to show counsel was deficient in moving to vacate the judgment.

Additionally, as found by the PCR court, and the trial court, the new DNA report would not have affected the trial. The PCR court noted the "jury heard overwhelming evidence of [Cromwell's] guilt." R.O.A. 803 at 34; *see* R.O.A. 304. Given the overwhelming other evidence, including his DNA found in the victim's vagina and three witnesses, Cromwell cannot show any theoretical deficiency prejudiced him. *See Strickland* 466 U.S. at 687

### G.    Appellate counsel was not ineffective (Claim 7).

Cromwell raises eight claims of ineffective assistance of appellate counsel. Doc. 38, at 171-77. Cromwell has not shown that any of these claims warrant habeas relief.

### 1.    Standards for effective assistance of appellate counsel.

The *Strickland* standard applies to claims of ineffective assistance of appellate counsel. *Smith v. Robbins*, 528 U.S. 259, 285, 287-88 (2000).

The showing a defendant must make to prove deficient performance depends on whether appellate counsel filed a merits brief. *Robbins*, 528 U.S. at 287-88. It is "easier for a defendant[] to satisfy the first part of the *Strickland* test" when appellate counsel has not filed a merits brief; the defendant has to show only that "a reasonably competent

141

1  attorney would have found one nonfrivolous issue warranting a merits brief." *Id.* at 288;

2  *see id.* at 285 (requiring defendant to first show that "counsel unreasonably failed to

3  discover nonfrivolous issues and to file a merits brief raising them").

4      It is "difficult," however, for a defendant to show that appellate counsel's

5  performance was deficient when counsel has filed a merits brief. *Id.* at 288. That is

6  because "appellate counsel who files a merits brief need not (and should not) raise every

7  nonfrivolous claim, but rather may select from among them in order to maximize the

8  likelihood of success on appeal." *Id.* This winnowing process "is the hallmark of

9  effective appellate advocacy." *Smith v. Murray*, 477 U.S. 527, 536 (1986). Only when a

10  defendant shows that "a particular nonfrivolous issue was clearly stronger than issues that

11  counsel did present" can a defendant satisfy the first part of the *Strickland* test. *Robbins*,

12  528 U.S. at 288.

13      Regardless, "the prejudice analysis will be the same" in either scenario. *Robbins*,

14  528 U.S. at 288. A defendant "must show a reasonable probability" that "he would have

15  prevailed on his appeal." *Id.* at 285.

16  **2.    The state court reasonably found that appellate counsel was not

17  ineffective for failing to challenge the "especially cruel, heinous,
     or depraved" aggravator (Claim 7-1).**

18      Cromwell begins by reiterating what he also asserted in Issue 2-11: the State failed

19  to prove the "especially cruel, heinous, or depraved" aggravator because the victim was

20  unconscious when injured and killed.  Doc. 38, at 171-72; *id.* at 149-50. Based on that

21  premise, he claims his appellate counsel failed to raise this issue on appeal and draw the

22  issue to the supreme court's attention for consideration during its independent review of

23  the death sentence. Doc. 38, at 171-72. Cromwell further claims that the appellate court

24  "would have weighed the mitigation evidence differently" if the issue had been raised,

25  and that counsel's failure to do so violated "a reasonable standard of care, which

26  prejudiced [his] defense." *Id.* at 172. Cromwell, however, is not entitled to relief on his

27  claim of appellate counsel's ineffectiveness because the PCR court's denial of the claim

28  was reasonable.

   a. *Background, exhaustion, and state court decision.*

The jury was instructed on cruelty as follows:

> Cruelty goes to mental and physical anguish suffered by the victim. Mental anguish occurs when the victim experiences significant uncertainty about her fate. In order to constitute cruelty, conduct must occur before death and while a victim is conscious. Conduct occurring after death or while a victim is unconscious does not constitute cruelty. Before conduct can be found to be cruel, the State must prove that the defendant knew or should have known that the conduct would cause suffering to the victim.

R.T. 2/20/03, at 55. The jury found the murder was committed in an especially cruel manner, R.O.A. 137, and in an especially heinous or depraved manner, R.O.A. 136.

  On appeal, Cromwell argued that the "especially heinous, cruel or depraved" aggravator was unconstitutionally vague. *Cromwell*, 119 P.3d at 455, ¶ 40. The Arizona Supreme Court rejected the argument because the cruelty instruction was not vague, and it declined to address the other instructions on heinousness or depravity because it "conclude[d] that the jury's cruelty finding [was] amply supported by the evidence." *Id.* at 456, ¶¶ 42-43. The Arizona Supreme Court also independently reviewed each aggravating factor and the mitigating evidence to determine if the death sentence was appropriate. *Id.* at 458, ¶ 52. The court found plenty of evidence of cruelty when doing so:

> The record is replete with evidence of cruelty. Stephanie, the eleven-year-old victim, unquestionably suffered unspeakable mental anguish, given the medical examiner's finding that she was still alive at the time of the stabbing injuries and the sexual assault. The crimes committed by Cromwell against the child bespeak horrific cruelty.  Eleven-year-old Stephanie, given her tender age, was made to suffer pre-death anguish by conduct indescribable except in the most repulsive terms.

*Id.* at 458, ¶ 55. The court concluded the death sentence was appropriate after weighing the mitigating evidence against the aggravating factors and finding the mitigating evidence weak and insubstantial. *Id.* at 459, ¶ 57.

  In his PCR petition, Cromwell argued that the State failed to prove the especially heinous, cruel or depraved aggravator because Stephanie was unconscious, and he claimed that his "[a]ppellate counsel's failure to raise this issue on appeal was

1  prejudicially deficient performance." R.O.A. 604 at 145-46. He claimed that "there is a

2  reasonable probability that [the Arizona Supreme Court] would have concluded that the

3  aggravating factors were not sufficient to support the death penalty" if the issue had been

4  raised because it would have learned the cruelty aggravator was unproven, leaving only

5  the victim's age as an aggravator. R.O.A. 604 at 146-47; R.O.A. 798 at 64-65.

6      The PCR trial court rejected the ineffectiveness claim, finding appellate counsel

7  was not ineffective because the underlying issue had no merit:

> At the time of [Cromwell's] appeal, the Arizona Supreme Court conducted
> an independent review of an imposed death sentence, and each aggravating
> factor and any mitigating evidence. *Cromwell*, 211 Ariz. at 191 ¶ 52. The
> Court found the trial "record is replete with evidence of cruelty," *id.* at ¶ 54.
> Additionally, [Cromwell] did not show that trial counsel unreasonably
> failed to challenge the especially cruel aggravator. (*See*, *supra*, Claim
> (A)(4)(a),(b)) In sum, substantial evidence supports the especially cruel
> aggravator, and appellate counsel did not render ineffective assistance in
> failing to raise a non-meritorious issue on appeal.

13  R.O.A. 803 at 34-35.

14      Cromwell again raised the issue in his petition for review to the Arizona Supreme

15  Court, exhausting the claim. PCR PFR, at 74-75. The Arizona Supreme Court denied

16  review without comment. ASC Minute Letter (4/5/2023).

17              b.    *Cromwell is not entitled to relief.*

18      Cromwell does not argue, much less show, that the last reasoned decision on this

19  issue was contrary to or an unreasonable application of Supreme Court precedent or

20  based on an unreasonable determination of the facts under 28 U.S.C. § 2254(d). Doc. 38,

21  at 171-72. He has therefore not met his burden under AEDPA. *See Pinholster*, 563 U.S.

22  at 181 ("The petitioner carries the burden of proof.").

23      Appellate counsel who file a merits brief (as here) have not performed deficiently

24  under *Strickland* unless "a particular nonfrivolous issue was *clearly* stronger than issues

25  that counsel did present." *Robbins*, 528 U.S. at 288 (emphasis added). Cromwell has not

26  argued the issue of whether the (F)(6) aggravator had been proven is *clearly* stronger than

27  the issues appellate counsel raised on appeal. Doc. 38, at 171-72.

28

1    Indeed, Cromwell's appellate counsel winnowed down the issues and raised those

2  that, at the time, had at least some strength and even novelty. *See, e.g.*, *Cromwell*, 119

3  P.3d at 455-56, ¶¶ 40-42 (addressing argument that (F)(6) aggravator was

4  unconstitutionally vague when a *jury* found the aggravator existed and when prior case

5  law found no vagueness problem because the *trial judge* was presumed to apply the

6  supreme court's narrowing constructions); Opening Brief at 36-39, 54 (briefing this

7  vagueness issue before the issue was decided in *State v. Anderson*, 111 P.3d 369, 394-95,

8  ¶¶ 109-14 (Ariz. 2005)).

9    Moreover, Supreme Court precedent holds that prejudice may be proven only

10  when there is a "reasonable probability" that the defendant "would have prevailed on his

11  appeal." *Robbins*, 528 U.S. at 285. Here, there is no reasonable probability Cromwell's

12  appellate counsel would have prevailed on appeal because, as the PCR court concluded,

13  the argument that the (F)(6) aggravator was unproven had no merit. R.O.A. 803 at 34-35.

14  That is because, as the PCR court correctly found, "substantial evidence support[ed] the

15  especially cruel aggravator." R.O.A. 803 at 34-35 (quoting *Cromwell*, 119 P.3d at 458, ¶

16  55). Even assuming Stephanie was unconscious at the time of death and when she

17  received some of her many injuries, R.T. 2/11/03, at 59-61, the evidence the PCR court

18  detailed elsewhere in its ruling nonetheless showed that Stephanie was conscious when

19  she suffered mental anguish and physical pain and that her injuries did not occur in "rapid

20  succession" as Cromwell claims. R.O.A. 803 at 13-15; *see* Claim 2-11 *supra*.

21    For example, the testimony of Stephanie's sister, Amanda, reveals that Stephanie

22  was conscious while suffering mental and physical pain both in the bathroom and

23  bedroom—places where blood splatter and broken metal objects were found, including a

24  knife. R.T. 2/4/03, at 167, 171, 176, 180, 182, 184-85; Trial Ex. 70 (items found in

25  bedroom). Amanda heard Stephanie making noises in the bathroom like she was "really

26  hurt" and "getting hurt." R.T. 2/5/03, at 21-23, 43-44. Amanda then saw Stephanie

27  standing in the hallway "look[ing] hurt a little bit," saw Stephanie walk "[s]low[ly]" into

28

the bedroom, and then heard Stephanie make more sounds in the bedroom like she was hurt. *Id.* at 24-25, 28-29.

Cromwell's argument that the Arizona Supreme Court's independent review of the death sentence would have been different if his appellate counsel had raised the issue has no force to it. Doc. 38, at 172. The Arizona Supreme Court is presumed to know and follow the law, *see Woodford v. Visciotti*, 537 U.S. 19, 24 (2002), so it presumably knew and followed the law that required evidence of consciousness when it independently reviewed the death sentence and found the record was "replete with evidence of cruelty," *Cromwell*, 119 P.3d at 458, ¶ 55; *see State v. Sansing*, 77 P.3d 30, 33, ¶ 7 (Ariz. 2003) (requiring consciousness while suffering physical or mental pain to find cruelty, although not requiring consciousness for every wound inflicted). In other words, there is no reason to believe that raising the issue of whether the (F)(6) aggravator was proven in the briefing would have changed the supreme court's independent review when that independent review necessarily required it to consider that issue.

For these reasons, Cromwell has not shown that the post-conviction court's denial of this claim was contrary to or an unreasonable application of Supreme Court precedent, or that it was based on an unreasonable determination of the facts.

### 3. The Arizona Supreme Court reasonably found that appellate counsel was not ineffective for failing to raise the *Simmons* issue on direct appeal (Claim 7-2).

Cromwell claims that his appellate counsel was ineffective for failing to "raise the *Simmons* issue on direct appeal or preserve the issue for later review," and that "but for that failure there is a reasonable probability of a different result on [his] direct appeal." Doc. 38, at 172-73. Cromwell, however, is not entitled to relief on his claim of appellate counsel's ineffectiveness because the Arizona Supreme Court's denial of the claim was reasonable under AEDPA.

#### a. *Exhaustion and state court decision.*

Cromwell exhausted this claim when he presented it in his PCR petition and, after the PCR court denied relief, when he presented it in his petition for review to the Arizona

1   Supreme Court. R.O.A. 604 at 95-96; PCR PFR, at 77-78. In denying relief, the PCR

2   court first found (when addressing a similar IAC claim but as to trial counsel) that there

3   was "no reasonable probability of a different sentencing result" because of the jury's

4   findings that Cromwell committed the murder "in an especially cruel and especially

5   heinous or depraved manner," and because of "the evidence that overwhelmingly

6   supports these findings." R.O.A. 803 at 23. The PCR court then found no reasonable

7   probability of a different outcome on appeal given how the Arizona Supreme Court has

8   ruled on the issue:

> With respect to appeal, [Cromwell] has not shown a reasonable probability
> of a different appellate decision, and legal authority defeats [Cromwell's]
> claim. As discussed above, counsel did not raise the *Simmons* error at trial
> or otherwise request a parole-eligibility jury instruction. In *Bush*, the
> Arizona Supreme Court found that "*Simmons* 'relief is foreclosed by [the
> defendant]'s failure to request a parole ineligibility instruction at trial." *Id.*
> at 593 ¶ 74. The Court explained that "in every case in which the [United
> States] Supreme Court or [Arizona Supreme] Court has found reversible
> Simmons error, the trial court either rejected the defendant's proposed jury
> instruction regarding his ineligibility for parole, prevented defense counsel
> 'from saying anything to the jury about parole ineligibility,' or both." *Id.*
> (citations omitted).

16  R.O.A. 803 at 23. The Arizona Supreme Court granted review but denied relief because it

17  found that appellate counsel had not been ineffective:

> The record does not show that trial and appellate counsel violated
> Cromwell's Sixth Amendment right to effective assistance of counsel by
> failing to invoke *Simmons v. South Carolina*, 512 U.S. 154 (1994).

20  ASC Decision Order *filed* 4/5/2023.

               b.    *Cromwell is not entitled to relief.*

22  Cromwell does not argue, much less show, that the last reasoned decision on this

23  issue was contrary to or an unreasonable application of Supreme Court precedent or

24  based on an unreasonable determination of the facts under 28 U.S.C. § 2254(d). Doc. 38,

25  at 172-73. He has therefore not met his burden under AEDPA. *See Pinholster*, 563 U.S.

26  at 181 ("The petitioner carries the burden of proof.").

27  Regardless, Cromwell cannot do so. His appellate counsel was not deficient in

28  failing to raise the *Simmons* issue on appeal when the issue was not clearly stronger than

147

the issues that were raised on appeal. *See Robbins*, 528 U.S. at 288. In fact, Cromwell's appellate counsel raised at least one issue that had been preserved, so the unpreserved *Simmons* issue may not have been as strong. *See Cromwell*, 119 P.3d at 452-55, ¶¶ 19-37 (reviewing denial of motion for change of counsel for abuse of discretion); *see Davila v. Davis*, 582 U.S. 521, 533 (2017) ("In most cases, an unpreserved trial error will not be a plainly stronger ground for appeal than preserved errors."); *State v. Henderson*, 115 P.3d 601, 607, ¶ 19 (Ariz. 2005) (explaining that fundamental error review applies to unpreserved errors, this review is "limited," and relief is "rare").

