**WO**

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Robert Louis Cromwell,<br><br>           Petitioner,<br><br>v.<br><br>Ryan Thornell, et al.,<br><br>           Respondents. | No. CV-23-00783-PHX-DWL<br><br>**ORDER**<br><br>DEATH PENALTY CASE |

Pending before the Court is Petitioner Robert Louis Cromwell's motion for stay under *Rhines v. Weber*, 544 U.S. 269 (2005), and his request for authorization for federal habeas counsel to represent him in the Arizona courts for the purpose of exhausting four claims asserted in his habeas petition. (Doc. 64.)[1]  Also pending is Cromwell's motion to strike.  (Doc. 65.)  The motions are fully briefed.  (Docs. 69, 70, 73, 80.)[2]  For the reasons that follow, both motions are denied.

I.    Background

Cromwell is an Arizona death row inmate seeking federal habeas relief in this Court. On February 19, 2003, a Maricopa County jury convicted Cromwell of one count of first-degree murder and one count of sexual assault in the death of 11-year-old Stephanie Shortt ("Stephanie").  *State v. Cromwell*, 119 P.3d 448 (Ariz. 2005).  He was also convicted of

---

[1]    "Doc." refers to numbered documents in this Court's electronic case docket; page citations are to page numbers generated by the Court's electronic filing system.

[2]    Cromwell has also filed a motion to amend (Doc. 76), which will be addressed in due course in a separate order.

two counts of aggravated assault, one against Ella Speaks, Stephanie's mother, the other against Ella's friend, Kim Jensen. *Id.* at 449.

The jury also found both of the aggravating factors alleged by the State: that Cromwell murdered Stephanie in an especially cruel, heinous, or depraved manner, and that Stephanie was under the age of 15 years. *Id.* at 458. The jury determined that Cromwell should be sentenced to death. (IOR 253.)[3] The trial court then imposed a death sentence for the murder and prison sentences for the noncapital counts. *Cromwell*, 119 P.3d at 449.

In 2005, the Arizona Supreme Court affirmed Cromwell's convictions and death sentence on direct appeal. *Id*. at 460. The trial court subsequently denied post-conviction relief ("PCR") (IOR at 803), and on April 5, 2023, the Arizona Supreme Court summarily denied review of all but a single PCR claim and, after granting review, denied relief on that claim. (PR 33.)

On May 9, 2023, Cromwell initiated federal habeas proceedings. (Doc. 1.) On April 18, 2024, Cromwell filed a first amended petition ("Amended Petition"), raising 13 claims and numerous subclaims. (Doc. 38.) Relevant to the motion to stay, Cromwell alleges he received ineffective assistance of trial counsel because counsel: (1) abandoned him, Claim 1-1 (*id.* at 43-45); (2) simultaneously represented victim Kim Jensen, Claim 1-6 (*id.* at 95-96); (3) failed to withdraw based on the simultaneous representation, Claim 1-7 (*id.* at 96), and (4) failed to request a *Simmons*[4] instruction and argue to the jury that if Cromwell were sentenced to natural life, he could never be released, Claim 2-10 (*id.* at

---

[3]    "IOR" refers to the indexed documents from Maricopa County Superior Court Case No. CR-2001-095438. "PR" refers to the indexed documents from the Arizona Supreme Court's review of post-conviction proceedings in CR-22-0068-PC.

[4]    In *Simmons v. South Carolina*, 512 U.S. 154 (1994), the Supreme Court held that "where the defendant's future dangerousness is at issue, and state law prohibits the defendant's release on parole, due process requires that the sentencing jury be informed that the defendant is parole ineligible." *Id.* at 156. *See also Lynch v. Arizona*, 578 U.S. 613 (2016) (holding that *Simmons* applies to Arizona capital cases). In Arizona, parole is available only for juveniles and individuals who committed a felony before January 1, 1994, categories that do not include Cromwell.

- 2 -

148-49).

Respondents allege in their Answer that Claims 1-1, 1-6, and 1-7 are technically exhausted and procedurally defaulted as well as meritless. (Doc. 51 at 13, 15, 36.) They further allege that Claim 2-10 is exhausted and meritless. (*Id.* at 84-87.)

II.    Discussion

A.    **Motion to Strike**

The Court *sua sponte* directed Respondents to file a surreply "supporting their affirmative allegations of procedural defenses and addressing arguments made by Petitioner regarding the availability of state remedies, cause and prejudice, fundamental miscarriage of justice, or equitable tolling." (Doc. 59 at 1.) Respondents were advised that "[t]he Surreply shall not be used to address the merits of Petitioner's claims except to the extent the merits of a claim are implicated in Petitioner's response to Respondents' affirmative defenses." (*Id.*) Later, the Court denied Cromwell's motion for reconsideration. (Doc. 62 at 5-6.)

In the Amended Petition, Cromwell includes a statement of exhaustion, asserting that several of his claims were raised in his PCR Petition. (*See e.g.*, Doc. 38 at 104 [Claim 1-14].) In their Answer, Respondents contend that although Cromwell attempted to incorporate his entire PCR Petition by reference into his petition for review ("PR") to the Arizona Supreme Court, this approach was impermissible and did not serve to fairly present the claims—and, thus, several claims raised in the PCR Petition, but not in the PR, are technically exhausted and procedurally defaulted. (*See e.g.*, Doc. 51 at 13, 47 & n.13.) In his Reply, Cromwell disagrees with this argument, asserting all of the claims raised in the PCR Petition were fairly presented to the Arizona Supreme Court because they were included in the appendix to the PR. (Doc. 61 at 10.) In Section II of the Surreply, Respondents attempt to rebut this argument and provide additional legal citations in support of their position. (Doc. 63 at 3-7.)

Cromwell now moves the Court to strike Section II of Respondents' Surreply, arguing that Respondents' "lengthy new argument on fair presentation" exceeds the scope

of a permissible surreply. (Doc. 65 at 3.) Cromwell also contends that Section II violates the Court's order directing Respondents not to raise new affirmative defenses in the Surreply and allowing them only to respond to his arguments on cause and prejudice or actual innocence. (*Id.*)

As previously explained, a surreply in this circumstance is "more appropriately considered a reply in support of a motion to dismiss the claims as procedurally barred." (Doc. 62 at 3.) As such, Respondents' arguments in the Surreply regarding fair presentation (or the absence thereof) do not exceed the proper scope of the Surreply. (Doc. 59 at 1 ["Respondents shall file a Surreply supporting their affirmative allegations of procedural defenses . . . ."].) Nor did Respondents impermissibly raise new affirmative defenses or address the merits of Cromwell's claims in Section II of the Surreply. Although Cromwell contends the Court ordered Respondents to only respond to his arguments on cause and prejudice or actual innocence, this is incorrect. That language was taken from the order denying Cromwell's motion for reconsideration. (Doc. 62 at 5-6.) The order directing Respondents to file a Surreply, as noted above, specifically authorized them to support their affirmative allegations of procedural defenses. (Doc. 59 at 1.) The challenged arguments in Section II of the Surreply fall into this permissible category of argument.