Cromwell's appellate counsel also cannot have been deficient in failing to raise a *Simmons* issue when no one at the time of Cromwell's appeal—which was decided in August 2005—had challenged the parole-eligibility instruction on appeal, and when the Arizona Supreme Court had said that parole *was available*.  *See State v. Cruz*, 181 P.3d 196, 207, ¶¶ 41-42 (Ariz. 2008) (first death penalty case where *Simmons* issue was raised, which was years after Cromwell's appeal); *Wagner*, 982 P.2d at 273 ("Arizona's statute, however, *states with clarity* that the punishment for committing first degree murder is either death, natural life, or life in prison with the *possibility of parole*." (emphasis added)). In other words, Cromwell's appellate counsel could have reasonably concluded that there was no viable *Simmons* issue to raise on appeal. *See Simmons*, 512 U.S. at 156 (requiring that "state law prohibit[] the defendant's release on parole" as one of two prerequisites to informing jury of parole ineligibility); *see also Ellison*, 721 F. Supp. 3d at 972-73 (finding that "reasonable counsel could have concluded that [petitioner] was in fact parole-eligible (and, therefore, there were no grounds for a[ *Simmons*] objection)" when Arizona law allowed for parole and no court had addressed how *Simmons* applied in Arizona).

Indeed, the Arizona Supreme Court held in a "series" of subsequent capital appeals that "*Simmons* did not apply in Arizona," and that law did not change until the United States Supreme Court held that "*Simmons* applies with full force in Arizona" in 2016. *Cruz*, 598 U.S. at 21-22. Cromwell's appellate counsel cannot be faulted for failing

to anticipate changes in the law. *See Kulbicki*, 577 U.S. at 4 (explaining that courts must assess the reasonableness of counsel's actions from their perspective at the time); *Gerard*, 856 F. App'x at 647 ("The failure to predict future changes in the law cannot be considered ineffective assistance.").

Further, there is no reasonable probability that Cromwell's appellate counsel would have prevailed even if counsel had raised the *Simmons* issue on appeal. *See Robbins*, 528 U.S. at 285. As discussed, the *Simmons* issue is meritless because Cromwell has not shown he was not prevented from informing the jury of his parole ineligibility. *See Supra* Claims 2-7-5; 2-10 & 5-1-2. Apart from that, Cromwell's appellate counsel would not have been able to show prejudice on appeal[30] because of the strong aggravating factors and weak mitigating factors, and the lack of any record evidence showing that the possibility of parole played a role in the jury's sentencing decision. *See supra* Claim 5-1-2(c) (argument on why *Simmons* error had no effect on jury's sentencing decision); *State v. Escalante*, 425 P.3d 1078, 1087, ¶ 31 (Ariz. 2018) (defendant must show "a reasonable jury could have plausibly and intelligently returned a different verdict" to prove prejudice).

Finally, the theoretical sentencing error alleged here was cured when the Arizona Supreme Court independently reviewed the aggravating and mitigating circumstances and concluded that Cromwell's death sentence was appropriate. *See supra* Claim 2-10 ("No prejudice"); *see also Clemons*, 494 U.S. at 748-50.

### 4. The state court reasonably found that Cromwell's appellate counsel did not have a conflict of interest (Claims 7-3 & 7-4).

Cromwell argues that his appellate counsel, Consuelo Ohanesian, represented him despite the "ethics committee of the OLA" finding it would not be appropriate for the

---

[30] Cromwell would have been required to show prejudice on appeal because his trial counsel did not object below requiring the issue to be reviewed only for fundamental error. *State v. Riley*, 459 P.3d 66, 105, ¶ 159 (Ariz. 2020); *Henderson*, 115 P.3d at 607, ¶¶ 19-20.

1   OLA to represent him at a post-trial hearing and his "objections to her representing him."

2   Doc. 38, at 173. He also argues that Ohanesian "failed to establish any relationship with

3   [him]," and her "loyalty to Logan and the OLA rather than [him] prejudiced [his]

4   appeal." *Id.* at 173-74. He further claims that Ohanesian should have withdrawn given her

5   conflict of interest. *Id.* at 174. Cromwell, however, is not entitled to relief on these claims

6   because the post-conviction court's denial of the claims was reasonable under AEDPA.

7              a.      *Exhaustion and state court decision.*

8        Cromwell exhausted these claims when he presented them in his petition for post-

9   conviction relief and, after the post-conviction court denied relief, when he presented

10  them in his petition for review to the Arizona Supreme Court. R.O.A. 604 at 120-29;

11  PCR PFR at 6, 40-48. The post-conviction court denied the conflict-of-interest claims and

12  explained its reasons for doing so. The court first gave the factual background for the

13  conflict claim:

> Several months prior to trial, counsel filed a motion to withdraw and argued
> there existed an irreconcilable conflict and a breakdown in communication
> with [Cromwell]. The trial judge held a hearing on November 20, 2002.
> During the ex-parte portion of the hearing, counsel described that
> [Cromwell] did not believe the State had evidence "of any sort."
> [Cromwell] explained his view of the evidence, and told the trial judge that
> he did not trust trial counsel and needed new counsel. The trial judge
> denied the request for new counsel. [Cromwell] thereafter refused to speak
> with trial counsel and [Cromwell] filed a bar complaint, both of which were
> brought to the trial court's attention. After the trial concluded, the State
> disclosed an amended DNA report, which recalculated the "likelihood
> ration" related to DNA profiles obtained from a "penile swab" taken from
> [Cromwell]. Trial counsel filed a motion to vacate judgment and moved to
> withdraw, stating that the ethics committee of his office determined that "it
> would be inappropriate" to represent [Cromwell] at the hearing on the
> motion to vacate judgment.
>
> Contract counsel, Robert Doyle, represented [Cromwell]in the post-verdict
> hearing. After the trial court denied relief, Doyle filed a notice of appeal
> and withdrew from the representation. [Cromwell's] case then returned to
> trial counsel's agency, and an appellate attorney with that agency
> represented [Cromwell] on appeal.

26  R.O.A. 803 at 29-30. The court then found Cromwell's conflict-of-interest claim as to

27  appellate counsel meritless:

> [Cromwell] next contends that appellate counsel labored under the same
> conflict as trial counsel, failed to fulfill an ethical duty to establish a

working relationship with [Cromwell], and did not competently present available appellate issues because [Cromwell] refused to assist in the preparation of his appeal.

[Cromwell's] allegations fail to show an actual conflict during the appellate representation. Appellate counsel communicated with [Cromwell], advised him on the status of the case, requested his input on the appellate issues, and incorporated [Cromwell's] suggestions. (Ex. 87, 88-appellate counsel responding, "I paid particular attention to your letters detailing your thoughts about the case" and that she incorporated the conflict argument raised by [Cromwell].) [Cromwell] has not presented evidence to demonstrate an irreconcilable conflict with either trial or appellate counsel, and [Cromwell] fails to show that a conflict hindered appellate counsel from pursuing a plausible defense strategy on appeal.

[Cromwell] also faults appellate counsel for not expanding the record on appeal to include a memorandum in trial counsel's file, arguing this information would have supported the conflict of interest argument on appeal. However, trial counsel did not present this memorandum to the trial court, and an appellate court's review is limited to the record before the trial court. *State v. Carter*, 216 Ariz. 286, 291 124 (App. 2007). Inadmissible evidence does not demonstrate counsel failed to pursue an alternative strategy. *Moore* at 16 1 83. Additionally, given that appellate counsel solicited and incorporated [Cromwell's] input and that appellate claims are limited to issues contained in the trial record, the disagreements and potential animosity between [Cromwell] and trial counsel do not demonstrate that appellate counsel operated under a conflict of interest. *See State v. Bennett*, 213 Ariz. 562, 567 1 22 (2006) ("Appellate counsel is responsible for reviewing the record and selecting the most promising issues to raise on appeal.").

This claim is not colorable. [Cromwell] has not shown an actual conflict of interest with respect to the trial or appellate representation, or that a conflict adversely affected trial or appellate counsel from pursuing a plausible alternative defense strategy.

R.O.A. 803 at 32-33. The Arizona Supreme Court denied review of the claim without comment. *See* ASC Decision Order *filed* 4/5/2023.

> b.    *Cromwell is not entitled to relief.*

Cromwell does not argue, much less show, that the last reasoned decision on these issues was contrary to or an unreasonable application of Supreme Court precedent or based on an unreasonable determination of the facts under 28 U.S.C. § 2254(d). Doc. 38, at 173-74. He has therefore not met his burden under AEDPA. *See Pinholster*, 563 U.S. at 181 ("The petitioner carries the burden of proof.").

However, even assuming he made such arguments, he cannot succeed. The Sixth Amendment right to counsel includes the right to assistance by a conflict-free attorney.

151

*Wood*, 450 U.S. at 271. A defendant is not, however, entitled to counsel of choice or to a meaningful relationship with his or her attorney. *Morris*, 461 U.S. at 13-14. "To establish a Sixth Amendment violation based on a conflict of interest ..., the defendant 'must demonstrate that an actual conflict of interest adversely affected his lawyer's performance.'" *Noguera*, 5 F.4th at 1035 (quoting *Cuyler*, 446 U.S. at 348).

Here, Cromwell cannot show that the PCR court's decision that his appellate counsel had no conflict of interest that adversely affected her performance was unreasonable for several reasons. First, the finding by the OLA's ethics committee that it would be "inappropriate" for that office to represent Cromwell in a post-trial hearing is not a finding that Logan or anyone else in the office had to withdraw because of a conflict of interest. Logan's motion to withdraw explained:

> Counsel for defendant Robert Louis Cromwell moves the court to allow the Office of the Legal Advocate to withdraw from representing this defendant for the purposes of the Motion to Vacate Judgment that is scheduled to be heard on August 5, 2003. The ethics committee of the Office of the Legal Advocate has determined that it would be inappropriate for this office to represent this defendant at the hearing on this motion.
>
> Arrangements have been made for Robert Doyle to represent the defendant should the court grant this motion. It is, therefore, requested that Mr. Doyle be appointed for purposes of this hearing only.

R.O.A. 282. Nothing in the motion shows that Logan or OLA was moving to withdraw because of a conflict of interest.

However, assuming a finding that representation was "inappropriate" equates to a finding of a "conflict of interest," Logan explained in his motion to withdraw that the OLA's finding was limited to the hearing on the motion to vacate judgment. Nothing shows that the alleged conflict continued after the hearing or infected Ohanesian's representation of Cromwell on appeal.

Second, Cromwell's objections to Ohanesian representing him and the alleged lack of a relationship do not show a conflict of interest. The Sixth Amendment does not guarantee a meaningful relationship between a defendant and his counsel. *Morris*, 461 U.S. at 14. This is particularly true during direct appeals in Arizona, which generally do

1    not require a defendant's participation and are record based. *See Fitzgerald v. Myers*, 402

2    P.3d 442, 448-49, ¶¶ 18, 20 (Ariz. 2017) (explaining prior decision that concluded a

3    defendant's competence is not required during appeal when "convicted defendants

4    generally do not participate in the appeal," and explaining that direct appeals differ from

5    PCR proceedings in that appeals are record based). In this case, however, the state court

6    record shows that Cromwell and Ohanesian had a working relationship and Cromwell

7    participated in the appeal. Indeed, as the PCR court found, Ohanesian communicated

8    with Cromwell multiple times, Cromwell communicated detailed thoughts about the case

9    to Ohanesian, Ohanesian listened to Cromwell's thoughts, and Ohanesian even raised

10   issues on appeal based on Cromwell's input. PCR Exs. 87-88.

11       Finally, the state record does not show that Ohanesian's alleged loyalty to Logan

12   and OLA prejudiced Cromwell's appeal like Cromwell claims. Cromwell specifically

13   points to Ohanesian's oral argument before the Arizona Supreme Court on the issue of

14   whether the trial court abused its discretion in denying the motion for new counsel. Doc.

15   38, at 173-74. But there is no indication in that oral argument or in the state court record

16   that Ohanesian's professional relationship with Logan and OLA adversely affected her

17   performance. The state court record instead shows that Ohanesian believed that the

18   request-for-new-counsel issue was a strong one that had a good chance of success. *See*

19   PCR Ex. 71, at 27 (Ohanesian states she "thought I had a great issue with the [sic] they

20   should have let [Logan] withdraw"); PCR Ex. 88 (Ohanesian writes that the "request for

21   new counsel was a strong issue," it was the "first argument" in her brief, and she did "not

22   want to get [Cromwell's] hope up" but she "believe[d] that Arizona law support[ed] the

23   argument"). The record also shows that she vigorously argued the issue based on what

24   was in the record on appeal—a record that did not include any, or at least very few,

25   details on Logan's part in the alleged conflict. *See* Doc. 38, at 173-74 (Cromwell claims

26   that Ohanesian should have argued that Logan was "at least partially responsible for the

27   conflict"); *see also* PCR Ex. 67, at 5, 9 (Ohanesian argued that Logan should have been

28   let off the case, but she explained multiple times that aspects of Logan's and Cromwell's

1    relationship were not in the "court record" or "on the record" when the supreme court

2    questioned her about defense counsel's role in the conflict); PCR Ex. 71, at 9-16

3    (Ohanesian suggests there was nothing in the record showing what Logan's part was in

4    the alleged conflict of interest, such as stating that Logan could have maybe "gotten a

5    little more graphic" on the record about the conflict issue and that Logan was "so polite

6    during the hearing" on the motion for new counsel).

7        In fact, Ohanesian's raising of the request-for-change-of-counsel issue did not

8    require her to criticize Logan. Cromwell has not pointed to anything in the record on

9    appeal that Ohanesian could have cited as a basis for criticizing Logan and that would

10   have allowed her to prevail on the change-of-counsel issue.

11       Given these circumstances, Cromwell cannot show that the PCR court's decision

12   was contrary to or an unreasonable application of Supreme Court precedent or based on

13   an unreasonable determination of the facts.

14       **5.    Appellate counsel was not ineffective for recounting the facts of
         the crime in the light most favorable to sustaining the jury's

15         guilty verdicts (Claim 7-5).**

16       Cromwell argues that his appellate counsel incorrectly concluded that she was

17   required to present the facts of his crimes in the light most favorable to supporting the

18   jury's verdicts. Doc. 38, at 174-75. Cromwell did not raise this claim in the state court,

19   and he would be procedurally barred from exhausting the claim now.[31]   *See* Ariz. R.

20   Crim. P. 32.2(a)(3) (precluding claims that could have been raised on direct appeal or in a

21   prior PCR proceeding); *Shrum*, 203 P.3d at 1178, ¶ 12 ("Rule 32.2(a) precludes collateral

22   relief on a ground that either was or could have been raised on direct appeal or in a

23   previous PCR proceeding."); *see also Stewart*, 46 P.3d at 1071, ¶ 12 ("The ground of

24   ineffective assistance of counsel cannot be raised repeatedly."). As such, this claim is

25   procedurally defaulted. *See Coleman*, 501 U.S. at 735 n.1. Cromwell identifies no cause

26   _____

27   [31]    Cromwell asserted in his PCR proceeding that his appellate counsel portrayed the
     facts "from the State's point of view," but he did so in the context of showing only that

28   his counsel's alleged conflict of interest affected her representation. ROA 604 at 122.

and prejudice or fundamental miscarriage of justice to excuse the default. *See* Doc. 38, at 174-75. Thus, his claim is procedurally defaulted without excuse.