## B. Stay and Abeyance

Federal courts may not grant a writ of habeas corpus unless "the applicant has exhausted the remedies available in the courts of the State." 28 U.S.C. § 2254(b)(1)(A). The exhaustion requirement is "grounded in principles of comity" as it gives the states "the first opportunity to address and correct alleged violations of state prisoner's federal rights." *Coleman v. Thompson*, 501 U.S. 722, 731 (1991).

A *Rhines* stay allows a habeas petitioner who presents a mixed petition containing both exhausted and unexhausted claims "to exhaust claims in state court that had not previously been presented there, and to do so without dismissing their federal habeas petition . . . and without running afoul of the one-year statute of limitations established by" the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"). *Doerr v. Shinn*,

176 F.4th 1117, 1125 (9th Cir. 2026), pet. for rehearing en banc filed (9th Cir. May 18, 2026) (Nos. 09-99026, 10-99007, 20-99002).

Under *Rhines*, "a district court must stay a mixed petition only if: (1) the petitioner has 'good cause' for his failure to exhaust his claims in state court; (2) the unexhausted claims are potentially meritorious; and (3) there is no indication that the petitioners intentionally engaged in dilatory litigation tactics." *Wooten v. Kirkland*, 540 F.3d 1019, 1023 (9th Cir. 2008) (citing *Rhines*, 544 U.S. at 278).

The *Rhines* "good cause" standard does not require "extraordinary circumstances." *Id.* at 1024 (citing *Jackson v. Roe*, 425 F.3d 654, 661-62 (9th Cir. 2005)). However, courts "must interpret whether a petitioner has 'good cause' for a failure to exhaust in light of the Supreme Court's instruction in *Rhines* that the district court should only stay mixed petitions in 'limited circumstances.'" *Id.* (citing *Jackson*, 425 F.3d at 661). Courts must also "be mindful that AEDPA aims to encourage the finality of sentences and to encourage petitioners to exhaust their claims in state court before filing in federal court." *Id.* (citing *Rhines*, 544 U.S. at 276-77).

C. **Exhaustion**

Before applying the *Rhines* criteria to Cromwell's claims, the Court must first determine if he has presented a mixed petition by including unexhausted claims in his request for habeas relief.

A claim is exhausted if (1) the petitioner has fairly presented the federal claim to the highest state court with jurisdiction to consider it; or (2) no state remedy remains available for the claim. *Johnson v. Zenon*, 88 F.3d 828, 829 (9th Cir. 1996). The latter form of exhaustion is referred to as "technical exhaustion." *Coleman*, 501 U.S. at 732 ("A habeas petitioner who has defaulted his federal claims in state court meets the technical requirements for exhaustion; there are no state remedies any longer 'available' to him."); *Smith v. Baldwin*, 510 F.3d 1127, 1139 (9th Cir. 2007) (observing that if state court where petitioner would be required to present the claims would find the claims procedurally barred, petitioner has technically exhausted the claims through procedural default);

*Dickens v. Ryan*, 740 F.3d 1302, 1317 (9th Cir. 2014) ("An unexhausted claim will be procedurally defaulted, if state procedural rules would now bar the petitioner from bringing the claim in state court.").

Therefore, in the present case, for the claims that were not fairly presented in state court, the Court must first determine whether Cromwell has state remedies currently available to him. *Ortiz v. Stewart*, 149 F.3d 923, 931 (9th Cir. 1988). If no remedies are available, Cromwell's claims are "technically" exhausted and procedurally defaulted. *Coleman*, 501 U.S. at 732, 735 n.1.

### 1.    Claims 1-1, 1-6, and 1-7

Respondents argue that Claims 1-1, 1-6, and 1-7 are technically exhausted and procedurally defaulted because Cromwell did not raise them in his first PCR proceeding and they would be precluded under Arizona Rule of Criminal Procedure 32.2(a)(3) if brought in a successive PCR petition. (Doc. 51 at 15, 36.)

Cromwell disagrees. (Doc. 61 at 11-13, 22, 34.) First, he argues that Rule 32 provides an express exception to preclusion because he was "deprived entirely of the opportunity to vindicate his Sixth Amendment right to counsel 'through no fault of his own.'" (Doc. 64 at 4, quoting *State v. Diaz*, 340 P.3d 1069, 1070-71 (Ariz. 2014)). Additionally, he argues that the right to counsel is "such a fundamental bedrock of criminal law in Arizona" that the State "must prove the defendant knowingly, voluntarily, and intelligently waived' that right." (*Id.* at 4-5, quoting *State v. Anderson*, 547 P.3d 345, 351 (Ariz. 2024)). Finally, in addition to arguing that the procedural rules in Arizona regarding successive or untimely PCR applications are not consistently applied to capital cases, Cromwell asserts that he was incompetent throughout his state-court proceedings and that this entitles him to merits review of his claims. (*Id.* at 5-6, citing *Fitzgerald v. Myers*, 402 P.3d 442, 450 (Ariz. 2017)). At a minimum, Cromwell argues that "there is a nontrivial possibility that an Arizona court would find an exception to the preclusion bar of Rule 32.2(a)(3)," so this Court "should not on [its] own hold that the bar applies." (*Id.* at 6, quoting *Doerr v. Shinn*, 127 F.4th 1162, 1174 (9th Cir. 2025), *amended and superseded by*

176 F.4th 1117 (2026)).

"[A] state procedural default rule applies only when 'it is clear that the state court would hold the claim procedurally barred.'" *Doerr*, 176 F.4th at 1126 (quoting *Franklin v. Johnson*, 290 F.3d 1223, 1230-31 (9th Cir. 2002)).  Arizona's procedural-default rule precludes any post-conviction claim "waived at trial or on appeal, or in any previous post-conviction proceeding, except when the claim raises a violation of a constitutional right that can only be waived knowingly, voluntarily, and personally by the defendant."  Rule 32.2(a)(3).  "[Arizona's] preclusion rules require a defendant to raise all known claims for relief in a single petition to prevent endless trial-court reviews of the same case." *Anderson*, 547 P.3d at 350.  The preclusive effect of Rule 32.2(a) may be avoided only if a claim falls within certain exceptions and the petitioner can justify his omission of the claim from a prior petition or adequately explain his failure to present the claim in a timely manner. *See* Rule 32.1(b)-(h), 32.2(b), 32.4(b)(3).  The Ninth Circuit has held that "[Rule] 32.2(a)(3) is independent of federal law and has been regularly and consistently applied, so it is adequate to bar federal review of a claim." *Jones v. Ryan*, 691 F.3d 1093, 1101 (9th Cir. 2012).