Nonetheless, the claim is meritless. At the time, the Arizona Supreme Court recounted the facts of the crime in the light most favorable to sustaining the jury's verdicts. *E.g.*, *State v. Tucker*, 68 P.3d 110, 113, ¶ 3 n.1 (Ariz. 2003). That is still what it does to this day. *E.g.*, *State v. Rushing*, 404 P.3d 240, 244, ¶ 2 n.2 (Ariz. 2017). Ohanesian, an experienced appellate attorney, recognized this principle and explained it to Cromwell in one of her letters to him. Ex. 88.

In fact, there are few appellate issues that would require an Arizona appellate court to view the evidence in the defendant's favor, and none of those issues were present in Cromwell's appeal. *See* Opening Brief; *see also State v. Carson*, 410 P.3d 1230, 1231, ¶ 2 (Ariz. 2018) (viewing "evidence in the light most favorable to a defendant's request for a self-defense instruction"); *State v. Castro*, 788 P.2d 1216, 1224 (Ariz. App. 1989) (viewing evidence in light most favorable to the proponent of the evidence, which could be the defendant).

But even if one of those issues had been present, Arizona appellate courts have related the crime's facts in the light most favorable to sustaining the jury's verdict in the facts section of their decisions but have then viewed the evidence under a different standard when a specific issue required them to do so. *See, e.g.*, *State v. Kiper*, 887 P.2d 592, 594, 596 (Ariz. App. 1994) (viewing evidence "in the light most favorable to sustaining the verdict" in the facts section, but viewing "evidence in the light most favorable to the proponent" of the evidence when that issue called for doing so); *State v. Petzoldt*, 836 P.2d 982, 983, 986 (Ariz. App. 1991) (same). Cromwell's appellate counsel cannot therefore be ineffective for relating the facts of the crime in the light most favorable to sustaining the jury's verdict in the facts section of her opening brief—a section that merely related the facts of the crime as found by the jury and that did not relate the pertinent facts of the raised issues. *See* Opening Brief at 12-28, 31.

**6.    Appellate counsel adequately communicated (Claim 7-6).**

Cromwell alleges that his "appellate counsel had a duty to communicate with [him]" but that "appellate counsel failed to do so." Doc. 38, at 175. Cromwell, however, did not raise this claim in state court, and he would be procedurally barred from exhausting the claim now. *See* Ariz. R. Crim. P. 32.2(a)(3); *Shrum*, 203 P.3d at 1178; *see also Stewart*, 46 P.3d at 1071. As such, this claim is procedurally defaulted. *See Coleman*, 501 U.S. at 735 n.1. Cromwell identifies no cause and prejudice or fundamental miscarriage of justice to excuse the default. *See* Doc. 38, at 175. The claim is thus procedurally defaulted without excuse.

Even so, the claim is meritless because Ohanesian communicated with Cromwell.[32]  When she took over the case, Ohanesian informed Cromwell she had done so, and she told him to "contact [her] with any questions or concerns."  PCR Ex. 87. Cromwell, for his part, wrote Ohanesian "letters detailing [his] thoughts about the case." PCR Exh. 88. Ohanesian "paid particular attention" to those letters, and she incorporated at least some of his ideas into the opening brief (e.g., the request-for-new-counsel issue). *Id.* Once the opening brief was filed, Ohanesian informed Cromwell of that fact. *Id.* She also informed Cromwell that she would be writing a reply and that she expected oral argument to be scheduled in the fall or early winter. *Id.* She further explained that she believed the request-for-new-counsel issue was "a strong issue" supported by Arizona law, and that the other issues were good but might not be as impactful. *Id.* She then explained her reasoning for writing the facts the way she did. *Id.* She again told Cromwell to contact her with "any questions or comments." *Id.*

Given this evidence, there is no doubt that Ohanesian communicated with Cromwell and Cromwell communicated with her. That Ohanesian and Cromwell

---

[32]    The PCR court found when addressing the conflict-of-interest claim that "[a]ppellate counsel communicated with defendant, advised him on the status of the case, requested his input on the appellate issues, and incorporated [his]suggestions."  R.O.A. 803 at 32.

1   communicated in writing, and that Cromwell alleges he has a "disorder that affects his
2   ability to communicate through writing," Doc. 38, at 175, does not change the fact that
3   Cromwell could and did communicate with Ohanesian in writing and that Cromwell had
4   an impact on the appeal by doing so, *see Strong v. Burt*, 2016 WL 7116593, at *5 (E.D.
5   Mich. Dec. 7, 2016) (appellate counsel who corresponded through mail was not
6   ineffective); *Robert J. M. v. Ballard*, 2016 WL 3369556, at *10 (W. Va. June 17, 2016)
7   (appellate counsel did not render deficient performance when counsel communicated by
8   mail and included claim in brief that defendant wanted).  The claim has no merit.

9
10
### 7.    The state court reasonably found that appellate counsel was not ineffective for failing to expand the record on appeal (Claim 7-7).

11   Cromwell claims that his counsel was ineffective when she failed to supplement
12   the record with evidence relevant to the request-for-counsel issue, including "Logan's
13   successful motion to withdraw following the conviction and death sentence" and Logan's
14   "memo to the file documenting his 'fuck you' statement to his client while at counsel
15   table." Doc. 38, at 175-76. He further claims that the failure to supplement prevented
16   appellate counsel from showing the "extent of the irreconcilable conflict between Logan
17   and [himself]." *Id.* at 176. Yet Cromwell is not entitled to relief on this claim because the
18   post-conviction court's denial of claim was reasonable under AEDPA.

19                    a.    *Exhaustion and state court decision.*

20   Cromwell exhausted this claim when he presented it in his petition for post-
21   conviction relief and, once the post-conviction court denied relief, when he presented it in
22   his petition for review to the Arizona Supreme Court. R.O.A. 604 at 131-32; PCR PFR, at
23   68-70. The post-conviction court denied relief because "appellate review is limited to the
24   evidence before the trial court," and because "there is no reasonable probability that the
25   additional evidence would have shown a complete breakdown in communication or
26   irreconcilable differences." R.O.A. 803 at 33. The Arizona Supreme Court denied review
27   of the claim without comment. ASC Decision Order *filed* 4/5/2023.

28                    b.    *Cromwell is not entitled to relief.*

1    Cromwell does not argue, much less show, that the last reasoned decision on this

2    issue was contrary to or an unreasonable application of Supreme Court precedent or

3    based on an unreasonable determination of the facts under 28 U.S.C. § 2254(d). Doc. 38,

4    at 175-76. He has therefore not met his burden under AEDPA. *See Pinholster*, 563 U.S.

5    at 181 ("The petitioner carries the burden of proof.").

6    Nonetheless, Cromwell cannot do so. To begin with, Logan's successful motion to

7    withdraw following Cromwell's conviction and sentence was in the appellate record.

8    R.O.A. 292 (supplemental index "No. 2," generated almost a year before the opening

9    brief was filed, included the motion to withdraw as record on appeal item 130). Appellate

10    counsel cannot therefore have been ineffective for failing to supplement when the motion

11    was already in the appellate record.

12    Next, appellate counsel could not have expanded the record to include Logan's

13    memo or any other evidence not considered by the trial court in denying Cromwell's

14    pretrial motion for new counsel. "[It is a] basic tenet of appellate jurisprudence ... that

15    parties may not unilaterally supplement the record on appeal with evidence not reviewed

16    by the court below." *Lowry v. Barnhart*, 329 F.3d 1019, 1024-25 (9th Cir. 2003) (quoting

17    *Tonry v. Sec. Experts, Inc.*, 20 F.3d 967, 974 (9th Cir. 1994)). And, specifically in

18    Arizona, the appellate court "decide[s] matters based on the record in the trial court, and

19    do[es] not invite or consider evidence offered for the first time on appeal." *State v.*

20    *Carter*, 165 P.3d 687, 692, ¶ 24 (Ariz. App. 2007). An Arizona appellate court also does

21    not "act as a fact-finder" and does not consider "materials that are outside the record on

22    appeal." *Schackart*, 947 P.2d at 324.

23    The issue on appeal was whether the trial court abused its discretion in denying the

24    motion for new counsel, which was filed and ruled on in November 2002. *Cromwell*, 119

25    P.3d at 452-53, ¶¶ 19-27. The memo, however, was authored in February 2003—after the

26    trial court disposed of the motion—and it was not filed with the trial court at any time.

27    PCR Ex. 68 (memo); R.O.A. 71 (order denying motion). This means the Arizona

28    Supreme Court could not have considered the memo and any evidence not before the trial

1  court or part of the trial record when reviewing the trial court's order denying the motion

2  for new counsel. *See GM Dev. Corp. v. Cmty. Am. Mortg. Corp.*, 795 P.2d 827, 830

3  (Ariz. App. 1990) (matters not part of record before trial court cannot be considered on

4  appeal); *Dushoff v. Phx. Co.*, 532 P.2d 180, 181 (Ariz. 1975) (briefs must be limited to

5  the record before the reviewing court). Accordingly, appellate counsel cannot have been

6  deficient in failing to attempt to expand the record.

7      Beyond that, and as the PCR court found, neither the memo nor any other

8  evidence would have shown a complete breakdown in communication or an

9  irreconcilable conflict. Cromwell therefore cannot have suffered prejudice, and he cannot

10  show that the PCR court's decision was unreasonable.

11
12  **8.    The state court reasonably found that Cromwell's appellate counsel was not ineffective for failing to raise a number of other issues (Claim 7-8).**

13      Cromwell argues that his appellate counsel performed deficiently because she

14  failed to raise "all viable appellate claims," and he lists a number of issues he claims his

15  appellate counsel should have raised. Doc. 38, at 176-77. Cromwell, however, is not

16  entitled to relief on this claim because the PCR court's denial of the claim was reasonable

17  under AEDPA.

18      a.    *Exhaustion and state court decision.*

19      Cromwell exhausted this claim when he presented it in his petition for post-

20  conviction relief and, after the post-conviction court denied relief, when he presented it in

21  his petition for review to the Arizona Supreme Court. R.O.A. 604 at 147-48; PCR PFR, at

22  75-77. In denying relief, the post-conviction court found that Cromwell, "without

23  analysis, summarily fault[ed] appellate counsel for failing to raise these issues," and that

24  because Cromwell "fails to show both that counsel performed deficiently and a

25  reasonable probability that any of these claims would have prevailed on appeal,

26  [Cromwell] has not shown ineffective assistance."  R.O.A. 803 at 35. The Arizona

27  Supreme Court denied review of the claim without comment. ASC Decision Order *filed*

28  4/5/2023.

1          b.      *Cromwell is not entitled to relief.*

2          Cromwell does not argue, much less show, that the last reasoned decision on this

3    issue was contrary to or an unreasonable application of Supreme Court precedent or

4    based on an unreasonable determination of the facts under 28 U.S.C. § 2254(d). Doc. 38,

5    at 176-77. He has therefore not met his burden under AEDPA. *See Pinholster*, 563 U.S.

6    at 181 ("The petitioner carries the burden of proof.").

7          Regardless, Cromwell cannot do so because his appellate counsel was not required

8    to raise all viable claims. *See Robbins*, 528 U.S. at 288 ("[A]ppellate counsel who files a

9    merits brief need not (and should not) raise every nonfrivolous claim, but rather may

10   select from among them in order to maximize the likelihood of success on appeal.");

11   *Jones v. Barnes*, 463 U.S. 745, 751-52 (1983) (A strategic decision to "winnow[] out

12   weaker arguments on appeal and focus[] on" those more likely to prevail is an acceptable

13   exercise of professional judgment."). To be effective, appellate counsel should instead

14   winnow down the claims. *See Smith*, 477 U.S. at 536.

15         Moreover, and because his appellate counsel filed a merits brief, Cromwell has the

16   heavy burden of showing that "a particular nonfrivolous issue was *clearly* stronger than

17   issues that counsel did present." *Robbins*, 528 U.S. at 288 (emphasis added). Cromwell,

18   however, has made no such showing. He has not argued, much less shown, that any of the

19   claims he lists in his petition are clearly stronger, and the claims he references in other

20   parts of his petition are meritless (and thus not clearly stronger) for the reasons given

21   elsewhere in this filing, *see* Claims 3-2, 4-5, 5-1-2, & 10-1-3 *supra*.

22         What is more, most of the issues Cromwell summarily identifies are unpreserved,

23   so they may not have been as strong as the preserved issue of whether the trial court erred

24   in denying the motion for change of counsel. *See Davila*, 582 U.S. at 533 ("In most cases,

25   an unpreserved trial error will not be a plainly stronger ground for appeal than preserved

26   errors."); *Henderson*, 115 P.3d at 607, ¶ 19 (explaining that fundamental error review

27   applies to unpreserved errors, this review is "limited," and relief is "rare"). Hence,

28   Cromwell cannot show deficient performance.

1    Even so, Cromwell has not shown a reasonable probability that he would have

2    prevailed on appeal. *See Robbins*, 528 U.S. at 285. He simply lists the claims without

3    exploring their merits or explaining why he would have prevailed on the claims. Doc. 38,

4    at 176-77. For these reasons, the PCR court's decision finding that Cromwell has not

5    shown ineffective assistance based on his lack of analysis and his summary assertions

6    was reasonable.

7        **H.    Cromwell's claim of ineffective assistance of PCR counsel is not cognizable (Claim 8).**

8

9    Cromwell asserts that he received ineffective assistance during his PCR

10   proceedings; alleging both that counsel "failed to raise viable claims," specifically the

11   conflict between Cromwell and Attorney Logan, and that PCR counsel was ineffective in

12   how they drafted the petition. Doc. 38 at 177.[33] This claim is not a cognizable ground for

13   relief.

14   Post-conviction relief is not constitutionally required. *Pennsylvania v. Finley*, 481

15   U.S. 551, 557 (1987) ("States have no obligation to provide [Post-Conviction Relief].").

16   When states choose to provide an opportunity to seek Post-Conviction Relief, due

17   process does not dictate the exact form it must take, and the State has flexibility in

18   deciding its procedures. *Dist. Att'y Off. Third Jud. Dist. v. Osborne*, 557 U.S. 52, 69

19   (2009). Likewise, defendants do not have a constitutional right to counsel in collateral

20   attack proceedings like post-conviction relief. *Finley*, 481 U.S. at 555*; Graves v.*

21   *McEwen*, 731 F.3d 876, 878 (9th Cir. 2013) ("no general constitutional right to counsel,

22   however, in collateral postconviction review proceedings"); *see Murray v. Giarratano*,

23   492 U.S. 1, 8-9 (1989) (no constitutional right to counsel in collateral proceedings for

24   death row inmates); *accord Coleman v. Thompson*, 501 U.S. 722, 752 (1991).

25   _____

26   [33]    Although Cromwell criticizes PCR counsel for having to cut the draft petition

27   from 370 to 160 pages, the state court denied a motion to extend the limit to 300 but allowed 160; double the standard page limit. *See* R.O.A. 598 & 600; Ariz. R. Crim P.

28   32.5(b) (2018).

Because there is no right to the assistance of counsel in Cromwell's PCR proceedings, he has no cognizable federal claim for ineffective assistance of his PCR attorneys. *See Wainwright v. Torna*, 455 U.S. 586 (1982) ("Since respondent had no constitutional right to counsel, he could not be deprived of the effective assistance of counsel ...."); *Mintz v. Ryan*, 2018 WL 8918219, at *4 (D. Ariz. Sept. 30, 2018) ("no cognizable federal claim for ineffective assistance of his post-conviction attorney").