Under Arizona law, collateral review proceedings are the first point at which an ineffective assistance of counsel ("IAC") claim may be presented for review. *State v. Spreitz*, 39 P.3d 525, 527 (Ariz. 2002); *accord State v. Traverso*, 576 P.3d 97, 99 (Ariz. 2025).  Additionally, "the ground of ineffective assistance of counsel cannot be raised repeatedly" in state court. *Anderson*, 547 P.3d at 350.  Generally, where an IAC claim was raised or could have been raised in a previous Rule 32 PCR proceeding, "subsequent claims of ineffective assistance will be deemed waived and precluded." *Id.* (quoting *Spreitz*, 39 P.3d at 526 (2002)).

Preclusion of IAC claims, however, is not automatic. *Traverso*, 576 P.3d at 104.  As the Arizona Supreme Court recently explained, whether a defendant must personally waive an IAC claim to warrant preclusion under Rule 32.2(a)(3) depends on the particular right implicated by the allegedly ineffective representation. *Id.* at 105.  The rights to

counsel, to a jury trial, and to a twelve-person jury have been identified as belonging to the narrow category of rights that are of sufficient constitutional magnitude to require a defendant's knowing, voluntary, and personal waiver. *Id.* at 106. In *Traverso*, the IAC claim at issue concerned the defendant's "right to be sufficiently informed of the prosecution's plea offer to decide whether to accept it, plead guilty, and waive a jury trial" and was thus of "sufficient constitutional magnitude" for purposes of Rule 32.2(a)(3) to require the defendant's "knowing, voluntary, and personal waiver." *Id.*

Although Respondents correctly note that a "mere assertion by a defendant that his or her right to a fair trial has been violated is not a claim of sufficient constitutional magnitude" under Rule 32.2(a)(3) (Doc. 73 at 18 n.8, citation omitted), the right to conflict-free counsel, like the right to plead guilty and waive a jury trial, is arguably a right "so inherently personal that it cannot be waived by defense counsel; only the defendant can waive it." *Traverso*, 576 P.3d at 106, quoting *Stewart v. Smith*, 46 P.3d 1067, 1070 (Ariz. 2002)); *see also State v. Moody*, 968 P.2d 578, 582 (Ariz. 1998) (trial court's refusal to appoint new counsel rendered waiver involuntary when the options presented to defendant were continued representation by a lawyer with whom he had an irreconcilable conflict or self-representation); *Cassett v. Stewart*, 406 F.3d 614, 622 (9th Cir. 2005) (noting that the "Arizona state courts are better suited to make these determinations"—i.e., whether a claim requires a knowing, voluntary, and intelligent waiver before preclusion applies—because that question "may require both a fact-intensive inquiry and an application of Arizona's complex case law on waiver"); *but see Robinson v. Schriro*, 366 F. App'x 801, 803 (9th Cir. 2010) (unpublished) (noting that PCR court declined to address the merits of habeas petitioner's conflict-of-interest claim, holding the claim was waived by failure to raise it on direct appeal or in a previous collateral proceeding). "PCR counsel can waive most claims of trial error on the defendant's behalf by failing to assert them in a PCR petition. If the claim is of 'sufficient constitutional magnitude,' however, the state must prove that the defendant knowingly, voluntarily, and intelligently waived the claim." *Anderson*, 547 P.3d at 351 (quoting *State v. Diaz*, 340 P.3d 1069, 1070 (Ariz. 2014)).

Respondents do not contest Cromwell's assertion that he did not knowingly, voluntarily, and personally waive his right to bring these claims in his first PCR proceeding.  It is therefore not clear that the Arizona courts would find these claims precluded under Rule 32.2(a)(3).

Respondents do, however, contend that the exception provided by Rule 32.2(a)(3)—for claims of sufficient constitutional magnitude—has no bearing on a claim's timeliness, and they further contend that any attempt to bring these claims in state court now would be futile because they are untimely and, in Arizona, timeliness is jurisdictional.  (Doc. 73 at 10, citing Ariz. Rev. Stat. § 13-4234(G)); *see also id.* at 18 n.9, citing *State v. Lopez*, 323 P.3d 1164 (Ariz. App. 2014)).

To the extent Respondents rely on the jurisdictional time limitations set forth in Ariz. Rev. Stat. § 13-4234(G), Cromwell correctly points out that the Arizona Supreme Court has since clarified that this subsection of the statute, which eliminated the "no fault" exception to time limits, *see Lopez*, 323 P.3d at 1166, is unconstitutional.  *State v. Bigger*, 492 P.3d 1020, 1030 (Ariz. 2021).  However, to the extent Respondents cite *Lopez* for the proposition that a claim's constitutional magnitude has no bearing on the issue of timeliness under Rule 32.4, this contention is well taken.  The role of personal waiver in determining whether a claim is precluded under Rule 32.2(a)(3) was first raised in a comment to the rule, and then later added via amendment to the rule regarding preclusion.  *Traverso*, 576 P.3d at 103-4. The time limitations in Rule 32.4, however, do not recognize a similar exception in either the comments or the rule itself.  *See* Rule 32.4.

Rule 32.4(b)(3)(A) requires defendants to file PCR notices brought under Rule 32.1(a) "within 90 days after the oral pronouncement of sentence or within 30 days after the issuance of the mandate in the direct appeal, whichever is later."  But under Rule 32.4(b)(3)(D), "[t]he court must excuse an untimely notice requesting post-conviction relief filed under subpart (3)(A) if the defendant adequately explains why the failure to timely file a notice was not the defendant's fault."

Cromwell alleges that his failure to bring Claims 1-1, 1-6, and 1-7 in a timely

manner is attributable to PCR counsel. (Doc. 80 at 3, citing Doc. 64 at 6-7, 10.) Respondents contend this argument is "unavailing" because there "is no Sixth Amendment right to the effective assistance of PCR counsel." (Doc. 73 at 17 n.7, citing *Smith v. Idaho*, 392 F.3d 350, 357 (9th Cir. 2004)). The Court disagrees. Respondents do not cite any authority, and the Court is unaware of any authority, holding that only constitutional violations can be alleged as adequate explanations for the untimeliness of a claim under Rule 32.4(b)(3). Because Cromwell was represented by counsel during his PCR proceedings, the Arizona courts may find that his failure to file a timely PCR notice alleging Claims 1-1, 1-6, and 1-7 "was not his fault because he was represented by counsel at that time." *Bigger*, 492 P.3d at 1030.