### I.    Cromwell has failed to demonstrate that biased jurors were seated on the jury (Claim 9).

In Claim 9, Cromwell argues that he is entitled to relief because: (1) biased jurors were allegedly seated on the jury; and (2) the jury engaged in misconduct. Doc. 38 at 173. Cromwell thus asserts that he was denied a fair trial, rendering his death sentence invalid. *Id.* Cromwell's claims are unavailing.

### 1.    Cromwell was not denied a fair and impartial jury.

Cromwell argues that he was denied a fair and impartial jury due to juror bias. *Id.* Specifically, Cromwell maintains that Jurors 3 and 7 were biased in that they demonstrated that they would automatically vote for death upon conviction of first-degree murder. *Id.* In his PCR proceedings, Cromwell presented a claim asserting that Jurors 3 and 7 committed misconduct by failing to disclose their automatic-death bias during voir dire. R.O.A. 604 at 80; PCR PFR at 57. As such, Cromwell arguably exhausted this claim in State court. The PCR court rejected this claim, holding that Cromwell "has not shown these jurors were substantially impaired or unable to perform their duties in accordance with the jury instructions due to their views about the death penalty." R.O.A. 803 at 18. Cromwell's claim is unavailing.

"Capital defendants have the right to be sentenced by an impartial jury." *Uttecht v. Brown*, 551 U.S. 1, 22 (2007). In *Witherspoon*, the Supreme Court recognized that guarantee of an impartial jury under the Sixth Amendment confers on capital defendants a right to a jury not "uncommonly willing to condemn a man to die." 391 U.S. at 521. The State also has a "strong interest in having jurors who are able to apply capital

punishment within the framework state law prescribes." *Brown*, 551 U.S. at 9. "The process of *voir dire* is designed to cull from the venire persons who demonstrate that they cannot be fair to either side of the case. Clearly, the extremes must be eliminated—*i.e.*, those who, in spite of the evidence, would automatically vote to convict or impose the death penalty or automatically vote to acquit or impose a life sentence." *Morgan*, 504 U.S. at 734 n. 7. In *Witt*, the Supreme Court clarified *Witherspoon*, holding that the "proper standard for determining when a prospective juror may be excluded for cause because of his or her views on capital punishment ... is whether the juror's views would 'prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath.'" 469 U.S. at 424 (quoting *Morgan*, 504 U.S. at 728). That is, "a juror who in no case would vote for capital punishment, regardless of his or her instructions, is not an impartial juror and must be removed for-cause." *Morgan*, 504 U.S. at 728. Likewise, a juror who would automatically impose the death penalty if a defendant is found guilty is not impartial and must be removed for cause. *Id.* at 733; *Ross v. Oklahoma*, 487 U.S. 81, 85 (1988).

Although sparsely argued and supported, Cromwell maintains that Jurors 3 and 7 were biased because they would automatically vote for death upon conviction of first-degree murder and thus, they should have been stricken for cause. Doc. 38 at 173. Cromwell's claim is without merit.

The record reflects that, in their jury questionnaires, in response to the question, "what is your opinion of the death penalty, please explain," Juror 3 responded, ""If an individual is guilty with no possibility of innocence & they intentionally killed someone then the death penalty is appropriate," and Juror 7 responded, "I think it's fair if person is found guilty of the crime." R.O.A. 726 (Ex. 76). Contrary to Cromwell's apparent assertion, the jurors' answers merely reflected their own general opinions regarding the death penalty, it did not demonstrate that the jurors would automatically vote for death upon conviction.

1    Moreover, Cromwell conveniently ignores Juror 3's and 7's answers to other

2    questions, including that: (1) their decision on whether or not to impose the death penalty

3    would depend on "the facts and circumstance of the case" (question 57),  and neither

4    juror answered that they "would vote to impose the death penalty in every case where I

5    could" (question 57); (2) after hearing "the evidence, reviewing the instructions and

6    deliberating with your fellow jurors" Jurors 3 and 7 indicated that they could enter a

7    verdict of death if appropriate or life if appropriate (questions 62 and 63); and (3) that it

8    would be wrong for a juror to sit if he or she would never vote for the death penalty or

9    alternatively would always for the death penalty (question 65). R.O.A. 724; 726 (Exs. 74

10   & 76). The questionnaires stated at the beginning: "The questions are asked not to invade

11   your privacy, but to make sure that you can be a fair and impartial juror. If there is any

12   reason why you might not be able to give both sides a fair trial in this case, it is important

13   that you say so." *Id*. Neither juror volunteered a reason that they could not be fair to both

14   sides.

15   And, during *voir dire*, when the trial court queried whether any juror would vote in

16   favor of the death penalty in every case in which a defendant was convicted of

17   premeditated/first-dgree murder, neither Juror 3 nor Juror 7 indicate they would. R.T.

18   1/30/03, at 31-36. Finally, Cromwell's assertions ignore that, at the time of answering the

19   juror questionnaires, the jurors had yet to be instructed on the law and neither juror

20   indicated that they would not follow the law as instructed by the judge (question 67).

21   Even if Juror 3's and 7's opinions of the death penalty (question 56) could be

22   interpreted as believing that the death penalty is appropriate if someone is guilty of first

23   degree murder, both Jurors 3 and 7 confirmed in their answers to many of the other

24   questions in the questionnaire that they would base their decision on the facts and

25   circumstances, the evidence, and instructions in this case, and never indicated otherwise

26   during *voir dire*. *See* R.T. 1/30/03. Thus, when considered in context and in their totality,

27   Juror 3's and 7's answers on the questionnaires reflect that they could be fair and

28   impartial and that their views would not "'prevent or substantially impair the

1  performance of'" their duties as jurors in accordance with his instructions and their oath.
2  *Witt*, 469 U.S. at 424 (quoting *Morgan*, 504 U.S. at 728).

3      Accordingly, the State courts' rejection of this claim was neither contrary to, nor
4  an unreasonable application federal law, nor an unreasonable determination of the facts.
5  Cromwell's claim must thus be dismissed.

6      ### 2.    Jurors 1, 3, 5, 7, 9, and 10 did not commit misconduct.

7      Cromwell argues that juror misconduct denied him his right to due process and a
8  fair trial. Doc. 38, at 173-74. Specifically, Cromwell argues that jurors committed
9  misconduct by "failing to reveal their debilitating biases during *voir dire*." *Id.* Cromwell
10 presented this claim in his PCR proceedings. R.O.A. 604 at 88. The PCR court rejected
11 this claim, holding that Cromwell failed to proffer "evidence of intentional concealment
12 of bias or prejudice in response to a question posed during voir dire examination." R.O.A.
13 803 at 18. Cromwell failed to raise the claim in his petition for review. *Cf.* PCR PFR at
14 59. *See also Bortz*, 821 P.2d at 238; *Carriger*, 143 Ariz. at 146. Cromwell cannot return
15 to state court to exhaust it. *See* Ariz. R. Crim. P. 32.2(a)(3); *Shrum*, 203 P.3d at 1178.
16 Thus, the claim is technically exhausted but procedurally default. *Coleman*, 501 U.S. at
17 735 n.1. Cromwell asserts no cause to excuse the procedural default. Moreover, the claim
18 is meritless.

19      "The right to an impartial jury is guaranteed by both the Sixth Amendment, made
20 applicable to the States through the Fourteenth Amendment, and by principles of due
21 process." *Turner v. Murray,* 476 U.S. 28, 36 n. 9 (1986). "In essence, the right to jury
22 trial guarantees to the criminally accused a fair trial by a panel of impartial, 'indifferent'
23 jurors." *Irvin,* 366 U.S. at 722; *Morgan,* 504 U.S. at 727; *Daniels v. Woodford,* 428 F.3d
24 1181, 1210 (9th Cir.2005), *cert. denied,* 550 U.S. 968 (2007). *Voir dire* examination
25 serves to protect the right to an impartial jury "by exposing possible biases, both known
26 and unknown, on the part of potential jurors. Demonstrated bias in the responses to
27 questions on *voir dire* may result in a juror being excused for cause; hints of bias not
28 sufficient to warrant challenge for cause may assist parties in exercising their peremptory

1   challenges. The necessity of truthful answers by prospective jurors if this process is to

2   serve its purpose is obvious." *McDonough Power Equip., Inc. v. Greenwood,* 464 U.S.

3   548, 554 (1984); *Fields v. Brown,* 503 F.3d 755, 766 (9th Cir. 2007) (en banc), *cert.*

4   *denied,* 552 U.S. (2008). "[T]o obtain a new trial on a claim of juror untruthfulness

5   during *voir dire* ..., a party must first demonstrate that a juror failed to answer honestly a

6   material question on *voir dire*, and then further show that a correct response would have

7   provided a valid basis for a challenge for cause." *Greenwood,* 464 U.S. at

8   556; *Fields*, 503 F.3d at 767. "Additionally, a litigant must show that the fairness of his

9   trial was affected either by the juror's 'motives for concealing [the] information' or

10  'reasons that affect [the] juror's impartiality.'" *Conaway v. Polk,* 453 F.3d 567, 585 (4th

11  Cir. 2006) (quoting *Greenwood,* 464 U.S. at 556).

12      Cromwell argues that Jurors 1, 3, 5, 7, 9, and 10 committed misconduct by failing

13  to reveal their alleged biases during *voir dire*. Doc. 38, at 173. Contrary to Cromwell's

14  suggestion, none of the aforementioned jurors were "mitigation impaired" or withheld

15  such a fact during *voir dire,* nor did the jurors fail to follow the State trial court's

16  instructions.

17      Here, despite the fact that Cromwell fails to adequately support or explain his

18  assertion that several jurors committed misconduct[34] by failing to disclose their biases, a

19  review of the record nevertheless demonstrates that no such misconduct occurred. Rather,

20  a review of the record, including the juror questionnaires reflect the jurors were not

21  mitigation-impaired, would follow the law, and that their views on the death penalty

22  would not prevent or substantially impair their performance of their duties as jurors. *See*

23  *Witt*, 469 U.S. at 424; *Morgan*, 504 U.S. at 728. The jurors indicated that their decision

24  _____

25  [34]    During his state PCR proceedings, Cromwell submitted several juror declarations
    ostensibly to support his juror misconduct claim. The PCR court, however, refused to
26  consider the declarations as they were not properly submitted pursuant to Arizona law.
    Because Cromwell failed to properly develop his claim in state court in a procedurally
27  appropriate manner, this Court is precluded from considering the juror declarations in
    considering Cromwell's claim. *See Shinn v. Ramirez*, 596 U.S. 366, 384 (2022).

28

on whether to imposed the death penalty would depend on the facts and circumstances of the case, that some crimes warrant the death penalty, that they would follow the courts instructions, that they would return a verdict of death or life after hearing the evidence, reviewing the instructions and deliberating with fellow jurors," and that they would accept and follow the law as instructed by the judge, even if he did not personally agree with that law. R.O.A. 724; 726; 727; 730; 732 (Exs. 74, 76, 77, 80, 82).[35]

Additionally, the record reflects that, during *voir dire*, the trial court asked if anybody would vote in favor of the death penalty in every case in which a defendant was convicted of premeditated and/or first-degree murder. None of Jurors 1, 3, 5, 7, 9, or 10 responded affirmatively. R.T. 1/30/03, at 31-36, 41, 128, 132-33, 135. The court asked if the jurors could follow the instructions based on the evidence and be fair to both sides. *Id*. at 35-36, 38, 41. Again, none of Jurors 1, 3, 5, 7, 9, or 10 indicated they could not follow the law with respect to mitigation. *Id*. During *voir dire*, defense counsel specifically asked:

> How many of you here believe that if the State does prove that Mr. Cromwell is guilty and they prove that beyond a reasonable doubt, and they prove those aggravating factors, that there is just no mitigation in the world that is sufficient to call for something other than the death penalty?

R.T. 1/30/03, at 68. Although some prospective jurors believed this, none of Jurors 1, 3, 5, 7, 9, or 10 agreed with this. *Id*. at 68-71. Similarly, none of these jurors agreed that "1st Degree Murder essentially qualifies the death penalty regardless of mitigation factors or aggravating factors, despite the fact of the laws that judge has explained to you all?" *Id*. at 71. As the trial court explained, the first level of questions might be how you feel about the death penalty and the second level "would be even though you feel this way, could you follow the law." *Id*. at 71.

Furthermore, the court repeatedly instructed the jury regarding its duties:

---

[35]    Cromwell did not attach Juror 10's redacted juror questionnaire (PJ 51), who Cromwell also challenged, during his PCR proceeding. All the sealed juror questionnaires should be in the state court record at R.O.A. 148–244.

- You must keep an open mind throughout the trial. Do not form final opinions about any fact or about the outcome of the case until you have heard all of the evidence, the final instructions, the closing arguments, and your deliberations have begun. R.T. 2/3/03, at 11; R.T. 2/20/03, at 8.
- You must carefully listen to the laws that I will instruct you on at the end of the case. You must follow them in reaching your verdict. R.T. 2/3/03, at 11.
- It is your duty as a juror to decide this case by applying these jury instructions to the facts as you determine them. You must follow these jury instructions. They are the rules that you must use to decide this case. R.T. 2/13/02, at 30; R.T. 2/20/03, at 50; R.T. 3/4/03, at 136.
- You must not be influenced by sympathy or prejudice. R.T. 2/3/03, at 13-14; R.T. 2/13/02, at 30; R.T. 2/20/03, at 50; R.T. 3/4/03, at 136.
- Your verdict must be based solely on the evidence. R.T. 2/3/03, at 14; R.T. 2/13/02, at 30; R.T. 2/20/03, at 50; R.T. 3/4/03, at 136.
- You must not consider the possible punishment "when deciding on guilt," R.T. 2/13/02, at 32, "when making your decision in this phase" R.T. 2/20/03, at 52 (aggravation phase).
- You must make your decision about whether the mitigation is sufficiently substantial to call for leniency based solely upon your weighing of the mitigation and the three aggravating factors that you found during the aggravation phase. R.T. 3/4/03, at 139-40.

This Court presumes the jurors followed the state trial court's instructions. *See United States v. Reyes*, 660 F.3d 454, 468 (9th Cir. 2011).

Thus, reviewing the jury selection record in its entirety, shows that Jurors 1, 3, 5, 7, 9, and 10 and were not "automatic-death jurors," nor "mitigation impaired." That is, the jurors were not substantially impaired in their performance of their duties as jurors. *See Witt*, 469 U.S. at 424; *Morgan*, 504 U.S. at 728.

### J.    Cromwell's prosecutorial misconduct claims are all procedurally defaulted without an excuse and also fail on the merits (Claim 10).

Cromwell argues that the prosecutor engaged in several acts of misconduct that deprived him of a fair trial. Doc. 38 at 181. As set forth below, each of Cromwell's subclaims are procedurally defaulted, and he has not provided cause to excuse the default. Moreover, the subclaims fail on the merits.