In sum, because it is not clear that the Arizona courts would find Claims 1-1, 1-6, or 1-7 precluded or untimely if brought in a second PCR petition, the Court declines to find these claims technically exhausted through procedural default. *Doerr*, 176 F.4th at 1131 ("[I]t is enough for Doerr to show that 'it is not clear that the Arizona courts would hold' his claim barred.") (citation omitted).

### 2.    Claim 2-10

In Claim 2-10, Cromwell asserts that trial counsel "failed to recognize and correct *Simmons* error even when alerted to it" and that this claim "was arguably presented" in Claim C(3)(a)–(b) of his PCR Petition. (Doc. 38 at 148-49.) In their Answer, Respondents agree that the claim was exhausted by Cromwell's presentation of it to the PCR court and the Arizona Supreme Court. (Doc. 51 at 84.) In his Reply, Cromwell concedes that the Respondents have correctly identified Claim 2-10 as exhausted and asserts that the state court's rejection of the claim was both an unreasonable application of clearly established federal law and an unreasonable determination of fact. (Doc. 61 at 64.) Nevertheless, Cromwell now asserts that he is entitled to a *Rhines* stay with respect to Claim 2-10 because there has been a "sea change in Arizona law" giving "rise to a new version of this claim" and it is, at the very least, unclear that Arizona courts would apply Rule 32.2 to preclude review of this IAC claim. (Doc. 64 at 12-13.)

As background, during the guilt phase of Cromwell's trial, the trial court instructed the jurors that if they did not sentence Cromwell to death, he would be eligible for parole after 35 years:

> If you find the mitigation is sufficiently substantial to call for leniency, the Court will sentence the defendant either to life imprisonment without the possibility of parole or life without parole until at least thirty-five years have passed.

(RT 03/04/2003 at 140; IOR 252 at 5.)  Although parole had been eliminated for all felonies committed after 1993, *see* Ariz. Rev. Stat. §41-1604.09(I), trial counsel did not object to this instruction or ask that the jury be informed of Cromwell's parole ineligibility.

Cromwell did not raise any *Simmons*-related claims in his direct appeal but argued in Claim C(2) of his PCR Petition that he was entitled to relief under Rules 32.1(a) and (g) for a violation of his due process right to be sentenced by a jury correctly informed of his ineligibility for parole under *Simmons* and *Lynch v. Arizona*, 578 U.S. 613 (2016) (holding that *Simmons* applies to Arizona capital cases).

The PCR court denied Cromwell's claim of a standalone due process violation under Rule 32.1(a) as precluded under Rule 32.2(a)(3) due to counsel's failure to challenge the parole eligibility instruction at trial or on appeal.  (IOR 803 at 20.)  The PCR court also found that Cromwell had not stated a colorable claim under Rule 32.1(g) because he had not shown that *Lynch* was applicable to his case, that it was a significant change in the law, or that it was retroactive to Cromwell's collateral proceedings.  (*Id.* at 20-22.)

In Claim C(3)(a) of his PCR Petition, Cromwell alleged that trial counsel was ineffective because "[t]rial counsel neither objected, moved for mistrial, nor requested a positive *Simmons* instruction informing the jurors that [Cromwell] could never be released," as well as by failing to mention Cromwell's parole ineligibility during closing arguments even though future dangerousness was at issue.  (IOR 604 at 90; *see also id.* at 93.)  Cromwell asserted that "[c]ompetent trial and appellate counsel at the time were raising and preserving this issue, understanding that eventually reasonable minds would prevail."  (*Id.* at 93, citation omitted.)  Relying on the answers that four jurors provided in

their screening questionnaires—that the possibility of release was an important consideration to them with future danger to society being among their concerns—Cromwell alleged that he was prejudiced by trial counsel's performance because "at least one juror would have come to a different conclusion regarding the death penalty." (*Id.* at 94.)

Addressing Cromwell's claim under *Strickland*, the PCR court concluded that Cromwell was not entitled to relief because:

> [T]he jury convicted [Cromwell] of sexually assaulting, and beating and stabbing to death a ten-year-old victim. The jury further found [Cromwell] committed these crimes in an especially cruel and especially heinous or depraved manner. Given the jury's findings and the evidence that overwhelmingly supports these findings, there is no reasonable probability of a different sentencing result, but for the parole eligibility instruction. [Cromwell] has not shown that counsel's failure to raise the *Simmons* error at trial caused prejudice.

(IOR 803 at 23.) The Arizona Supreme Court granted review of this claim but denied relief, holding: "The record does not show that trial and appellate counsel violated Cromwell's Sixth Amendment right to effective assistance of counsel by failing to invoke *Simmons v. South Carolina*, 512 U.S. 154 (1994)." (PR 33.)

Cromwell asserts that the PCR court's denial of his claim rested on "decades of misapplication" of *Simmons* by the Arizona Supreme Court. (Doc. 64 at 13.) He contends that because the Arizona Supreme Court "has finally begun recognizing the error of its *Simmons*-related ways," Claim 2-10, which would ordinarily be precluded as a successive IAC claim, is now "viable under state law" and is thus subject to a *Rhines* analysis. (*Id.* at 13-14.)

This argument lacks merit. Claim 2-10, as Cromwell acknowledges, is fully exhausted—it was adjudicated by both the PCR court and the Arizona Supreme Court. The stay and abeyance procedure articulated in *Rhines* is for the purpose of allowing federal habeas petitioners to exhaust claims in state court that had not previously been presented there, and to do so without dismissing their federal habeas petitions and running afoul of

the one-year statute of limitations. *Doerr*, 176 F.4th at 1125. But when, as here, the state court has already had a full opportunity to determine a constitutional issue, and in the absence of any state interest in ruling again on a petitioner's case, returning an exhausted claim to state court for re-examination because of an intervening decision is "both unnecessarily time-consuming and otherwise burdensome." *Francisco v. Gathright*, 419 U.S. 59, 62–63 (1974) (quoting *Roberts v. LaValle*, 389 U.S. 40, 43 (1967)); *see also Moore v. Biter*, 725 F.3d 1184, 1193 n.5 (9th Cir. 2013) ("The Supreme Court has instructed . . . that when a habeas petitioner has exhausted his state remedies, he should not be required to return to state court in light of an intervening state court decision that would favorably resolve the petitioner's claim.").