168

**1**          **1.    Procedural status.**

**2**          Cromwell failed to raise a prosecutorial-misconduct claim on direct appeal. *See*

**3** *generally* Opening Brief, *Cromwell*, 119 P.3d 448. Although Cromwell tried to raise

**4** misconduct claims in PCR related to the DNA analyst (*See* Claims 10-1-3 & 10-8), and

**5** closing argument (Claim 10-5-2), the PCR court found them precluded under Arizona

**6** Rule of Criminal Procedure 32.2(a)(3). R.O.A. 803 at 19, 34. Accordingly, the state court

**7** applied an independent and adequate state procedural bar to avoid reaching the claims'

**8** merits, and they are procedurally defaulted. *See Nunnemaker*, 501 U.S. at 802-05;

**9** *Robinson*, 595 F.3d at 1100; *Stewart v. Smith*, 536 U.S. 856, 860 (2002). The PCR

**10** court's alternative merits ruling does not nullify the default. *See Harris*, 489 U.S. at 264

**11** n.10; *Comer*, 480 F.3d at 964 n.6. The remaining claims are likewise precluded, and

**12** Cromwell cannot return to state court to exhaust them. *See* Ariz. R. Crim. P. 32.2(a)(3);

**13** *Shrum*, 203 P.3d at 1178. They are thus technically exhausted but procedurally default.

**14** *Coleman*, 501 U.S. at 735 n.1. Cromwell asserts no cause to excuse the procedural

**15** default.

**16**          **2.    Legal standards for prosecutorial error claims.**

**17**          The appropriate standard of federal habeas review for a claim of prosecutorial

**18** misconduct is "the narrow one of due process, and not the broad exercise of supervisory

**19** power." *Darden*, 477 U.S. at 181 (quoting *Donnelly v. DeChristoforo*, 416 U.S. at 642)

**20** (petitioner not entitled to relief in the absence of a due process violation even if the

**21** prosecutor's comments were "undesirable or even universally condemned"). Therefore,

**22** to succeed on this claim, Cromwell must prove not only that the prosecutor's remarks and

**23** other conduct were improper but that they "so infected the trial with unfairness as to

**24** make the resulting conviction a denial of due process." *Id.*; *see Johnson v. Sublett*, 63

**25** F.3d 926, 930 (9th Cir. 1995) (relief on such claims is limited to cases in which the

**26** petitioner can establish that prosecutorial misconduct resulted in actual prejudice) (citing

**27** *Brecht*, 507 U.S. at 637-38); *Smith v. Phillips*, 455 U.S. 209, 219 (1982) ("the touchstone

**28**

of due process analysis in cases of alleged prosecutorial misconduct is the fairness of the trial, not the culpability of the prosecutor").

In determining if Cromwell's due process rights were violated, the Court "must consider the probable effect [of] the prosecutor's [comments] on the jury's ability to judge the evidence fairly." *United States v. Young*, 470 U.S. 1, 12 (1985). Such assessment requires placing the prosecutor's remarks in context. *See Boyde*, 494 U.S. at 385; *United States v. Robinson*, 485 U.S. 25, 33-34 (1988).

### 3. Cromwell is not entitled to relief on his defaulted *Brady* claims (Claim 10-1).

Cromwell alleges that the prosecutor withheld evidence in violation of *Brady v. Maryland*. Doc. 38 at 181. Specifically, Cromwell alleges that the prosecutor withheld evidence related to Kim, Ella, and the DNA analysis.

Due process rights are violated when the state fails to disclose "evidence favorable to an accused ... where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." *Brady*, 373 U.S. at 87. The prosecution's duty to disclose favorable evidence is not dependent upon a request from the accused, and even an inadvertent failure to disclose may constitute a violation. *United States v. Agurs*, 427 U.S. 97, 107 (1976). *Brady* and its progeny "illustrate the special role played by the American prosecutor in the search for truth in criminal trials." *Strickler*, 527 U.S. at 281. The State's duty to comply with its obligations under *Brady* is ongoing and continues to bind the prosecution even after conviction and sentencing. *Thompson v. Goldsmith*, 979 F.2d 746, 749-50 n.2 (9th Cir. 1992). There are three components of a true *Brady* violation:

> The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued.

*Strickler*, 527 U.S. at 281-82 (finding no *Brady* violation because petitioner failed to establish that there was a reasonable probability that his conviction or sentence would

have been different had the information been disclosed). The terms "material" and "prejudicial" are used interchangeably to describe the third *Brady* component. *Bailey v. Rae*, 339 F.3d 1107, 1116 n.6 (9th Cir. 2003). "[E]vidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A 'reasonable probability' is a probability sufficient to undermine confidence in the outcome." *Bagley*, 473 U.S. at 682. To be material under *Brady*, undisclosed evidence must be also admissible—*Brady* claims cannot be based on inadmissible evidence. *Wood v. Bartholomew*, 516 U.S. 1, 6 (1995).

Regarding Kim, as an initial matter, the documents about Kim cited by Cromwell from Doc. 27 are not in the State court record. *See Gonzalez v. Wong*, 667 F.3d 965, 979 (9th Cir. 2011) ("*Pinholster* applies here and prevents us from considering the new evidence in reviewing Gonzales's *Brady* claim" but court would not "disregard the new evidence").

The State noticed Kim as a victim and possible witness in November 2001. R.O.A. 15. In July 2002, Cromwell moved to depose Kim, stating "the State has notified defense counsel that [Kim] is currently incarcerated in a county jail in San Diego, California … it is possible [she] will be released from custody during this trial." R.O.A. 45. The court granted the motion. *See* R.T. 8/9/02; R.O.A. 57. The deposition occurred on August 30. *See* Doc. 27-1. In January 2003, the court issued an order for Kim's appearance which included: "That Kim[] by attending and testifying in CR 2001-095438 pursuant to this summons, is protected from arrest or the service of processes, either civil or criminal, in connection with matters which arose before Kim['s] entrance into this State." R.O.A. 82. Cromwell speculates a deal occurred to secure the court's order and Kim's testimony. Doc. 38 at 183.

Cromwell's *Brady* claim regarding Kim is spurious. First, he cannot demonstrate a *Brady* violation without suppression; and the information from Kim's forgery case was, in his words, "readily available to any member of the public." Doc. 29 at 3. Cromwell could (and did) obtain it. *See United States v. Dupuy*, 760 F.2d 1492, 1501 n.5 (9th Cir.

1   1985) ("[S]uppression by the Government is a necessary element of a *Brady* claim.");

2   *United States v. Wilson*, 901 F.2d 378, 380 (4th Cir. 1990) ("*Brady* rule does not apply if

3   the evidence in question is available to the defendant from other sources." (collecting

4   cases)).

5       In the Ninth Circuit, as long as "a defendant has enough information to be able to

6   ascertain the supposed *Brady* material on his own, there is no suppression by the

7   government." *United States v. Aichele*, 941 F.2d 761, 764 (9th Cir. 1991). Here, the

8   defense was aware of Kim's criminal history, including her felony conviction in Arizona

9   for forgery, for which she said she served 3 months jail, and her California felony for

10  burglary, and questioned her about it at her deposition. *See* Doc. 27-1 at 18, 95-96. And

11  defense was aware Kim was immune from arrest based on the court's order. R.O.A. 82.

12  *See United States v. Bracy*, 67 F.3d 1421, 1428-29 (9th Cir. 1995) (holding criminal

13  history not suppressed because government disclosed "all the information necessary for

14  the defendants to discover the alleged *Brady* material"). Cromwell cannot show any

15  suppression.

16      Second, Cromwell cannot carry his burden of proving the materiality element of a

17  valid *Brady* claim. Far from being some covert deal with Kim, as Cromwell basely

18  insinuates, the court's order that she testify without fear of arrest is taken nearly verbatim

19  from Arizona's adoption of the 1936 Uniform Act to Secure the Attendance of Witnesses

20  from Without a State in Criminal Proceedings. *See* A.R.S. § 13-4094 ("Exemption from

21  arrest and service of process"); *see also Lamb v. Schmitt*, 285 U.S. 222, 225 (1932) ("due

22  administration of justice requires that a court shall not permit interference with the

23  progress of a cause pending before it"). And, upon information and belief, Kim remains

24  wanted in Arizona on the 2003 bench warrant.[36] Moreover, defense counsel strategically

25  chose not to impeach Kim with fact of her felony fraud and burglary convictions. R.T.

26  ———————————

27  [36]    *See* Minute Entry, CR 2001-011360, *filed* 12/18/2012, available at
    https://courtminutes.clerkofcourt.maricopa.gov/viewerME.asp?fn=Criminal/122012/m55

28  59630.pdf.

2/10/03, at 66-92; *see supra* Claim 1-3-4. Any additional disclosure would have been immaterial. *Strickler*, 527 U.S. at 280. Finally, as discussed *supra*, Cromwell has not substantiated his materiality claim with anything more than speculation, which is insufficient to demonstrate a *Brady* violation. *See United States v. Abonce-Barrera*, 257 F.3d 959, 970 (9th Cir. 2001) (finding that evidence was not material under *Brady* where the defendant had only "a hunch" that the evidence would be useful); *Brecht*, 507 U.S. at 637.

Cromwell's claim regarding Ella is similarly nothing more than a baseless "hunch" that a theoretical deal existed based primarily off an alleged statement by the County Attorney in a news report that is neither in the record nor cited in the petition. Doc. 38 at 184. *See Abonce-Barrera*, 257 F.3d at 970. This claim fails to establish any of the three elements of *Brady* on its face, and, even taking all of Cromwell's unsupported claims as true, there is no probability of a different result. *See Strickler*, 527 U.S. at 281-82; *Brecht*, 507 U.S. at 637.

Cromwell's claim regarding the DNA analyst is similarly unavailing. Analyst Sartor testified that she considered two possibilities for the "mixed DNA profile" from the combined swabs of Cromwell's penis:

> The mixture is a combination of Items [2.1], Robert Cromwell, and [3.1], Stephanie [], or the mixture is a combination of Item [2.1], Robert Cromwell, and an unidentified person. The chance of obtaining this particular mixed DNA is 100 billion times more likely in the Caucasian population if it's a mixture of [2.1], Robert Cromwell, and [3.1], Stephanie [], than if it's a mixture of Item [2.1], Robert Cromwell, and an unidentified person.

R.T. 2/6/03, at 64. The analyst was testifying to the likelihood ratio that Stephanie was the source of the DNA on Cromwell's penis. For comparison, the analyst also testified in this case that the random match probability for the sperm in Stephanie's vagina that matched Cromwell's DNA was "one in 2.1 quadrillion Caucasians." Id. at 50. *Cf. State v. Hall*, 419 P.3d 1042, 1073 (Idaho 2018) ("experts in this case did not conflate random match and source probability"). In Arizona, likelihood ratios are admissible. *State v. Garcia*, 3 P.3d 999, 1004 (Ariz. App. 1999); *see State v. Hummert*, 933 P.2d 1187, 1192

(Ariz. 1997) ("there is no single or specific scientific method" of introducing DNA evidence "but, rather, different ways of explaining the significance in a forensic setting").

At closing, the prosecutor discussed the large quantity of DNA evidence. *See* R.T. 2/13/03, at 66-68. He spent two sentences on the penile swab: "She told you that the penile swab, Exhibit Number 139, was a mixed sample. That was Robert Cromwell's and Stephanie['s]." R.T. 2/13/03, at 68. This statement "invited the jury to draw reasonable inferences from the DNA evidence." *See State v. Marrero-Alejandro*, 122 A.3d 272, 282 (Conn. App. 2015); *see also State v. Escalante-Orozco*, 386 P.3d 798, 817-18 (Ariz. 2017) (prosecutor's use of word "'match' to describe DNA profiles consistent with" defendant's not error when "profile would be expected in one in thirty-four southwestern Hispanics").

On April 23, 2003, the Phoenix lab reviewed all cases in which likelihood ratios had been used. R.T. 1/30/04, at 22-23. As a result of that order, Sartor recalculated the statistics here and found them overstated. *Id.* at 26-27. On May 6, 2003, the State disclosed to the defense an amended DNA report reflecting a recalculation of the "likelihood ratio" for the mixed DNA profile to 1 billion times more likely in the Caucasian population. R.O.A. 273. The court held a hearing in January 2004 and denied Cromwell's motion, finding it clear the new evidence "would not have changed the verdict." R.O.A. 304; *see also* Claim 6 *supra*.

Cromwell asserts the State violated *Brady* because it "did not disclose this critical impeachment evidence until sixty-one days after Mr. Cromwell was condemned to death." Doc. 38 at 186. But the State disclosed the new report within 13 days of the start of the lab reviews. Cromwell's alleged impeachment evidence did not exist at the time of his trial. *Brady* does not require the State to seek out and disclose material not in its possession. *Unites States v. Celestin*, 612 F.3d 14, 22 (1st Cir. 2010); *see United States v. Cano*, 934 F.3d 1002, 1023 (9th Cir. 2019) (*Brady* does not require prosecution to produce information which it does not possess or is unaware). Thus, no *Brady* error occurred. Moreover, as found by both the trial court and the PCR court, this information

would not have changed the verdict and thus Cromwell cannot show prejudice. *See Strickler*, 527 U.S. at 281-82; *Brecht*, 507 U.S. at 637.

### 4. Cromwell is not entitled to relief on his defaulted guilt-phase closing argument claims (Claims 10-2 and 10-3).

Cromwell argues the prosecutor committed misconduct in his guilt-phase closing arguments; specifically, that he bolstered Ella's and Amanda's testimony, made unsubstantiated claims about their testimony, and made "false statements about the forensic evidence." Doc. 38 at 187-88.

"Counsel are given latitude in the presentation of their closing arguments, and courts must allow the prosecution to strike hard blows based on the evidence presented and all reasonable inferences therefrom." *Ceja v. Stewart*, 97 F.3d 1246, 1253-54 (9th Cir. 1996); *see also United States v. Molina*, 934 F.2d 1440, 1445 (9th Cir. 1991) ("[T]he prosecution must have reasonable latitude to fashion closing arguments. Inherent in this latitude is the freedom to argue reasonable inferences based on the evidence." (citations omitted)). "Vouching consists of placing the prestige of the government behind a witness through personal assurances of the witness's veracity, or suggesting that information not presented to the jury supports the witness's testimony." *United States v. Necoechea*, 986 F.2d 1273, 1276 (9th Cir. 1993).

Cromwell attacks the prosecutor's statements about Amanda by claiming that the statement she "liked math and did well in school" is not true. Doc. 38 at 187, 189 (citing R.T. 2/13/03 at 59).[37] Amanda only testified that her favorite subject was math. R.T. 2/5/03, at 16. This misstatement did not rise to misconduct. *Darden*, 477 U.S. at 181. And even if the misstatement constituted prosecutorial misconduct, it did not have "a substantial and injurious effect or influence in determining the jury's verdict." *Wood*, 693 F.3d at 1113.

---

[37]     Cromwell references Amanda's interview that, as previously noted *supra*, is not in the state court record.

175

1    Cromwell argues that the prosecutor misspoke when he argued that Amanda's

2  "position on the bed certainly enables her to see what she saw from the bathroom." R.T.

3  2/13/03 at 59; *see* Doc. 38 at 187. Amanda testified that she heard her "sister in the

4  bathtub and a shocking noise" and "saw my -- him washing my sister … in the

5  bathroom." R.T. 2/5/03, at 21-22. Cromwell argues that Amanda's testimony was false

6  "as pictures and diagrams of the apartment reflect." Doc. 38 at 187. Cromwell does

7  identify this contradictory evidence; but the diagrams at trial indicate that someone could

8  see the bathtub from the living room where Amanda was sleeping. *See* Ex. 33 (diagram).

9  The prosecutor's statements were a fair comment on the evidence. *Necoechea*, 986 F.2d

10  at 1276.