Moreover, Cromwell's argument regarding this IAC claim—that the PCR court's denial of his claim rests on "decades of misapplication" of *Simmons* by the Arizona Supreme Court—is incorrect. In addressing Claim 2-10, the PCR court applied the second prong of the two-pronged test from *Strickland v. Washington*, 466 U.S. 668 (1984), which is the clearly established federal law governing this IAC claim. The court did so without addressing *Strickland*'s deficient-performance prong. The court then denied the claim on the grounds that Cromwell failed to demonstrate that counsel's failure to raise the *Simmons* error at trial caused prejudice.

Cromwell's request for a *Rhines* stay on this ground is denied.

D.    **"Plainly Meritless" Analysis**

"A federal habeas petitioner must establish that at least one of his unexhausted claims is not 'plainly meritless' in order to obtain a stay under *Rhines*." *Dixon v Baker*, 847 F.3d 714, 722 (9th Cir. 2017). A federal court should refrain from ruling on the merits of a claim unless "it is perfectly clear that the [petitioner] does not raise even a colorable federal claim." *Cassett*, 406 F.3d at 624. If "a reasonable state court might be persuaded to grant relief" on a claim, it is potentially meritorious. *Gonzalez v. Wong*, 667 F.3d 965, 972 (9th Cir. 2011).

"As a general matter, a defendant alleging a Sixth Amendment violation must

- 13 -

demonstrate 'a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.'" *Mickens v. Taylor*, 535 U.S. 162, 166 (2002) (citing *Strickland*, 466 U.S. at 694). The Supreme Court has held, however, that "where assistance of counsel has been denied entirely," there is an exception to the general rule requiring the defendant to show the probable effect upon the outcome because "the likelihood that the verdict is unreliable is so high that a case-by-case inquiry is unnecessary." *Id.* (citing *United States v. Cronic*, 466 U.S. 648, 658-59 (1984)). Only in "circumstances of that magnitude" does the court forgo individual inquiry into whether counsel's inadequate performance undermined the reliability of the verdict. *Id.* (quoting *Cronic*, 466 U.S. at 659 n.26). Thus, prejudice may be presumed if an attorney fails to "subject the prosecution's case to meaningful adversarial testing." *Cronic*, 466 U.S. at 659. Additionally, "'circumstances of that magnitude' may also arise when the defendant's attorney actively represented conflicting interests." *Mickens*, 535 U.S. at 166.

### 1. Claim 1-1

In Claim 1-1, Cromwell alleges that his trial counsel "effectively abandoned him prior to trial," giving rise to a presumption of ineffectiveness under *Cronic*. (Doc. 38 at 43.) Cromwell asserts that counsel abandoned the duty of loyalty to him, telling him before trial that "he would be found guilty" and "would without a doubt be given a death sentence." (*Id.* at 44.) Cromwell alleges that counsel harbored great antipathy toward him and confirmed during an ex parte hearing that he would "succumb completely to the prosecution." (*Id.*) Cromwell further alleges that counsel capitulated to "nearly every aspect of Mr. Cromwell's case" by "barely questioning a single prospective juror"; "inexplicably declining to give an opening statement"; failing to cross examine vital witnesses, including the detective and the medical examiner; failing to challenge the DNA evidence; giving an argument in which he did not get the victim's name right; and giving away numerous key points of the State's case. (*Id.* at 44-45.)

Having reviewed the record and transcripts of Cromwell's trial, the Court finds it clear that this claim is plainly meritless. 28 U.S.C. § 2254(b)(2) ("An application for a writ

of habeas corpus may be denied on the merits, notwithstanding the failure of the applicant to exhaust the remedies available in the courts of the State."); *Cassett*, 406 F.3d at 624 ("Adopting a standard that allows a federal court to deny relief on the merits of an unexhausted claim only when it is perfectly clear that the petitioner has no chance of obtaining relief comports with the legislative history of § 2254(b)(2).  The House Report on the AEDPA explained that this provision 'will help avoid the waste of state and federal resources that now result [sic] when a prisoner presenting a hopeless petition to a federal court is sent back to the state courts to exhaust state remedies.'") (citation omitted).

*Cronic* held that the application of presumptive prejudice is appropriate when "there [is] a breakdown in the adversarial process," such that "counsel entirely fails to subject the prosecution's case to meaningful adversarial testing."  466 U.S. at 659, 662.  The Supreme Court has made clear, however, that the *Cronic* exception is very narrow.  "When we spoke in *Cronic* of the possibility of presuming prejudice based on an attorney's failure to test the prosecutor's case, we indicated that the attorney's failure must be complete."  *Bell v. Cone* ("*Cone*"), 535 U.S. 685, 696-97 (2002); *see also United States v. Thomas*, 417 F.3d 1053, 1057 (9th Cir. 2005) (explaining that in *Cone* "the Court emphasized that *Cronic's* exception for failing to test the prosecution's case applies when the attorney's failure to oppose the prosecution goes to the proceeding as a whole—not when the failure occurs only at specific points in the trial").

*Cronic* is inapplicable here because Cromwell only criticizes specific points where his trial counsel took no action.  The record belies Cromwell's assertion that counsel completely failed to subject the prosecution's case to meaningful adversarial testing.  *Cone*, 535 U.S. at 698 ("The aspects of counsel's performance challenged by respondent—the failure to adduce mitigating evidence and the waiver of closing argument—are plainly of the same ilk as other specific attorney errors we have held subject to *Strickland's* performance and prejudice components.").

Cromwell's counsel opposed the State's case at every stage of trial.  Cromwell "insisted on . . . a mistaken identify defense."  (IOR 803 at 11.)  To that end, Cromwell's

counsel cross-examined most of the State's primary witnesses, highlighting major discrepancies between Jensen's description of the man who attacked her, which she provided to investigating officers immediately after the incident as well as in later depositions, and her in-court identification of Cromwell, as well as other discrepancies between statements provided to law enforcement at the time of the incident and the witnesses' in-court testimony. (*See, e.g.*, RT 2/3/03 at 67 [Officer Vine], 103 [Officer Busby]; RT 2/4/03 at 101 [Ella Speaks]; RT 2/5/03 at 39 [A.S.], 68 [Yedowitz], 118 [Fitch]; RT 2/6/03 at 71 [Sartor], 105 [Detective Caruso]; RT 2/10/03 at 66 [Jensen].) Counsel also presented three defense witnesses, including Cromwell.  (RT 2/12/03.)   During the mitigation phase, counsel gave an opening statement and presented a mental health expert (RT 2/24/03 at 31-100; RT 2/25/03 at 11-110) and presented additional mitigating evidence through the testimony of a mitigation specialist (*id.* at 110-41).  Counsel also gave closing arguments during the guilt phase (RT 2/13/03 at 78-101), the aggravation phase (RT 2/20/03 at 40-44), and penalty phase of trial (RT 3/04/03 at 107-16).