11    Also regarding Amanda, the prosecutor argued at closing that if Cromwell "didn't

12  kill Stephanie[], then somebody fooled Amanda and Amanda knew who Greg was, the

13  boyfriend, and Amanda knew who these other people were. There was no long-haired

14  man with tattoos." R.T. 2/13/03, at 106-07. Amanda had testified that Cromwell was the

15  man assaulting Stephanie. R.T. 2/5/03, at 28, 38.  She testified on cross that it was "the

16  first time [she] had ever seen that guy," but that "there been other guys over at the

17  apartment earlier, say, that week or that month." *Id.* at 42. The prosecutor and the jury

18  could reasonably infer that Greg was the "other guy," when considering that Kim testified

19  Greg had dated Ella and he "came and went all the time." R.T. 2/10/06, at 69. The

20  prosecutor's argument was a fair comment on the evidence. *Necoechea*, 986 F.2d at

21  1276. Moreover, it countered the defense's theory that Greg, the tattooed man, was the

22  killer. *See* R.T. 2/13/03, at 81-83; *see also* Doc. 38 at 91 (discussing alternate suspect

23  theory). "Criticism of defense theories and tactics is a proper subject of closing

24  argument." *United States v. Sayetsitty*, 107 F.3d 1405, 1409 (9th Cir. 1997).

25    Cromwell argues that the prosecutor misspoke about Officer Vine's description of

26  Ella when she first asked for help. Doc. 38 at 188 & 189. On direct, Officer Vine testified

27  that Ella was "hysterical," while on cross, he said he observed that she appeared to be on

28  meth. R.T. 2/3/03, at 47, 70-71. The prosecutor argued, "He said she didn't appear high,

but very hysterical." R.T. 2/13/03, at 48. The prosecutor's statement was a fair comment on the evidence, as the officer never explicitly testified that Ella appeared "high." But assuming it was a misstatement, it did not rise to misconduct. *Darden*, 477 U.S. at 181; *see also State v. Harrod*, 183 P.3d 519, 529, ¶ 35 (Ariz. 2008) (stating that it is not prosecutorial misconduct to "'argue all reasonable inferences from the evidence'" during closing) (quoting *State v. Hughes*, 969 P.2d 1184, 1197, ¶ 59 (Ariz. 1998)). And even if the misstatement constituted misconduct, it did not have "a substantial and injurious effect or influence in determining the jury's verdict." *Wood*, 693 F.3d at 1113.

Cromwell argues that the prosecutor misspoke about whether Ella told Amanda to call 911. Doc. 38 at 188. Ella testified that she called 911. R.T. 2/4/2003 at 63-64. Amanda testified that she and her sister had their landlord call 911. R.T. 2/5/03, at 33-34. The state court record does not support the prosecutor's statement, but the misstatement did not rise to misconduct. *Darden*, 477 U.S. at 181. And even if the misstatement constituted misconduct, it did not have "a substantial and injurious effect or influence in determining the jury's verdict." *Wood*, 693 F.3d at 1113.

Cromwell argues that the prosecutor "made a number of false statements about the forensic evidence." Doc. 38 at 188. Cromwell is mistaken. A prosecutor can make reasonable inferences and arguments based on the evidence. *Necoechea*, 986 F.2d at 1276. Cromwell merely asserts that the prosecutor's argument goes against *Cromwell's theory* of the evidence. *Cf. Sayetsitty*, 107 F.3d at 1409 ("Criticism of defense theories and tactics is a proper subject of closing argument."). And even assuming the prosecutor made a misstatement about the evidence, nothing Cromwell cites rises to misconduct. *Darden*, 477 U.S. at 181.

Cromwell argues that the prosecutor improperly bolstered Ella's testimony. Doc. 38 at 188-90. The prosecutor asked whether Ella was initially honest with the police, and she admitted that she was not. R.T. 2/4/03, at 98. She admitted being "concerned with losing my girls," "ha[ving] drugs in the apartment," and being "scared." *Id.* at 98-99. The prosecutor later asked:

1  Q. I'm going to ask you another question?

2  A. Okay.

3  Q. And you need to be honest with me, okay, just like you have been.

4  A. I swear to God.

5  Q. Had you had sex with anyone else in that bedroom in say within 30 days
   prior?

6
   A. Yes.
7
   Q. Okay. But not Robert?
8
   A. No.
9

10  *Id.* at 101.

11  On cross, defense counsel asked whether she had lied during her initial interview

12  with police; Ella said she had because she "was afraid of what would happen[]. Because I

13  left somebody with my kids, who I barely knew." *Id.* at 104. She later told a different

14  officer that she had lied. *Id.* She testified that what she told the second officer was the

15  truth. *Id.* at 105. She corrected some testimony about how many times she went to

16  Cromwell's house, and she said, "I told the Court today exactly what I remembered,

17  truthfully, word for word, step-by-step." *Id.* at 106-11.

18  In closing, the prosecutor argued, "Why would she come here and lie?" R.T.

19  4/13/03, at 112.

20  The prosecutor's questions and argument were not bolstering but concerned the

21  victim's lack of motive to testify falsely. *Cf. United States v. Kerr*, 981 F.2d 1050, 1053

22  (9th Cir. 1992) (prosecutor "deliberately introduced into the case his personal opinion of

23  the witnesses' credibility" through comments such as, "I think he [the witness] was very

24  candid"). The question, as a result, is not improper bolstering but an attempt to mitigate

25  the anticipated cross- examination, which would, and did, explore the victim's initial

26  false statements to police. *See United States v. Wilkes*, 662 F.3d 524, 540 (9th Cir. 2011)

27  ("[S]tatements made by the prosecution do not constitute improper vouching where the

28  argument that witnesses had no motive to lie is a permissible response to the defense

178

1    counsel's earlier attacks on the witnesses' credibility."); *State v. Vazquez*, 830 A.2d 261,

2    271 n.10 (Conn. App. 2003) (stating that because a witness's motivation to lie may be

3    explored on cross-examination, it may also be discussed during direct examination). *Cf.*

4    *United States v. Shaw*, 829 F.2d 714, 717 (9th Cir. 1987) (improper vouching occurred

5    where the prosecutor implied that he would be able to determine whether the witness was

6    testifying truthfully).

7        Last, Cromwell does not argue how the prosecutor's statements prejudiced him.

8    *See Drayden*, 232 F.3d at 712-13 (concluding prosecutor's "soliloquy in the voice of the

9    victim" was "deplorable" but did not so infect the trial with unfairness that the petitioner

10   was entitled to habeas relief). The jury was instructed that statements made by counsel

11   during argument are not evidence and that its verdict must be based only on admissible

12   evidence presented during trial. R.O.A. 113; 252; *see Romano v. Oklahoma*, 512 U.S. 1,

13   12 (1994) (holding that a limiting instruction by the trial court precluded a finding that

14   improperly admitted evidence "so infected the sentencing proceeding with unfairness as

15   to render the jury's imposition of the death penalty a denial of due process"). And given

16   the strength of the aggravating factors, Cromwell cannot establish that the prosecutor's

17   statements "had substantial and injurious effect" on the jury's sentencing decision.

18   *Brecht*, 507 U.S. at 637.

19           **5.    Cromwell's claim regarding non-statutory aggravating factors is
                     not cognizable; alternatively, it is defaulted and meritless (Claim
20                   10-4).**

21       Cromwell alleges the prosecutor argued for non-statutory aggravators at

22   sentencing in violation of Arizona law. Doc. 38 at 190. But consideration of a non-

23   statutory aggravating circumstance, even if contrary to state law, does not violate the

24   Constitution. *Barclay*, 463 U.S. 939; *Zant*, 462 U.S. at 878-79. Because habeas relief

25   does not lie for state-law claims, this is not cognizable in Cromwell's habeas petition.

26   *Estelle v. McGuire*, 502 U.S. 62, 67 (1991). Alternately, this claim is defaulted, meritless,

27   and not prejudicial. *See* Claim 2-7-4 *supra*.

28

**6.  Cromwell is not entitled to relief on his defaulted sentencing-phase closing argument claims (Claim 10-5).**

Cromwell contends that the prosecutor committed misconduct during his closing argument when he argued that Cromwell "must overcome [the aggravators]. That's the law." Doc. 38 at 192 (quoting R.T. 3/4/03, at 128). Cromwell notes that that is not the current law in Arizona, citing *State ex rel. Thomas v. Granville*, 123 P.3d 662 (Ariz. 2005). But *Granville*, was decided two years <u>after</u> Cromwell's trial. *Id.* at ¶ 15 ("The precise question before us apparently has not been addressed by our courts."). Prior cases had held a guilty defendant may constitutionally be required to establish "by a preponderance of the evidence, the existence of mitigating circumstances sufficiently substantial to call for leniency." *Walton v. Arizona*, 497 U.S. 639, 649 (1990). Attorneys are expected to be zealous advocates, not clairvoyants. *See also Smith v. Ryan*, 2014 WL 1247828, at *20 (D. Ariz. Mar. 24, 2014), *aff'd*, 823 F.3d 1270 (9th Cir. 2016), *cert. denied*, 581 U.S. 954 (2017) ("Petitioner's rights were not violated by the prosecutor's comments about the burden of proof" in pre-*Granville* trial).

Moreover, the court's instructions did not place the burden on the defendant to show the mitigating evidence was sufficiently substantial to call for lenience. R.O.A. 252 at 4 ("You alone decide whether the mitigation is sufficiently substantial to call for leniency."). And given the strength of the aggravating factors, Cromwell cannot establish that the prosecutor's statement "had substantial and injurious effect" on the jury's sentencing decision. *Brecht*, 507 U.S. at 637.

**7.  Cromwell is not entitled to relief on his defaulted *Napue* claim (Claim 10-6).**

Cromwell alleges that the prosecutor knowingly presented or failed to correct false testimony in violation of *Napue v Illinois*. Doc. 38 at 193-94. This claim is meritless.

Frist, Cromwell claims the prosecutor allowed false testimony that DNA testing "works" because "it's been tested over and over and over again in proficiency tests and everyone gets the same answer." Doc. 38 at 193 (quoting R.T. 2/6/03 at 31). Cromwell

provides no authority for why he believes this is untrue. And to the contrary, DNA testing in Arizona has long been held admissible under *Frye* as generally accepted and relevant in the scientific community. *State v. Bible*, 858 P.2d 1152, 1185 (Ariz. 1993).[38] The expert here explained the type of testing used was Polymerase Chain Reaction and Short Tandem Repeat ("PCR/STR"). R.T. 2/6/03 at 30. The Supreme Court recognized the reliability of DNA testing in a case involving PCR/STR. *Williams v. Illinois*, 567 U.S. 50, 58 (2012), *abrogated on other grounds by Smith v. Arizona*, 602 U.S. 779 (2024). Cromwell is conflating the testimony regarding the reliability of the scientific methodology with his criticisms of its application.[39] *See United States v. Gipson*, 383 F.3d 689, 696 (8th Cir. 2004) (noting distinction between "challenges to a scientific methodology, and, on the other hand, challenges to the *application* of that scientific methodology" and affirming reliability of PCR/STR methods). This argument is meritless.

Cromwell similarly fails to support his accusations about Dr. Lang's testimony with relevant citations. Cromwell's record cite is just to Dr. Lang's definition of ASPD. Doc. 38 194 (citing R.T. 3/4/2003, at 68). Nor is it clear what is contradicted by the reference page he cites. *See* DSM-IV-TR, at 685 (listing personality disorders). A review of Dr. Lang's testimony does not reveal that she ever testified that "Cromwell actively chooses to have a personality disorder." Doc. 38 at 194. Instead, she testified that "with antisocial personality disorder, the individual understands what they are doing is wrong. They just don't care." R.T. 3/4/03, at 82. *See* DSM-IV-TR, at 702-03 (individuals with ASPD "generally fail to compensate or make amends for their behavior"). This argument is meritless.

---

[38]   Arizona switched from *Frye* to *Daubert* in 2012.

[39]   For example, defense counsel crossed the analyst about how they had to combine the three swabs from Cromwell's penis to get only a small amount of DNA. R.T. 2/6/03 at 74-75.

Cromwell's argument that the prosecutor knowingly used false testimony when he asked if Amanda meant "the man" when she said "they," is likewise meritless and contradicted by Amanda's answer and continued testimony. Doc. 38 at 194 (citing R.T. 2/5/03, at 23). *See People v. Gobrick*, 981 N.W.2d 59, 60 (Mich. 2022) (Welch, J. concurring) (noting "use of 'they' as a singular pronoun extends back to as early as the 1300s").

Cromwell again fails to cite to any contrary information when he claims that the emergency room records demonstrate the prosecutor was trying to elicit false testimony when asking Ella about the injuries to her arm. Doc. 38 at 194 (citing R.T. 2/4/03 at 93-94). Ella testified she had scars but not bulging or deformities. R.T. 2/4/03, at 94. When asked about her scar, Ella testified that she did not have that injury before the night of Cromwell's attack. *Id. See also* Trial Exs. 42 & 43 (pictures of Ella in hospital). This argument is meritless.

Not only are each of these arguments meritless, but given the strength of the aggravating factors, Cromwell cannot establish that the prosecutor's statements "had substantial and injurious effect" on the jury's sentencing decision. *Brecht*, 507 U.S. at 637.

### 8. Cromwell is not entitled to relief on his defaulted inflammatory-comments claim (Claim 10-7).

Cromwell raises additional arguments the prosecutor committed misconduct in his closing arguments; specifically, that the prosecutor "encourage the jurors to convict simply because the crime was repulsive," HIV as an aggravator, arguing Cromwell was an "uncontrollable pervert," and "overemphasize[d Stephanie and Amanda's] vulnerability." Doc. 38 at 194-96. This claim is procedurally defaulted and meritless.

In context, the prosecutor's remarks were not improper, let alone rise to misconduct. *See Boyde*, 494 U.S. at 385; *Robinson*, 485 U.S. at 33-34.

First, Cromwell criticizes the prosecutor's description of Stephanie's vagina as being "unnaturally open" as the result of Cromwell's assault. R.T. 2/13/03, at 106. This

1   was the description given by many witnesses in the case of the horrific damage Cromwell

2   inflicted upon Stephanie during his sexual assault. *See* R.T. 2/4/03, at 157 (paramedic

3   describing abnormality of vagina staying open; "It was a surreal moment for me."); R.T.

4   2/3/03, at 86-87 (first officer describing "Her vaginal area was -- it was stretched beyond

5   what it should be, to where it looked -- you could see inside. It was a hollow cavity");

6   R.T. 2/6/03, at 16-18 (medical examiner noting significant trauma to the vagina; "The

7   trauma is so severe that it almost connects the vagina to the anus."); R.T. 2/11/03, at 19

8   (doctor testifying vaginal opening was about 7 times larger than it should be); *id.* at 36,

9   63, 66 (Dr. Keen: "the vaginal area was traumatized and it's photographically

10  documented in Exhibit 123, in which the side walls of the vagina have been torn and

11  there is hemorrhage into the tissue"); Ex. 141 at 8 (autopsy: "There are contusions and

12  lacerations of the posterior floor of the vagina with laceration to the outer layers of the

13  rectum."). The prosecutor committed no misconduct in his description of the evidence.

14  *See People v. Martinez*, 224 P.3d 877, 910 (Cal. 2010) (prosecutor's description of victim

15  suffering a savage injury reflecting on defendant's violent capabilities was fair comment

16  on the evidence); *Breedlove v. Moore*, 74 F. Supp. 2d 1226, 1254 (S.D. Fla. 1999), *aff'd*,

17  279 F.3d 952 (11th Cir. 2002) (characterization of "brutal knife attack ... did not 'infect

18  the trial with unfairness'").