Counsel also made numerous evidentiary objections and otherwise actively represented Cromwell during trial by objecting to testimony and questioning witnesses; arguing for the admission and preclusion of statements; requesting a witness be admonished for making allegedly gratuitous, prejudicial comments; asking to reopen a cross-examination after new evidence had come to light; participating in the voir dire of jurors exposed to a news report; successfully objecting to the admission of photographs and a portion of the autopsy report; and moving for acquittal at the conclusion of the State's case. (*See, e.g.*, RT 2/3/04 at 61-62; RT 2/4/03 at 24, 47, 50, 55, 56, 87, 141-42, 182; RT 2/5/03 at 4, 10, 35, 62; RT 2/6/03 at 27; RT 2/11/03 at 4-8, 67, 73.) Even assuming for the sake of argument that counsel may have performed deficiently in some aspects of the trial, it cannot be said that counsel's failure to test the prosecutor's case was complete.  It follows that *Strickland*, not *Cronic*, provides the proper framework for analyzing Cromwell's specific claims of attorney error.  *Cone*, 535 U.S. at 696-97.

Because Cromwell does not argue, in Claim 1-1, that he was prejudiced under

- 16 -

*Strickland* by counsel's allegedly deficient performance, Claim 1-1 is plainly meritless.[5] Additionally, Cromwell's reliance (Doc. 38 at 45) on *McCoy v. Louisiana*, 584 U.S. 414 (2018), is misplaced. *McCoy* held that trial counsel may not admit guilt at trial, no matter how well-advised that strategy, "over the client's intransigent objection to that admission." *Id.* at 426. But Cromwell's counsel did not admit guilt at trial, nor did he, as Cromwell alleges, "effectively" do so. The portion of the transcript Cromwell cites in support of this claim is from a pretrial hearing on counsel's motion to withdraw. (RT 11/20/02 at 8.) Thus, even if counsel had conceded Cromwell's guilt, it would not have been a concession before the jury. Moreover, counsel did not concede Cromwell was guilty during the hearing. At most, counsel conceded that he and Cromwell had a difference of strategy. (*Id.*) Later, in a closed hearing, counsel advised the court that he had informed Cromwell, based on his analysis of the evidence, that he believed that if Cromwell went to trial, he would be convicted, and that if he was convicted, there was no doubt the jury would hand down the death penalty. (RT 11/20/02 (closed) at 14-15.) Once again, this is not a confession of guilt during trial, so *McCoy* is inapplicable.

### 2. Claims 1-6 and 1-7

In Claim 1-6, Cromwell alleges he was denied his Sixth Amendment right to counsel due to attorney Logan's simultaneous representation of Kim Jensen, a victim in this case, and in Claim 1-7, Cromwell alleges he was denied his Sixth Amendment right to counsel due to attorney Logan's failure to move to withdraw based on the simultaneous representation. (Doc. 38 at 95-96.)[6]

#### a.    **Relevant Background**

Cromwell alleges that the Office of the Legal Advocate ("OLA") and attorney James Logan were appointed to represent him after the Maricopa County Public Defender

---

[5]    Cromwell does allege prejudice under *Strickland* from specific attorney errors in several other claims and subclaims of his petition. The Court will consider those aspects of Cromwell's IAC claims in an order addressing Cromwell's habeas petition in its entirety.

[6]    Cromwell was represented at trial by James P. Logan and Bruce Buck, both from the Office of the Legal Advocate, but he asserts this claim only against Logan.

and Office of the Legel Defender ("OLD") withdrew from representation due to conflicts. (*Id.* at 36.)  Cromwell further alleges that the OLA and Logan were appointed to represent Kim Jensen in an unrelated criminal case on October 31, 2001, the day before they were appointed to represent him.[7]  (*Id.* at 95.)  Cromwell asserts, without support, that Logan directly represented Jensen for more than a week before he moved to withdraw on November 8, 2001.  (*Id.*)  During this time, Cromwell contends, Logan "took action in [Jensen's] forgery case, requesting more time to challenge grand jury proceedings."  (Doc. 61 at 35.)  Cromwell also asserts that discovery was served on Logan from Jensen's case before Logan withdrew.  (*Id.*)  Cromwell alleges that Logan failed to disclose the simultaneous representation to either Cromwell or the trial court.  (Doc. 38 at 96.)[8]

Jensen testified as a prosecution witness during Cromwell's trial.  (RT 2/10/03.) She identified Cromwell in court as the man to whom Speaks introduced her when they arrived at Speaks's apartment in the early morning hours the day of Stephanie's murder and as the same man who then assaulted both her and Speaks and fled the apartment before Stephanie's body was discovered.  (*Id.* at 34-61, 101-02.)  Logan cross-examined Jensen and attacked her credibility before the jury by establishing that she had been released from jail right before the murder and was living with a drug dealer name Kelley; that she had previously stated that the person who assaulted her had also been at the drug dealer's apartment and helped her push her car earlier in the evening; that she testified that Speaks had referred to Cromwell as Bobby but had told the police that she used the name Tim; and that she had first described her assailant as a bald "skinhead" with tattoos, a description

---

[7]    It appears from the record that Logan may have been appointed to represent Cromwell on October 30, 2001, the day before he was allegedly appointed to represent Jensen.  Although the trial court granted a motion to withdraw and entered an order appointing the OLA to represent Cromwell on November 1, 2001 (IOR 12), Logan had already appeared on behalf of Cromwell for an arraignment on October 31, 2001, and stated in court that he had been appointed to represent Cromwell the day before.  (RT 10/31/01 p.m. at 3; *see also* IOR 16 [minute entry dated October 31, 2001, appointing Logan to represent Cromwell in all further proceedings].)

[8]    Because Cromwell has not yet filed a notice of request for evidentiary development, the Court gives him the benefit of the doubt and analyzes this claim as alleged.

that did not fit Cromwell.  (*Id.* at 66-69, 76, 82, 85, 89-92.)

b. **Analysis**

The Sixth Amendment right to counsel includes the right to assistance by a conflict-free attorney.  *Wood v. Georgia*, 450 U.S. 261, 271 (1981).  A conflicted-counsel claim has merit when counsel "actively represented conflicting interests" and when those conflicting interests "actually affected the adequacy of his representation."  *Lockhart v. Terhune*, 250 F.3d 1223, 1230 (9th Cir. 2001); *see also United States v. Walter-Eze*, 869 F.3d 891, 900 (9th Cir. 2017). If both tests are met, a defendant need not demonstrate prejudice to obtain relief.  *Cuyler v. Sullivan*, 446 U.S. 335, 349-50 (1980).  Prejudice is presumed in that circumstance because the "assistance of counsel has been denied entirely or during a critical stage of the proceeding."  *Mickens v. Taylor*, 535 U.S 162, 166 (2002).  An "actual conflict of interest" means "a conflict *that affected counsel's performance*—as opposed to a mere theoretical division of loyalties."  *Id.* at 171 (emphasis in original).