19  Second, Cromwell alleges the prosecutor referenced HIV as a reason to convict

20  Cromwell. Doc. 38 at 195. Cromwell is mistaken. During the guilt phase closing, the

21  prosecutor briefly mentioned Cromwell's HIV diagnosis in the context of repeating Ella's

22  testimony about meeting Cromwell. R.T. 2/13/03, at 51, 56, 108. The state did not

23  mention HIV during the aggravation or penalty phase arguments. R.T. 2/20/03, at 1-67;

24  R.T. 3/4/03, at 116-28. The record does not support Cromwell's assertions, and he fails to

25  cite any law in support of this argument. Nor can he prove prejudice.

26  Cromwell claims the prosecutor misstated evidence when he mentioned Amanda

27  hearing "moaning." Doc. 38 at 195 (citing R.T. 2/20/03 at 38). When asked what kind of

28  noise her sister was making, Amanda testified "like I know what noise, but she was like

183

really hurt." R.T. 2/5/03, at 21; *id.* ("it sounded like somebody was hurt"). On cross-examination, defense counsel asked "you said when you walked down towards the bathroom, is that where you went when you *heard the moaning* … or the noises?" *Id.* at 42-43 (emphasis added). "Prosecutors must have reasonable latitude to fashion closing arguments and thus can argue reasonable inferences based on the evidence." *Necoechea*, 986 F.2d at 1276. Cromwell shows no error.

Cromwell criticizes the prosecutor for arguing Amanda's statements support the finding of the cruelty aggravator. Doc. 38 at 195. The prosecutor argued:

> She was conscious. Amanda told us. Amanda told us that she heard her moaning from the bedroom. She could hear it and you saw it on the diagram where her sister was and with the hand dangling over the side and hear her moaning. We have the circumstantial evidence that an injury has been inflicted in the bathroom, because we have the blood splatter on the wall.

R.T. 2/20/03, at 36. The prosecutor's argument was a fair inference from the evidence and he could permissibly argue the jury should find the murder committed in an "especially heinous or depraved" and "especially cruel" manner. *See Necoechea*, 986 F.2d at 1276; *cf. also State v. Schurz*, 859 P.2d 156, 162 (Ariz. 1993) ("It was adversely probative in the sense that all good relevant evidence is."); *Rosen v. Superintendent*, 972 F.3d 245, 258 (3d Cir. 2020) (noting "the adversarial process" includes "fairness to the government"). Cromwell shows no error.

Cromwell asserts that the prosecutor "argued, falsely, that []Cromwell's mother 'ran away from him[ ]' and was 'afraid of him[ ]' because of his alleged insatiable hunger for 'our little girls.'" Doc. 38 (quoting R.T. 3/4/03, at 119). But in context, those two statements were not connected:

> It was not just his family members that he says abused him and subjected him to abuse and sexual molestations and that sort of thing. What he says is that that's all because my mother's abuse.

> But in their reports, remember, they talked about, well, gee, mom ran away from him. Mom was not there abusing him. Mom was running away from him.

> The part about eating dog food and that sort of thing, where does that come from? The family members. Are these people on drugs? Yes. That's what

1
2
3
4
5

> Lisa said. These family members were not doctors. These family members were not the local minister in the church. These family members wouldn't even meet her in a home somewhere or let Lisa Christianson know where they were.
>
> Not only that, they were afraid of that man right there. Why? The people that know him best are afraid of him. The people that know him best say he wanted our little girls.

6  R.T. 3/4/03, at 119. The statement about the mom running away referenced Dr.

7  Rosengard's testimony that Cromwell's "mother abandoned him." R.T. 2/25/03, at 47;

8  *see* R.T. 2/24/03, at 32. Defense counsel also discussed Cromwell's abandonment by his

9  mother earlier in closing. *See* R.T. 3/4/03, at 114. The statement about "he wanted our

10 little girls," referenced that Cromwell's sister had told the mitigation specialist that

11 Cromwell "had asked her daughters to find him young girls." R.T. 2/25/03, at 159.

12 Cromwell's niece also reported that he "had asked to see her breasts." *Id.* at 160. The

13 prosecutor's statements were a fair comment on the evidence. *Necoechea*, 986 F.2d at

14 1276. Cromwell shows no error.

15     Cromwell also asserts that the prosecutor "infantilized" 11-year old Stephanie and

16 her nine-year-old sister Amanda to "overemphasize their vulnerability and play on the

17 jurors' emotions." Doc. 38 at 196. This argument is without merit. *See United States v.

18 Almonte–Nuñez*, 771 F.3d 84, 91 (1st Cir. 2014) (no error from the government's

19 emphasis at sentencing on the vulnerability of the victim); *United States v. Susi*, 378 Fed.

20 Appx. 277, 283 (4th Cir. 2010) ("argument that the prosecutor improperly commented on

21 the victims' age or vulnerability is without merit"); *United States v. Young*, 470 U.S. 1, 7

22 (1985) ("adversary system permits the prosecutor to prosecute with earnestness and

23 vigor" (cleaned up)).

24     Finally, Cromwell cannot establish prejudice given that the court instructed the

25 jury that statements made by counsel during argument are not evidence and that its

26 verdict must be based only on admissible evidence presented during trial. R.O.A. 113;

27 252; *see Romano*, 512 U.S. at 12 (holding that a limiting instruction by the trial court

28 precluded a finding that improperly admitted evidence "so infected the sentencing

185

proceeding with unfairness as to render the jury's imposition of the death penalty a denial of due process"). And given the strength of the aggravating factors, Cromwell cannot establish that the prosecutor's statements "had substantial and injurious effect" on the jury's sentencing decision. *Brecht*, 507 U.S. at 637.

### 9. Cromwell is not entitled to relief on his defaulted late-DNA-disclosure claim (Claim 10-8).

Cromwell claims the DNA retesting done after trial violated his right to a complete defense. Doc. 38 at 196. As explained in response to Claims 6 and 10-1, the evidence did not exist at the time of trial, thus Cromwell has no valid disclosure complaint. And as found by both the trial court and the PCR court, this information would not have changed the verdict, and thus Cromwell cannot show prejudice. *See Brecht*, 507 U.S. at 637.

### 10. Cromwell is not entitled to relief on his defaulted cumulative error review claim (Claim 10-9).

Cromwell argues that collectively his claims of misconduct show the trial "was overall infected with unfairness." Doc. 38 at 196-97. But as explained *supra*, no misconduct occurred. Accordingly, there was no prejudicial impact to accumulate. Moreover, given the overwhelming evidence of Cromwell's guilt, he cannot establish that any theoretical claims of misconduct prejudiced him. *See Brecht*, 507 U.S. at 637; *see also Runningeagle v. Ryan*, 686 F.3d 758, 771 (9th Cir. 2012) (undisclosed statements not prejudicial under *Brady* where they would not have "materially detracted from the overwhelming evidence of [appellant's] guilt"). Therefore, the claim lacks merit.

### K. Cromwell's death sentence is constitutional (Claim 11).

Cromwell asserts several claims alleging that his death sentence is unconstitutional. Doc. 38 at 197. He presented some of these claims on direct appeal, providing no argument to support them and citing state and federal law rejecting them. *See* Opening Brief at 55-59. The Arizona Supreme Court found these arguments previously rejected. *Cromwell*, 119 P.3d at 459, ¶¶ 58-70.

1.    **Arizona's capital sentencing scheme sufficiently channels the jury's discretion (Claim 11-1).**

Cromwell asserted on direct appeal that Arizona's death penalty statutory scheme "does not sufficiently channel the sentencing jurors' discretion." Opening Brief at 57. Cromwell also cited the state law rejecting this claim. *Id.* at 58 (citing *Pandeli*, 26 P.3d at 1153, ¶ 90). The Arizona Supreme Court found it "[r]ejected." *Cromwell*, 119 P.3d at 459, ¶ 66. Cromwell raised the claim in his PCR Petition, PCR Pet. at 165-68, which the PCR court rejected. R.O.A. 803 at 36 (citing *State v. Hidalgo*, 390 P.3d 783, 791-92, ¶ 28 (Ariz. 2017), *cert. denied*, 583 U.S. 1196 (2018)). But Cromwell did not present the claim in his PCR PFR. To the extent this Court considers this claim's merits, it should review the state court's rejection of this claim with the deference required by 28 U.S.C. § 2254(d).

To the extent Cromwell asserts that Arizona's statutes defining capital offenses and aggravators are overbroad, he failed to present that argument in state court. *Cf.* Doc. 38, at 197. Because Cromwell cannot return to state court to present the claim, it is technically exhausted but procedurally defaulted. Cromwell does not identify cause and prejudice to excuse the default.

Cromwell cites no law holding Arizona's statute does not sufficiently narrow the class of defendants eligible for the death penalty. Doc. 38, at 197. His citation to Justice Breyer's dissent respecting the denial of certiorari does not constitute such law. *Id.* Moreover, the Ninth Circuit has rejected this argument. *Smith*, 140 F.3d at 1272; *see Atwood v. Schriro*, 489 F. Supp. 2d 982, 1057 (D. Ariz. 2007). Even under de novo review, this claim fails.

2.    **The death penalty is not per se cruel and unusual (Claim 11-2).**

On direct appeal, Cromwell asserted, as he does in his habeas petition, that "[t]he death penalty is cruel and unusual under any circumstances," citing the law rejecting this claim. Opening Brief at 55 (citing *State v. Harrod*, 26 P.3d 492 (Ariz. 2001); *State v. Gillies*, 662 P.2d 1007, 1014 (Ariz. 1983)); *see* Doc. 38, at 197. Cromwell did not argue

1    that this controlling authority should be overruled or that his claim otherwise had merit.

2    Accordingly, he arguably waived the claim. Nevertheless, the Arizona Supreme Court

3    denied the claim when it found it "[r]ejected." *Cromwell*, 119 P.3d at 459, ¶ 60. To the

4    extent this Court considers the claim's merits, it should review the state court's rejection

5    of this claim with the deference required by 28 U.S.C. § 2254(d).

6        Cromwell did not assert in state court that "killing as a means of punishment is

7    'obviously' cruel." Doc. 38, at 198. Because Cromwell may not return to state court to

8    present this argument, it is technically exhausted but procedurally defaulted. Cromwell

9    does not assert cause and prejudice or a fundamental miscarriage of justice to excuse the

10   default.

11       Cromwell identifies no clearly established federal law establishing that capital

12   punishment is cruel and unusual. *Id.* at 246. In *Gregg*, the Supreme Court held that "the

13   infliction of death as a punishment for murder is not without justification and thus is not

14   unconstitutionally severe." 428 U.S. at 187. *Gregg* remains governing law, and there is

15   no clearly-established federal law holding that the death penalty is per se

16   unconstitutional. *See Glossip v. Gross*, 576 U.S. 863, 869 (2015) ("[I]t is settled that

17   capital punishment is constitutional."). Even under de novo review, Cromwell's claim

18   lacks merit.

19              **3.    Arizona's execution protocol is constitutional (Claim 11-3).**

20       Cromwell asserted on direct appeal that "[e]xecution by lethal injection is cruel

21   and unusual punishment." Opening Brief at 58. Cromwell also cited the state law

22   rejecting this claim. *Id.* (citing *State v. Spears*, 908 P.2d 1062, 1076 (Ariz. 1996)). The

23   Arizona Supreme Court found it "[r]ejected." *Cromwell*, 119 P.3d at 459, ¶ 67. To the

24   extent this Court considers the claim's merits, it should review the rejection of this claim

25   with the deference required by 28 U.S.C. § 2254(d).

26       Cromwell does not explain how the court's adjudication was unreasonable in light

27   of clearly-established federal law at the time of his appeal. And this Court, in accordance

28

with *Pinholster*, should decline Cromwell's invitation to consider events that purportedly occurred after the state court rejected the claim in 2005.

Regardless, the claim also fails on the merits because Cromwell does not identify an alternative to lethal injection that is "feasible, readily implemented, and in fact significantly reduces a substantial risk of severe pain." *Glossip v. Gross*, 576 U.S. 863, 877 (2015) (cleaned up). Moreover, the claim is not cognizable on habeas review but is more appropriately raised under 42 U.S.C. § 1983, as it challenges the method of execution rather than his death sentence itself. *Nance v. Ward*, 597 U.S. 159, 163 (2022); *Beardslee v. Woodford*, 395 F.3d 1064, 1068-69 (9th Cir. 2005). This Court should dismiss the claim.

### L.    Cromwell is eligible for the death penalty (Claim 12).

#### 1.    Freestanding Claim of Actual Innocence (Claim 12-1).

Cromwell asserts he is actually innocent and that executing him "would be a miscarriage of justice" in violation of the Eighth Amendment. Doc. 38 at 199-203.

This is a "freestanding" actual innocence claim like that discussed in *Herrera v. Collins*, where a majority of the Supreme Court assumed, without deciding, that executing an innocent person would violate the Constitution. Finding the defendant unpersuasive under any standard, the Court stated only that the threshold for a habeas petitioner would be "extraordinarily high" and the showing would have to be "truly persuasive." 506 U.S. 390, 417 (1993); *accord id.* at 426 (O'Connor, J., concurring). The Ninth Circuit requires that, "at a minimum, the petitioner must go beyond demonstrating doubt about his guilt, and must affirmatively prove that he is probably innocent." *Jones v. Taylor*, 763 F.3d 1242, 1246 (9th Cir. 2014). Such evidence must rise to the level of "conclusive exoneration." *Id.* at 1247 (quoting *House v. Bell*, 547 U.S. 518, 539-40 (2006)); *see also Carriger v. Stewart*, 132 F.3d 463, 477 (9th Cir. 1997) (rejecting freestanding innocence claim even though another suspect reliably confessed to the murder, with details only a participant would know, boasted the petitioner had been set up, and all other evidence pointed equally to the new suspect as to the petitioner).

1    Cromwell describes "indicators of actual innocence" but admits that his "attempt
2    at explaining the apparent presence of his DNA on the vaginal swabs of S.S. – that if his
3    DNA really was there it must have been planted by someone, via the condom he used
4    when he had sex with Ms. Speaks – sounds implausible." Doc. 38 at 201. He has failed to
5    put forth any evidence of "conclusive exoneration." *Jones*, 763 F.3d at 1247. This claim
6    should be denied.

7    **2.    The Constitution does not prohibit the execution of persons who
8    suffer from mental illnesses (Claim 12-2).**

9    Cromwell asserts he suffers from mental illnesses, which he contends render him
10   ineligible for the death penalty under the Eighth and Fourteenth Amendments. Doc. 38 at
11   203.[40] Cromwell raised this claim in his PCR petition and the state court rejected it. *See*
12   R.O.A. 803 at 35. But Cromwell did not present the claim in his PCR PFR. Because
13   Cromwell may not return to state court to present this argument, it is technically
14   exhausted but procedurally defaulted. He does not assert cause and prejudice or a
15   fundamental miscarriage of justice to excuse the default.

16   To the extent this Court considers the claim's merits, it should review the state
17   court's rejection with the deference required by 28 U.S.C. § 2254(d). Cromwell does not
18   explain how the court's adjudication was unreasonable in light of clearly-established
19   federal law at the time of his state court proceeding.

20   Moreover, the Eighth and Fourteenth Amendments do not prohibit the execution
21   of individuals who suffer from mental illnesses, as Cromwell contends. Relying on *Atkins*
22   and *Roper*[41], Cromwell asserts that mentally ill persons should be categorically excluded
23   from the death penalty. *See* Doc. 38 at 203-04. The Supreme Court, however, did not

---

26   [40]   Respondents do not concede that Cromwell is mentally ill, but it is unnecessary to
27   address this here because the Eighth and Fourteenth Amendments do not prohibit the
     execution of individuals who suffer from a mental illness.
28   [41] *Roper v. Simmons*, 543 U.S. 551 (2005)

hold in *Atkins* or *Roper*—nor has it ever held—that the Constitution prohibits the execution of individuals with mental illnesses.