Cromwell argues there was an "actual conflict," and thus a presumption of prejudice, based on Logan's brief representation of Jensen in a forgery case at the same time Logan represented Cromwell at the outset of his murder case.  The Court disagrees. In *Mickens*, "the Supreme Court explicitly limited this presumption of prejudice for an actual conflict of interest . . . to cases involving 'concurrent representation'"—that is, simultaneous representation of two or more defendants.  *Rowland v. Chappell*, 876 F.3d 1174, 1192 (9th Cir. 2017) (citing *Mickens*, 535 U.S. at 175); *see* also *Earp v. Ornoski*, 431 F.3d 1158, 1184 (9th Cir. 2005) ("The *Mickens* Court specifically and explicitly concluded that *Sullivan* was limited to joint representation . . . .").  The Court explained that the presumption of prejudice is needed in cases of concurrent representation because of "the high probability of prejudice arising from multiple concurrent representation, and the difficulty of proving that prejudice."  *Mickens*, 535 U.S. at 175.  "Not all attorney conflicts present comparable difficulties," however, and the *Mickens* Court criticized circuit courts for applying "*Sullivan* unblinkingly to all kinds of alleged attorney ethical conflicts," including cases when "there is a conflict rooted in counsel's obligation to *former*

clients." *Id.* at 174 (cleaned up). Accordingly, the Court concluded that the *Sullivan* presumption of prejudice did not apply to a conflict of interest rooted in the petitioner's counsel's previous brief representation of the victim. *Id.* at 164-65, 175-76; *see also Rowland*, 876 F.3d at 1192 ("We have held that a state court's rejection of a conflict claim not stemming from concurrent representation is neither contrary to, nor an unreasonable application of, established federal law as determined by the United States Supreme Court."); *Earp*, 431 F.3d at 1184. Because Cromwell has not clearly alleged or shown concurrent representation, he does not benefit from a presumption of prejudice. *See also Rienhardt v. Thornell*, 178 F.4th 539, 556 (9th Cir. 2026) ("Rienhardt's reliance on *Sullivan* is misplaced because the Supreme Court has not extended its holding to any context beyond concurrent conflicting representation."); *Jackett v. Santoro*, 2023 WL 3990060, *15-16 (S.D. Cal. 2023), *report and recommendation adopted*, 2023 WL 7547517 (S.D. Cal. 2023) (concurrent representation not clearly alleged or shown where petitioner's attorney had previously represented the state's key witness and parts of the witness's prior unrelated case were ongoing during petitioner's trial).

At any rate, even if the *Sullivan* exception applies to the representation here, there is no evidence that an actual conflict adversely affected Logan's representation of Cromwell. *Walter-Eze*, 869 F.3d at 906. Conflicts of interest can arise both in cases of simultaneous and successive representation, but it is more difficult to show an actual conflict in the latter circumstance. *Manhalt v. Reed*, 847 F.2d 576, 580 (9th Cir. 1988). Here, as an initial matter, it is difficult to ascertain whether Logan's representation was simultaneous or merely successive because Cromwell's relevant allegations are entirely without factual support. (Doc. 51 at 37 ["As an initial matter, Cromwell fails to cite anything in the state court record supporting that Logan ever represented Kim, and this Court, in accordance with *Pinholster*, should decline to consider new evidence."].)

In any event, the inquiry "does not rely on the characterization or type of conflict presented: an 'actual conflict is defined by its impact' on counsel's representation." *Walter-Eze*, 869 F.3d at 901 (quoting *Hovey v. Ayers*, 458 F.3d 892, 908 (9th Cir. 2005)).

"In successive representation, conflicts of interest may arise if the cases are substantially related or if the attorney reveals privileged communications of the former client or otherwise divides his loyalties." *Hovey*, 458 F.3d at 908 (quoting *Mannhalt*, 847 F.2d at 580). "One of the risks created by successive representation is 'that the attorney who has obtained privileged information from the former client may fail to conduct a rigorous cross-examination [of that client] for fear of misusing that confidential information.'" *United States v. Shwayder*, 312 F.3d 1109, 1118 (9th Cir. 2002) (citation omitted).

First, the Court considers whether the two cases are substantially related. "Substantiality is present if the factual contexts of the two representations are similar or related." *Trone v. Smith*, 621 F.2d 994, 998 (9th Cir. 1980). "If there is a reasonable probability that confidences were disclosed [in the earlier representation] which could be used against the former client in the later adverse representation . . . a substantial relationship between the two cases will be presumed." *Thomas*, 878 F.2d at 288 (citing *Trone*, 621 F.2d at 999). "This inquiry calls for a careful comparison between the factual circumstances and legal theories of the two cases." *In re Cnty. of Los Angeles*, 223 F.3d 990, 994 (9th Cir. 2000).

Cromwell has not demonstrated a substantial relationship within the meaning of *Trone*. Even assuming that Logan in fact represented Jensen in a forgery case, Cromwell does not assert that the allegations or evidence in the forgery case are linked in any way to Cromwell's murder trial. Instead, he merely notes that the fact of a forgery conviction should have been used for impeachment purposes because it is "indicative of deceitfulness and dishonesty." (Doc. 61 at 35.) This does not establish a substantial relationship because "[t]he relationship is measured by the allegations in the complaint and by the nature of the evidence that would be helpful in establishing those allegations," *Trone*, 621 F.2d at 1000, and Cromwell does not allege that the allegations underlying these two cases or the evidence necessary to prove those allegations are related.

Next, the Court considers whether Cromwell has alleged an actual conflict resulting in an adverse effect, that is, whether Cromwell has demonstrated "that some plausible

- 21 -

alternative defense strategy or tactic might have been pursued but was not and that the alternative defense was inherently in conflict with or not undertaken due to the attorney's other loyalties or interests." *Hovey*, 458 F.3d at 908 (quoting *United States v. Wells*, 394 F.3d 725, 733 (9th Cir. 2005)).   In response to Respondents' assertion that Logan's performance was not affected by the alleged conflict because he still cross-examined Jensen regarding her release from jail right before the murder (Doc. 51 at 37), Cromwell asserts that this impeachment "pales in comparison to informing the jury Jensen was convicted of forgery—that is, she was found deceitful and dishonest beyond a reasonable doubt." (Doc. 61 at 36.)   Cromwell does not dispute Respondents' assertion (Doc. 51 at 37) that the most Logan could have done would have been to inform the jury of the fact of the conviction, the name of the crime, and the place and the date of the offense.   *State v. Tucker*, 759 P.2d 579, 594 (Ariz. 1988) ("Under Arizona law, impeaching a witness with a prior felony conviction is limited to showing the fact of the conviction, the name of the crime, the place, and the date.").   Instead, Cromwell emphasizes that the fact Jensen was convicted of a crime of dishonesty "is vastly different than simply living with a drug dealer." (Doc. 61 at 36-37.)   But Cromwell has failed to show a link between Logan's failure to impeach Jensen with her prior conviction and the alleged conflict.   *Alberni v. McDaniel*, 458 F.3d 860, 872 (9th Cir. 2006) ("A link between deficient performance and the conflict of interest must be shown.") (citations omitted).   Because only the fact of the conviction—a matter of public record—could be used to impeach Jensen, Logan had no reason to refrain from cross-examining her regarding the forgery conviction for fear of misusing confidential information.