In concluding intellectually disabled persons should be exempt from a death sentence, the Court primarily relied on the fact that there were a large number of States that had already prohibited the execution of the intellectually disabled. *Atkins*, 536 U.S. at 315-16. The Court found that this consensus provided "powerful evidence that today our society views [intellectually disabled] offenders as categorically less culpable than the average criminal." *Id.* at 316. In addition, intellectual disability, the Court held, diminishes personal culpability and the impairments of the intellectually disabled make the death penalty less defensible as retribution for past crimes and less likely to have a deterrent effect. *Id.* at 319-20.

Following *Atkins*, the Court in *Roper* decided whether it is permissible under the Eighth Amendment to execute a juvenile offender who was older than 15 but younger than 18 when he committed a capital crime. 543 U.S. at 555. In holding that the Eighth Amendment prohibits the execution of juvenile offenders, the Court again looked at whether there was a national consensus sufficient to label the execution of juvenile offenders cruel and unusual, and the differences between juvenile offenders, as a class, compared to adult offenders. *Id.* at 562-74. Finding there was objective indicia of consensus among the States against the execution of juvenile offenders—a majority of the States had rejected the imposition of the death penalty on juvenile offenders under 18—the Court held that the Eighth Amendment prohibits the imposition of the death penalty on juvenile offenders who were under the age of 18 when their crimes were committed. *Id.* at 578.

Cromwell attempts to expand the application of *Atkins* and *Roper* to mentally ill persons. But the Supreme Court has "held on numerous occasions that it is not an unreasonable application of clearly established Federal law for a state court to decline to apply a specific legal rule that has not been squarely established by [the Supreme Court]." *Knowles v. Mirzayance*, 556 U.S. 111, 122 (2009). Accordingly, numerous

courts have considered similar arguments and consistently rejected the proposition that the Eighth Amendment prohibits execution of the mentally ill. *See, e.g.*, *Carroll v. Secretary*, 574 F.3d 1354, 1369 (11th Cir. 2009); *Shisinday v. Quarterman*, 511 F.3d 514, 521 (5th Cir. 2007); *Baird v. Davis*, 388 F.3d 1110, 1114-15 (7th Cir. 2004); *State v. Hulsey*, 408 P.3d 408, 427 (Ariz. 2018); *People v. Ghobrial*, 420 P.3d 179, 200 (Cal. 2018); *Commonwealth v. Baumhammers*, 960 A.2d 59, 96-97 (Penn. 2008); *Lawrence v. State*, 969 So.2d 294, 300 (Fla. 2007); *State v. Johnson*, 207 S.W.3d 24, 51 (Mo. 2006); *Lewis v. State*, 620 S.E.2d 778, 786 (Ga. 2005); *Matheny v. State*, 833 N.E.2d 454, 458 (Ind. 2005); *see also Doerr v. Ryan*, 2010 WL 582198, * 3 (D. Ariz. Feb. 11, 2010). Thus, the Constitution does not prohibit the execution of the mentally ill.

Finally, to the extent that Cromwell conflates "intellectual disability" and "mental illness," those terms describe different conditions and are not interchangeable. *Heller v. Doe*, 509 U.S. 312, 323 (1993). And to the extent that Cromwell conflates insanity and serious mental illness, and relies on *Ford v. Wainwright*, 477 U.S. 399, 410 (1986), to argue that executing a mentally ill person violates the Eighth Amendment, his argument fails because mental illness is meaningfully distinct from insanity.

*Ford* "established that … the Eighth Amendment prohibits the execution of the insane." *See In re Neville*, 440 F.3d at 221. A claim of insanity or incompetency to be executed, however, is different than Cromwell's claim that the Eighth Amendment prohibits the execution of the mentally ill. *See, e.g.*, *Cornwell v. Warden*, 2018 WL 934542, *129 (E.D. Cal. Feb. 15, 2018) ("[S]ans a decision from the Supreme Court barring the execution of mentally ill prisoners, this court rejects petitioner's claim that he is exempt from execution because he is mentally ill."). And the claim does not become ripe until an execution date has been set. *See Panetti*, 551 U.S. at 942; *Stewart v. Martinez-Villareal*, 523 U.S. 637 (1998). This Court should deny habeas relief on the claim.

3. **Cromwell was competent to stand trial (Claim 12-3).**

Cromwell alleges that he was incompetent to stand trial because he lacked a rational understanding of the proceedings against him. Doc. 38 at 204-05. The PCR court found this claim both precluded and meritless. R.O.A. 803 at 24-27. This claim is procedurally defaulted. Moreover, Cromwell does not explain how the PCR court's alternative adjudication of this claim was unreasonable in light of the facts and clearly-established federal law.

a. *Procedural status.*

Cromwell failed to request a competency evaluation at trial or raise a competency claim on direct appeal. Cromwell was found competent in 2014 prior to his PCR petition. *See* R.O.A. 499. Although Cromwell tried to raise a competency claim in PCR, R.O.A. 604 at 108, the PCR court found it precluded under Arizona Rule of Criminal Procedure 32.2(a)(3). R.O.A. 803 at 27. Accordingly, the state court applied an independent and adequate state procedural bar to avoid reaching the claim's merits, and it is procedurally defaulted. *See Nunnemaker*, 501 U.S. at 802-05; *Robinson*, 595 F.3d at 1100. The PCR court's alternative merits ruling does not nullify the default. *See Harris*, 489 U.S. at 264 n.10; *Comer*, 480 F.3d at 964 n.6. Cromwell asserts no cause to excuse the procedural default.

b. *The claim lacks merit.*

Alternatively, as found by the PCR court, the claim lacks merit.

The critical inquiry is "whether [the defendant] has sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding—and whether he has a rational as well as factual understanding of the proceedings against him." *Dusky v. United States*, 362 U.S. 402, 402 (1960) (per curiam). The state court found as follows:

> Counsel did not request a competency evaluation during defendant's trial proceedings, nor did a competency evaluation take place. It appears that the only information concerning [Cromwell's] competence came from Dr. Rosengard's testimony in the penalty proceeding. During direct-examination, Dr. Rosengard testified that he reviewed [Cromwell's] jail records and went to the jail three times to conduct· a psychiatric evaluation. (R.T. 2/24/03 at 41-43) The first visit took place on November 3, 2002, and [Cromwell] pleasantly and firmly stated that he did not want to have any

193

contact with Dr. Rosengard. (*Id.* at 43) Dr. Rosengard returned to the jail on December 24, 2002 and "spent a good deal of time" with [Cromwell] "obtaining information," asking [Cromwell] whether he experienced symptoms for different diagnoses, conducting an "objective" evaluation, and reading additional information, such as "the records in the jail." (*Id.*)

While recounting his professional background, Dr. Rosengard explained that 25 percent of his practice is forensic-related, and that he conducts competency evaluations. (*Id.* at 39) Referring to "Arizona State Statutes," Dr. Rosengard explained the legal requirements for a competency evaluation, and testified that he was on the County's list of mental health experts who are qualified to conduct competency evaluations. (*Id.* at 39-40)

During cross-examination, the prosecutor referred to this prior testimony and clarified with Dr. Rosengard that he "didn't do a competency evaluation in this case." (*Id.* at 77) The prosecutor then asked, "But being aware of the competency evaluations and what you have to do for competency evaluations, you didn't see anything during your contact with Mr. Cromwell here that would indicate to you that he was not competent to stand trial?" Dr. Rosengard responded, "That's right." (*Id.*)

[O]n January 2, 2009, "a Psychologist Associate II at the Arizona Department of Corrections ("ADOC") reported that Mr. Cromwell had undergone a "recent and sudden change in behavior." (*Id.* at 2) …. [In PCR,] Counsel also presented the opinion of Dr. Weller, a clinical psychologist. Dr. Weller evaluated [Cromwell] and concluded that, due to mental illness and a serious thought disorder, [Cromwell] was "presently incapable of meaningfully participating in or contributing to the preparation and management of his case." (*Id.* at 3) Counsel also noted that [Cromwell] had been filing "incoherent pro per pleadings in the Arizona Supreme Court."" (*Id.*)

R.O.A. 803 at 24-25.

In April 2014, the trial court held a competency hearing, finding Cromwell competent. R.O.A. 495; 496; 499. Ultimately, the PCR court rejected the competency claim, finding:

Assuming the truth of [Cromwell's] allegations, the evidence does not demonstrate that [Cromwell] did not understand the nature of the proceedings against him or that he was unable to assist in his defense. As discussed above, a "sudden change" in behavior many years after trial does not demonstrate [Cromwell's] incompetence, nor does a mental health diagnosis. …

[Cromwell's] evidence demonstrates that [he] displayed a few instances of unusual facial expressions and behaviors in court, sometimes declined visits from experts and counsel, and expressed strong disagreement with trial counsel's professional judgment concerning the strength of the State's evidence. However, the evidence does not demonstrate that these behaviors and actions were the result of a mental disorder that affected [Cromwell's] competency. Instead, the totality of the trial record strongly demonstrates that [Cromwell] understood the nature of the trial proceeding and the

194

evidence against him, and that [Cromwell] could control his behavior when he decided to do so.

Specifically, the evidence demonstrates that [Cromwell] directly and intelligently participated in colloquies with the court and answered questions during his trial testimony. Additionally, [Cromwell] did not display erratic or inappropriate behavior in court, and Dr. Rosengard has not pointed to any information in the jail records describing such behavior.

R.O.A. 803 at 26-27.

Cromwell fails to argue that the PCR court made unreasonable factual determinations. As recounted above, the PCR court carefully detailed the evidence supporting a finding that Cromwell was competent during trial.

Cromwell cites to the general due process right to be tried while competent in *Drope*, but fails to argue how the state court violated federal law. Doc. 38 at 204-05. In *Drope*, the defendant had a history of irrational behavior, which his attorney attempted to bring to the trial court's attention by asking for a continuance to have the defendant evaluated and treated for psychiatric problems. 420 U.S. at 164-67. Missouri law permitted either party to request or the court to order on its own motion a competency evaluation. *Id.* at 173. The trial court did not allow the examination because the request was made in an improper form. *Id.* at 165. The defense did not resubmit the request in the proper form. *Id.* While the trial was pending, the defendant attempted suicide. *Id.* at 166. The defendant's attorney moved for a mistrial based on the defendant's suicidal actions, but the trial court denied the motion because it found that the defendant's absence was voluntary. *Id.* at 167. The Supreme Court held that Missouri's competency "procedure is, on its face, constitutionally adequate to protect a defendant's right not to be tried while legally incompetent." *Id.* However, the Court found that the application of this law in the defendant's case violated the due process clause because the Missouri court erroneously construed the facts surrounding the defendant's competency before and during trial. *Id.* at 181.

Like Missouri, Arizona permits either party to request a competency hearing or the trial court to order one on its own motion. *See* Ariz. R. Crim. P. 11.2(a)(1), (3). This

procedure is "on its face, constitutionally adequate." *Drope*, 420 U.S. at 173. Here, after Cromwell's post-trial "sudden change in behavior" was reported, the PCR court ordered a competency evaluation, R.O.A. 499, which established that Cromwell was competent to stand trial, to "understand the nature of the proceedings against him," and "assist in his defense." R.O.A. 803 at 26-27. The trial court evaluated Cromwell's competency through the numerous evaluations and by noting Cromwell "directly and intelligently participated in colloquies with the court and answered questions during his trial testimony." *Id.* In the words of Cromwell's trial counsel:

> He knew what the proceedings were. And he went through those proceedings with us, he understood them. He knew those things. Able to assist? He did everything that he thought he could do to assist. I mean he was telling us his version of the facts and doing what he thought had, you know, we talked about lots of things.

Ex. 73 at 24.

Even assuming Cromwell suffers from schizophrenia, a mental disease or defect is not dispositive of incompetence to assist counsel and stand trial. *Boag v. Raines*, 769 F.2d 1341, 1343 (9th Cir. 1985); *see State v. Harding*, 670 P.2d 383, 391 (Ariz. 1983) (holding "mere diagnosis of a mental disease or disorder does not mean that the defendant is unable to make rational decisions regarding his case"); *see also* Ariz. R. Crim. P. 11.1 ("The presence of a mental illness, defect or disability alone is not grounds for finding a defendant incompetent to stand trial.").

The PCR court's decision thus is not contrary to or an unreasonable application of *Dusky* or *Drope*.

### M.    No cumulative error occurred (Claim 13).

Cromwell claims the cumulative impact of the alleged errors in his petition cumulatively violate due process. Doc. 38 at 205. This claim lacks merit.

### 1.    Procedural status.

Cromwell argues that "[t]his issue was arguably presented in Claim I of the PCR petition [but] because the cumulative error analysis this Court must undertake will include numerous errors that were not presented to the ASC, Mr. Cromwell submits that

this issue was not exhausted before the ASC." Doc. 38 at 206. Cromwell fails to argue why this Court should excuse his failure to fully raise his cumulative error claim in state court. *See id.* Moreover, Cromwell cannot return to state court to exhaust this claim; not only would such a claim be precluded and untimely, but Arizona does not recognize cumulative error outside of prosecutorial misconduct. *Pandeli*, 394 P.3d at 18, ¶ 69.

Cromwell raised a partial cumulative error claim in his PCR petition. R.O.A. 604 at 168-72. The post-conviction court reviewed the record and denied the claim on the merits. R.O.A. 803 at 36; *see also* PCR PFR at 7 (raising cumulative error claim). The state court's rejection of this part of the claim, therefore, is entitled to AEDPA deference.

## 2. The claim lacks merit.

Respondents have shown that each claim contained in this petition lacks merit. Therefore, there is no cumulative effect of errors, as none occurred. Cromwell also failed to establish the PCR court's ruling—that no cumulative error occurred—is contrary to clearly established federal law or an unreasonable determination of the facts under § 2254(d)(1)–(2). *See* R.O.A. 803 at 36. This Court should dismiss this claim.

## Conclusion

For these reasons, Respondents respectfully request that this Court deny the Petition for Writ of Habeas Corpus and dismiss it with prejudice. Respondents also request that no certificate of appealability be issued because the dismissal of the petition is justified by a plain procedural bar, reasonable jurists would not find the ruling debatable, and Cromwell has not made a substantial showing of the denial of a constitutional right. *See* 28 U.S.C. § 2253(c)(2); *Slack v. McDaniel*, 529 U.S. 473, 484 (2000).

1

Respectfully submitted this 16th day of April, 2025.

2

Kristin K. Mayes
Attorney General

3

4

Jason D. Lewis
Deputy Solicitor General /
Section Chief of Capital Litigation

5

6

s/ Kevin M. Morrow
Assistant Attorney General
Attorneys for Respondents

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**CERTIFICATE OF SERVICE**

I hereby certify that on April 16, 2025, I electronically transmitted the attached document to the Clerk's Office using the ECF System for filing and served the attached document by mail on the following, who is not a registered participant of the ECF System:

MARY E. SPEARS
DEBORAH A. CZUBA
Federal Defender Services of Idaho
Capital Habeas Unit
702 W. Idaho, Suite 900
Boise, Idaho 83702
Mary_Spears@fd.org
Deborah_A_Czuba@fd.org

Attorneys for Petitioner Robert L. Cromwell


s/ E.M.A.V.