Cromwell also asserts that because Logan received discovery during his brief representation of Jensen, there was a "possibility that Logan learned privileged information during his stint as [Ms.] Jensen's attorney." (Doc. 64 at 11.)   Cromwell speculates that Logan failed to adequately cross-examine Jensen because he was "hamstrung by his ethical obligations to his former client." (Doc. 38 at 95.)   He argues that Logan failed to uncover potential evidence under *Brady v. Maryland*, 373 U.S. 83 (1963), related to Jensen because

investigating Jensen's forgery convictions would have led Logan "too close to his conflicting obligations." (Doc. 61 at 36, citing Doc. 38 at 182–84 [claiming Jensen appears to have received special sentencing treatment on her forgery charges, likely in return for testifying for the prosecution at Cromwell's murder trial].)

It is true that "[a]mong the dangers in a successive representation situation is that the attorney who has obtained privileged information from the former client may fail to conduct a rigorous cross-examination for fear of misusing that confidential information." *Fitzpatrick v. McCormick*, 869 F.2d 1247, 1252 (9th Cir. 1989). Even so, Cromwell has not established the necessary link between Cromwell's performance and the asserted conflict of interest. *Alberni*, 458 F.3d at 872. In *Clark v. Chappell*, 936 F.3d 944 (9th Cir. 2019), the Ninth Circuit considered a habeas claim that trial counsel had a conflict of interest based on counsel's prior representation of a witness for the state. *Id.* at 984. The court found it "troubling" that counsel had personally represented the witness and possessed confidential information from their attorney-client relationship. *Id.* Nevertheless, the court concluded there was nothing in the record indicating that the conflict adversely affected counsel's representation of the habeas petitioner because counsel terminated representation of the witness and both counsel and co-counsel (who cross-examined the witness at trial) attested that counsel did not share any confidential information from counsel's representation of the witness. *Id.* at 984-86.

Similarly, even assuming Logan should have informed the court and his client that he had previously represented one of the victims for a short period of time in an unrelated criminal matter, the purpose of the *Sullivan* exception "is not to enforce the Canons of Legal Ethics." *Mickens*, 535 U.S. at 176; *see also Nix v. Whiteside*, 475 U.S. 157, 165 (1986) ("[B]reach of an ethical standard does not necessarily make out a denial of the Sixth Amendment guarantee of assistance of counsel"). Even assuming that Logan received confidential information about Jensen, Cromwell's allegation that this adversely affected his representation amounts to no more than a potential "theoretical division of loyalties" and does not support his claim that there existed a "conflict that affected counsel's

performance." *Mickens*, 535 U.S. at 171; *see also Noguera v. Davis*, 5 F.4th 1020, 1037 (9th Cir. 2021) ("The issue is whether there existed a conflict that affected counsel's performance—as opposed to a mere theoretical division of loyalties.  To make this showing, the petitioner must demonstrate that some plausible alternative defense strategy or tactic might have been pursued but was not and that the alternative defense was inherently in conflict with or not undertaken due to the attorney's other loyalties or interests.") (cleaned up).

Claims 1-6 and 1-7 are therefore denied as plainly meritless.

E.      **Request for Authorization**

Cromwell asks the Court to authorize the Federal Public Defender's ("FPD") office to represent him in state court.  (Doc. 64 at 1.)

The Criminal Justice Act provides for appointed counsel to represent their client in "other appropriate motions and procedures."  18 U.S.C. § 3599(e).  The Supreme Court interpreted § 3599 in *Harbison v. Bell*, 556 U.S. 180 (2009), holding that the statute "authorizes federally appointed counsel to represent their clients in state clemency proceedings and entitles them to compensation for that representation."  *Id.* at 194.  The Court explained that "subsection (a)(2) triggers the appointment of counsel for habeas petitioners, and subsection (e) governs the scope of appointed counsel's duties."  *Id.* at 185. The Court noted, however, that appointed counsel is not expected to provide each of the services enumerated in section (e) for every client.  Rather, "counsel's representation includes only those judicial proceedings transpiring 'subsequent' to her appointment."  *Id.* at 188.

*Harbison* addressed the concern that federally appointed counsel would be required to represent their clients in state retrial or state habeas proceedings that occur after counsel's appointment because such proceedings are also "available post-conviction process."  *Id.*  The Court explained that § 3599(e) does not apply to those proceedings because they are not "properly understood as a 'subsequent stage' of judicial proceedings but rather as the commencement of new judicial proceedings."  *Id.* at 189.  *See also Lugo*

*v. Sec'y, Fla. Dep't of Corr.*, 750 F.3d 1198, 1213 (11th Cir. 2014) (explaining that "a state prisoner is not entitled, as a matter of statutory right, to have federally paid counsel assist him in the pursuit and exhaustion of his state postconviction remedies, including the filings of motions for state collateral relief . . . ."). However, *Harbison* also noted that "a district court may determine on a case-by-case basis that it is appropriate for federal counsel to exhaust a claim in the course of her federal habeas representation." 556 U.S. at 190 n.7.

Here, the Court has determined that Cromwell is not entitled to a *Rhines* stay. Based on that determination, together with *Harbison*'s discussion of the parameters of § 3599(e), the Court concludes it is not necessary or appropriate to authorize the FPD to represent Cromwell in state court.

Accordingly,

**IT IS ORDERED** that:

1.    Claims 1-1, 1-6, and 1-7 in the Amended Petition (Doc. 38) are **denied**.

2.    Cromwell's motion for stay and abeyance (Doc. 64) is **denied**.

3.    Cromwell's motion to strike (Doc. 65) is **denied**.

4.    Cromwell's request for federal habeas counsel to represent him in state court (Doc. 64 at 1) is **denied**.

Dated this 8th day of July, 2026.

Dominic W. Lanza
United States District Judge